# EXHIBIT J

1
2        UNITED STATES DISTRICT COURT
3          DISTRICT OF CONNECTICUT
4     - - - - - - - - - - - - - - - - - - -x
5   LORI SANBORN, BDK ALLIANCE LLC,
    IRON MAN LLC, and STEPHANIE
6   SILVER, on behalf of themselves and all
    others similarly situated,
7
                        Plaintiffs,
8
          -against-
9
    VIRIDIAN ENERGY, INC.,
10
                        Defendant.
11
    - - - - - - - - - - - - - - - - - - -x
12
                        29 South Main Street
13                      West Hartford, Connecticut
14                      February 4, 2016
                        8:37 a.m.
15
16
17        DEPOSITION of IRONMAN LLC by
18   CHRISTOPHER KIRK, a Plaintiff in the
19   above-entitled action, held at the above
20   time and place, taken before Dawn Matera,
21   a Shorthand Reporter and Notary Public of
22   the State of Connecticut.
23
24
25

Page 2

```
 1
 2  APPEARANCES:
 3
 4     IZARD NOBEL, LLP
          Attorneys for Plaintiffs
 5        29 South Main Street
          Suite 305
 6        West Hartford, Connecticut 06107
       BY: SETH R. KLEIN, ESQ.
 7
 8
 9
       VENABLE LLP
10     Attorneys for Defendant
          575 Seventh Street, NW
11        Washington, DC 20004
       BY: DANIEL S. BLYNN, ESQ
12     BY: ERIC S. BERMAN, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1         CHRISTOPHER KIRK
 2  CHRISTOPHER KIRK, a Plaintiff herein,
 3  having first been duly sworn by the
 4  Notary Public, was examined and testified
 5  as follows:
 6
 7  EXAMINATION BY MR. BLYNN:
 8     Q.   Good morning, Mr. Kirk.  We
 9  just introduced ourselves off the record,
10  but for the record, I am Dan Blynn.  I am
11  an attorney at Venable LLP in Washington,
12  DC.
13         With me is my colleague Eric
14  Berman.  We represent the Defendant
15  Viridian Energy in this case.
16         I want to just spend a couple
17  of seconds, a couple of minutes just
18  going over deposition ground rules to
19  make sure we're on the same page, and
20  then we'll move into the substance.
21         Do you understand that you're
22  under oath, and I will be asking a series
23  of questions and you have to provide
24  complete and truthful answers?
25     A.   I do.
```

Page 4

```
 1         CHRISTOPHER KIRK
 2     Q.   And you're doing a good job
 3  right, off the bat, but answers need to
 4  be vocalized.  Head nods and head shakes
 5  don't show up on the record.  And
 6  similarly, mm-hmm doesn't show up as a
 7  yes or a no.
 8     A.   I will vocalize all of my
 9  answers.
10     Q.   Great.  If you didn't hear one
11  of my questions, and I do have a tendency
12  to mumble, as I have been told by my
13  wife, or if you don't understand a
14  question, please ask me to restate the
15  question or to clarify.  If you don't, I
16  am going to assume that you could hear my
17  question and you understood what I was
18  asking.
19     A.   Understood.
20     Q.   Okay.  Sometimes it happens
21  that you will give an answer as
22  completely as possible at that time.  And
23  then later, five minutes or two hours
24  later, you may remember something
25  additional or need to correct an answer.
```

Page 5

```
 1         CHRISTOPHER KIRK
 2  And if that happens, I would ask that you
 3  let us know on the record and we'll
 4  correct your answer.
 5     A.   Okay.  Understood.
 6     Q.   This isn't a marathon, by any
 7  means.  And we certainly don't want to
 8  keep you here for the length of a
 9  marathon.  So if you need bathroom
10  breaks, or coffee or water breaks, just
11  let us know.
12     A.   Thank you.
13     Q.   The only caveat to that is if I
14  asked a question, I want you to answer
15  before we take a break.
16     A.   Understood.
17     Q.   So Viridian served a deposition
18  notice been BDK Alliance, which is the
19  Plaintiff in this case?
20         MR. KLEIN:  IronMan.
21         MR. BLYNN:  IronMan, I am
22  getting ahead of myself.
23     Q.   IronMan.  And you, Christopher
24  Kirk, served a subpoena on you
25  Christopher Kirk in your individual
```

2 (Pages 2 - 5)

Page 6

1      CHRISTOPHER KIRK
2   capacity.  You're here to testify wearing
3   both hats, Christopher Kirk as an
4   individual and IronMan, as the
5   corporation.
6         Do you understand that?
7   A.   I do.
8   Q.   And for the sake of expediency
9   of trying to get you out of here as soon
10  as possible, we decided to combine those
11  two depositions into one deposition.
12        I will do my best to ask
13  questions if there is a distinction
14  between Christopher Kirk or IronMan, but
15  if it's unclear whether -- if the answer
16  differs, if I am asking IronMan versus
17  Christopher Kirk, will you please let me
18  know?
19  A.   I will.
20  Q.   Otherwise, I am going to assume
21  the answer for Christopher Kirk and
22  IronMan would be the same.
23  A.   Understood.
24        [The Rule 30(b)(6) deposition
25  notice, was hereby marked as

Page 7

1      CHRISTOPHER KIRK
2   Defendant's Exhibit 1 for
3   identification, as of this date.]
4   Q.   So this is the Rule 30(b)(6)
5   deposition notice that was served on your
6   attorneys in this case.
7         Have you seen this document
8   before?
9         (Witness reviews document.)
10  A.   I have.
11  Q.   And when was that?
12  A.   Approximately, a week ago or so
13  before that.
14        MR. KLEIN: You're best
15  recollection is fine.
16  A.   My best recollection is about a
17  week ago.
18  Q.   Okay.  Are you prepared -- on
19  the third page there is an Attachment A
20  that lists a number of topics for you to
21  testify about.
22        Are you prepared to testify
23  about all of those topics?
24  A.   Yes, I am.
25  Q.   Okay.  And you understand that

Page 8

1      CHRISTOPHER KIRK
2   your testimony will be binding on
3   IronMan; is that right?
4   A.   That's correct.
5   Q.   What did you do to prepare to
6   testify on each of these topics?
7   A.   I've reviewed obviously all of
8   the documentation provided to me by my
9   attorney.
10        I reviewed -- and I also
11  reviewed a few of the past electric
12  bills.
13  Q.   You said reviewed some
14  documentation provided by your attorneys.
15        What were those documents?
16  A.   The actual complaint, as well
17  as the deposition notice.
18  Q.   Have you seen the complaint
19  before in this case?
20  A.   Yes, I have seen the complaint
21  before.
22  Q.   Do you recall when that was?
23  A.   Approximately -- to the best of
24  my recollection, about a month to six
25  weeks ago, via e-mail that was given to

Page 9

1      CHRISTOPHER KIRK
2   me.  And I read through it.
3   Q.   And we're talking maybe
4   mid-December you saw the complaint?
5   A.   Yes, that sounds accurate.
6   Q.   Did you see the complaint at
7   any time before that, that you recall?
8   A.   No.
9   Q.   Have you ever been deposed
10  before?
11  A.   Given a deposition?
12  Q.   Yes.  Been in the same kind of
13  situation we're in now, where someone is
14  asking you deposition questions?
15  A.   I have been in a deposition
16  once.  That was for the application for a
17  New York State holding permit.
18  Q.   Okay.  Is that just -- was that
19  kind of to get the permit you had to come
20  and answer questions?
21  A.   Exactly.  It was a half hour,
22  at most.
23  Q.   Okay.  And was that under oath?
24  A.   Yes, it was.  That's for
25  Westchester County.

3 (Pages 6 - 9)

Page 10

CHRISTOPHER KIRK

1
2     Q.   I am glad I don't work in
3  Westchester County.  Sounds like a pain
4  in the ass.
5     A.   Try New York City.
6     Q.   So I know you've been --
7  IronMan has been involved in some Small
8  Claims debt collection cases in the past.
9          Did you give any depositions in
10 those cases?
11    A.   No.
12    Q.   Did you ever testify in a
13 Court?
14    A.   Not to the best of my
15 recollection.
16    Q.   Okay.  Going back to your
17 preparation for this deposition today,
18 did you meet with your attorneys at all
19 to prepare for today?
20    A.   Yes, I did.
21    Q.   Okay.  When was that?
22    A.   It was the day before
23 yesterday.  I met with Attorney Klein.
24    Q.   So that was Tuesday?
25    A.   Yes, correct.

Page 11

CHRISTOPHER KIRK

1
2     Q.   How long did you meet with
3  Mr. Klein?
4     A.   Approximately, an hour.
5     Q.   Was that face-to-face?
6     A.   It was.
7     Q.   Was that here in West Hartford?
8     A.   No.  It was in my office in
9  Stratford, Connecticut.
10    Q.   Was anyone else present?
11    A.   No.
12    Q.   I am sorry, I didn't -- no?
13    A.   No, nobody else was present.
14    Q.   Okay.  Yeah, so there is a
15 natural tendency to have a conversation.
16         But for the record, I need to
17 ask the question and you need to answer.
18 And I won't -- I will do my best not to
19 jump into your answer, and you just have
20 to let me finish the question, so the
21 court reporter --
22    A.   My apologies.  I just did it.
23    Q.   It's natural, right.  So you
24 said you looked at the complaint and the
25 deposition notice in this case?

Page 12

CHRISTOPHER KIRK

1
2     A.   Correct.
3     Q.   Any other documents that you
4  reviewed to prepare for this deposition?
5     A.   Not to the best of my
6  recollection.  I am sorry, let me
7  correct.  I did look at several different
8  contracts, forms of contracts.
9     Q.   Do you know whether those forms
10 of contracts were produced in this case?
11    A.   I am sorry, I don't understand
12 your question.
13    Q.   So you had to gather some
14 documents.  And you provided them,
15 presumably, to your attorney, who
16 produced them, who gave them to us in
17 this case.
18         Do you understand that?
19    A.   Correct, yes.
20    Q.   Were any of those contracts,
21 that you reviewed in preparation for this
22 deposition, contracts that were produced
23 to Viridian in this case?
24    A.   I am not sure I understand, but
25 if you're asking me if I gave -- if any

Page 13

CHRISTOPHER KIRK

1
2  of those contracts were ones that I had
3  in my possession, they were not.
4     Q.   Okay.  Okay.  Other than your
5  attorneys, Mr. Klein and Mr. Izard, have
6  you spoken to anyone else about your
7  deposition today?
8     A.   No, I haven't.  Other than
9  mentioning to my wife that I had a
10 deposition.
11    Q.   Sure.  But you didn't get into
12 the substance?
13    A.   No substantive discussion.
14    Q.   It was just I got to head to
15 West Hartford and sit in a conference
16 room with some mean attorneys for several
17 hours, right?
18    A.   That's correct.
19    Q.   Have you talked to your wife
20 about this case at all?
21    A.   Only in the broadest sense.
22    Q.   What kinds of things have you
23 talked about with your wife?
24    A.   I just said there is a class
25 action happening and I am part of it.

4 (Pages 10 - 13)

Page 14

CHRISTOPHER KIRK

1    CHRISTOPHER KIRK
2    Q.   And she didn't ask what's the
3  case about?  Did she ask that sort of
4  question?
5    A.   No, she didn't.
6    Q.   Have you talked to anyone else
7  about this case?
8    A.   I have not.
9    Q.   What kind of business is
10  IronMan?
11    A.   IronMan, LLC is a holding
12  company for my real estate possessions.
13  In a nutshell, that is, it's also -- I
14  also have Bull Enterprises LLC, which is
15  1-800-GOT-JUNK?
16        IronMan is a separate LLC
17  simply to limit my liability because of
18  the real estate holdings.  It's who Bull
19  Enterprises pays the bills to.
20    Q.   How long has IronMan LLC been
21  around?
22    A.   I am going to say
23  approximately, 7 years.  Since the
24  initial purchase of the piece of real
25  estate.

Page 15

CHRISTOPHER KIRK

1    CHRISTOPHER KIRK
2    Q.   2009 period, approximately?
3    A.   Give or take, yeah.
4    Q.   Other than IronMan, LLC, what
5  was the other company?
6    A.   Bull, like the animal, Bull
7  Enterprises LLC.
8    Q.   Other than IronMan and Bull
9  Enterprises LLC, do you own any other
10  businesses?
11    A.   I do not.
12    Q.   Aside from those Small Claims
13  debt collection cases, has IronMan been
14  involved in any other kind of Court
15  cases?
16    A.   No, no Court cases.
17    Q.   Are there any other kinds of
18  cases?
19    A.   Only -- not even a case.  The
20  only legal procedure is the purchase of
21  the real estate.
22    Q.   Okay.  Now, IronMan had an
23  account with Viridian for some period of
24  time?
25    A.   Correct.

Page 16

CHRISTOPHER KIRK

1    CHRISTOPHER KIRK
2    Q.   When did IronMan enroll with
3  Viridian?
4    A.   To the best of my recollection,
5  approximately, six years ago.  And that's
6  very broad.
7    Q.   Your recollection sounds good.
8        Does January 14th, 2010 sound
9  about right?
10    A.   Sounds about right, yeah.
11    Q.   Did IronMan have an electricity
12  provider before Viridian?
13    A.   We did, yes.
14    Q.   Who was that?
15    A.   I believe it was United
16  Illuminating.
17    Q.   And was United Illuminating the
18  provider for that approximately, one year
19  since IronMan had been, you know,
20  incorporated, or had been founded until
21  you switched to Viridian?
22    A.   To the best of my recollection,
23  yes.
24    Q.   When did IronMan terminate its
25  service with Viridian?

Page 17

CHRISTOPHER KIRK

1    CHRISTOPHER KIRK
2    A.   Approximately, if I -- based on
3  the best of my recollection, early 2015.
4    Q.   Does mid-March 2015 sound about
5  right?
6    A.   Yes, it does.
7    Q.   Who has IronMan used as its
8  electricity supplier since terminating
9  with Viridian?
10    A.   Two companies that are, they
11  are the actual generation suppliers.  It
12  still has to come through United
13  Illuminating.
14    Q.   Go ahead.  I didn't mean to
15  gesture that I understood.  Go ahead and
16  finish your answer.
17    A.   I've had two suppliers.
18  Obviously, UI owns the supply means.  It
19  has been Town Square Energy, and up until
20  about, I think it was six months ago, and
21  then since then, ABest.
22    Q.   A, as in the letter?
23    A.   Correct.
24    Q.   Best?
25    A.   Correct.

5 (Pages 14 - 17)

Page 18

CHRISTOPHER KIRK

2    Q.   With Town Square, were you on a
3  fixed rate plan or a variable rate plan?
4    A.   I was on a plan that was fixed
5  for a specified period of time, after
6  which it would go variable.
7      MR. BLYNN:  Let's mark this as
8  Defendant's 2.
9      [The copy of Town Square's
10  Terms of Service effective June 2013,
11  was hereby marked as Defendant's
12  Exhibit 2 for identification, as of
13  this date.]
14      (Witness reviews document.)
15    Q.   I am going to represent to you
16  that this is a copy of Town Square's
17  Terms of Service effective June 2013 that
18  is accessible on the Town Square Energy
19  Website.
20      The first five pages, numbered
21  pages, they're a cut and paste of the
22  text that appears on the pages
23  afterwards.  I did that because there's a
24  little need help logo that appears on the
25  Website.

Page 19

CHRISTOPHER KIRK

2    A.   Correct.
3    Q.   When printed, it obscures some
4  of the text.  I will represent that the
5  text on the first five pages is the same
6  on the Website.
7    A.   So this is what we pay
8  attention to, the first five pages?
9    Q.   Correct.
10    A.   Because it's more legible?
11    Q.   Right.
12    A.   Okay.
13    Q.   So you said you were on a fixed
14  rate plan that rolled into or renewed
15  into a variable rate plan, or turned into
16  a variable rate plan?
17    A.   To the best of my recollection,
18  correct.
19    Q.   If you turn to Page 2, there
20  are several -- do you see at the bottom
21  there is a heading that says Product
22  Descriptions?
23    A.   Mm-hmm.
24    Q.   Underneath that, there is a
25  bullet for Monthly Variable Rate and

Page 20

CHRISTOPHER KIRK

2  another bullet for Variable Rate?
3    A.   Correct.
4    Q.   There is also a bullet for
5  Fixed Rate and a bullet for Promotional
6  Rate and 100 Percent Renewable Rate,
7  right?
8    A.   It is correct.
9    Q.   How long were you on a fixed
10  rate plan; do you recall?
11    A.   I believe it was about, between
12  6 months and a year.
13    Q.   And that's with Town Square?
14    A.   Correct.
15    Q.   And you said you were with Town
16  Square for about six months before
17  switching to ABest?
18    A.   I believe it was a little bit
19  longer.  Between six months and a year.
20  But that's essentially correct.
21    Q.   So long enough for the fixed
22  rate to expire and IronMan to roll into a
23  variable rate?
24    A.   Correct.  The reason I switched
25  is because the fixed rate was ending.

Page 21

CHRISTOPHER KIRK

2    Q.   Okay.  When you enrolled with
3  Town Square, did you receive terms of
4  service similar to Exhibit 2?
5    A.   I believe I did, yes.
6    Q.   Did you read the terms of
7  service?
8    A.   Only the parts regarding the
9  times of rate and the specifics to the
10  plan of which I signed up.  So I knew
11  exactly what I was signing up for.
12    Q.   Okay.  So when you say you
13  looked at the specifics about the rates,
14  that would be the product description
15  section; does that sound right?
16    A.   Correct.  But I also paid
17  attention to the actual numbers at this
18  point, of what they were going to charge
19  me per kilowatt hour.
20    Q.   So the initial rate, the fixed
21  rate?
22    A.   Correct, yeah.
23    Q.   Do you see on Page 2, at the
24  Monthly Variable Rate bullet, it says
25  "Customers can expect their rate to

6 (Pages 18 - 21)

CHRISTOPHER KIRK

1
2 change on a monthly basis"?
3    A.   I do.
4    Q.   Do you have any sense from this
5 what that rate, how that rate would be
6 set, that variable rate?
7    A.   My best understanding of how
8 rates are set is that there is generally
9 a fixed spread between the wholesale rate
10 and the retail rate to which the retail
11 rate being that I, as the consumer, is
12 charged for the energy.
13    Q.   And that's your general
14 understanding?
15    A.   Yes.  There is the wholesale
16 rate, the retail rate, and the spread
17 between those is what the power companies
18 make their money on.
19    Q.   And so is that a fixed -- you
20 said there is the spread.
21       Is that a spread that is the
22 same amongst each supplier?
23    A.   I can't really talk to that,
24 because I don't know the particulars of
25 each supplier and their fixed cost

CHRISTOPHER KIRK

1
2 structure, whether there's some things
3 that may cause it to vary.  I can't
4 really comment on that.
5    Q.   And this monthly variable rate
6 description doesn't mention anything
7 about how the monthly rate, the variable
8 rate would be based; is that correct?
9    A.   That's correct.  It just says
10 it will vary on a monthly, or may vary on
11 a monthly basis.
12    Q.   So your understanding of how
13 that variable rate would change is based
14 on your general understanding of the
15 supply, the electricity supply industry,
16 fair to say?
17    A.   Yeah.  That would be fair to
18 say.  But also I run my own business.  So
19 clearly, you want to maintain your
20 margins.  They are not going to swing
21 wildly.  They shouldn't.  Then you're not
22 doing something right.
23    Q.   What is IronMan's targeted
24 margin?
25    A.   Gross margin is between 40 and

CHRISTOPHER KIRK

1
2 45 percent.
3    Q.   So that's the targeted gross
4 margin.  What is the actual margin?
5    A.   Between 40 and 45 percent.
6    Q.   You guys are doing a good job.
7    A.   Well, it's a service.
8    Q.   40 to 45 percent actual margin
9 isn't excessive, is it?
10    A.   Not for a service.
11    Q.   And when you say "a service,"
12 what do you mean by "a service"?
13    A.   As opposed to manufacturing a
14 hard good, like a washing machine.
15    Q.   How do you set your -- how does
16 IronMan set its prices?  IronMan is a
17 holding company, though, right?
18    A.   Yeah.  But I can answer that as
19 a businessperson.
20    Q.   Please.
21    A.   Okay.  We have a specific cost
22 structure.  We have a target that we
23 would like to make in terms of profit.
24 And we have our overhead.
25       Overhead, by definition, does

CHRISTOPHER KIRK

1
2 not vary a great deal.  So given those
3 fixed points, we then set our prices that
4 will allow us to cover obviously our
5 variable cost, so there is money left
6 over, which is your margin, and then that
7 goes to cover your fixed cost, which
8 shouldn't vary that much, because if they
9 do, they are not fixed.
10    Q.   And so if the costs aren't
11 fixed -- let's say IronMan had some
12 variable costs --
13    A.   Which we do.
14    Q.   And what are IronMan's variable
15 costs?
16    A.   Well, variable costs are, by
17 definition, those things that vary
18 directly with the performance of the
19 service you provide.
20       If we do -- well, we do junk
21 removal.  So our variable costs are
22 labor, fuel and dumping fees, most
23 directly.  And gas -- and fuel, chart
24 fuel.
25    Q.   And those can obviously change

7 (Pages 22 - 25)

Page 26

CHRISTOPHER KIRK

1    over time?
2
3    A.   Somewhat, yeah.  But they are
4    not going to swing wildly.  You are not
5    going to see a variation of 50 percent in
6    one of those things.
7    Q.   Do you pass those, any of
8    those, either, you know, overhead kind of
9    fixed costs or variable costs along to
10   your customers as part of your prices?
11   A.   Well, by definition, I have to
12   pass the variable costs along to my
13   customers, because those are the costs
14   incurred directly in providing them with
15   the service that they request.
16        The fixed costs are, so to
17   speak, my problem.  They don't care how
18   much I am paying for my building.  They
19   don't care how much my trucks cost to
20   lease every month.
21        So variable costs are passed
22   along to the customers.  And we do it to
23   maintain a specific margin, a gross
24   margin.
25   Q.   Customers ever complain about

Page 27

CHRISTOPHER KIRK

1
2    IronMan's prices?
3    A.   Well, I won't make the
4    comparison about a bear doing something
5    in the woods, but -- the short answer --
6    we get complaints occasionally.  I am
7    going to say probably, about less than 5
8    percent of our customers complain about
9    our price.  When they do, it's a minor,
10   you know, oh, you didn't give me -- you
11   charged me $10 for this mattress.  Here
12   is your $10.
13   Q.   Okay.  Let's move away from
14   Town Square and talk about ABest.
15        So based on the timeline, it
16   sounds like you enrolled with ABest maybe
17   August or September of 2015.
18        Does that sound about right?
19   A.   Well, yeah, if you count back
20   six months, then that's where it puts us,
21   yes.
22   Q.   Let's say near the end of last
23   year?
24   A.   Yeah, early fall.
25   Q.   Before we get to ABest, one

Page 28

CHRISTOPHER KIRK

1
2    other question about Town Square.
3        Were you receiving green energy
4    or we'll call it traditional brown energy
5    from Town Square?
6    A.   My best understanding -- well,
7    I know I did not sign up for anything
8    that was specifically touted as green.
9    So whether it was green or some part of
10   green or brown, I don't know.
11   Q.   Now let's move to ABest.
12        What kind of a plan are you on
13   with ABest?
14   A.   I am on a plan that will remain
15   fixed for the next 12 months.  And then
16   it will go variable.
17   Q.   Okay.  And is that a green
18   energy plan or is it again, kind of --
19   well, is it a green energy plan?
20   A.   I did not sign up for a green
21   energy plan.
22   Q.   You're doing a great job of
23   anticipating what I am trying to get at.
24   I feel somewhat obligated to pay you for
25   doing my job.

Page 29

CHRISTOPHER KIRK

1
2        As Christopher Kirk, do you
3    have a residential account with Viridian?
4    A.   I do not.
5    Q.   Have you ever?
6    A.   I have never.
7    Q.   Okay.  Who is your residential
8    account with, currently?
9    A.   I believe United Illuminating.
10   Honestly, my wife does the bills.  She
11   says every month you need to give me this
12   much.  I don't really look at our
13   electrical bill on a residential basis.
14   Q.   That's more your wife's
15   responsibility and you deal with the
16   business?
17   A.   Correct.
18   Q.   Is there any reason -- have you
19   always been with United Illuminating,
20   residentially?
21   A.   On a -- well, I am with United
22   Illuminating because I am required
23   because they own, they own the grid.  So
24   like it or not, my bill says United
25   Illuminating on it.  They own the

8 (Pages 26 - 29)

CHRISTOPHER KIRK

1    CHRISTOPHER KIRK
2 delivery part of that.  So I don't have
3 the choice, as far as that goes.
4    Q.   Okay.  So I understand that.
5 Have you ever used a third-party
6 supplier, like a Viridian, for your
7 residential energy?
8    A.   Not to the best of my
9 knowledge.
10    Q.   Why back in 2010, early 2010
11 when IronMan enrolled with Viridian -- at
12 that time, did you, as Christopher Kirk
13 and your wife, consider Viridian for
14 residential electricity?
15    A.   I did not.
16    Q.   Why were you looking at
17 Viridian for the business rather than
18 residential?
19    A.   I was approached by a gentleman
20 I knew very casually.  And he said well,
21 I am an agent for Viridian and this can
22 save you significant amounts of money.
23 And I looked at the rates.  And at that
24 time, they appeared to be quite good, so
25 I signed up.

1    CHRISTOPHER KIRK
2    Q.   That was Mr. Schappert?
3    A.   Correct.
4    Q.   How did you know him casually?
5    A.   I went to high school with him.
6 I haven't seen him, I didn't even really
7 like him back then.  I hadn't seen him in
8 20 plus years.  He was on Facebook.  He
9 said -- and I was always looking for ways
10 to cut my overhead.  So he said, hey, and
11 I looked at it and the rates seemed to be
12 good.  So it was as simple as sign here.
13 Okay.  Done.
14    Q.   We'll get to Mr. Schappert
15 later.
16    MR. BLYNN:  Off the record.
17    (Off the record.)
18    Q.   When did IronMan find out about
19 this case against Viridian?
20    A.   The class action?
21    Q.   The class action.
22    A.   Approximately, the same time I
23 started talking with Attorney Klein here.
24 I heard about it on the news.  So I
25 believe it was, I think November,

1    CHRISTOPHER KIRK
2 something like that.
3    You alluded to the first time
4 we talked.  And it was about that time.
5 Other than that, why would I have any
6 reason to talk to an attorney in West
7 Hartford.
8    Q.   Sure.  And that would have been
9 November 2014, correct?
10    A.   I am getting a little squirrely
11 on the dates here.
12    No, because I left Viridian on
13 2015.  And then I heard, about six or so
14 months later, about the class action.  So
15 I would have had the conversations with
16 attorney/client in 2015.
17    Q.   So you ended service with
18 Viridian sometime around March 2015?
19    A.   Correct.
20    Q.   And you heard about the class
21 action maybe about six months after that?
22    A.   Yes, on Channel 12 News out in
23 Norwalk.
24    Q.   And that's when you contacted
25 Mr. Klein?

1    CHRISTOPHER KIRK
2    A.   Correct.
3    MR. BLYNN:  Let's mark this as
4    Exhibit 3.
5    [The Second Amended Class
6    Action Complaint, dated June 8, 2015,
7    was hereby marked as Defendant's
8    Exhibit 3 for identification, as of
9    this date.]
10    Q.   What I handed you is a copy of
11 the Second Amended Class Action Complaint
12 filed in this case.  And that's dated --
13 the Second Amended Complaint is dated
14 June 8th 2015.
15    (Witness reviews document.)
16    A.   Yeah, I see that up top.
17    Q.   And you had said the first time
18 you spoke with Mr. Klein was six months
19 after, about six months after you
20 terminated your enrollment with Viridian?
21    A.   That sounds good, but, you
22 know, honestly, my electric bill is not a
23 very big part of my life.  So I have not
24 kept a log of my contact dates.  So they
25 may or may not be accurate.

9 (Pages 30 - 33)

Page 34

CHRISTOPHER KIRK
1
2    Q.   And you see on the first page
3 in that little box at the top, which is
4 called the case caption, IronMan LLC
5 listed as a Plaintiff?
6    A.   It's very clear.
7    Q.   And you had seen this complaint
8 before it was filed, correct?
9    A.   I have seen -- yes, I saw the
10 initial complaint and then I saw a
11 revised complaint.
12    Q.   And the initial complaint,
13 you're referring to the one that was
14 filed sometime, I think it was November
15 2014.  Does that sound right?
16    A.   I don't know the date that it
17 was filed.
18    Q.   But the first complaint in this
19 case?  When you said the initial
20 complaint?
21    A.   Yeah, I was given this.  And
22 then I was given a complaint.  And then
23 there was some revision given to it and
24 then I saw that.  It's just kind of being
25 in the loop.

Page 35

CHRISTOPHER KIRK
1
2    Q.   Sure.  So you probably -- it
3 might have been a first amended complaint
4 that you probably saw?
5    A.   I can't speak with any type of
6 accurate recollection as to what the
7 heading was.  Because again, I went
8 through it.  My eyes started to glaze
9 over after the third page.  But I
10 endeavored to read through the whole
11 thing.  I don't recall the exact date
12 that it happened.  A lot of it was
13 boilerplate, but I tried to understand
14 what they were saying.
15    Q.   So you said your eyes started
16 glazing over after about Page 3, which is
17 two pages longer before my eyes started
18 glazing over.
19         Did you see -- on Page 12 of
20 this second amended complaint, did you
21 see paragraph 46?
22    A.   "Plaintiff IronMan LLC was on
23 Viridian's variable rate plan from June
24 2013 to February 2015."
25    Q.   You had seen that, though,

Page 36

CHRISTOPHER KIRK
1
2 before this complaint was filed?  You
3 read that -- you read paragraph -- let me
4 unpack it and we'll take it step by step.
5    A.   Okay.
6    Q.   And I am not trying to get you,
7 but I want to make sure we have a clean
8 record.
9         So you reviewed the second
10 amended class action complaint, Exhibit
11 3, before it was filed?
12    A.   Can I defer to attorney/client
13 on that?
14    MR. KLEIN:  It's your
15    recollection.
16    Q.   To the best of your
17 recollection?
18    A.   Before it was filed?
19    Q.   Mm-hmm.
20    A.   I cannot say that I had a good
21 sense for the filing dates.  I would talk
22 with attorney/client.  He would say, you
23 know, here is what -- here is the
24 complaint.  Can you review it, and let me
25 know if there is anything, you know, that

Page 37

CHRISTOPHER KIRK
1
2 you don't agree with or have any
3 objections, et cetera, et cetera, et
4 cetera.
5         As to the actual filing date
6 and status, I was not entirely clear,
7 because I was deferring to my attorney on
8 that.
9    Q.   And earlier you had said when
10 you were preparing for this deposition,
11 you had looked at a copy of the complaint
12 as one of the documents that you used to
13 prepare?
14    A.   Yeah, I did look at the final
15 -- we looked at the final amended
16 complaint, the one that I understood we
17 were moving forward with.
18    Q.   Okay.  And I will represent to
19 you the most recent amended complaint is
20 this second amended complaint.
21         So does this -- Exhibit 3.
22    A.   Understood.
23    Q.   This is the complaint you
24 looked at when you were preparing for
25 this deposition?

10 (Pages 34 - 37)

CHRISTOPHER KIRK

1
2    A.   To the best my recollection,
3  correct.
4    Q.   Now, you said earlier that you,
5  the complaint that you were shown to
6  prepare for this deposition, you had seen
7  about six weeks ago.
8         Does that sound about right?
9    A.   The first -- I am sorry, can
10  you repeat the question, I apologize.
11    Q.   I am trying to understand the
12  timeline.
13         When was the first time you saw
14  this second amended complaint?
15    A.   The second amended complaint?
16  To the best of my recollection, about six
17  weeks ago.  I was not paying strict
18  attention to the versions and the timing,
19  et cetera.
20    Q.   Have you ever seen a first
21  amended complaint in this case?
22    A.   To the best of my recollection,
23  I saw a complaint that has since been
24  revised.  So my assumption would be that
25  that was the first version of the

CHRISTOPHER KIRK

1
2  complaint.
3    Q.   Do you recall when you saw that
4  complaint?
5    A.   That was the initial contact
6  with Attorney Klein.
7    Q.   That was the one about six
8  months after cancelling with Viridian?
9    A.   Correct, again, to the best of
10  my recollection.
11    Q.   Is IronMan spelled one word or
12  two?
13    A.   One.
14    Q.   IronMan is on the first page of
15  Exhibit 3 is spelled as two words, right?
16    A.   It is, correct.
17    Q.   Did you ever ask -- and IronMan
18  on Page 12 is spelled as two words, as
19  well, correct?
20    A.   On Page 12?
21    Q.   Yes.
22    A.   Which paragraph -- oh, on
23  paragraph 47, 46.  Okay.  I see.  It is.
24  I didn't consider it relevant enough to
25  even say anything about.

CHRISTOPHER KIRK

1
2    Q.   But you had noticed that it was
3  spelled as two words rather than one when
4  you reviewed the complaint?
5    A.   I don't recall.
6    Q.   And you said at about Page 3,
7  your eyes began to glaze over when you
8  were reviewing this; is that right?
9    A.   Yeah.  And then you take
10  breaks, because I realized my eyes were
11  starting to glaze over.
12    Q.   But had you read through --
13  before any complaint was filed mentioning
14  IronMan, you read through the whole
15  complaint?
16    A.   I read through the entire
17  complaint.  I don't know -- now, when
18  you're saying when anything was -- I am
19  sorry, are you asking me did I read
20  through the complaint before I started to
21  become part of the action?
22    Q.   That's a good question.  Yes.
23  Did you read through a version of the
24  complaint before -- that had IronMan's
25  name on it, a draft version of the

CHRISTOPHER KIRK

1
2  complaint, before it was filed in Court?
3    A.   I honestly don't recall.  I
4  don't recall the timing.  So I can't
5  answer truthfully or not.  I can't answer
6  accurately.
7    Q.   But there is the possibility
8  that maybe you didn't?
9    A.   There is always a possibility.
10  I don't believe that I would become part
11  of a class action lawsuit without reading
12  something about it, because that's just
13  foolish.
14    Q.   Now, when you read through some
15  version of the complaint before you
16  became part of the class action lawsuit,
17  did you understand what the case was
18  about?
19    A.   Yes.
20    Q.   What's the case about?
21    A.   The case is about the fact that
22  Viridian is charging its customers, or
23  the rate which they charge their
24  customers was adjusted upward to
25  compensate for an increase in the

11 (Pages 38 - 41)

CHRISTOPHER KIRK

1       CHRISTOPHER KIRK
2 wholesale rate, but when that rate
3 decreased, the rate, the retail rate did
4 not decrease. And because of that, their
5 margins were artificially inflated.
6   Q.   And what are your allegations
7 in this case?
8   A.   My allegations, or my concerns
9 or the reason I'm here is because that --
10 the fact that they did not vary their
11 rates is, caused me to have financial
12 damage, to pay more for my electric bill
13 than I should have.
14   Q.   And you did nothing to
15 personally investigate the allegations at
16 issue in this case; is that right?
17    MR. KLEIN: Objection. Which
18 allegations?
19    MR. BLYNN: Any of the
20 allegations.
21   A.   The investigation that I did
22 was when I was with -- when I was still
23 with Viridian, I looked at some of the
24 other suppliers' per kilowatt hour rates.
25 And then I realized, oh, my God, these

1       CHRISTOPHER KIRK
2 are two to three times higher than some
3 of the other suppliers.
4    So I did see personally that,
5 at that point, right before I switched
6 over, that the rates were significantly
7 higher than could be had through another
8 supplier in the market.
9   Q.   So just from a timing
10 standpoint, that would have been, you
11 said, shortly before leaving Viridian,
12 which would have been, you know, early
13 part of 2015?
14   A.   Mm-hmm.
15   Q.   Does that sound right?
16   A.   Well, you look at the rates and
17 then you make the decisions to switch the
18 suppliers.
19   Q.   And so --
20    MR. BLYNN: Let's mark this.
21    [The document entitled
22 Plaintiff IronMan LLC Revised
23 Objections and Responses to
24 Defendant's First Set of
25 Interrogatories, was hereby marked as

1       CHRISTOPHER KIRK
2 Defendant's Exhibit 4 for
3 identification, as of this date.]
4   Q.   What I handed you as Exhibit 4
5 is a document entitled Plaintiff IronMan
6 LLC Revised Objections and Responses to
7 Defendant's First Set of Interrogatories.
8    Have you seen this document
9 before?
10    (Witness reviews document.)
11   A.   Yes, I have.
12   Q.   And you signed this document,
13 correct?
14   A.   I did.
15   Q.   And I will represent to you
16 that this version is unsigned. But I do
17 have your verification page. But you
18 recall signing it?
19   A.   I will concur that I did sign
20 it.
21   Q.   If you turn to Page 6, the
22 third full paragraph down that begins
23 with "Beyond IronMan"; do you see that
24 paragraph?
25   A.   I do.

1       CHRISTOPHER KIRK
2   Q.   The first sentence says "Beyond
3 IronMan and Kirk's personal experience,
4 IronMan did not personally investigate
5 the allegations at issue, but relied upon
6 Plaintiffs' counsel to do so and reviewed
7 the allegations in the complaint prior to
8 filing."
9    And so I just want to make sure
10 that this correct: IronMan did not
11 personally investigate the allegations at
12 issue, correct?
13    MR. KLEIN: Objection. Is this
14 with regard to interrogatory number 5?
15    MR. BLYNN: Yes, and I think
16 that language is throughout.
17    MR. KLEIN: But you are looking
18 at 5. Some have a different answer.
19    MR. BLYNN: Fair enough. We are
20 looking at interrogatory number 5.
21   Q.   And the question again is, I
22 just wanted to make sure that your answer
23 here is correct, IronMan did not
24 personally investigate the allegations at
25 issue?

Page 46

CHRISTOPHER KIRK

1
2    A.   Other than the statement that I
3 just made previously about the rates at
4 the time of switching.
5    Q.   Okay.  Do you know how many
6 causes of action are asserted in this
7 case against Viridian?
8    A.   No, I don't know the actual
9 number.
10    Q.   Is there a breach of contract
11 allegation?
12    A.   I can't say with certainty.
13    Q.   Do you know how many other
14 Plaintiffs are in this case?
15    A.   Based on -- well, these are
16 class action representatives.  My
17 understanding is that it represents
18 anybody in the entire population who was,
19 quote/unquote, wronged.
20    Q.   Okay.  How many named
21 Plaintiffs?
22    A.   Well, one, two --
23    Q.   Probably should have held off
24 on giving you that Exhibit.
25    A.   Yeah, one, two, three, four.

Page 47

CHRISTOPHER KIRK

1
2    Q.   There goes my Perry Mason
3 moment.
4         And those Plaintiffs are Lori
5 Sanborn, BDK Alliance LLC and Stephanie
6 Silver?
7    A.   Yes.  And it's also on Exhibit
8 1.  So you wouldn't have done any good
9 anyway.
10    Q.   One step ahead of me.
11         Do you know if any of those
12 individuals or BDK Alliance personally?
13    A.   No.
14    Q.   Ever spoken to them?
15    A.   No.
16    Q.   So who makes up the class
17 you're seeking to represent?
18    A.   Well, we have the named,
19 obviously, the class representatives, I
20 guess, of which I am one.  Plus anybody
21 else who, during that period of time, was
22 with Viridian Energy and suffered the
23 same financial losses as other people due
24 to the excessive spread between the
25 wholesale and the retail rate.

Page 48

CHRISTOPHER KIRK

1
2    Q.   And that's -- is that limited
3 to certain states or is that every state
4 Viridian does business in?
5    A.   My understanding is this is
6 based on Connecticut and Massachusetts.
7    Q.   Okay.  Has a class been
8 certified in this case?
9    A.   I don't know what that means.
10    Q.   What is your understanding of
11 how a class action works?
12    A.   A class action, my
13 understanding is that I am a
14 representative of all the people who have
15 been, who were subject to the, you know,
16 the facts of the case here who may have
17 or did suffer financial damages.  It's
18 not just me.  It's everybody.
19    Q.   Okay.  Do you understand that
20 when you file a class action, it doesn't
21 mean that it has been allowed to proceed
22 as a class action at that time?
23    A.   Yeah, filing does not mean it's
24 been, I guess, approved.  I don't know
25 the correct...

Page 49

CHRISTOPHER KIRK

1
2    Q.   Certified.  That's a good word.
3    A.   Yes.
4    Q.   Approved is fine.  So you don't
5 know whether the class has been approved
6 yet?
7    A.   I don't.  I am not an attorney.
8 I don't know the specifics of when things
9 happen.  What, you know, what the
10 specific hurdles are.
11    Q.   How often do you talk to your
12 attorneys in this case?
13    A.   Our contact has been more
14 through e-mail.  But actual phone
15 discussions probably had five to seven
16 with a number of different e-mail
17 exchanges.
18    Q.   Let's start with the phone
19 calls, and we'll get to just the e-mails
20 in a second.
21         But the phone calls, you know,
22 have those -- how often do you have phone
23 conversations with your attorneys?
24    A.   Well, it's on an irregular
25 basis, because it's as needed, obviously.

13 (Pages 46 - 49)

CHRISTOPHER KIRK

1
2 He's not just going to call me up and say
3 hi, how are you doing. It's when
4 something has to be dealt with and
5 something that we need to, you know,
6 something has to be done to proceed with
7 the case.
8    Q.   And is that the same with
9 e-mails?
10    A.   Correct. It's all fact or
11 action based.
12    Q.   So you don't get set updates
13 about the case on a regular basis?
14    A.   No. If I asked for them, I
15 know I would. He's the expert, not me.
16    Q.   And so you said if you asked
17 for them, you know you would.
18        Do you ask for periodic updates
19 about the case?
20    A.   I believe at one point I did.
21 And, you know, they said we're proceeding
22 and we'll be in contact.
23        So I am not going to engage
24 somebody who bills out at $600 an hour
25 more than I have to or whatever it is

CHRISTOPHER KIRK

1
2 that they bill out at.
3    Q.   Are you paying his hourly rate?
4    A.   I am not, no, no.
5    Q.   So really the fact that
6 Mr. Klein bills at $600 an hour --
7        MR. KLEIN: Which I don't.
8    A.   No, that's completely
9 irrelevant. That's more of a
10 conversation point. Attorneys make a lot
11 of money. God bless you. Law school is
12 fine.
13    Q.   We'll tell you about the law
14 firm dynamic or economics at a break.
15    A.   I am sure it's interesting.
16    Q.   So how have you been keeping
17 yourself informed of the developments in
18 this lawsuit, other than, you know,
19 periodic e-mails or phone calls from your
20 attorneys?
21    A.   I have been reading everything
22 that my attorney gave to me, front to
23 back. Once, if not twice. And that's
24 the extent of it.
25    Q.   Okay. So it's really more of a

CHRISTOPHER KIRK

1
2 reactionary thing. Your attorneys will
3 give you something to read and you read
4 it front to back?
5    A.   Correct.
6    Q.   Do you check in with your
7 attorneys and ask how is the case
8 proceeding?
9    A.   I believe I did once. The
10 response was, as I alluded to, we will
11 get back to you when we need you. And
12 okay, fine.
13    Q.   You understand, as a class
14 representative, one of your obligations
15 is to keep informed of the developments
16 in this case?
17    A.   And I believe that I have been,
18 based on my review of the documentation
19 provided to me. Because I don't have
20 easy access to anything else.
21    Q.   Now, do you review documents --
22 do you review any documents that were
23 filed in Court? Let's start with that.
24    A.   I do not. Correction. If
25 these documents have been filed in Court,

CHRISTOPHER KIRK

1
2 then yes, these are the documents that I
3 review. But I do not actively search out
4 documents through the Connecticut Website
5 -- you know, Connecticut judicial
6 Website.
7    Q.   Do your attorneys give you all
8 of the documents they filed in Court?
9    A.   To the best of my knowledge,
10 yes.
11    Q.   How many documents would you
12 say you got in this case?
13    A.   Four, five.
14    Q.   And are those documents
15 provided to you before they are filed in
16 Court for your review and comment?
17    A.   That is my understanding, yes.
18    Q.   Do you ever comment on the
19 documents?
20    A.   I haven't, because I saw no
21 real reason to.
22    Q.   When you review these
23 documents, do you understand what's in
24 them?
25    A.   I believe so, yes. Other than

14 (Pages 50 - 53)

Page 54

CHRISTOPHER KIRK

1    CHRISTOPHER KIRK
2  the dense language, you have to read it
3  very quickly.  But I am fairly clear on
4  what's going on.
5     Q.   Do you check these Court
6  filings for accuracy?
7     A.   To the best of my ability,
8  because I don't have intimate knowledge
9  of the actual numbers, I am not
10  necessarily able to make a judgment as to
11  whether something is, quote/unquote,
12  accurate or not.
13     Q.   And I am sorry, I forgot your
14  answer so I am going to ask the question
15  again.
16     A.   That's okay.  We are here.
17     Q.   And asked and answered is the
18  objection.
19        Do you ever provide edits or
20  comments on anything that your attorneys
21  give you?
22     A.   I have been invited to, but I
23  have not, because I have not seen the
24  need to.
25        Presumably, they are the expert

Page 55

CHRISTOPHER KIRK

1    CHRISTOPHER KIRK
2  at what they are doing.  So as long as I
3  don't see anything that's erroneous,
4  false, I have no comment.
5     Q.   Okay.  So beyond Court filings,
6  there are also what's called discovery.
7  For instance, Exhibit 4 that I showed you
8  are your objections and responses to
9  interrogatories.  The interrogatories are
10  essentially written questions and answers
11  that are given as part of a process
12  called discovery in this litigation.
13        Do you understand that?
14     A.   Mm-hmm.
15     Q.   And typically, discovery
16  documents are not filed in Court.
17     A.   I believe you.
18     Q.   Well, I will ask the question,
19  you understand that Viridian has served
20  discovery upon IronMan in this case?
21     A.   Yes, absolutely.
22     Q.   And have you seen the discovery
23  requests that Viridian has served on
24  IronMan?
25     A.   I have.  I have seen the

Page 56

CHRISTOPHER KIRK

1    CHRISTOPHER KIRK
2  specific questions and the specific
3  answers.
4        MR. BLYNN:  This will be Exhibit
5    5.
6     A.   Is that not what Exhibit 4 is?
7     Q.   Well --
8        MR. BLYNN:  Let's go off the
9  record for a second.
10        (Off the record.)
11        [The Defendant's First Set of
12  Requests For Production to Plaintiff
13  IronMan LLC, dated September 28th,
14  2015, was hereby marked as Defendant's
15  Exhibit 5 for identification, as of
16  this date.]
17     Q.   What I handed you is Exhibit 5.
18  And this is Defendant's First Set of
19  Requests For Production to Plaintiff
20  IronMan LLC; is that correct?
21        (Witness reviews document.)
22     A.   It is correct.
23     Q.   And your attorneys have
24  provided this to you?
25     A.   Yes, they have.

Page 57

CHRISTOPHER KIRK

1    CHRISTOPHER KIRK
2     Q.   Do you recall when they
3  provided this to you?
4     A.   To the best of my recollection,
5  it was at the beginning of the process.
6     Q.   And so these are dated, if you
7  turn to Page 7, September 28th, 2015.
8  Would you have received these around that
9  time?
10     A.   If that is when they were
11  created, correct.
12     Q.   And so what is -- well, these
13  requests for production ask for IronMan
14  to provide certain kinds of documents to
15  Viridian.  You understand that?
16     A.   I do.
17     Q.   Okay.  What did you do to find
18  responsive documents?
19     A.   I dug through probably two
20  years' worth of document boxes.
21     Q.   And when you say "document
22  boxes," what do you mean by that?
23     A.   Okay.  I do a lot of things on
24  computer but also still rely a lot on
25  paper.  And I keep a monthly file for

15 (Pages 54 - 57)

CHRISTOPHER KIRK

1
2  sales invoices, as well as any --
3  primarily invoices and receipts.
4        And part of that would have
5  been any electrical bills, as well as any
6  contracts I may have received.  So I
7  looked through those.  I dug through
8  that.  And I couldn't find anything that
9  really, you know, fit the description
10 here, other than the bills, which
11 obviously I produced.
12       So, yeah, I did my best to kind
13 of dig through the documentation that I
14 have.
15   Q.   You said you do a lot on a
16 computer, as well, in your business,
17 generally?
18   A.   Well, I do a lot of bill
19 payments, et cetera, on computers.  And
20 our scheduling is computerized, but as
21 far as bills go, I use QuickBooks, et
22 cetera.  But I don't do a lot of
23 electronic analysis.  I mean I do do
24 some, but not a ton.
25   Q.   I wasn't asking really for

CHRISTOPHER KIRK

1
2  electronic analysis, per se.
3        You send and receive e-mails.
4   A.   I send and receive e-mails.  I
5  pay bills electronically.  Something most
6  small business people do.
7   Q.   Did you -- when you received
8  these, Exhibit 5, the request for
9  production, did you look in any of your
10 e-mails for responsive documents?
11   A.   I did.  However, you have to
12 realize that that was probably three
13 computers ago, as well as with several
14 associated hard drive crashes.
15       So I knew, because of my
16 personal experience with my own crappy
17 computer systems, that I would not
18 physically have anything.  But I did
19 look, but there was nothing there.
20   Q.   So you looked in your e-mails,
21 as well?
22   A.   Correct, yeah.
23   Q.   So you never mentioned
24 Viridian -- other than to e-mails to your
25 attorney, you never mentioned Viridian in

CHRISTOPHER KIRK

1
2  any e-mails?
3   A.   Not that I can recall, no.
4   Q.   But you searched for -- what
5  e-mail system does IronMan use?
6   A.   Well, are you talking now or at
7  the time of the actual signing up for the
8  contract?
9   Q.   I am talking at any time from
10 March 2009 forward, if you can recall all
11 the various e-mail systems you used?
12   A.   I used Hotmail.  I used gmail.
13 I used Outlook on various and assorted
14 different servers.
15   Q.   And did you -- when you
16 received these document requests, did you
17 search your gmail accounts?
18   A.   Yes, I did search my gmail
19 account.  I also searched Hotmail.  I
20 looked at Outlook to the best of my
21 ability, which was almost nothing.  I
22 mean, because we don't have anything.
23   Q.   And you provided all of the
24 bills that you could find in your
25 document boxes, right?

CHRISTOPHER KIRK

1
2   A.   Well, yeah.  Those I pulled
3  electronically, but they were the same as
4  what -- I mean, they are bills,
5  regardless of where they came from.  They
6  were just easier.
7   Q.   We'll just mark those bills
8  right now, just so we have them in the
9  record.
10       [The packet of bills, was
11       hereby marked as Defendant's Exhibit
12       6 for identification, as of this
13       date.]
14   Q.   I will represent to you that I
15 have done my best to assemble in a
16 chronological order, beginning with the
17 earliest bill to the last bill, the bills
18 that relate to IronMan that relate to
19 Viridian in this case.
20       There are a couple of gaps.
21 And I just want to make sure that we're
22 not missing anything intentionally.  I am
23 not accusing you of holding back a bill.
24       MR. KLEIN:  If I can just ask
25 you, I produced his bills in two

16 (Pages 58 - 61)

Page 62

1          CHRISTOPHER KIRK
2   separate installments.  This has both
3   of them?
4          MR. BLYNN:  This has both of
5   them.  The way I put this together,
6   Seth, is I went through the initial
7   disclosures and then the production
8   that came in near the end of last
9   year.
10         MR. KLEIN:  Okay.
11         MR. BLYNN:  And that's why some
12  of these are numbered in the 50s and
13  some in the 500s or 400 range.
14         But what I tried to do is just
15  assemble them in a chronological order
16  rather than a Bates number order.
17    Q.   It doesn't look like, if you
18  look at -- a Bates number is a little
19  number at the bottom that says Viridian
20  P.  It's kind of tough to see at the
21  bottom with a number next to it.
22    A.   Got it.
23    Q.   And these are kind of not in
24  Bates number order, because I try to keep
25  them chronologically.  But if you flip

Page 63

1          CHRISTOPHER KIRK
2   about seven or eight pages in, do you see
3   Viridian P Page 52?  It's a -- the
4   payment date at the top, that may be
5   easiest to go back, is September 15th,
6   2013?
7     A.   Right.
8     Q.   The next bill we have, the next
9   page, is page due 11/15.
10         So my question is just simply,
11  did you have an October 13 bill and were
12  you just not able to find it?
13    A.   I screwed up.  I paid it twice
14  by mistake.
15    Q.   The October bill?
16    A.   I believe so.  Yeah.  I think I
17  had the bill, I lost it.  I thought I
18  didn't pay it and I paid it twice.  That
19  was an error on my part.
20    Q.   But in your document boxes or
21  wherever you pulled these bills, you
22  didn't have a statement with a payment
23  date in October.  I just want to make
24  sure I am not missing something?
25    A.   Nothing was going on in terms

Page 64

1          CHRISTOPHER KIRK
2   of switching or anything like that.  It
3   may have just been an error on my part.
4   I may have missed the bill.
5     Q.   And you can take my
6   representation, but if you want to go
7   maybe eight pages from the back, if you
8   look, there is a page number 510 with a
9   payment due date of August 14th, 2015?
10    A.   Okay.
11    Q.   And the page before that, the
12  Bates Page 34, the payment due there is
13  March 17th.  So it looks like there is a
14  gap from April to July bills,
15  essentially.
16         Again, you just didn't find
17  them?
18    A.   Yeah.  Now I remember.  I
19  called up UI to specifically see if they
20  can get me those bills.  Oh, I am sorry,
21  we had a system changeover.  We don't
22  have those bills.
23    Q.   Okay.
24    A.   Okay?
25    Q.   Yeah, that's fine.  Not as

Page 65

1          CHRISTOPHER KIRK
2   nefarious as I thought.
3     A.   No.
4          MR. KLEIN:  At some point, can
5   we take a quick break?
6          MR. BLYNN:  Right now?
7          (Off the record.)
8     Q.   We're back on the record and
9   Mr. Kirk, I think you may have a
10  clarification to give?
11    A.   Yes.  After conversations with
12  Attorney Klein and review of the relevant
13  e-mail records, my memory was refreshed.
14  And I can say with absolute certainty
15  that I did review the complaint before it
16  was filed.
17    Q.   Okay.  And that was the first
18  amended complaint, the first time IronMan
19  was a Plaintiff in this case; is that
20  correct?
21    A.   Yes, I believe so.
22    Q.   I want to take a few minutes to
23  talk about your experience enrolling in
24  Viridian.  And you had touched on
25  Mr. Schappert earlier, and we will get to

17 (Pages 62 - 65)

CHRISTOPHER KIRK

1
2 him.
3      But why did you decide to
4 enroll with Viridian back in early 2010?
5    A.   Save money.
6    Q.   Any other reasons?
7    A.   No.  Strictly to save money.
8    Q.   Green energy wasn't a factor?
9    A.   It was not.
10   Q.   Did you understand that
11 Viridian offered green energy?
12   A.   I don't recall that I did.  And
13 even if I did, it would have been
14 irrelevant.
15   Q.   So it was really just a purely
16 economic reason?
17   A.   Yeah.
18   Q.   And when you say "Save money,"
19 save money over what?
20   A.   Save money over the current
21 rate that I was paying through United
22 Illuminating.
23   Q.   Did you look at any other
24 third-party suppliers?
25   A.   To the best of my recollection,

CHRISTOPHER KIRK

1
2 at that point, no.  Although I did check
3 the rate Viridian offered versus what I
4 was paying, you know, through United
5 Illuminating, and there was a savings.
6    Q.   Do you recall how much?
7    A.   I do not.
8    Q.   Approximately?
9    A.   I am sorry, I don't recall.
10 All I can say it was significant enough
11 to cause me to change.
12   Q.   Do you recall which Viridian
13 plan you enrolled in?
14   A.   I do not.
15   Q.   We'll take it step by step.
16      Viridian, at the time, offered
17 a 100 percent renewable plan and a 50
18 percent green plus state minimum standard
19 plan.
20   A.   Mm-hmm.
21   Q.   Do you recall which of those
22 green energy plans?
23   A.   I do not.
24   Q.   Do you recall when you enrolled
25 back in January of 2010, if you were

CHRISTOPHER KIRK

1
2 enrolled in a fixed rate or purely a
3 variable?
4    A.   I don't recall, to be honest
5 with you.
6    Q.   Have you ever been on a fixed
7 rate with Viridian?
8    A.   I don't recall.
9    Q.   Do you ever recall
10 transitioning to a variable rate with
11 Viridian?
12   A.   I don't recall a date in which
13 they informed me that your rate is now
14 going variable.  I don't.
15   Q.   Okay.  Did you pay a teaser
16 rate with Viridian, a, quote/unquote,
17 teaser rate?
18   A.   I don't know, to be honest with
19 you.  I know the rate at the time I
20 compared it was favorable to what I was
21 paying at United Illuminating.
22   Q.   I just want to clarify, if you
23 pull out Exhibit 4, that's the, IronMan's
24 objections and responses to the
25 interrogatories.

CHRISTOPHER KIRK

1
2    A.   Got it, right here.
3    Q.   Okay.  If you go to Page 13,
4 paragraph 25, there is a response.
5    A.   Page 13?
6    Q.   The little paragraph sign at
7 the bottom?
8    A.   Yes.
9    Q.   Do you see, paragraph 25 says
10 IronMan's allegation --
11   A.   I do.  It goes from 7 to 25.
12   Q.   Paragraph 25 says "IronMan's
13 allegation that Viridian offers teaser
14 rates based on IronMan's own experience
15 with Viridian's contract which
16 transitioned from a fixed rate to a
17 variable rate."
18      When you signed this -- you
19 mentioned Viridian offering a teaser rate
20 based on your own experience with
21 Viridian's contract.  And I just want to
22 understand what you mean by that?
23   A.   To the best of my knowledge, or
24 best as I can recall, which isn't very
25 good, they said well, they have a great

18 (Pages 66 - 69)

CHRISTOPHER KIRK

1    rate right now.  Whether that was a
2    teaser rate or, a, quote/unquote, teaser
3    rate, meaning it was something to get me
4    to sign up versus what they were actually
5    charging, I can't recall.  It seemed to
6    me that it was so low at that point.
7    Q.   Okay.  And in your complaint,
8    you say, and this is Exhibit 3 if you
9    want to look at it, paragraph 3 on the
10   first page; do you see paragraph 3?
11   A.   Mm-hmm.
12   Q.   It says "Viridian entices
13   residential customers to sign up for its
14   services by offering low initial rates
15   for electricity.  When the 'teaser rate'
16   period expires, however, customers are
17   rolled over into month-to-month variable
18   rate plans with exorbitant rates."
19        So what did you mean when you
20   said "teaser rate" in paragraph 3 of the
21   second amended complaint?
22   A.   Well, teaser rate is a rate
23   that is so low that it doesn't reflect
24   the actual cost that the company is

CHRISTOPHER KIRK

1    paying for electricity.  It's a rate that
2    attracts you to sign up, because for a
3    short period of time, you will save a
4    significant amount of money.
5    Q.   And then going back to Exhibit
6    4, the interrogatory responses, the rest
7    of paragraph 25 -- well, the rest of that
8    first sentence in paragraph 25, after
9    we're talking about teaser rates, says --
10   well, I will just read it again.
11   "IronMan's allegation that Viridian
12   offers teaser rates is based on IronMan's
13   own experience with Viridian's contract
14   which transitioned from a fixed rate to a
15   variable rate."
16        That's the first sentence.
17   A.   Mm-hmm.
18   Q.   And so does this refresh your
19   recollection that you had a fixed rate
20   that transitioned to a variable rate?
21   A.   Based on what this is saying, I
22   honestly can't recall with any degree of
23   certainty.  I can't say for certain.
24   Q.   But you said for certain in

CHRISTOPHER KIRK

1    this document, right?  I mean, this is
2    your answer.
3    A.   Well, yeah, it's been six to
4    eight months.  I don't recall, off the
5    top of my head, to be honest with you.  I
6    can't say that.
7    Q.   You say it's been six to eight
8    months.  What are you referring to?  Your
9    answer to this document?
10   A.   Yeah.
11   Q.   You signed this verification
12   for this answer on January 14th, 2016.
13        Does that sound right?
14   A.   If that's what you have, yeah.
15   Q.   We'll mark it and I'll show it
16   to you, so we have it.
17   A.   Is this not an amended one?
18   Were the interrogatories amended?
19        MR. BLYNN:  Off the record.
20        (Off the record.)
21        [The Verification, was hereby
22        marked as Defendant's Exhibit 7 for
23        identification, as of this date.]
24   Q.   We just took a quick break, and

CHRISTOPHER KIRK

1    you had brought up a good point that
2    we're looking at supplemental
3    interrogatory responses that are dated
4    January 14th, 2016.
5        Does that sound right?
6    A.   Correct.
7    Q.   And I will represent that
8    IronMan and the other Plaintiffs in this
9    case initially responded to the
10   interrogatories in December 2015.
11        Do you understand that to be
12   the case?
13   A.   I do.  If you have
14   documentation, I can't argue.
15   Q.   So when you said it's been six
16   months from your answer, it's really only
17   been one-and-a-half months, two months?
18   A.   Well, when I say since my
19   answer, it's since this case really
20   started.  And that's when my whole
21   process of recollection started.  That's
22   my frame of reference with this.
23   Q.   Right.  Okay.  So since this
24   case has started, you realized you had a

19 (Pages 70 - 73)

CHRISTOPHER KIRK

1
2 fixed rate that transitioned to a
3 variable rate.
4     Does that seem to sound right?
5     A.   Honestly, if that's what I said
6 at that time, that's what I recall.
7 That's what it was.  I don't recall right
8 now.
9     Q.   Would it surprise you to learn
10 that back in January of 2010, Viridian
11 didn't offer a fixed rate plan?
12     A.   It's possible.  We're talking
13 six years ago.
14     Q.   But what I am more focused on
15 is your December and supplemental January
16 answer where you say, where you state
17 that IronMan transitioned from a fixed
18 rate to a variable rate.
19         And I just want to understand
20 -- and this isn't a gotcha -- I just want
21 to understand why you answered it that
22 way.
23     A.   Okay.  My understanding is that
24 they offer initially low rates to attract
25 people to sign up to their plans.  That

CHRISTOPHER KIRK

1
2 is -- I mean, everybody does that for
3 everything.  That's standard business
4 practice.  You offer somebody.  You get
5 them in.  And then whether that was a
6 fixed rate or a low variable rate, I
7 don't really know.  But clearly, I didn't
8 feel -- I felt that the rate was good, it
9 would save me money.
10        But for after that point, it
11 clearly ratcheted up a significant
12 amount, which caused my electric rate to
13 go up.
14        So whether it was a low rate,
15 but was it a fixed low rate or was it
16 perhaps a rate at a much lower margin, I
17 can't say for sure, because I don't know
18 specifically how, you know, how Viridian
19 runs their business.
20     Q.   Okay.  These interrogatory
21 responses, you believe them to be
22 accurate, correct?
23     A.   Yes.  I would not have signed
24 them if I didn't.
25     Q.   But, in fact, we've just

CHRISTOPHER KIRK

1
2 established that you don't recall if you
3 had a fixed rate that transitioned to a
4 variable rate and, in fact, I represented
5 that Viridian didn't.  So that's not
6 really accurate, correct?  Your
7 interrogatory answer isn't really
8 accurate?
9     A.   Well, it's based on my best
10 recollection.
11     Q.   Did you draft this
12 interrogatory response?
13     A.   No.  I relied on my attorneys
14 to do that.
15     Q.   And you reviewed this response
16 for accuracy?
17     A.   Yes, I did.
18     Q.   Okay.  Did you ask your
19 attorneys, you know, where they got this
20 information from?
21     A.   I didn't, because again, at the
22 time of my best recollection, it sounded
23 accurate.
24     Q.   Okay.  Let's talk about
25 Mr. Schappert.

CHRISTOPHER KIRK

1
2        Who is Mr. Schappert?  I know
3 you had said earlier.
4     A.   A distant acquaintance from
5 high school.  I had -- you know, I was
6 aware of his presence on Facebook.  And I
7 think he did an e-mail blast, I am a
8 representative for Viridian.  You know,
9 you can save money by switching.
10     Q.   Okay.  So the way, so the way
11 he solicited you -- you think you
12 received an e-mail from him about
13 Viridian?
14     A.   Yes.
15     Q.   Do you recall when that was --
16 well, do you recall when that was?
17     A.   It would have been about a
18 month before I switched over to Viridian.
19     Q.   So probably the end of 2009,
20 early 2010?
21     A.   Yeah.
22     Q.   You can't remember an e-mail
23 from six years ago?
24     A.   You know, what did you have for
25 lunch yesterday.

20 (Pages 74 - 77)

Page 78

```
1        CHRISTOPHER KIRK
2     Q.   And what was the substance of
3  that e-mail?
4     A.   The substance of the e-mail was
5  that Viridian offers this really low rate
6  that can save you money if you switch.
7     Q.   Okay.  What else do you recall
8  from that e-mail, anything else?
9     A.   That's it.
10    Q.   And so you received this e-mail
11 in the 2009/early 2010 period.
12         Did you respond to the e-mail?
13    A.   Not to Mr. Schappert directly,
14 but I did at that point look at the
15 supplier rates.  And I said, wow, this
16 looks to be pretty good.  So I switched.
17    Q.   So did you ever have -- after
18 receiving this e-mail from Schappert, did
19 you have a face-to-face meeting with him?
20    A.   No, never.
21    Q.   Talk to him on the phone?
22    A.   No.
23    Q.   You didn't e-mail him back?
24    A.   No, it was a blast.
25    Q.   So you got this e-mail.  You
```

Page 79

```
1        CHRISTOPHER KIRK
2  looked at other electricity rates.  And
3  you switched to Viridian?
4     A.   I don't believe -- I think I
5  said this before.  I don't believe I
6  looked at any other companies other than
7  UI, so.
8     Q.   Fair.  So -- okay, so you
9  looked at UI's rate and saw that Viridian
10 offered --
11    A.   It was significantly lower, so
12 I said, okay, looks good.
13    Q.   Are you still in touch with --
14 well, do you --
15    A.   I have never been in touch with
16 this man other than the e-mail and seeing
17 his postings on Facebook.
18    Q.   Did the e-mail from
19 Mr. Schappert have any attachments?
20    A.   Not that I recall.
21    Q.   Did you ever get any mail from
22 Mr. Schappert with Viridian marketing
23 material?
24    A.   Not that I recall.
25    Q.   Did you ever receive a copy of
```

Page 80

```
1        CHRISTOPHER KIRK
2  the Viridian Connecticut terms and
3  conditions of service?
4     A.   Not that I recall.
5     Q.   So other than -- you said that
6  the substance of Mr. Schappert's e-mail
7  would be that you would save money
8  essentially by switching to Viridian?
9     A.   Correct.
10    Q.   Did he make any mention about
11 green energy, that you recall?
12    A.   Not that I recall.
13    Q.   Anything about Viridian's
14 commitment to the environment?
15    A.   Not that I recall.
16    Q.   Do you recall anything other
17 than really the general representation
18 that you might -- you would save money
19 with Viridian?
20    A.   No.
21    Q.   And again, just to be clear,
22 you didn't respond to the e-mail or ask
23 Mr. Schappert any questions?
24    A.   I did not.
25    Q.   You just looked at UI's rate
```

Page 81

```
1        CHRISTOPHER KIRK
2  and saw that Viridian's rate was lower
3  and switched, right?
4     A.   Correct.
5     Q.   So you didn't see a copy of
6  Viridian's terms and conditions of
7  service before you switched to Viridian?
8     A.   Not that I recall, no.
9     Q.   Did you ever receive a copy of
10 that?
11    A.   Not that I recall.
12    Q.   Do you recall getting a welcome
13 letter from Viridian?
14    A.   No.
15    Q.   So you don't know what contract
16 governed your relationship with Viridian?
17    A.   I don't recall any specific
18 contract.
19    Q.   If you go back to Exhibit 4, I
20 just want to clarify one of your
21 interrogatory answers.
22    A.   Okay.
23    Q.   Page 11.  Do you see in the
24 middle of the page, interrogatory number
25 12?
```

21 (Pages 78 - 81)

CHRISTOPHER KIRK
1
2    A.   Mm-hmm.
3    Q.   And then there is an objection,
4   and then a bolded response underneath.
5   Do you see where I am at?
6    A.   Can you talk to me about the
7   extent of which the terms of service were
8   reviewed? Because in my mind, terms of
9   service mean rates.
10   Q.   Let me read, just for the
11  record, the response to interrogatory
12  number 12.
13       "Subject to the foregoing
14  general objections, IronMan responds that
15  it generally reviewed, through Mr. Kirk,
16  the entirety of Viridian's terms of
17  service presented to him by Mr. Schappert
18  on the same day that Mr. Kirk was
19  solicited by Mr. Schappert, and in which
20  Mr. Kirk enrolled in Viridian on behalf
21  of Iron Man."
22       Did I read that correctly?
23   A.   Yes, absolutely.
24   Q.   So you just said that your
25  understanding of terms of service, at

CHRISTOPHER KIRK
1
2   least, that's the rates?
3    A.   Yes, I reviewed -- one thing
4   that we have to talk about is presented
5   to him by Mr. Schappert, which was
6   essentially a very simple e-mail saying
7   that you will save money based on the
8   rates. I checked out those rates online.
9   So in my mind, that's terms of service.
10   Q.   So it wasn't a document. We're
11  not talking about a document. It's the
12  rates presented by Mr. Schappert?
13   A.   Yes, and I saw online. And I
14  did not receive one of these, where I
15  went through.
16   Q.   How did you enroll with
17  Viridian?
18   A.   Electronically.
19   Q.   So you went to the Website?
20   A.   Yeah, I believe so. Yeah, I
21  believe you go to their Website. And you
22  have to give them a number off of your UI
23  bill. And they identify your service and
24  then they switch.
25   Q.   So you didn't place a call to

CHRISTOPHER KIRK
1
2   Viridian and say you want to switch?
3    A.   No.
4        MR. KLEIN: Chris, let him
5    finish his question. I know you know
6    where he's going, but it makes for a
7    cleaner record.
8        THE WITNESS: Sorry.
9    Q.   It's natural. It's fine. It's
10  a good reminder for both of us, because I
11  do the same thing.
12       So the chronology is you got an
13  e-mail from Mr. Schappert sometime in the
14  late 2009/early 2010 period. Before you
15  enrolled in Viridian, you checked out
16  Viridian's rate, compared it to UI's
17  rate, and then in around that same time
18  period, you enrolled online with
19  Viridian.
20       Does that sound right?
21   A.   Yes, sounds approximately
22  correct.
23   Q.   After you enrolled in Viridian,
24  did you ever call Viridian's customer --
25  did you ever call Viridian?

CHRISTOPHER KIRK
1
2    A.   Never.
3    Q.   You ever send any e-mails to
4   Viridian?
5    A.   Never.
6    Q.   Did Viridian ever call you?
7    A.   No.
8    Q.   I assume Viridian didn't send
9   you any e-mails?
10   A.   Not that I recall.
11   Q.   And you testified that you
12  don't recall getting a welcome letter?
13   A.   I do not.
14   Q.   You don't recall getting a copy
15  of your contract from Viridian?
16   A.   I don't recall, no.
17   Q.   And so you terminated your
18  contract with Viridian in about March of
19  2015. Does that sound about right?
20   A.   Yes, it does.
21   Q.   How did you terminate your
22  contract?
23   A.   I terminated by going online,
24  finding the supplier with a substantially
25  lower rate and following the same

22 (Pages 82 - 85)

Page 86

CHRISTOPHER KIRK

1
2 electronic procedure that I did to switch
3 to Viridian.
4     Q.   So you didn't call Viridian and
5 say I'm cancelling my contract?
6     A.   I did not.
7     Q.   Okay.  Do you recall how --
8 when you switched, or when you terminated
9 from Viridian in March 2015 -- well, you
10 went to another supplier's Website and
11 enrolled with that supplier.  That was
12 Town Square?
13    A.   Correct.
14    Q.   Do you recall what Town
15 Square's rate was at the time?
16    A.   I do not.
17    Q.   But it was lower than
18 Viridian's?
19    A.   Significantly.
20    Q.   And when you say
21 "Significantly," approximately how much?
22    A.   I would say approximately half.
23 And that's to the best of my
24 recollection.
25    Q.   That's fair.  This isn't a

Page 87

CHRISTOPHER KIRK

1
2 memory contest.
3     A.   Good, because I would fail.
4     Q.   Have you ever complained about
5 Viridian to anyone prior to switching
6 service to Town Square?
7     A.   Never.
8     Q.   And did you talk to anyone
9 about Viridian prior to switching
10 service?
11    A.   Never.
12    Q.   Let's go back to the second
13 amended class action complaint in this
14 case, Exhibit 3.  And let's start at
15 paragraph 4, which is at the bottom of
16 Page 1 and runs over to Page 2.
17    A.   Yup, I see it.
18    Q.   So paragraph 4, the first
19 sentence says "Viridian represents that
20 it offers a 'variable rate' electricity
21 plan to residential consumers that is
22 tied to the market rate in the wholesale
23 power market."
24         Did I read that correctly?
25    A.   Yes, you did.

Page 88

CHRISTOPHER KIRK

1
2     Q.   Now, what do you mean when you
3 allege that the "Market rate in the
4 wholesale power market"?  What is that
5 rate?
6     A.   Sorry, can you repeat the
7 question?
8     Q.   Sure.  What is the -- what do
9 you mean when you say the "Market rate in
10 the wholesale power market"?  What is
11 that rate?  Not asking for a number, but
12 just generally, what that rate is?
13    A.   A market rate is whatever a
14 business decides to set vis-à-vis all of
15 the other competitors.  And the reason I
16 say vis-à-vis is because if you're three
17 times higher than somebody else, no one
18 is going -- but it's also subject to
19 other things, i.e., are you green, that
20 is of great concern to some people;
21 length of contract for which the rate is
22 fixed.  Sometimes it's not.  Sometimes it
23 is.
24    Q.   And I assume ease of
25 cancellation, as well?  You know, whether

Page 89

CHRISTOPHER KIRK

1
2 you pay a termination fee for cancelling
3 or not?
4     A.   Termination fee, correct.  I
5 don't know if that's ease of cancelling,
6 because that's all the same.  You just go
7 online and done.
8     Q.   So not ease of cancelling, but
9 whether or not there is a fee?
10    A.   Penalty associated.  Yes, that
11 would have something to do with it, as
12 well.
13    Q.   More artfully put than me,
14 thank you.
15         And that's the market rate?
16 Those are all components of the market
17 rate?
18    A.   There is not one thing that's a
19 market rate.  A market rate is just that.
20 You know, a rate in which multiple
21 suppliers compete.
22    Q.   Now, when you say the market
23 rate and the wholesale power market, is
24 it the wholesale price of which power is
25 sold to retailers through ISO-NE market?

23 (Pages 86 - 89)

CHRISTOPHER KIRK

2   A.   I don't know what ISO-NE market
3   means.
4        When there is -- market rate at
5   the wholesale market, that is kind of an
6   oxymoron to me, it seems like.  Because
7   you have the wholesale rate.  That is
8   what suppliers charge retailers.  That is
9   based on any number of different factors,
10  not the smallest of which is their cost
11  of producing the energy.
12       Now, yeah, there is some
13  competition there, but market rate is
14  something typically that occurs on an
15  open market with generally end consumers.
16  Q.   Right.  So there is a
17  difference between a wholesale rate and
18  the market rate?
19  A.   Yes.  And the difference
20  between the two is your retail margin.
21  Q.   And I just mentioned -- I said
22  wholesale rate.  That's the same as the
23  wholesale market rate.
24       Would you agree or no?
25  A.   Yeah, I think we're getting

CHRISTOPHER KIRK

2   tripped up in semantics here.  But a
3   wholesale rate is what a retailer pays
4   before they sell it to the end user.  And
5   there is a range based on a number of
6   factors.
7   Q.   I just used the acronym ISO-NE.
8   And you said you don't know what that
9   means?
10  A.   I have no idea what that means.
11  Except maybe in search of.
12  Q.   If you go back to Exhibit 4 for
13  a moment, and it's Page 20, do you see
14  interrogatory number 20?
15  A.   I do.
16  Q.   At the bottom, there is a
17  response in bold.
18  A.   Mm-hmm.
19  Q.   Okay.  Now, interrogatory
20  number 20 asks to define the following
21  terms and phrases in the SAC.  And one is
22  market rate in the wholesale power
23  market, which we just discussed.  Market
24  rate, we just discussed.  Wholesale
25  market rate.  Wholesale rate.

CHRISTOPHER KIRK

2        You said wholesale market rate
3   and wholesale rate, the differences are
4   kind of semantics, rate?
5   A.   Yeah, wholesale is wholesale.
6   Q.   And as you look through
7   interrogatory number 20, there is various
8   terms from A through L.
9        Would you agree that those all
10  mean the same thing?
11  A.   This could be a very long
12  discussion.
13       Market rate in the wholesale
14  power market, underlying market price,
15  underlying market rate, market rate.
16  Market rate can refer to the retail end.
17  It can refer to the wholesale end.  It's
18  not specific in that regard.
19       Wholesale market rate, it's
20  pretty clear that we're talking about the
21  market rate in the wholesale market where
22  suppliers, suppliers compete for
23  retailers.
24       Average wholesale price,
25  average is different than a wholesale

CHRISTOPHER KIRK

2   price.
3        Wholesale rate -- I'm --
4   Q.   So not all of these terms are
5   synonymous.  A market rate is different
6   than a wholesale market rate, right?
7   A.   Depends on the context in which
8   it's used.
9   Q.   Let's use it in the electricity
10  context.
11  A.   Well, market rate, are you
12  talking about a market rate for a
13  retailer or for end users?
14  Q.   I am asking for the definition
15  for the term as used in the complaint.
16  A.   Okay.
17  Q.   The second amended complaint.
18  A.   Okay.  And we are talking about
19  market rate?
20  Q.   Yeah, let's talk about market
21  rate.
22  A.   Okay.
23  Q.   And you had said, you had
24  mentioned a number of components that go
25  into a market rate.  How one rate is

24 (Pages 90 - 93)

CHRISTOPHER KIRK

1
2 vis-à-vis other competitors, you know,
3 whether or not, whether green energy is
4 of great concern to certain customers,
5 the fixed rate length.
6    A.   Termination cost.
7    Q.   Termination, penalty, right.
8        So I just want to understand,
9 you know -- well, let's scratch the
10 question, because I am now confused
11 myself substantially.
12        This interrogatory asks for the
13 definitions for these various terms and
14 phrases, correct?
15    A.   Mm-hmm.
16    Q.   In your response, you say that
17 "Subject to the foregoing objections,
18 IronMan responds that, with the exception
19 of item J" -- and item J is the
20 definition for standard offer fixed
21 rate discussed below -- "each of the
22 terms specified above refers to the same
23 thing."
24        Let's just stop there.  I know
25 that's in the middle.

CHRISTOPHER KIRK

1
2    A.   Okay.
3    Q.   So in the complaint, all of
4 these various terms mean the same thing.
5 That's your testimony, correct?
6    A.   To the best of my knowledge
7 regarding the wholesale power market,
8 that's the context in which we're
9 talking, they seem to represent the same
10 thing, but I am not an expert in the
11 wholesale power market or the
12 nomenclature used to refer to different
13 rates of power.
14    Q.   Did you, when you were
15 reviewing this, really the first amended
16 complaint, the first time IronMan
17 appeared in this case, before it was
18 filed, did you ask any questions about
19 what these various terms meant?
20    A.   I don't recall that I did.
21    Q.   Going back to the response, I
22 will finish out the answer, after the
23 colon in the third line, after the word
24 "thing," so "Each of the terms specified
25 above refers to the same thing: The

CHRISTOPHER KIRK

1
2 wholesale price of which power was sold
3 to retailers through the ISO-New England
4 market."
5        What is the ISO-New England
6 market?
7    A.   I don't know.
8    Q.   Did you know at the time you
9 reviewed the first amended complaint?
10    A.   I do not now know or have ever
11 known what ISO-New England means.  ISO
12 appears to be an acronym.  I have no idea
13 what it means.  My knowledge of the
14 wholesale market is scant.
15    Q.   So you signed these
16 interrogatories, correct?
17    A.   Yes, I did.
18    Q.   So when you signed these, did
19 you not understand what your answers
20 said?
21    A.   No, I did understand.  But
22 these are all answered and understood to
23 the best of my knowledge.  That is the
24 context in which I answered these.  I
25 can't say I'm wrong if I don't know that

CHRISTOPHER KIRK

1
2 I am wrong.  If I'm not understanding
3 something, I'll say that I do to the best
4 of my knowledge.  If I don't understand
5 something and I don't know that I don't
6 understand it, I can't say that I don't.
7 I am sorry if that was kind of obtuse.
8    Q.   That's fine.  And I appreciate
9 the concern.  I get it.  You didn't draft
10 this response, right?
11    A.   I did not.
12    Q.   Okay.  And you didn't ask for
13 -- you didn't ask for an explanation of
14 the response?
15    A.   No.
16    Q.   Just assumed it was correct,
17 right?
18    A.   To the best of my knowledge, I
19 assumed that it was correct, because,
20 again, I am relying on the expertise of
21 my attorneys.
22    Q.   Okay.  But you understand that
23 this, for purposes of the litigation,
24 this is your own testimony, right?
25    A.   I do.

25 (Pages 94 - 97)

CHRISTOPHER KIRK

1
2    Q.   But, again, you can't really
3  explain to me what the wholesale price at
4  which power was sold to retailers through
5  the ISO-New England market means, right?
6    A.   I can explain to you everything
7  in that sentence with the exception of
8  ISO-New England.
9    Q.   Okay.  And that's what you had
10 explained to me previously, correct?
11   A.   That I don't understand ISO-New
12 England?
13   Q.   No, sorry.  We'll just make it
14 clear on the record.
15       So let's leave out the ISO-New
16 England market.  The wholesale price at
17 which power was sold to retailers is
18 what?
19   A.   It's the price at which a
20 retailer, i.e. Viridian Energy, pays for
21 energy, I believe on a kilowatt basis
22 hour, from the actual company or
23 organization that produces that energy.
24   Q.   Okay.  Now, in the next
25 sentence of your response, you say in the

CHRISTOPHER KIRK

1
2  SAC, which is the second amended
3  complaint, "Plaintiff used the 'All in
4  price.'"  Let's just end there.
5        What is an "all in price"?
6    A.   In what context?  In wholesale?
7    Q.   In the context -- what did you
8  mean when you said in the SAC "Plaintiff
9  used the 'All in price'"?
10       I just want to understand what
11 you meant when you adopted that
12 testimony?
13   A.   All in price to me means a
14 price, a wholesale price reflective of
15 all the costs plus the margin of profit
16 for a particular supplier.
17   Q.   You said a "margin of profit
18 for a particular supplier"?
19       What is the margin of profit
20 for Viridian?
21   A.   I have no idea.
22   Q.   What would be too high a margin
23 of profit?
24   A.   It depends on a myriad of
25 things, including what the prevailing

CHRISTOPHER KIRK

1
2  rate of costs of producing energy is.  I
3  have no knowledge of the margins of
4  electricity.  I know that in some cases,
5  it's government regulated, but I don't
6  know these private companies.  I don't
7  know -- I don't know what's unreasonable
8  as a freestanding rate.  It's kind of
9  like I don't know what pornography is.  I
10 can't define it, but I know it when I see
11 it.
12       If I see all the other
13 companies making a retail margin of 40
14 percent -- and I'm picking that out of
15 midair -- and another one making 200
16 percent, I can say that that's, there is
17 something wrong there.
18   Q.   You're sure you're not an
19 attorney.  You just used Supreme Court
20 First Amendment language.
21   A.   No.
22   Q.   Is there something you're not
23 telling us, Chris?
24   A.   I have an MBA.  But no law
25 degree.

CHRISTOPHER KIRK

1
2    Q.   Where did you get your MBA
3  from?
4    A.   Penn State.
5    Q.   Okay.  The margin of profit, if
6  a company has too high a profit margin
7  and their price may be too high, then
8  they lose consumers, right?
9    A.   One would expect that.  But
10 that also assumes perfect market
11 knowledge, which I think you and I know
12 doesn't exist.  It's a fallacy.  You can
13 find out more about the market, how much
14 time you want to spend learning about
15 that market.  So the information a
16 consumer has is not necessarily perfect.
17 And because of that, there is, I don't
18 want to say -- there is not the perfect
19 ability to make the most benefit,
20 decision that benefits the consumer most.
21   Q.   And would you agree with me
22 that there is nothing wrong with seeking
23 profit as a business?
24   A.   There is nothing wrong with
25 seeking profit in a business, as long as

26 (Pages 98 - 101)

CHRISTOPHER KIRK

1 CHRISTOPHER KIRK
2 it does not come at the expense and
3 well-being of a consumer.
4    Q.   And why not?
5    A.   If you're charging rates that
6 are so high to a consumer, that causes
7 them financial damage. If they are
8 paying so much money for whatever X may
9 be, either a Big Mac or garbage
10 collection, that would in some cases
11 prevent them from doing other things that
12 they want to do. Because they don't have
13 perfect market knowledge, they would
14 assume that those costs are fixed. Where
15 in reality, they may not be. And because
16 of that, you can realize consumer damage.
17    Q.   Could a consumer decide just
18 not to buy the Mac or the garbage, I
19 forget what --
20    A.   Whatever it is.
21    Q.   Whatever the product it is.
22 Can a consumer just not buy it if the
23 profit margin and the price is too high?
24    A.   Not electricity, unless you
25 want to go off the grid.

1 CHRISTOPHER KIRK
2    Q.   And so consumers -- well,
3 Viridian customers can terminate their
4 plan at any time. Would you agree with
5 me on that, if they have a variable rate?
6 Actually, if they have any rate, they can
7 terminate?
8    A.   They can, because as we
9 discussed earlier, there is also a number
10 of different plans which carry penalties
11 for early termination. So there are some
12 barriers in some cases for some people.
13    Q.   Assume we're dealing with a
14 variable rate that has no penalty for
15 termination.
16    A.   Mm-hmm.
17    Q.   A consumer can cancel, can
18 terminate that rate plan at any time?
19    A.   Yeah, yes, they could.
20    Q.   And so if they didn't like the
21 rate, they could look elsewhere, right?
22    A.   Yeah, assuming that they know
23 that they didn't like the rate.
24    Q.   Well, how would they know
25 whether they liked the rate or not?

1 CHRISTOPHER KIRK
2    A.   You have to actually take the
3 time to look at your electrical bill and
4 say, hey, there are other suppliers out
5 there. So it's not something that's
6 immediately apparent.
7    Q.   So if a customer saw its
8 electricity bill and saw that the
9 Viridian generation charge was, let's
10 say, 13.99 cents a kilowatt hour, the
11 customer can look and see what UI, what
12 UI's rate was or other suppliers' rate
13 was at that time, right?
14    A.   You can. It's not the easiest
15 thing in the world, but it can be done.
16    Q.   So there is nothing preventing
17 a customer -- there is nothing that
18 Viridian does to prevent a customer from
19 looking at other rates, correct?
20    A.   In instances where there is no
21 penalty for cancellation, yes. No, and
22 that's the same for any energy company.
23 I think there would probably be a law
24 against that, if there were.
25    Q.   I think we're both in agreement

1 CHRISTOPHER KIRK
2 that there is nothing inherently wrong
3 about seeking a profit, with that basic
4 concept. Would you agree?
5    A.   I think that's why businesses
6 exist.
7    Q.   Would you say there is a magic
8 profit margin that is, per se, wrong?
9    A.   It depends on the effect to the
10 end consumer. And I would also contend
11 that it also depends possibly on what the
12 other producers in the market are
13 charging, whether or not there is free
14 exit and entry into that market, et
15 cetera.
16    Q.   If Viridian's actual profit
17 margin were 45 percent, with the caveats
18 that you just mentioned, assuming
19 Viridian's profit margin was 45 percent,
20 there is nothing wrong with that, right?
21    A.   What are the other producers'
22 margins?
23    Q.   I don't know.
24    A.   Well -- I am sorry.
25    Q.   And assuming there is no

27 (Pages 102 - 105)

CHRISTOPHER KIRK

1
2 penalty to terminate. I mean a consumer
3 is free to go to any supplier, or UI or
4 the utility, the relevant utility at any
5 time, assuming there is no penalty,
6 right?
7     A.   I can't answer whether a given
8 profit margin in an industry that I know
9 nothing about is good or bad, because I
10 don't know what the prevailing rate --
11 what the prevailing rates are among the
12 other consumers. I don't know the
13 elasticity of demand.
14         Certainly, if we were talking
15 about a lifesaving drug that had zero
16 elasticity of demand, that's a different
17 conversation. I can't comment on a
18 number put out in space without any
19 context.
20         If everybody else is charging a
21 nickel per kilowatt hour, and people
22 don't necessarily know that or you
23 wouldn't expect a reasonable person to do
24 that, then, no, that's not reasonable.
25     Q.   But it seems like you're

CHRISTOPHER KIRK

1
2 placing the fault on the company for a
3 consumer not knowing, assuming that
4 consumers could check out other rates,
5 but they don't. Is that a supplier's
6 problem?
7     A.   It depends on the ease of which
8 you could check rates.
9     Q.   So it wouldn't matter whether
10 we're talking 45 percent or 120 percent
11 profit margin, right? It's all on
12 whether the ease by which a consumer can
13 check out other rates?
14     A.   Well, I mean the question being
15 is that wrong?
16     Q.   Right. Is there anything
17 unlawful about that?
18         MR. KLEIN: Objection, to the
19     extent you're asking for an unlawful
20     determination.
21     Q.   Is there anything wrong about
22 that?
23     A.   That's a difficult question to
24 answer. On the face of it, it would seem
25 to me that that is not a good, correct,

CHRISTOPHER KIRK

1
2 normal, right thing to do, is to charge
3 people, who may not necessarily have
4 perfect market knowledge, three times, or
5 two times or 1.5 times an amount above
6 the prevailing market rate.
7     Q.   But if they did have perfect
8 knowledge, market knowledge, wouldn't you
9 expect those consumers to leave if they
10 were being charged 120 percent profit
11 margin?
12     A.   If they knew that they were --
13 if they could see that there were other
14 producers that could -- they could save
15 money, yes.
16     Q.   If they could go elsewhere at a
17 lower rate, one would assume they might,
18 right?
19     A.   They might. It just depends.
20 The whole context here being that the, my
21 power bill is a very small part of my
22 life. It is almost, it's something that
23 comes in, I pay and it's done. And I
24 think, I would contend that I don't think
25 a lot of people in this world pay a whole

CHRISTOPHER KIRK

1
2 lot of attention to their power bill.
3     Q.   So would you place the fault on
4 a consumer not paying a lot of attention
5 to their power bill on the supplier or
6 the consumer?
7     A.   It's a combination of both, I
8 believe. Because if there is no reason
9 for them to believe that something
10 nefarious is going on, then why would
11 they check it. The argument could be
12 made either way.
13     Q.   Going to the same paragraph
14 that we were looking at, Exhibit 3, the
15 second amended complaint?
16     A.   I am sorry, this is on which?
17     Q.   Exhibit 3.
18     A.   Right here?
19     Q.   Right there.
20         The first sentence to paragraph
21 4.
22     A.   Correct, yup.
23     Q.   "Viridian represents that it
24 offers a variable rate electricity plan
25 to residential consumers that is tied to

28 (Pages 106 - 109)

CHRISTOPHER KIRK

1
2 the market rate in the wholesale power
3 market."
4       Where does Viridian actually
5 represent that its variable electricity
6 rate plan to residential consumers is
7 tied to the market rate in the wholesale
8 market?
9    A.   Where does Viridian represent
10 that assertion?
11    Q.   That's correct.
12    A.   I would assume in their
13 contract.  As we alluded to before, I
14 don't recall seeing any of that.
15    Q.   So it's an assumption that
16 Viridian represents that it offers a
17 variable rate electricity plan that's
18 tied to the market rate?
19    A.   It's an assumption, but
20 understanding that if the company made a
21 false assumption, that would probably
22 open them up to some litigation.  Imagine
23 that.
24    Q.   I am shocked we're here right
25 now.

CHRISTOPHER KIRK

1
2    A.   Yeah.
3    Q.   But you've never actually seen
4 that representation, right?
5    A.   In writing?  No, I have not.
6    Q.   Have you heard that
7 representation, from anyone, other than
8 your attorneys?
9    A.   Not that I can recall.
10    Q.   Just to be clear, in this case,
11 this litigation, you're not claiming that
12 Viridian's variable rate should not have
13 been higher than the utility's rate?
14    A.   It should not -- well, it has
15 to be higher, somewhat higher than the
16 wholesale rate which they are paying or
17 else that's how they make money.
18    Q.   Well, okay.  The wholesale
19 rate, would you agree, is not a rate that
20 you or I could get?
21    A.   That's correct.
22    Q.   Right.
23    A.   Yes.
24    Q.   So when I mean the utility's
25 rate, I mean the rate that UI is

CHRISTOPHER KIRK

1
2 charging.
3       Would you agree -- this case is
4 not about Viridian charging a rate that
5 is higher than UI's rate, correct?
6    A.   Possibly in part.  The main
7 contention in this case is that Viridian
8 raised its rates when the wholesale rates
9 went up.  But when the wholesale rates
10 dropped, Viridian did not drop its rates.
11    Q.   Should Viridian's rates risen
12 and fallen in lockstep with the wholesale
13 rate?
14    A.   Well, I am reading this,
15 Viridian itself says in this official
16 Court document represents that it "offers
17 a variable rate electricity plan to
18 residential consumers that is tied to the
19 market rate."
20       My understanding of "tied to"
21 means that it varies directly and in
22 proportion with that rate.
23       So, yes, there should be
24 some -- it should vary directly because
25 this tied to meaning, when it goes up, it

CHRISTOPHER KIRK

1
2 goes up, when it goes down, it goes down.
3    Q.   Let's say Viridian's variable
4 rate is two cents above the wholesale
5 rate.  When the wholesale rate rises two
6 cents, Viridian's rate should also rise
7 two cents, but when the wholesale rate
8 goes down a cent, Viridian's rate should
9 also go down a cent?
10    A.   That's my understanding.
11    Q.   So it's a rigid correlation
12 between Viridian's rate and the wholesale
13 rate?
14    A.   That's my understanding.
15 Whether it's regulated or not, I don't
16 know.
17    Q.   And does that factor in any of
18 Viridian's variable costs?
19    A.   Variable costs?  Well, by
20 definition, it's directly tied to the
21 variable costs, which is the wholesale
22 rate at which they buy the power.
23    Q.   I'm going off on a tangent.
24 Let me head back.
25       Just to be clear, you're not

29 (Pages 110 - 113)

Page 114

CHRISTOPHER KIRK

1
2 claiming that Viridian expressly
3 represents that its variable rate is tied
4 to the market rate, correct?
5    A.   Not that I have ever seen,
6 because I never saw any documentation, so
7 I can't make that assertion because I
8 never saw it.
9    Q.   So you understand that this
10 Exhibit 3, the second amended complaint,
11 is your assertion; do you understand that
12 these are your allegations against
13 Viridian?
14    A.   I do.
15    Q.   So you are asserting that
16 Viridian represents that its variable
17 rate is tied to the market rate in the
18 wholesale power market, right?
19    A.   Okay.  If it's there.  I
20 signed.  I can't argue with you.
21    Q.   You've never firsthand seen
22 that representation?
23    A.   No, but that's the basis --
24 that's why we're here.
25    Q.   So, okay.

Page 115

CHRISTOPHER KIRK

1
2    A.   I mean, that's kind of what
3 this whole thing is about.
4    Q.   Right, but you, or IronMan or
5 Chris Kirk has never seen that actual
6 representation?
7    A.   Not in print, no.
8    Q.   But you heard it?  You said
9 "Not in print."  Have you heard -- have
10 you heard it, other than from your
11 attorneys?
12    A.   I cannot recall an exact time
13 where somebody said to me those exact
14 words.  But that's my understanding of
15 the power market.
16    Q.   So this is based on your
17 understanding of the power market,
18 generally?
19    A.   Yes.
20        (Off the record.)
21    Q.   Mr. Kirk, if you turn to Page 6
22 of the amended complaint.
23    A.   That's Exhibit 3?
24    Q.   Exhibit 3, yeah.
25    A.   Okay.

Page 116

CHRISTOPHER KIRK

1
2    Q.   Do you see the heading D in
3 bold, Viridian's excessive rates?
4    A.   Correct, yes, I do.
5    Q.   Explain to me why Viridian's
6 rates are allegedly excessive?
7    A.   Because the spread between the
8 wholesale rate and the retail rate is
9 significantly higher, my understanding is
10 by a matter of double which that of
11 everybody else in the market would be
12 charging.
13    Q.   So it's some multiple higher
14 than what everybody else in the market is
15 charging; that's what you just said?
16    A.   Correct.
17    Q.   And that would be -- when you
18 say everyone else in the market, that
19 would be other third-party suppliers?
20    A.   Correct, yes, other third-party
21 suppliers to the retail market.
22    Q.   So in other words, Viridian's
23 rate would be, could be two times like
24 Town Square's rate, right?  Is that what
25 you're talking about, excessive?

Page 117

CHRISTOPHER KIRK

1
2    A.   Correct.
3    Q.   On that same page, if you look
4 at paragraph 26, it says "Viridian
5 represents that its variable rate plan is
6 based upon the wholesale market rate.
7 Indeed, that is the entire hook by which
8 Viridian attracts consumers to variable
9 rate plans."
10        Earlier you said there might be
11 other reasons why consumers would enroll
12 in a variable rate plan; do you agree?
13    A.   Yes, I did say that.
14    Q.   So it could be green energy;
15 right, that's one reason?
16    A.   Yes.
17    Q.   Another is ease of terminating
18 without a penalty or terminating without
19 a penalty?
20    A.   Mm-hmm.
21    Q.   Another reason might be how
22 Viridian's rate compares to other
23 third-party suppliers, right?
24    A.   Yeah, direct comparison.
25    Q.   And another reason might be the

30 (Pages 114 - 117)

Page 118

CHRISTOPHER KIRK

2 fixed rate length?
3    A.    Correct.
4    Q.    Could another reason be because
5 a family member was selling Viridian
6 Energy?
7    A.    That could be a reason.
8 Probably why most people buy insurance.
9    Q.    It could also be because a
10 friend was selling it, right?
11    A.    Case in point.
12    Q.    There are a lot of reasons that
13 folks may enroll with Viridian; do you
14 agree?
15    A.    Well, there's a lot of reasons
16 that they would initially consider it,
17 look at it.  The actual enrollment, I
18 think by most people would base on the
19 comparison of rates.
20    Q.    Okay.  And is it rates for
21 comparable products?
22    A.    To the extent that those
23 comparable products are available.
24    Q.    So Viridian, assume Viridian
25 only offers green energy.

Page 119

CHRISTOPHER KIRK

2        Is it possible that a consumer
3 may say that I am environmentally
4 conscious.  For me, even if Viridian's
5 rate may be higher, 1 cent higher per
6 kilowatt hour than a traditional brown
7 energy supplier, I am committed to the
8 environment.  I am willing to pay that
9 additional one cent?
10    A.    It's absolutely possible.  If
11 you're talking about 1 cent on a basis of
12 30 cents a kilowatt hour, 40 cents or
13 even for 15 cents, of course, I don't
14 believe that would have a significant
15 impact, if the environmental aspect is
16 that important.
17        I think in this case, we're
18 talking about significantly above 1
19 penny, though.
20    Q.    Let's go back to Exhibit 4,
21 your interrogatory responses.
22    A.    Okay.
23    Q.    In the middle of the page, do
24 you see interrogatory number 18?
25    A.    Yes.

Page 120

CHRISTOPHER KIRK

2    Q.    I am going to ask about the
3 bolded response underneath that.  And it
4 says, the first sentence says "Subject to
5 the foregoing general objections, IronMan
6 responds that it would review its
7 electric bill monthly through Mr. Kirk,
8 and then Mr. Kirk noticed a spike in the
9 rates charged by Viridian in the winter
10 2014/15 time frame."
11        And the second sentence goes on
12 to say "Mr. Kirk, at that point, began
13 comparing the previous rate to the rate
14 charged by the suppliers."  And then it
15 goes on.
16        But I want to focus on that
17 language.  First, did I read that
18 correctly?
19    A.    Yes, you did.
20    Q.    So you say you noticed a,
21 quote/unquote, spike in the rates charged
22 by Viridian in the winter of 2014/15 time
23 frame?
24    A.    Correct.
25    Q.    And I am trying to connect the

Page 121

CHRISTOPHER KIRK

2 dots here.  So let's look at the bills,
3 which are Exhibit 6.
4        If you look at, it will be
5 easier to do the -- if you look at, it's
6 Bates Page 37.  It says Payment Due at
7 top, 1/14/15.  That's how I put these in
8 order.
9    A.    I am sorry, what was the Bates?
10    Q.    It's Bates Page 37.  It's kind
11 of near, kind of in the middle.  It might
12 be easier if you look for the January
13 14th, 2015 payment due date.
14    A.    I got it.  39, 38, 36.  Here we
15 go, 37.
16    Q.    Okay.  Actually, let's look at
17 the page two pages before, the one that
18 says Bates Page 38, so we have a basis.
19    A.    Mm-hmm.
20    Q.    And you see that Viridian
21 generation services charge looks in that
22 month to have jumped, within the month
23 from 16.99 cents a kilowatt hour to 17.99
24 cents a kilowatt hour?
25    A.    Distribution, transmission.

31 (Pages 118 - 121)

Page 122

CHRISTOPHER KIRK

2  Q.   It's about in the middle of the
3  page.
4  A.   Okay.
5  Q.   I'll ask you again.  Do you see
6  that Viridian Energy's generation
7  services charge, in that month, at least
8  for part of the month was 16.99 cents a
9  kilowatt hour.  And then increased, it
10  look like 17.99 cents a kilowatt hour?
11  A.   Yes, I see that.
12  Q.   So that's, that's a difference
13  of a cent per kilowatt hour?
14  A.   Mm-hmm.
15  Q.   And that was for an October 16
16  to November 13, 2014 billing period.
17       Would you agree with me on
18  that?
19  A.   For number 38?
20  Q.   Yes.
21  A.   I am sorry, 10/16/14 through
22  11/13/14.
23  Q.   Okay.
24  A.   Mm-hmm.
25  Q.   Okay.  And then the next bill

Page 123

CHRISTOPHER KIRK

2  in this chronology is actually the one
3  that's, it's Bates Page 37.  It's two
4  pages towards the back.
5  A.   Mm-hmm.
6  Q.   And there the Viridian, that's
7  a bill for the period mid-November to
8  mid-December 2014; would you agree?
9  A.   Yes, I do.
10  Q.   And the service, the generation
11  charge there is 17.99 cents a kilowatt
12  hour; do you agree?
13  A.   Yes, it is.
14  Q.   And that's Viridian's
15  generation services charge?
16  A.   Correct.
17  Q.   So we're still at that 1 cent
18  increase from 16.99 cents a kilowatt hour
19  to 17.99?
20  A.   Mm-hmm.
21  Q.   If you go to the next page,
22  Bates Page 35, this covers the billing
23  period December, mid-December '14 to
24  mid-January 2015.
25  A.   Mm-hmm.

Page 124

CHRISTOPHER KIRK

2  Q.   Viridian's rate has --
3  generation services charge is the same
4  rate, 17.99 cents a kilowatt hour?
5  A.   Yes, I see that.
6  Q.   And then not to belabor the
7  point, but I am an attorney, so we
8  belabor a lot of things --
9  A.   I understanding.
10  Q.   -- if you go to the next page,
11  page 30 -- Bates Page 34, that covers the
12  period mid-January '15 to mid-February
13  '15, right?
14  A.   Mm-hmm.
15  Q.   And that rate is still 17.99
16  cents?
17  A.   That's correct.
18  Q.   So during that period, that
19  would be the winter of 2014/2015 time
20  frame, would you agree with me --
21  A.   Correct.
22  Q.   -- Viridian's rate increased
23  from 16.99 cents to 17.99 cents a
24  kilowatt hour, right?
25  A.   Yes, correct.

Page 125

CHRISTOPHER KIRK

2  Q.   And that's 1 cent?
3  A.   It is 1 cent.
4  Q.   And you said 1 cent based on a
5  15 cent rate just a moment ago would not
6  be a huge amount?
7  A.   It wouldn't be a huge amount.
8  And I guess in this case, the context
9  would be what was it -- you have to
10  increase your time period of examination.
11  Q.   Okay.
12  A.   So --
13  Q.   But you would agree that that 1
14  cent increase was, in your terms, a spike
15  in the rate, in Viridian's rate?
16  A.   It was an increase in the rate.
17  Q.   Was it a spike?  Those are your
18  words, right?
19  A.   Yes.  Again, it depends on the
20  context.  How much -- in months past, how
21  much had it gone up.  If it hadn't varied
22  for a year, perhaps it could be
23  considered a spike.
24  Q.   Well, let's go back a year, to
25  the winter of 2013 to 2014.  And let's

32 (Pages 122 - 125)

Page 126

1          CHRISTOPHER KIRK
2  start at -- it's going to be Bates Page
3  49, which is about 10 pages in.  It's a
4  payment due date of January 14, 2014.
5     A.   Okay.
6     Q.   And do you see -- okay.  And
7  there, this is a bill covering -- what I
8  am doing is mirroring the winter
9  2014/2015 time frame, but taking it back
10 a year.
11    A.   Yes, I understand.
12    Q.   And here the Viridian Energy
13 generation charge for that period rose
14 from, it looks like 12.99 cents a
15 kilowatt hour, to 13.99 cents a kilowatt
16 hour?
17    A.   Yes.
18    Q.   So that's an increase of a
19 penny, as the following year?
20    A.   But if you look at 2013 to
21 2014, you see a significant jump.
22    Q.   Mm-hmm.
23    A.   So you have to compare like
24 periods, that's my understanding, winter
25 to winter.

Page 127

1          CHRISTOPHER KIRK
2     Q.   So that -- and let's keep
3  comparing.  So if you go to the next
4  page, page 48, it covers the billing
5  period mid-December '13 to mid-January of
6  2014.  Again, Viridian's generation
7  charge rose from 13.99 cents a kilowatt
8  hour to 14.99 cents a kilowatt hour,
9  right?
10    A.   Correct.
11    Q.   So over that -- taking the
12 previous bill and this bill, now over two
13 months, Viridian's generation, or
14 Viridian's rate has risen two cents,
15 right?
16    A.   Mm-hmm.
17    Q.   If we go to the next page, page
18 47, it's the bill period January 15th,
19 2014 to mid-February of 2014, would you
20 agree?
21    A.   Yes, correct.
22    Q.   Viridian's rate, generation
23 services or Viridian's rate again rose
24 from, rose again, this time from 14.99
25 cents to 16.99 cents kilowatt hour; would

Page 128

1          CHRISTOPHER KIRK
2  you agree?
3     A.   Yes, that's correct.
4     Q.   So now we're at three months.
5  And the rate has steadily risen, and
6  we're now at 4 cents a kilowatt hour?
7     A.   Yes, from 12.9 to 16.9.
8     Q.   And I promise it will be the
9  last page of this bill, but it's
10 important for the record.
11         If you go to page 46, that
12 covers the billing period mid-February of
13 '14 to mid-March of '14; is that right?
14    A.   Yes.
15    Q.   And there again, Viridian's
16 rate rose from 16.99 cents a kilowatt
17 hour to 17.49 cents a kilowatt hour,
18 correct?
19    A.   Correct.
20    Q.   Okay.  So over that four month
21 period, Viridian's rate rose 4-and-a-half
22 cents, right?
23    A.   Well, if you're looking from
24 payment due date of 1/14, page 49 to page
25 45, and I am just saying this because I

Page 129

1          CHRISTOPHER KIRK
2  want to make sure that we're on the same
3  page.
4     Q.   Yes, please.
5     A.   -- it's from 12.9 to 17 .1749.
6     Q.   Yeah.  So we've risen from
7  12.99 cents a kilowatt hour to 17.49
8  cents per kilowatt hour?
9     A.   Mm-hmm.
10    Q.   And that's a 4-and-a-half cent
11 rise?
12    A.   Yes, roughly.
13    Q.   So the 1 cent increase over
14 that same four month period, but a year
15 later was a spike.  And that's what
16 caused you to begin comparing Viridian's
17 rate to the rate charged by other
18 suppliers; is that right?
19    A.   Well, it gets to the point
20 where it has risen slowly, slowly,
21 slowly, and then one penny makes a
22 difference.  It's kind of the just
23 noticeable difference thing that they
24 talk about in psychology.
25         You know, it's slowly risen and

33 (Pages 126 - 129)

Page 130

CHRISTOPHER KIRK

1
2 then finally, it gets to the point where
3 it's risen, hey, wow, it's over time.
4     Q.    So 1 cent itself is not a
5 spike, would you agree?
6     A.    Well, it depends if you look at
7 it from a percentage basis, what is it.
8 If your kilowatt hour is 1 cent, and you
9 raise a cent, well, yeah, that's huge.
10 But if it's 15 to 1, it's there, it's
11 noticeable.  And if you look at it in
12 totality over the period of a year, yeah,
13 then it did spike from one winter to the
14 next.
15     Q.    Well, I am not talking about
16 one winter to the next.  I am talking
17 about the four month time frame that we
18 just discussed as being the winter from
19 2014 to 2015?
20     A.    Yes, it did increase.  It
21 increased a penny.  And that's the point
22 where I started noticing that hey, this
23 is getting expensive.  It's the point in
24 which I started noticing.  And at that
25 point, yes, it looked like a spike.

Page 131

CHRISTOPHER KIRK

1
2     Q.    So when you said "a spike," it
3 was that 1 cent movement when you began
4 noticing the rate increasing from, in
5 this case, 16.99 cents a kilowatt hour to
6 17.99 cents a kilowatt hour?
7     A.    Yeah, in totality, I noticed
8 the cost was going up.
9     Q.    In totality.  And you said you
10 reviewed your electric bill monthly,
11 right?
12     A.    I look at it and I pay it.
13     Q.    And you weren't -- my question
14 here is, that 1 cent increase from 16.99
15 to 17.99 cents, excuse me, a kilowatt
16 hour in the winter 2014/2015 time frame,
17 that caused you to begin comparing
18 Viridian's rate to the rate charged by
19 other suppliers, but just to be clear,
20 the 4-and-a-half cent increase over that
21 same period a year before, that didn't
22 cause you to consider leaving Viridian,
23 or at least it didn't cause you to
24 compare Viridian's rate to the rates?
25     A.    It wasn't significant enough

Page 132

CHRISTOPHER KIRK

1
2 for me to stand up and take notice.  But
3 then, again, in totality, over that year
4 period, you're looking at a significant
5 increase.  So that's from whence the
6 spike language comes from.
7     Q.    So it's not -- so it's not
8 really winter 2014/2015.  But it's over
9 the period of a couple of years?
10     A.    Well, I would say more
11 accurately one year or less, because
12 that's, you know, if you look at that
13 time period, it is up to a year ago.
14     Q.    Okay?
15     A.    A couple of years is
16 inaccurate.  I would say it's inaccurate.
17     Q.    And just for the record, a
18 four-and-a-half cent rate increase from
19 12.99 cents to 17.49 cents would be a --
20 let's use on a percentage basis, it would
21 be a higher rate increase from the 1 cent
22 from 16.99?
23     A.    Absolutely.
24     Q.    Okay.  Would you agree that
25 going back to page 46, you would agree

Page 133

CHRISTOPHER KIRK

1
2 that the later generation charge from
3 Viridian was 17.49 cents?
4     A.    Yes.  At the end of the billing
5 period.
6     Q.    And during that year,
7 Viridian's rate actually dropped,
8 correct?
9     A.    During the year of 2014?
10     Q.    Right.
11     A.    I would have to look at the
12 records.  I don't have --
13     Q.    If you look at, it looks like
14 maybe five pages towards the back, Bates
15 Page 42, it's the billing period June
16 14th to July 14th?
17     A.    Yes, I see it.  It drops, let's
18 see if I can do the math here, .005, so
19 less than a penny.
20     Q.    Yeah, half a cent, right?
21         So just to be clear, obviously,
22 Viridian's rate, while it rose, it also
23 went down, too, correct?
24     A.    Yeah.  But the increases far
25 outpace the decreases.

34 (Pages 130 - 133)

Page 134

1    CHRISTOPHER KIRK
2    Q.    Over that limited time period,
3  correct?  Over this time period, winter
4  2013 to -- sorry, winter 2013 to '14, to
5  winter 2014 to 15, that one year period,
6  there was a decrease, but the decrease of
7  a half cent was not, was less than the
8  increase of that rate over that same time
9  period; would you agree, overall?
10   A.    Well, I mean that's what we...
11   Q.    I'll ask the question, do you
12 recall what your variable rates looked
13 like in 2010, 2011 or 2012?
14   A.    I do not recall.
15   Q.    Let me look at the second
16 amended complaint, Exhibit 3.  And I am
17 at Pages 7 and 8, starting at Pages 33.
18   A.    Mm-hmm.
19   Q.    At the end of paragraph 33,
20 really on Page 8, there is a table?
21   A.    Okay.
22   Q.    And actually, if you want, I
23 have a question about the whole
24 paragraph.  Why don't you read paragraph
25 33 to yourself, and I will ask you some

Page 135

1    CHRISTOPHER KIRK
2  questions about it.  I want you to have a
3  full chance to review.
4        (Witness reviews document.)
5    A.    Wow, I wish I could make some
6  of those margins.
7    Q.    Are you ready for the question?
8    A.    I don't know what the question
9  is.  But I think I will be ready.
10   Q.    The third column of the table,
11 in paragraph 33, the one that has the
12 Viridian price, the one headed Viridian
13 Price?
14   A.    Viridian Price Cents Per
15 Kilowatt Hours, correct.
16   Q.    Just to be clear, that is the
17 highest non-promotional variable rate
18 that Viridian charged to consumers in
19 Connecticut for these same months; would
20 you agree with me?
21   A.    Assuming this is factual,
22 correct.
23   Q.    And I only take that from the
24 narrative in paragraph 33.  That comes
25 right from the complaint describing that

Page 136

1    CHRISTOPHER KIRK
2  column.
3    A.    The highest non-promotional
4  variable rates Viridian charged to
5  consumers, okay.
6    Q.    Why did you select the highest
7  non-promotional rate to put in this
8  table?
9    A.    The highest non-promotional
10 rate, being the one in the second number
11 of columns, correct, starting with 14.49?
12   Q.    Yes.
13   A.    November 13?
14   Q.    That's the right column.
15 Mm-hmm.
16   A.    Okay.  Promotional rates by
17 definition, in my understanding, are
18 those that are temporary.
19   Q.    Would those be the variable
20 rates?  It would be, right?
21   A.    Some promotional rates can be
22 variable, some can be fixed.
23   Q.    And I don't mean to cut you
24 off, but I will save us a line of
25 questioning.

Page 137

1    CHRISTOPHER KIRK
2        Paragraph 33 identifies that
3  column as representing the highest
4  non-promotional variable rate Viridian
5  charged.
6        So I don't want to worry about
7  fixed rates and we can avoid that.
8        But my question is:  Why did
9  you select the highest non-promotional
10 variable rate that Viridian charged to
11 consumer?
12      MR. KLEIN:  I am going to
13    interject that I will represent on the
14    record that the selection of that was
15    made by counsel, not by the witness.
16      MR. BLYNN:  I am not surprised.
17    I am not surprised.  But this is his
18    complaint.
19      MR. KLEIN:  He can answer as to
20    his knowledge.  But I wanted to be
21    clear, I am not hiding anything.
22      MR. BLYNN:  I understand.
23   A.    Those numbers came from my
24 attorney.
25   Q.    Do you know why the attorney

35 (Pages 134 - 137)

CHRISTOPHER KIRK

1
2  did not select the lowest promotional
3  rate?
4      A.   Because promotional rates by
5  definition are not permanent rates.  And
6  my assumption would be that the highest
7  non-promotional rates reflect reality.
8      Q.   But you didn't pay the highest
9  non-promotional variable rate while you
10 were enrolled with Viridian, did you?
11     A.   I can't answer.  I don't know.
12     Q.   Well, I'll walk you through it,
13 but, in fact, in certain months you paid
14 no more than 75 percent of the highest
15 non-promotional variable rate -- let's do
16 it an easier way and then I will ask the
17 questions.
18         If you go back to the bill
19 packet, Exhibit 6?
20     A.   Mm-hmm.
21     Q.   So I'm looking at to the March
22 to October 2014 time period.  And let me
23 find the exact Bates numbers so I can
24 give that to you.
25     A.   And this is payment due date?

CHRISTOPHER KIRK

1
2      Q.   I'm trying -- it's actually, it
3  would be -- it would actually be Bates
4  Page 45.  So payment due date, I think,
5  May 15th.
6      A.   I got it.
7      Q.   So your generation charge for
8  that month was 17.49 cents a kilowatt
9  hour?
10     A.   Correct.
11     Q.   And in this table you
12 identified, for that same period, the
13 March 2014 -- well, the billing period
14 for Bates Page 45 is mid-March to
15 mid-April; is that right?
16     A.   Mm-hmm.
17     Q.   For both March and April 2014,
18 in the table in your complaint, you've
19 identified the, quote/unquote, Viridian
20 price as being 24 cents a kilowatt hour,
21 correct?
22     A.   Correct.
23     Q.   But you only paid 17.49 cents a
24 kilowatt hour, correct?
25     A.   That's correct.

CHRISTOPHER KIRK

1
2      Q.   So about 6-and-a-half cents
3  less than the Viridian rate you actually
4  put in your complaint?
5      A.   About that, yeah.
6      Q.   So you would agree, for those
7  two months, you didn't pay -- you paid
8  roughly three-quarters, it's actually a
9  little bit less, of the rate you put in
10 your complaint, correct?
11     A.   Yes, that's correct.
12     Q.   Okay.  And if we were, and we
13 can, and I am just trying to get you out
14 of here faster, but in the complaint
15 table, that 24 cent Viridian price stays
16 constant -- that 24 cent highest
17 non-promotional Viridian variable rate
18 stays constant until October 2014,
19 October 2014, correct?
20     A.   That's correct.
21     Q.   And if you want to flip through
22 your bills, that's fine.  But I will
23 represent to you that during that same
24 period, you paid no more than 17.99 cents
25 a kilowatt hour, correct?

CHRISTOPHER KIRK

1
2      A.   That appears to be correct
3  based on what I am seeing.
4      Q.   So my question is:  If you
5  didn't pay anything approaching 24 cents
6  a kilowatt hour, other than to paint
7  Viridian's spread as higher than the
8  actual spread you paid, and let's say in
9  the light least favorable to Viridian,
10 why would you put 24 cents in the
11 complaint?
12         MR. KLEIN:  Objection.  Again,
13 that I don't think the witness is
14 competent to answer that.  But if you
15 have an answer, go ahead.
16     A.   I am not competent to answer
17 that question.
18     Q.   Did you ask about -- did you
19 ask your attorneys about why they
20 selected this Viridian highest
21 non-promotional variable rate?
22     A.   I did not.
23     Q.   Why not?
24     A.   Because of their greater
25 knowledge of the power market than mine.

36 (Pages 138 - 141)

CHRISTOPHER KIRK

1
2   I made the --
3        MR. KLEIN:  It's your answer, go
4   ahead.
5        A.   I made the assumption that they
6   are more qualified to make an assertion
7   and a factual statement that I am.
8        Q.   Okay.
9        A.   Because of their intimate
10  knowledge of the market.
11       MR. KLEIN:  Just to be clear,
12  don't turn to me to guide you on the
13  answer.  If I have an objection, I
14  will say it.
15       THE WITNESS:  Fine.
16       Q.   There is nothing salacious
17  there.
18       You understand that this is
19  IronMan's and the three other Plaintiffs'
20  case?
21       A.   I do.  I'm trying to...
22       Q.   And I will just tell you why
23  I'm asking these kinds of questions.  It
24  just comes across to me that you relied
25  on your attorneys for an awful lot of the

1        CHRISTOPHER KIRK
2   complaint and your interrogatory
3   answers --
4        A.   Mm-hmm.
5        Q.   And that's a yes?
6        A.   I did rely on them for a
7   significant amount of the information.
8        Q.   And you reviewed both documents
9   before they were either filed or served
10  on Viridian, correct?
11       A.   Mm-hmm.
12       Q.   But you didn't ask a lot of
13  questions about what the contents of
14  either document were.
15       Would you agree with me on
16  that?
17       A.   I would agree with that simply
18  because as a normal private citizen, I
19  don't have the knowledge base to ask an
20  intelligent question.  I don't know
21  enough about the wholesale or retail
22  power markets.
23       Q.   And just to be clear, to be
24  fair, much of this complaint is
25  nonspecific to IronMan.

1        CHRISTOPHER KIRK
2        A.   Of course.
3        Q.   Let me just ask you to go to
4   paragraph 46 on Page 12.  Let's start
5   with paragraph 46.
6        A.   Yes, Page 12, 46.
7        Q.   "Plaintiffs' IronMan LLC was on
8   Viridian's variable rate plan from June
9   2013 to February 2015."
10       That's what it says?
11       A.   Correct.
12       Q.   And for the record, you were
13  also on the variable rate plan before
14  June 2013, correct?
15       A.   Well, that's based on what
16  we've talked about and the types of plans
17  that they offer.  That is correct.
18       Q.   And if I were to tell you, and
19  I have told you, that I made the
20  representation that when you signed up,
21  Viridian did not offer a fixed rate plan,
22  would you agree with me that you were on
23  a variable rate plan from January 2010,
24  really until February of 2015?
25       A.   If those are the facts, I can't

1        CHRISTOPHER KIRK
2   dispute that.
3        Q.   Let's look at the next
4   paragraph, paragraph 47.
5        Before we get there, there are
6   only three paragraphs about IronMan in
7   this complaint, other than one about --
8   and then there is one more, but it's just
9   identifying IronMan as an LLC with its
10  principal place of business in Monroe,
11  Connecticut.  That's paragraph 10?
12       A.   Yes, I understand.
13       Q.   So we're really talking about
14  these three paragraphs, or I am sorry,
15  three paragraphs, 46, 47, 48, being about
16  IronMan specifically?
17       A.   Mm-hmm.
18       Q.   I know you said you generally
19  reviewed this complaint before it was
20  filed.
21       Did you pay any specific
22  attention to the three paragraphs about
23  IronMan?
24       A.   Okay.  "Viridian's variable
25  rate plan from June 2013 to February

37 (Pages 142 - 145)

CHRISTOPHER KIRK

1
2  2015," we've established that as fact.
3  Can't argue that.
4     Q.    Yep.
5     A.    "Viridian's exorbitant variable
6  electricity rates and thereby suffered
7  monetary damages as a result of
8  Viridian's conduct as set forth above.
9  While its rate from 2013 ranged from
10  11.99 to 13.99," it skyrocketed from --
11  February ranged between 16, 17 -- okay,
12  "when it should have paid a substantially
13  lower amount."
14     Q.    Let's just talk about paragraph
15  47, and I don't really have any questions
16  about paragraph 48, but you can look at,
17  as well.
18        Paragraph 47, did you confirm
19  the accuracy of that paragraph?  And
20  mainly, in particular, the second
21  sentence is what I care about, "While its
22  rate from 2014 ranged from 11.99 to 13.99
23  cents per kilowatt hour, it skyrocketed
24  from February 2014 to February 2015 where
25  it ranged between 16.99 and 17.99 cents

CHRISTOPHER KIRK

1
2  per kilowatt hour for each month during
3  that period when it should have paid a
4  substantially lower amount."
5     A.    No, I did not get out my bills
6  and look at that and do a side-by-side
7  comparison.  I did not do that.
8     Q.    Okay.  Have you provided your
9  bills to your attorneys?
10     A.    Yes, I did.
11     Q.    So your attorneys came up with
12  the variable rate range for those
13  periods, correct?
14     A.    Yes, they did.
15     Q.    And you accepted that as being
16  accurate?
17     A.    I did, absolutely.
18     Q.    Would it surprise you that it
19  was not accurate?
20     A.    I don't have any answer to
21  that.
22     Q.    If we go to the bill packet,
23  the first page, Bates Page 498, that
24  covers a bill period from mid-December
25  2012 to mid-January 2013.  The Viridian

CHRISTOPHER KIRK

1
2  generation service charge there is 9.49
3  cents a kilowatt hour, right?
4     A.    Mm-hmm.
5     Q.    And so that's, of course, less
6  than 11.99 to 13.99 cents per kilowatt
7  hour?
8     A.    Mm-hmm.
9     Q.    Just based on that bill alone,
10  paragraph, that sentence of paragraph 47
11  is incorrect, of the complaint is
12  incorrect?
13     A.    My only response to that would
14  be if they are using on the previous
15  table the highest non-promotional rate, I
16  would assume that they are talking here
17  about the highest non-promotional rate,
18  as well.
19     Q.    Okay.  But here it looks like
20  paragraph 47 is referring to Plaintiff
21  IronMan.  And then the second sentence
22  starts, "While its rate" -- and I'm
23  assuming it is referring to Plaintiff
24  IronMan.
25        Is that how you read the

CHRISTOPHER KIRK

1
2  sentence?
3     A.    Absolutely.
4     Q.    And if you look in Exhibit 6 at
5  the next page, Bates Page 499, the
6  Viridian rate is again 9.49 cents per
7  kilowatt hour; is that right?
8     A.    No, that's correct.
9     Q.    And that's billing period
10  mid-January to mid-February 2013?
11     A.    Okay.
12     Q.    So again, that's less than
13  11.99 cents?
14     A.    But it does jump to 11.99 cents
15  in the March '13 through April 15th
16  billing period with a payment date of
17  5/15/13.
18     Q.    Right.  I agree with that.
19        Let's take a step back from
20  that page, Page 500, the third page of
21  Exhibit 3.
22        There you were charged two
23  variable rates by Viridian.  It looks
24  like a charge of 9.49, or is that 8.49?
25     A.    I read it as .0949.

38 (Pages 146 - 149)

1     CHRISTOPHER KIRK
2     Q.   That's how I read it, too.  So
3  9.49 kilowatt hour, as well.  And that's
4  in the 2013 period; that's less than
5  11.99 cents per kilowatt hour, correct?
6     A.   Oh, yes, absolutely.
7     Q.   And actually, it looks like it
8  drops to 8.99 cents a kilowatt hour for
9  some period of time on this billing
10  cycle; would you agree?
11     A.   Yes, it does.  I guess my
12  response to that would be on the bill
13  page numbered 57, from the period 3/18/13
14  to 4/15/13 going forward.
15     Q.   Mm-hmm.
16     A.   11.99, 11.99, 12, 12, 12, 12,
17  13.  75 percent of the year.
18     Q.   That's fine.  And I agree.  And
19  the bills reflect that.
20        I just wanted to make sure I
21  hadn't misread the bills where it says in
22  2013, which I don't see, you know, for
23  three-quarters of 2013 ranged from 11.99
24  to 13.99.
25        I just wanted to be clear that

1     CHRISTOPHER KIRK
2  I wasn't misreading the bills.
3        Let's move on from there.
4        And we actually saw that in
5  certain months there were two Viridian
6  variable rate charges, correct?
7     A.   Yeah, and that happened several
8  times throughout this whole period.
9     Q.   Staying in paragraph 47, the
10  first sentence, "Plaintiff IronMan LLC
11  paid Viridian's exorbitant variable
12  electricity rates and thereby suffered
13  monetary damages as a result of
14  Viridian's conduct as set forth above."
15        My question is:  What are
16  IronMan's monetary damages?
17     A.   I don't have an exact
18  calculation.
19     Q.   How about approximately?
20     A.   I don't want to speculate.
21     Q.   Do you have any sort of theory
22  as to what the damages might be?
23     A.   I don't.
24     Q.   So what were you thinking --
25  when you said "monetary damages" in

1     CHRISTOPHER KIRK
2  paragraph 47, did you have any sense for
3  what that might be?
4     A.   The amount?
5     Q.   No.  You say you suffered
6  damages.  I just want to know what you're
7  referring to.
8     A.   That would refer to the rate
9  that Viridian was charging versus a rate
10  for another supplier in the market that
11  was charging a lower rate.
12     Q.   And again, it would be for the
13  same kind of product as you were on,
14  correct, a 50 percent green energy
15  product?
16     A.   Whatever the product was that I
17  was -- yes, you have to make.
18     Q.   An apples-to-apples comparison?
19     A.   Correct.
20     Q.   Because if you're comparing
21  green energy versus traditional brown
22  energy, that's not, that's not the same
23  kind of energy -- well, it's not the same
24  kind of product; would you agree?
25     A.   Well, it's a different cost

1     CHRISTOPHER KIRK
2  structure.  Electricity is electricity.
3     Q.   Plug in your radio and the
4  electricity is there, okay.
5        Now, in paragraph 32 -- I am
6  sorry to jump back and forth -- the first
7  sentence says, "Instead, in contrary to
8  reasonable consumer expectation, Viridian
9  uses variable rates as a pure profit
10  center that was not tied to underlying
11  wholesale market rates."
12        You're not arguing in this case
13  that Viridian is not entitled to make
14  some profit, correct?
15     A.   No.
16     Q.   And you don't have -- you're
17  not -- and part of this case is not what
18  an appropriate amount of profit would
19  have been, correct?
20     A.   I'm not qualified to answer
21  that.
22        MR. KLEIN:  You need to take as
23  long as you need to take, but if
24  you're going to be a while longer, can
25  we take a break at some point?

39 (Pages 150 - 153)

1        CHRISTOPHER KIRK
2        MR. BLYNN:  Yes.  We might be at
3    a good stopping point for a minute.
4        (Off the record.)
5    Q.   Looking back, I want to go back
6    to a question that I just asked a moment
7    ago.  It's about the table in the amended
8    complaint.  The Exhibit 3, Mr. Kirk.
9    A.   Mm-hmm.
10    Q.   You looked at the Viridian
11    price and the spread and you made a
12    comment.  And I think it was a kind of an
13    offhand comment.  You said you wished you
14    had made these margins as well.
15        Do you remember saying that?
16    A.   I do.
17    Q.   And now that you compared your
18    bills to the Viridian price represented
19    in the table, at least as to you, you
20    know that Viridian made nowhere near this
21    margin.  Would you agree?  Off of you?
22    A.   No, I wouldn't agree.  I don't
23    have a calculator, but I am fairly
24    confident that if you do the math, the
25    spread between, what is it around, 17

1        CHRISTOPHER KIRK
2    cents versus 24 cents, at 24 cents, they
3    were making a 573 percent margin.  I
4    don't know what that margin number would
5    be at a 17 cents rate, but I am still
6    fairly confident it's in the triple
7    digits.
8    Q.   Okay.  All right.  We at least
9    know that as to IronMan, it wasn't paying
10    24 cents.  It was somewhere in the 16.99
11    to 17.99 cents per kilowatt?
12    A.   That's correct.
13    Q.   So at least close to at least 7
14    cents difference, right -- or I'm sorry.
15    At least -- somewhere in the 6 to 7 cent
16    difference range, right?
17    A.   Yes.  It was definitely lower,
18    but it was still what I would consider to
19    be incredibly high.
20    Q.   Okay.  And you said earlier
21    that, and I had asked you some questions
22    about you saying, well, 1 cent could be a
23    significant increase for certain
24    consumers, depending on, you know, how
25    much the rate rose -- or what the rate

1        CHRISTOPHER KIRK
2    was, 1 cent.  I think your example was a
3    1 cent increase over a variable rate of 1
4    cent is huge, would you agree?  If the
5    rate you actually paid was 6 to 7 cents
6    lower than 24 cents, the rate in the
7    table, would you also agree that that is
8    a significant difference?
9    A.   Oh, yeah, that's a difference,
10    absolutely.
11    Q.   Let's shift gears and finish
12    out the complaint and hopefully, we can
13    be close to be being done.
14        Paragraph 74 of Exhibit 3.  74
15    says "Viridian's performance of its
16    discretionary functions under the terms
17    of service, as alleged herein, to
18    maximize its revenue from variable
19    electric rates impedes the rights of
20    Plaintiffs and other class members to
21    receive benefits that they reasonably
22    expected to receive under the contract."
23        Did I read that correctly?
24    A.   Yes.
25    Q.   And just going back to the

1        CHRISTOPHER KIRK
2    term, the phrase terms of service, to you
3    meant the variable rate represented in
4    Mr. Schappert's e-mail?  And it's not a
5    physical document?
6    A.   The --
7    Q.   I don't think it matters.
8    Let's try to get you out of here.
9        Paragraph 34, you say that the
10    variable electric rate -- Viridian's --
11    well, we just read it and you use the
12    word --
13        MR. KLEIN:  34 or 74?
14        MR. BLYNN:  74.  You have me
15    flustered now.  I shouldn't have taken
16    that break.
17    Q.   Second-to-last line in
18    paragraph 74, you use the word, you say
19    Viridian's electric rate -- or the
20    variable electric rates impeded the
21    rights of Plaintiffs, IronMan, and other
22    class members to receive benefits that
23    they reasonably expected to receive under
24    the contract.
25        What are the benefits when you

Page 158

1 CHRISTOPHER KIRK
2 use that word there?
3    A.   Cost savings.
4    Q.   Cost savings over what?
5    A.   Cost savings over competitive
6 suppliers of electric.
7    Q.   And again, it would be the same
8 kind of product that you're on?  If it
9 was a green energy product, it would be a
10 comparable green energy product from
11 another supplier.
12       Would you agree with me?
13    A.   Yes.  There has to be accurate
14 comparisons.
15    Q.   So would you agree with me if
16 it turns out that Viridian's variable
17 rate for green energy product actually is
18 lower than a competitor's in a given
19 month, that you got the savings?
20    A.   I mean, on a strictly numerical
21 basis, yes.  You can't argue that.  If
22 they are charging X and somebody else is
23 charging X plus 1, yes.
24    Q.   And again, you don't -- when
25 you switched to Viridian, you only looked

Page 159

1 CHRISTOPHER KIRK
2 at UI's rate?
3    A.   I only looked at UI's rate and
4 obviously Viridian's rate.  I strictly
5 looked at the number.  I didn't -- It was
6 of no concern for me whether it was
7 brown, green or any other color.
8    Q.   And then the next time you
9 really, we'll say comparison shopped, is
10 when you switched from Viridian to Town
11 Square; do you agree?
12    A.   Correct.
13    Q.   And do you recall what Town
14 Square's rate was?  I think you had said
15 it was like a half?
16    A.   Yes.  It was significantly
17 lower.  I will put out a half.
18    Q.   It was significantly lower is
19 fine.
20    A.   Yes.
21    Q.   It was lower.
22       Did you look at any, did you
23 look at any other suppliers' rates that
24 you recall?
25    A.   Oh, yeah.  The one page that

Page 160

1 CHRISTOPHER KIRK
2 you looked at on the Website, like it or
3 not, has 15 suppliers there.
4    Q.   And the Website would be, what
5 Website are you referring to?
6    A.   I don't recall the exact URL.
7 I think it's like ctpower.com or
8 something like that.
9    Q.   Okay.  And Viridian's rate was
10 the highest amongst all the suppliers; do
11 you know?
12    A.   To the best of my knowledge, I
13 don't even recall that Viridian was
14 listed.
15    Q.   But you knew the rate,
16 obviously?
17    A.   Yeah, I knew the rate.  It was
18 on my bill.  And, yes, it was by -- it
19 was one of the highest there.
20    Q.   Okay.  That complaint, Page 17,
21 do you see the heading says Count 2,
22 Breach of Covenant of Good Faith and Fair
23 Dealing?
24    A.   Which one?
25    Q.   Right at the top.

Page 161

1 CHRISTOPHER KIRK
2    A.   Yes.
3    Q.   I expect I know the answer to
4 this line of questioning:  What is the
5 covenant of good faith and fair dealing?
6    A.   I can only guess as to what it
7 is.  I am not trained as a lawyer.  I
8 don't know the textbook definition.
9    Q.   Did you ask anyone what the
10 covenant of good faith and fair dealing
11 was?
12    A.   No, I didn't ask for a clinical
13 description.
14    Q.   How about a general
15 description?
16    A.   No, I did not.
17    Q.   So you just didn't ask?
18    A.   No.
19    Q.   Why do you believe Viridian
20 breached the covenant of good faith and
21 fair dealing?
22       MR. KLEIN:  Objection.  Calls
23 for a legal conclusion.
24       If you can answer, you can
25 answer.  If not.

41 (Pages 158 - 161)

Page 162

CHRISTOPHER KIRK

1
2    A.   I would rather not answer,
3 given I don't know the strict definition
4 of that term.
5    Q.   I can appreciate that.  I know
6 you would rather not answer it, but what
7 is the answer?  Do you not know?
8       MR. KLEIN:  If you know, you can
9 answer.  If you don't, you can say you
10 don't.
11   Q.   Right.
12   A.   Okay.  Can you repeat the
13 question?
14   Q.   Sure.  Why do you believe
15 Viridian breached the covenant of good
16 faith and fair dealing?
17   A.   Okay.  Covenant means an
18 agreement.  And my understanding of an
19 agreement with a provider of service or
20 a good is they will deal with you on an
21 arm's-length basis, meaning that they
22 will not take advantage of either lack of
23 knowledge or contract terms to make
24 profit that is above and beyond what
25 could be reasonably expected, nor will

Page 163

CHRISTOPHER KIRK

1
2 they use those terms -- nor will they use
3 that to subject the consumer to any type
4 of conditions that could be deemed
5 dishonest, misleading, et cetera.  That's
6 my understanding.
7       Now, how did Viridian violate
8 that?  My understanding is that rates
9 should vary as they are stated in this
10 document.  They are tied to, meaning, in
11 my mind, meaning that if they are tied
12 to, that means they should vary upwards
13 as well as downwards, as a reflection of
14 market conditions.
15      Based on the numbers presented
16 to me, I can see the numbers did indeed
17 rise in wholesale rates, but they did not
18 drop in response to drops in wholesale
19 rates.
20   Q.   To be clear, you have never
21 seen your actual contract in this case,
22 correct?
23   A.   I have said that, correct.
24   Q.   And what you just described, if
25 Viridian -- let me just summarize it, and

Page 164

CHRISTOPHER KIRK

1
2 see if you can agree with me, so we can
3 move forward.
4       If Viridian represented that
5 its variable rate would rise and fall and
6 is tied to or in lockstep with the
7 wholesale market rate, if it didn't rise
8 and fall in that manner, it would be a
9 breach of the covenant of good faith and
10 fair dealing?
11   A.   I would agree with that
12 statement.
13   Q.   Would you say that also sounds
14 like a breach of contract?
15   A.   Not -- it's hard for me to say
16 because I don't know enough about the
17 background of that in order to do it.
18      But one thing I would like to
19 clarify is that it seems to be based on
20 the language used here that it should,
21 indeed, rise and fall in lockstep.
22   Q.   And the language used here,
23 you're referring to the language in the
24 complaint?
25   A.   Correct.

Page 165

CHRISTOPHER KIRK

1
2    Q.   And again, that language in the
3 complaint is not based on any document
4 that you've ever seen, correct?
5    A.   Not that I can recall seeing.
6    Q.   And we know that Viridian's
7 rate has risen in certain months.  We
8 also know that it's fallen in certain
9 months, as well.
10      Would you agree with me, as
11 well?
12   A.   Yeah, you can't argue that
13 based on what I've seen in my bill.  It
14 has gone up, as well as down, although
15 much more up than down.
16   Q.   And sitting here today, you
17 don't know what the wholesale market rate
18 looked like during those same periods,
19 right?
20   A.   No, I don't.
21   Q.   Okay.  Do you have any evidence
22 that Viridian raised your variable rate
23 targeting IronMan directly?
24   A.   I have no evidence of that.
25   Q.   Any evidence that they were

42 (Pages 162 - 165)

CHRISTOPHER KIRK

1
2 targeting any other Plaintiffs?
3     A.   I have no evidence of that.
4     Q.   Any evidence that Viridian was
5 targeting any other class members
6 specifically?
7     A.   No, no evidence.
8     Q.   In that same paragraph of the
9 amended complaint, paragraph 74, you say
10 that "Viridian's performance of its
11 discretionary functions under the terms
12 of service, as alleged herein, to
13 maximize its revenue."  And I want to
14 focus on -- "to maximize its revenue from
15 variable electric rates."  I want to
16 focus on the phrase "Maximize its revenue
17 from variable electric rates."
18          What evidence do you have that
19 Viridian's performance was to maximize
20 its revenue from variable electric rates?
21     A.   The spread between their
22 wholesale rate and the retail rate.
23     Q.   So purely the spread?  Nothing
24 else?
25     A.   Well, the spread vis-à-vis the

CHRISTOPHER KIRK

1
2 other suppliers -- the spread and the
3 final price vis-à-vis the other suppliers
4 in the market.
5     Q.   You're with Town Square Energy
6 right now?
7     A.   ABest.
8     Q.   So let's move back six months.
9 I think you said six months when you were
10 with Town Square.
11          Do you know what its spread
12 was, what the spread was between its rate
13 and the wholesale rate?
14     A.   I don't know the spread.
15     Q.   How about the ABest spread?
16     A.   I don't know the spread.  What
17 I pay attention to is the final retail
18 price, because that's the only freely
19 available market information I have.
20     Q.   So the reason you say Viridian
21 tried to maximize its revenue is based on
22 the spread between Viridian's rate and
23 the wholesale market rate, correct?
24     A.   Yes.  And that's based on
25 information given to me by my attorney.

CHRISTOPHER KIRK

1
2     Q.   Okay.  And to summarize, it was
3 just too high, correct?  The spread was
4 too much?
5     A.   Well, the spread was what I
6 would call exorbitant when compared to
7 the spread that other companies were
8 charging.  And that was reflected in
9 their much lower retail rate.
10     Q.   In the complaint, paragraph 31,
11 it's on Page 6, it's only one sentence,
12 but I will read it into the record:
13 "Accordingly, a reasonable consumer would
14 understand that Viridian's variable rates
15 would be reasonably related to and
16 fluctuate in a manner correlated with the
17 underlying wholesale market rate, and
18 that although prices would go up when
19 wholesale prices rose, they would also go
20 down when wholesale prices decreased
21 enabling consumers to take advantage of
22 the market lows."
23          Now, I want to focus on, you
24 say "A reasonable consumer" at the
25 beginning of paragraph 31.

CHRISTOPHER KIRK

1
2          Why would a reasonable consumer
3 understand that Viridian's variable rates
4 would correlate with underlying wholesale
5 rate?
6     A.   Because any company in a
7 competitive situation are subject to the
8 pressures of competitors in the market.
9 So if the other, if, assuming the other
10 companies are playing by the covenant of
11 fair play and they drop their rates,
12 well, then either Viridian should drop
13 their rates or they wouldn't have any
14 customers, or they are taking unfair
15 advantage of their customers.
16     Q.   And I understand that's kind of
17 the substance to the breach allegation.
18 But what I'm more concerned -- you're a
19 Nittany Lion MBA, right?  Maybe you don't
20 want to admit that during the later
21 Paterno years?
22     A.   I was long gone.
23     Q.   I know.
24     A.   '94.
25     Q.   I figured.

Page 170

CHRISTOPHER KIRK

1
2        Would you say you are a
3  reasonable consumer having an MBA?
4     A.   I would say that I'm a
5  reasonable consumer.
6     Q.   Do you think consumers
7  understand spread -- reasonable consumers
8  understand spread and the electricity
9  market like you do?
10    A.   I think reasonable consumers
11 understand the concept of buying
12 something for a dollar and selling it for
13 two dollars, as opposed to buying
14 something for a buck and selling it for
15 20.
16    Q.   And what evidence do you have
17 of that, other than your own belief?
18    A.   The fact that millions and
19 millions of retailers and restaurants
20 exist in this world, because, you know,
21 if people didn't have some idea and
22 businesses didn't have, function under
23 that premise, then you would have people
24 selling a burger for $150.
25    Q.   There is a burger for a

Page 171

CHRISTOPHER KIRK

1
2  thousand dollars in DC.
3     A.   I am sure there is.
4     Q.   It comes with a bottle of Veuve
5  or whatever it was, Dom Pérignon?
6     A.   Kobe beef or something like
7  that.
8     Q.   I don't think so.  I think
9  ground chuck.
10    A.   Well, that's not reality for
11 me.
12    Q.   It's not reality for either of
13 us, either.
14        So the evidence that a
15 reasonable consumer would understand
16 things -- would understand Viridian's
17 variable rates fluctuating in line with
18 the wholesale market rate is the fact
19 that there are thousands upon thousands
20 of businesses still in business, right?
21    A.   Yes.  And that's generally
22 accepted, that's how the market operates.
23    Q.   Okay.
24    A.   When costs go down, the very
25 nature of people engaged in business is

Page 172

CHRISTOPHER KIRK

1
2  well, I want to remain competitive and I
3  want to still make a profit.  So when
4  costs drop, everybody typically either
5  keeps their cost the same or starts
6  dropping it in response, because once one
7  person does it, it's the block taken out
8  of the bottom of the pyramid, it's going
9  to collapse.
10    Q.   Okay.  But you don't have -- no
11 other consumer other than maybe -- well,
12 you haven't talked to these other
13 Plaintiffs, no other consumer -- you
14 don't know for a fact that any other
15 consumer would understand Viridian's
16 variable rates in the same manner as you,
17 just based on the fact that there are
18 lots of businesses?
19    A.   I can't say what anybody knows.
20 I am not that person nor am I a mind
21 reader.
22        But I think it's true that any
23 consumer can generally understand if they
24 have any type of education or any type of
25 life experience at all that, you know,

Page 173

CHRISTOPHER KIRK

1
2  when a cost goes down and there are a
3  number of people in the market, they are
4  going to endeavor to keep their customers
5  lowered a little bit to reflect market
6  conditions, also to compete with the
7  other people in the market.  I feel
8  that's reasonable.  Unless you're living
9  in a vacuum.
10    Q.   Look, it's your testimony.
11 It's your belief.  And that's all that
12 I'm asking for.
13    A.   Go ahead.
14    Q.   You've said that you do review
15 your electric bill each month?
16    A.   Yeah, I take a look at it.
17    Q.   And what do you look at?
18 Explain what you're looking at when you
19 look at your electric bill.
20    A.   I look at the total cost.  Also
21 keeping in mind what it was the last
22 month.  And I also consider environmental
23 conditions.  If it's 20 below one month,
24 it's going to be higher.  I understand
25 that.  So a number of things I look at.

44 (Pages 170 - 173)

Page 174

CHRISTOPHER KIRK

1
2  So costs and conditions and cost -- cost
3  of the bill, if we had similar conditions
4  last month, it should be about the same,
5  give or take.  Maybe 10, 15 percent.
6      Q.   So you had mentioned
7  environmental conditions, like weather
8  conditions, right?
9      A.   Sure.
10     Q.   You said if the temperature is
11  20 below, it's going to be different than
12  the previous month, correct, it might be?
13     A.   If you have electric heat.
14     Q.   If you have electric heat.
15         So we'll call them dramatic
16  weather swings could cause a bill to
17  jump, correct, or to -- for your bill
18  amount to be higher than it was in the
19  previous month, right?
20     A.   Well, yeah, assuming your
21  number of kilowatt hours goes up.
22     Q.   Okay.
23     A.   The amount of electricity used
24  versus the cost of that electricity.
25     Q.   And when you review your

Page 175

CHRISTOPHER KIRK

1
2  electricity bills, did you pay particular
3  attention to, like, for instance, the
4  Viridian generation services charge?
5      A.   I didn't until I realized that
6  we kind of hit that just noticeable
7  difference.  And then I realized that
8  hey, this is getting kind of high.  And
9  then that's when I looked at it and said
10  it's really high.
11     Q.   That's when the rate went from
12  like 16.99 cents to 17.99 in the winter
13  of 2014/2015?
14     A.   Yes.  If that had to be a time,
15  I would identify that as the time.
16     Q.   Okay.  Did you pay attention to
17  the generation services charge line item
18  before that period?
19     A.   Not really.  The whole genesis
20  of looking at your bill and analyzing it
21  is kind of the end amount.  If everything
22  is fairly consistent and there is no
23  major market news, you know, why are you
24  going to sit there and tear it apart
25  every month.

Page 176

CHRISTOPHER KIRK

1
2      MR. BLYNN:  Why don't we go off
3  the record.
4      (Off the record.)
5      MR. BLYNN:  And so Mr. Kirk, I
6  don't have any further questions, but
7  I understand, Mr. Klein may have some
8  questions for you.  So I will turn the
9  deposition over to him.
10
11  EXAMINATION BY MR. KLEIN:
12     Q.   Mr. Kirk, do you recall
13  testifying earlier that you do not recall
14  receiving a contract or terms of service
15  for Viridian back when you signed up for
16  Viridian back in 2010?
17     A.   Yes, I do recall that.
18     Q.   Assuming that you did receive a
19  contract, would it have been your normal
20  business practice to review the pricing
21  terms of that contract?
22     A.   Absolutely, to confirm the
23  savings I was promised.
24     Q.   Now, do you recall earlier
25  testifying that you don't have any

Page 177

CHRISTOPHER KIRK

1
2  recollection of contract language from
3  Viridian's contracts that links the
4  variable rate charged by Viridian to the
5  underlying wholesale rate?
6      A.   Yes, I do.
7      Q.   Can you please bring up Exhibit
8  3.
9          Now, Exhibit 3 is the second
10  amended complaint.  Do you recall
11  testifying earlier that you reviewed an
12  amended complaint that included
13  allegations regarding you prior to our
14  filing the complaints?
15     A.   I do.
16     Q.   Okay.  I would ask you to read
17  to yourself paragraphs 27 and -- excuse
18  me, 29 and 30, and let me know when you
19  read those two paragraphs.
20         (Witness reviews document.)
21     A.   Okay.  I read them.
22     Q.   Do you understand those
23  paragraphs, number 29, to quote from the
24  Massachusetts terms of service, and
25  paragraph 30 to quote from the

45 (Pages 174 - 177)

CHRISTOPHER KIRK

1      CHRISTOPHER KIRK
2 Connecticut terms of service?
3   A.  I do understand them, yes.
4   Q.  Would you have reviewed these
5 paragraphs at the time that you were
6 reviewing the entire amended complaints?
7   A.  Yes, I would have.
8   Q.  Do you understand the language
9 in both paragraph 29 and paragraph 30 to
10 be a contractual representation that
11 Viridian's variable rate would in some
12 manner follow the wholesale rates?
13   A.  Yes, I do, especially since
14 it's a verbatim quote.
15   Q.  And do you think a reasonable
16 consumer would have that understanding as
17 well?
18   A.  I do.
19   Q.  And you said that you didn't
20 remember any contract language that made
21 that association.
22       In light of reviewing now
23 paragraphs 29 and 30, was that previous
24 testimony just a misrecollection or what
25 was the basis of that?

1      CHRISTOPHER KIRK
2   A.  That was a simple slip of
3 memory.
4      MR. KLEIN:  No further
5   questions.
6      MR. BLYNN:  Just a couple
7   cleanup for me.
8
9 EXAMINATION BY MR. BLYNN:
10   Q.  You just testified that your
11 practice, although you don't remember
12 ever reading any contract -- you don't
13 recall reading any contract ever of
14 Viridian, correct?
15   A.  That is correct.
16   Q.  But if you had received a
17 contract, you would have read it to
18 confirm the savings you were promised,
19 correct?
20   A.  Correct.
21   Q.  And what were those savings
22 that you were promised?
23   A.  I cannot quote a specific
24 number amount, but I do recall comparing
25 that it would have been a significant

1      CHRISTOPHER KIRK
2 savings based on United Illuminating's
3 rates, at that point in time.
4   Q.  And United Illuminating's rates
5 are not the wholesale market rates?
6   A.  No.  These are retail rates
7 that we are comparing it.
8   Q.  Mr. Klein just asked you about
9 two paragraphs from the second amended
10 complaint, Exhibit 3.  One is paragraph
11 29, correct?
12   A.  That is correct.
13   Q.  And another was -- paragraph 29
14 references the Massachusetts terms of
15 service, correct?
16   A.  That's correct.
17   Q.  But you live in Connecticut,
18 correct?
19   A.  I absolutely do.
20   Q.  And Massachusetts terms of
21 service, presumably, would not apply to
22 you, correct?
23   A.  No, they would not apply to me.
24   Q.  Paragraph -- and just to be
25 clear, paragraph 29 makes no mention of

1      CHRISTOPHER KIRK
2 the word wholesale, correct?
3   A.  It does not mention wholesale
4 rates.
5   Q.  And we've been through what you
6 believe market conditions to be.
7      What are operations costs?
8   A.  Operations costs are those
9 costs both fixed and variable associated
10 with making the product that you make,
11 i.e. generating electricity.
12   Q.  Okay.  At the end of paragraph
13 29, there is the phrase "and other
14 factors."
15      What are other factors that
16 could go into Viridian's rate?
17   A.  We have market conditions.  We
18 have operating costs.  There could be
19 specifics of an offering that they make,
20 that we had alluded to before.  You know,
21 fixed costs, et cetera.  That kind of
22 stuff.
23   Q.  Could other factors include
24 profit margin?
25   A.  Yes.

46 (Pages 178 - 181)

Page 182

```
1        CHRISTOPHER KIRK
2    Q.   Could other factors include the
3  cost of, the cost to Viridian of
4  obtaining green energy?
5    A.   It could.  That would I assume
6  fall under operations cost.
7    Q.   And when we get down to --
8  let's move to paragraph 30.
9        You say, that phrase,
10 "Viridian's Connecticut terms of service
11 state that the variable rate 'may
12 fluctuate each month based on wholesale
13 market conditions applicable in the
14 customer's area.'"
15       Did I read that correctly?
16   A.   Yes, you did.
17   Q.   And to be clear, there is
18 nothing in here that says Viridian's
19 variable rate will be tied to the
20 wholesale market rate, correct?
21   A.   Well, it says fluctuate.  And
22 that, to me that implies that it's going
23 to vary directly with that rate.  That's
24 how I would read it.
25   Q.   That's how you would read that.
```

Page 183

```
1        CHRISTOPHER KIRK
2  But it doesn't expressly say that,
3  correct?
4    A.   It does not say it's directly
5  tied.
6    Q.   Is it -- what evidence do you
7  have that your definition of the word
8  fluctuate is the same as any of the other
9  three Plaintiffs in this case?
10   A.   I don't have any evidence of
11 that, other than the general
12 understanding of the word fluctuate,
13 which means vary, go up and down.
14   Q.   And many consumers or other
15 customers may attribute different
16 meanings to the word fluctuate, correct?
17   A.   I don't know that a reasonable
18 person would think there is no
19 relationship between fluctuate and --
20 especially when we're talking wholesale
21 market conditions, meaning, I think it's
22 implied that you'll understand upward
23 fluctuation would be directly tied with
24 upward fluctuation in the upward, a rise
25 in the wholesale rate.  Why on earth
```

Page 184

```
1        CHRISTOPHER KIRK
2  would the wholesale rate go up and the
3  retail rate goes down.  That just doesn't
4  make any sense.
5    Q.   Mm-hmm.
6    A.   So I think it's implied,
7  understanding that it's a direct
8  correlational variation.
9    Q.   And just for the sake of
10 clarity, nowhere in here does -- nowhere
11 in paragraph 30 is the phrase -- there is
12 nothing in here that says wholesale
13 market rate, correct?  The phrase is
14 wholesale market conditions?
15   A.   Yes.  The exact word is
16 condition.  I would take that to imply
17 rate.  But that's me.
18 (CONTINUED ON NEXT PAGE TO ACCOMMODATE
19 THE JURAT.)
20
21
22
23
24
25
```

Page 185

```
1        CHRISTOPHER KIRK
2    Q.   And conditions, is conditions
3  broader than rate?
4    A.   Rates are part of conditions.
5    Q.   But there are some other
6  factors that go into conditions?
7    A.   Yes, there are.
8        MR. BLYNN:  Nothing further.
9        MR. KLEIN:  Nothing further for
10 me.
11       [TIME NOTED:  12:18 p.m.]
12       _____
13       CHRISTOPHER KIRK
14
15 Subscribed and sworn to before me
16 this _____ day of _____, 2016.
17
18 _____
19       NOTARY PUBLIC
20
21
22
23
24
25
```

47 (Pages 182 - 185)

Page 186

```
 1
 2          I N D E X
            WITNESS    EXAMINATION BY       PAGE
 4
 5  Christopher Kirk   Mr. Blynn      3
 6                     Mr. Klein     176
 7                     Mr. Blynn     179
 8
 9
10
11          E X H I B I T S
12  KIRK        DESCRIPTION      PAGE
13
    Exhibit 1  Rule 30(b)(6)        6
14             deposition notice
15
16  Exhibit 2  copy of Town Square's  18
               Terms of Service
17             effective June 2013
18
19  Exhibit 3  Second Amended Class  33
               Action Complaint, dated
20             June 8, 2015
21
22  Exhibit 4  document entitled     43
               Plaintiff IronMan LLC
23             Revised Objections and
               Responses to Defendant's
24             First Set of
               Interrogatories
25
```

Page 187

```
 1
 2  EXHIBITS (Continued):
 3
    Exhibit 5  Defendant's First Set  56
 4             of Requests For
               Production to Plaintiff
 5             IronMan LLC, dated
               September 28th, 2015
 6
 7
    Exhibit 6  packet of bills       61
 8
 9
    Exhibit 7  Verification          72
10
11  (The court reporter has retained all
       exhibits.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 188

```
 1
 2           CERTIFICATION
 3
 4     I, Dawn Matera, a Notary Public for
 5   and within the State of Connecticut, do
 6   hereby certify:
 7     That the witness whose testimony as
 8   herein set forth, was duly sworn by me;
 9   and that the within transcript is a true
10   record of the testimony given by said
11   witness.
12     I further certify that I am not
13   related to any of the parties to this
14   action by blood or marriage, and that I
15   am in no way interested in the outcome of
16   this matter.
17     IN WITNESS WHEREOF, I have hereunto
18   set my hand this 10th day of February,
19   2016.
20
21
                    Dawn Matera
22   _____
23           Dawn Matera
24
25
```

Page 189

```
 1         ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS
 2         330 OLD COUNTRY ROAD
         MINEOLA, NEW YORK 10001
 3           516-608-2400
 4  NAME OF CASE: SANBORN VS. VIRIDIAN ENERGY, INC.
    DATE OF DEPOSITION: FEBRUARY 4, 2016
 5  NAME OF DEPONENT: CHRISTOPHER KIRK
 6  PAGE  LINE(S)   CHANGE        REASON
 7   |____|_____|_____|_____
 8   |____|_____|_____|_____
 9   |____|_____|_____|_____
10   |____|_____|_____|_____
11   |____|_____|_____|_____
12   |____|_____|_____|_____
13   |____|_____|_____|_____
14   |____|_____|_____|_____
15   |____|_____|_____|_____
16   |____|_____|_____|_____
17   |____|_____|_____|_____
18   |____|_____|_____|_____
19   |____|_____|_____|_____
20   |____|_____|_____|_____
21          _____
           CHRISTOPHER KIRK
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS___DAY OF _____, 20__.
24
    _____  _____
25  (NOTARY PUBLIC)       MY COMMISSION EXPIRES:
```

48 (Pages 186 - 189)