# EXHIBIT K

Page 1

1

2      UNITED STATES DISTRICT COURT

3        DISTRICT OF CONNECTICUT

4    - - - - - - - - - - - - - - - - - - - -x

5   LORI SANBORN, BDK ALLIANCE LLC,

    IRON MAN LLC, and STEPHANIE

6   SILVER, on behalf of themselves and all

    others similarly situated,

7

                        Plaintiffs,

8

        -against-

9

    VIRIDIAN ENERGY, INC.,

10

                        Defendant.

11

    - - - - - - - - - - - - - - - - - - - -x

12

                    29 South Main Street

13                  West Hartford, Connecticut

14                  February 5, 2016

                    8:40 a.m.

15

16

17     DEPOSITION of STEPHANIE SILVER, a

18   Plaintiff in the above-entitled action,

19   held at the above time and place, taken

20   before Dawn Matera, a Shorthand Reporter

21   and Notary Public of the State of

22   Connecticut.

23

24

25

Page 2

1
2 APPEARANCES:
3
4    IZARD NOBEL, LLP
        Attorneys for Plaintiffs
5        29 South Main Street
          Suite 305
6        West Hartford, Connecticut 06107
        BY:  SETH R. KLEIN, ESQ.
7
8
9
        VENABLE LLP
10      Attorney for Defendant
          575 Seventh Street, NW
11        Washington, DC 20004
        BY: DANIEL S. BLYNN, ESQ
12      BY: ERIC S. BERMAN, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

STEPHANIE SILVER

1
2 STEPHANIE SILVER, a Plaintiff herein,
3 having first been duly sworn by the
4 Notary Public, was examined and testified
5 as follows:
6
7 EXAMINATION BY MR. BERMAN:
8    Q.   Good morning.
9    A.   Good morning.
10   Q.   We just met off the record.  I
11 am Eric Berman and this is Dan Blynn.  We
12 are from a law firm in Washington, DC
13 called Venable, and we represent Viridian
14 Energy.
15   A.   Good morning.
16   Q.   Can you state and spell your
17 name for the court reporter?
18   A.   Stephanie Silver,
19 S-T-E-P-H-A-N-I-E  S-I-L-V-E-R.
20   Q.   Thank you.
21       And what's your home address?
22   A.   13 Sword, S-W-O-R-D, Avenue,
23 Enfield, E-N-F-I-E-L-D, Connecticut,
24 06082.
25   Q.   How long have you lived at that

Page 4

STEPHANIE SILVER

1
2 address?
3    A.   A year-and-a-half.
4    Q.   Prior to living there, did you
5 still live in Connecticut?
6    A.   Yes.  In my own home, which is
7 21 Bobolink, B-O-B-O-L-I-N-K, Avenue.  I
8 mean Lane, excuse me, Enfield,
9 Connecticut, 06082.
10   Q.   In total, for how long have you
11 lived in Connecticut?
12   A.   My whole life.
13   Q.   Got it.  Okay.  So just, well,
14 let me ask you, have you ever had your
15 deposition taken before?
16   A.   No.
17   Q.   Better than going to the
18 dentist, maybe.
19       MR. BLYNN:  Slightly better.
20   Q.   Slightly better.  I am only a
21 juris doctor.
22       Let me just go through some
23 ground rules.  It will take two minutes.
24       You understand I will be asking
25 you some questions today.  You will be

Page 5

STEPHANIE SILVER

1
2 answering them to the best of your
3 ability based on your knowledge, okay?
4       The thing about a deposition is
5 it's different than kind of a normal
6 conversation.  Normal conversation, you
7 know, we're talking over each other.  We
8 anticipate what the other person says.
9 We joke, we use sarcasm, we use gestures
10 like I am.
11       This is a bit different.  We
12 want to keep a very clear record, because
13 we have a court reporter taking
14 everything down.  And in the event we
15 have to pull your transcript out, maybe a
16 year from now, we want to make sure that
17 my questions were clear and your answers
18 were good; does that make sense?
19   A.   Yes.
20   Q.   So based on that, first of all,
21 very important that you tell the truth.
22 You were just sworn under oath to do
23 that; do you understand?
24   A.   Yes.
25   Q.   You know we're in a conference

2 (Pages 2 - 5)

STEPHANIE SILVER

1
2  room.  This is similar to being in a
3  courtroom in front of a judge?
4     A.   Yes.
5     Q.   Is there any reason you can't
6  provide truthful testimony today?
7     A.   No.
8     Q.   Even with the ground rules,
9  this is going to happen, we're going to
10 break the ground rules, trust me.  People
11 fall back into old habits.  But let's try
12 our best.
13       I'm just going to ask you a few
14 favors.  First, make sure you understand
15 my question --
16    A.   Okay.
17    Q.   -- before you answer it.  If
18 you don't understand my question, just
19 tell me.  I'll try to ask a better
20 question.  Sometimes I don't ask the very
21 best questions.
22    A.   Okay.
23    Q.   If I ask you something and you
24 answer it, I will assume that you
25 understood my question; is that fair?

STEPHANIE SILVER

1
2     A.   Okay, fair.
3     Q.   Second, I'll ask that you try
4  to wait until I'm done answering --
5  pardon me, asking my question.  I'll
6  extend the same courtesy.  I will try to
7  wait for you to finish your answer before
8  I move on to the next question; is that
9  fair?
10    A.   Okay.
11    Q.   So we don't talk over each
12 other.
13       Third, please give only verbal
14 responses.  Sometimes people, it just
15 happened recently, they shake their head.
16 We are not being videotaped.  No one
17 would know that.  So we want to make sure
18 our court reporter can take everything
19 down.  And yes and no is better than
20 mm-hmm, uh-uh, that sort of thing.
21    A.   Sure.
22    Q.   Just two more things.  Not here
23 to kind of lock you up and grill you on
24 hours on end.  If you need to take a
25 break, or need to stretch your legs or

STEPHANIE SILVER

1
2  use the rest room, let me know.
3        I am just going to ask if I am
4  in the middle of the question or I asked
5  a question and your answer is
6  outstanding, I am going to ask you to
7  answer and then we can take a break,
8  okay?
9     A.   Okay.
10    Q.   Is that fair?
11    A.   That's fair.
12    Q.   Last thing.  While I am asking
13 you questions, your attorney, Seth Klein,
14 may interpose objections during the
15 morning.  If he does, in almost all
16 cases, I am still going to expect you to
17 answer my question, okay?
18    A.   Okay.
19    Q.   The only exception to that is
20 if I ask you something that requires you
21 to reveal privileged information,
22 information that you've communicated with
23 your attorneys that I am not supposed to
24 know, he will likely instruct you not to
25 answer, and that's fine.

STEPHANIE SILVER

1
2     A.   Okay.
3     Q.   But any other objections, I am
4  still going to, I will need your
5  response; is that okay?
6     A.   Okay.
7     Q.   Ms. Silver, are you currently
8  employed?
9     A.   Yes, I am.
10    Q.   Where do you work?
11    A.   I work for Webster Bank.
12    Q.   And where is that?
13    A.   In South Windsor, Connecticut.
14    Q.   And Webster, is it a commercial
15 bank or --
16    A.   Yes, it's a commercial bank.
17 Financial institution, yes.
18    Q.   And what's your job title?
19    A.   I am the assistant branch
20 manager.
21    Q.   And what do you do as assistant
22 branch manager at Webster Bank?
23    A.   I am the backup to the manager.
24 So I run a teller window.  Do all the
25 administrator things, reports.  Various

3 (Pages 6 - 9)

STEPHANIE SILVER

1
2 things. Sales process. Coaching team
3 members, thing like that.
4     Q.    You work at a bank. Do I take
5 it that you're kind of around numbers a
6 lot?
7     A.    Yes.
8     Q.    And familiar with reviewing
9 them and that sort of thing?
10     A.    For the most part. It's
11 usually the manager's job that takes care
12 of the main reporting. But I mainly
13 manage the staffing part of it.
14     Q.    Okay. Understood. What's the
15 highest level of education that you've
16 attained?
17     A.    One year of college.
18     Q.    What college was that?
19     A.    Southern Connecticut State.
20     Q.    Okay. And during what year did
21 you attend that college?
22     A.    Freshman year.
23     Q.    In what year?
24     A.    In what year, sorry. 1981.
25     Q.    Got it. I know a little bit of

STEPHANIE SILVER

1
2 your background, but I don't want to pry.
3         Are you the head of your
4 household?
5     A.    Yes, I am.
6     Q.    Are you the consumer in your
7 household that would make decisions with
8 respect to reviewing utility bills and,
9 you know, would supply you with that?
10     A.    At this time, yes.
11     Q.    Was that not always the case?
12     A.    No, it wasn't.
13     Q.    Okay. Who in your household
14 made that decision previously?
15     A.    My husband.
16     Q.    And until when was that true?
17     A.    2012.
18     Q.    Okay.
19     A.    My husband passed away.
20     Q.    I am sorry. I knew about that,
21 but I am sorry to hear it.
22     A.    Thank you.
23     Q.    Have you ever served as a
24 Plaintiff in any other lawsuits?
25     A.    No.

STEPHANIE SILVER

1
2     Q.    So I take it that this is the
3 first time that you served as a class
4 representative in a lawsuit?
5     A.    Yes.
6     Q.    What do you understand your
7 responsibilities to be as a class
8 representative in this case?
9     A.    I know that I represent
10 Connecticut and Massachusetts, but I do
11 know they have a representative in
12 Massachusetts, as well. And I represent
13 the consumer in small business.
14     Q.    Let's just unpack that a little
15 bit.
16         You understand that there is a
17 Massachusetts class representative, as
18 well?
19     A.    I do.
20     Q.    Do you know who that is?
21     A.    No, I don't. And I don't know
22 the person's name.
23     Q.    Okay. Do you know whether
24 there are any other class representatives
25 involved in this lawsuit?

STEPHANIE SILVER

1
2     A.    I believe there are three
3 additional ones in Connecticut.
4     Q.    Okay. So --
5     A.    I mean, I am led to believe
6 that there was, that it's all consumers
7 in Connecticut. I only know of three
8 specific ones. There's one consumer and
9 two businesses that I am aware of.
10     Q.    Okay. So you are one of the
11 Connecticut class representatives?
12     A.    Yes.
13     Q.    And your understanding is that
14 there is a Massachusetts --
15     A.    Yes.
16     Q.    -- based class representative?
17     A.    Mm-hmm.
18     Q.    And then two other class
19 representatives; is that your
20 understanding?
21     A.    I thought there was three.
22     Q.    Three others?
23         MR. KLEIN: Don't look at me.
24 Whatever your recollection is.
25         THE WITNESS: I'm sorry.

4 (Pages 10 - 13)

Page 14

1        STEPHANIE SILVER
2    Q.    So three others in Connecticut
3 besides you?
4    A.    Mm-hmm.
5    Q.    Got it.  And can you identify
6 any of those other class representatives,
7 at this time?
8    A.    I am not sure about their
9 names.
10   Q.    Let me ask you this:  Have you
11 ever spoken or communicated with any of
12 the other class representatives?
13   A.    No.
14   Q.    Do you have any insight or
15 understanding as to the types of Viridian
16 Energy plans that those other class
17 representatives had with Viridian?
18   A.    No.
19   Q.    Have you ever spoken with those
20 other class representatives about the
21 electricity --
22       MR. KLEIN:  Can we go off the
23   record for a moment.
24       (Off the record.)
25   Q.    Sorry for that interruption in

Page 15

1        STEPHANIE SILVER
2 our deposition, Ms. Silver.
3       So I was asking you about your
4 relationship or whether you have a
5 relationship with the other class
6 representatives in this case.
7       So do you have any
8 understanding or insight into what rates
9 or what prices the other class
10 representatives paid to Viridian?
11   A.    None.
12   Q.    Okay.  Do you understand the
13 nature of the other class
14 representatives' claims in this lawsuit
15 against Viridian?
16   A.    No.  Only my knowledge of my
17 own plan.
18   Q.    And do you have an
19 understanding as to whether your claims
20 are different or similar to the other
21 class representatives' claims?
22   A.    No.  I can only, I can only
23 assume, but I mean, no, I don't.
24   Q.    Okay.  I would rather you not
25 assume.

Page 16

1        STEPHANIE SILVER
2    A.    Then no.
3    Q.    So no, you don't have any
4 personal knowledge?
5    A.    No, I have no personal
6 knowledge.
7    Q.    Understood.  So your
8 understanding is you represent -- I don't
9 want to put words in your mouth.
10       Tell me how you believe you
11 represent as a class representatives in
12 this case.
13   A.    The consumers in Connecticut
14 and small businesses.
15   Q.    Is that it?
16   A.    Yes.
17   Q.    I am asking, because that
18 sounds like a very broad category of
19 people.
20       Is there any qualification to
21 consumers or small businesses in
22 Connecticut?
23       Are these people that had to
24 have a relationship with Viridian Energy,
25 for example?

Page 17

1        STEPHANIE SILVER
2    A.    Yes.
3    Q.    And did these people had to
4 have paid a certain rate to Viridian in
5 order to qualify for you to represent
6 them?
7    A.    I am not sure what rate they
8 would have paid.  They would have had to
9 have some issue with Verizon with regard
10 to the rate that they paid.
11       MR. KLEIN:  You mean Viridian,
12   not Verizon.
13       THE WITNESS:  Did I say Verizon?
14   Sorry.
15       MR. KLEIN:  Are you dismissing
16   Viridian and suing Verizon?  Because
17   we can be done.
18       THE WITNESS:  I don't know where
19   I got that.
20   Q.    When you say you represent
21 small businesses, what does that mean in
22 terms of size?
23   A.    It's just a small business --
24 I'm not --
25   Q.    I'll try to ask a better

5 (Pages 14 - 17)

STEPHANIE SILVER

1
2 question.
3       Is there a Connecticut-based
4 business that is sufficiently large that
5 you would not be representing them in
6 this case?
7    A.   It's small-based, I know that.
8    Q.   When you say "small," are you,
9 do you mean based on number of employees
10 at the business?
11    A.   I'm not sure.
12    Q.   When you say "small," do you
13 mean in terms of the revenue that the
14 business generates?
15    A.   Not sure.
16    Q.   What about the number of
17 offices or locations?
18    A.   Not sure.  Sorry.
19       MR. KLEIN:  Don't apologize.
20    Just say what you know and don't know.
21    Q.   Whether an individual or what
22 you're calling a small business, do the
23 entities that you are purporting to
24 represent, did they have to be on a
25 particular Viridian Energy plan?  Did it

STEPHANIE SILVER

1
2 have to be on the same one that you were
3 on?
4    A.   I don't know if they have to be
5 on the same plan as myself.
6    Q.   Do you have any other
7 responsibilities as a class
8 representative, other than what we just
9 talked about?
10    A.   I do know that if something is
11 proposed, then they would, they would
12 take me into consideration with asking me
13 questions.  It's not just me that's
14 involved.  Like if something is proposed,
15 it would be me considering the whole, the
16 whole, everyone into consideration, not
17 just myself.
18       So do you understand what I'm
19 saying?
20    Q.   Not really.  But we can figure
21 it out together.
22       So when you say "they," who do
23 you mean?
24    A.   I mean if a settlement was
25 proposed of some kind, if that was the

STEPHANIE SILVER

1
2 case, it's not just me I would need to
3 take into consideration.  It would be all
4 of the Plaintiffs that I would need to
5 take into consideration.  So I'm not just
6 in it for me.  I am in it for everyone.
7 Not in it.  I don't say it that way.  I
8 need to take everyone's -- into
9 consideration, not just myself.
10    Q.   So if there were a proposed
11 settlement in this case, you are somebody
12 who would have to review, understand and
13 approve that settlement; is that right?
14    A.   I would need to take everyone
15 into consideration.  I would be one of
16 the people that it would need to be
17 reviewed with and take that into
18 consideration.  So it's not just myself
19 that I need to think about.  It's
20 everyone else to consider with the
21 Plaintiffs.
22    Q.   So do you need to check with
23 individuals or small businesses in
24 Connecticut that you're representing in
25 order to make sure that they are okay

STEPHANIE SILVER

1
2 with the settlement?
3    A.   I don't believe that's the
4 case.  I am not sure.  I would have to
5 check with my counsel.
6    Q.   So you're not sure -- you don't
7 have any personal knowledge of how that
8 process works?
9    A.   I mean, I do know that I would
10 have to agree to the settlement.  Be one
11 of the people who would agree to the
12 settlement.  But I would be taking
13 everyone into consideration, not just
14 myself.  I would need to discuss that
15 further with my counsel.
16    Q.   Okay.  Let me ask you, what are
17 you hoping to accomplish with this
18 lawsuit?
19    A.   I believe that, I believe that
20 Viridian's rates did not follow the
21 wholesale rates that they -- I didn't
22 have my contract in front of me.  I don't
23 have the contract.
24       But I do know that at the time,
25 what my understanding was that they were

6 (Pages 18 - 21)

STEPHANIE SILVER

1
2 going to follow the wholesale rates.  And
3 I believe that the rates weren't.  The
4 rates were higher than what the utility
5 rates were.
6        So I thought there was a
7 considerable difference.  And I think
8 that there was a big difference between
9 what the rates were for Viridian and what
10 the utility rates were.
11    Q.    Okay.  So it sounds to me that
12 you identified two things.  I want to
13 make sure that I understand both of them.
14        You said that you believed that
15 Viridian's rates didn't follow the
16 wholesale rates.  Okay.  So that's one
17 thing.
18        And then you said that -- and
19 then you also talked about your belief
20 that Viridian's rates were higher than
21 the utility rates.
22        Did I get that right?
23    A.    Yes.
24    Q.    So are you suing Viridian
25 because its rates didn't follow the

STEPHANIE SILVER

1
2 wholesale rates, because its rates were
3 higher than the utility's or both?
4    A.    I believe my bills were higher.
5    Q.    Higher than what?
6    A.    Higher than what I felt they --
7 higher than what I felt that they should
8 have been, looking at -- well, I wasn't
9 really -- it's hard to explain.
10    Q.    Take whatever time you need.
11    A.    I think there was a big
12 difference between when I compared
13 Viridian's rates to the utility rates,
14 the difference between the two.
15    Q.    When you say "the utility
16 rates," are you talking about CL&P?
17    A.    Yes.  CL&P.
18    Q.    And did you personally compare
19 Viridian's rates to CL&P's rates?
20    A.    I did.  At one point, I did.
21    Q.    At what point is that?
22    A.    Actually, my sister pointed out
23 to me that she had read that Viridian's
24 rates were thought to be higher than CL&P
25 rates.  And she thought I should take a

STEPHANIE SILVER

1
2 look at that.
3        So I did call Viridian.  I
4 spoke to a customer service rep.  Not
5 Viridian, excuse me, I called CL&P.
6    Q.    Mm-hmm.
7    A.    And she told me what my
8 Viridian rate was getting and what CL&P
9 rate was getting.
10        And at that point, there was a
11 considerable difference.  So I switched
12 back to CL&P.
13    Q.    Okay.  I understand.
14        And we'll talk about all of
15 that soon enough, because I do want to
16 address that with you.
17        But let's get back to my
18 original question.  I asked what are you
19 hoping to accomplish with respect to this
20 lawsuit.
21        And you told me your belief,
22 your understanding about Viridian's
23 rates.
24        That's not what I was asking.
25 What outcome are you hoping for as a

STEPHANIE SILVER

1
2 result of this lawsuit?
3    A.    I think that they should be
4 held accountable for their increase in
5 their rates that didn't follow the
6 wholesale rates.
7    Q.    Held accountable to whom?
8    A.    To the consumers.
9    Q.    Which ones?
10    A.    The ones that they, that had --
11 the ones that they had the plans that
12 they were supposed to follow the
13 wholesale rates, or my understanding of
14 them needing -- well, I can only attest
15 to like my plan.  I can't attest to any
16 other consumer's plans or what their
17 rates were.  I can only really say what
18 my plan was.  I can't say any other
19 consumer's plans.  I don't know what they
20 were getting for rates.  I can only say
21 for mine.
22    Q.    You are representing those
23 other consumers, though, right?
24    A.    Yes.  But I don't know what
25 they were getting for rates.  I have no

7 (Pages 22 - 25)

STEPHANIE SILVER
1
2 knowledge of what their rates were, or
3 what the margin was, or what the
4 difference was or the variance on that
5 was.
6        So I am assuming that there is
7 obviously, if there are more than -- I
8 mean, there is more than one of us,
9 obviously, that there is, there is a
10 difference there.  But I can only know
11 what my, you know --
12    Q.   Are you done?
13    A.   Yes.
14    Q.   I'm just trying to wait for you
15 --
16    A.   It's okay.
17    Q.   Over what period of time are
18 you talking about when you say Viridian
19 should be held accountable to consumers?
20    A.   In my case?  I believe we
21 signed up for Viridian in 2009, I believe
22 it was.  2009.  2008 or 2009.  I am
23 sorry, it was quite a while ago.
24    Q.   I understand.  So you want
25 Viridian to be held accountable.  How

STEPHANIE SILVER
1
2 would that accountability manifest
3 itself?  Do you understand what I'm
4 saying?
5    A.   No.
6    Q.   Are you hoping to be
7 compensated in some way by Viridian?
8    A.   I guess, yes, in some form or
9 another.  I don't have Viridian any
10 longer, so I can't get a credit on my
11 bill.
12    Q.   But you sued them.  Do you want
13 something from them?  Do you want money?
14    A.   I would assume so.  I guess
15 that would be what the suit was about.
16    Q.   And again, I am not asking you
17 to assume.
18    A.   I'm sorry.
19    Q.   All this is is me trying to get
20 your understanding of things.
21    A.   Okay.
22    Q.   And you filed the suit?
23    A.   Mm-hmm.
24    Q.   Your name is, I will show you
25 this later, but your name is right on the

STEPHANIE SILVER
1
2 front of it.
3    A.   Yes.
4    Q.   So it's your lawsuit.
5    A.   Mm-hmm.
6    Q.   Without assuming, why did you
7 sue?
8    A.   Well, I'm assuming they have --
9 I am sorry, you said don't assume.  I
10 shouldn't say sorry either.
11    Q.   I'll try to help.  Are you
12 seeking monetary compensation or damages
13 in your lawsuit?
14    A.   I would say for the time that I
15 feel I was overcharged, yes.
16    Q.   For the time that you feel you
17 were overcharged?
18    A.   That I was overcharged.
19    Q.   Okay.  Are you hoping to change
20 Viridian's pricing model or business
21 model?
22    A.   Yes, absolutely.
23    Q.   Okay.  What is your
24 understanding of their pricing model
25 during the time that you were their

STEPHANIE SILVER
1
2 customer?
3    A.   I understood it to be that they
4 were following the wholesale rates.  That
5 mine was a variable rate, but they were
6 following the wholesale rates.  But I
7 don't believe that's what occurred.  I
8 believe that the rates were higher and
9 that they stayed higher.  And that there
10 was a big difference between the two.
11    Q.   So you're using the word
12 follow.  Let me make sure I understand
13 what you mean.
14        When you say that you thought
15 that Viridian's rate was supposed to
16 follow the wholesale rate, do you mean
17 that you expected Viridian's rate to be
18 the same as the wholesale rate?
19    A.   No.  I expected a fluctuation.
20 I expected the rate to, obviously, during
21 the winter months it's going to go up.
22 And during the warmer months it's going
23 to go down.  I didn't expect it to be
24 constant.  I didn't expect that.  I
25 expected it to -- I mean, there is going

8 (Pages 26 - 29)

Page 30

STEPHANIE SILVER

1
2  to be a fluctuation in the thing, but I
3  didn't expect it to be higher, you know.
4  I didn't expect it to be higher all the
5  time.
6      Q.   Did you expect that Viridian's
7  -- I am not asking about the direction,
8  whether it was up or down or whether it
9  remains flat, as a comparison point, did
10 you have an understanding as to whether
11 Viridian's rate would be higher, lower or
12 the same than the wholesale rate?
13     A.   I assumed Verizon was --
14         MR. KLEIN:  Viridian.
15     A.   What is my deal.
16         MR. BLYNN:  When you say
17     Verizon, we'll assume it's Viridian.
18     A.   I don't know why I'm saying
19 Verizon.  I do apologize for that.  I
20 don't know what my problem is.  Viridian.
21         When I received my bills, I
22 didn't -- the bills -- I did not check
23 them every single month because I felt
24 that it was, that they were doing exactly
25 what they were supposed to be doing.

Page 31

STEPHANIE SILVER

1
2      Q.   And what were they supposed to
3  be doing?
4      A.   Following the wholesale rates.
5      Q.   So we're back to "following."
6  So let me ask this:  Do you understand
7  Viridian to be a wholesale supplier of
8  electricity or a retail supplier of
9  electricity?
10     A.   I am not really sure of the
11 definition of either way.
12     Q.   So when I say a retailer, do
13 you understand what a retailer is?  When
14 you go to the Gap you buy a T-shirt,
15 that's a retailer.  The entity that
16 supplies the T-shirt to the Gap is the
17 wholesaler.
18     A.   Yes.
19     Q.   Do you understand Viridian to
20 be a wholesale supplier of electricity or
21 a retail supplier?
22     A.   A wholesaler.
23     Q.   Okay.  Is there anything else
24 that you're hoping to accomplish with
25 this lawsuit?

Page 32

STEPHANIE SILVER

1
2      A.   No.
3      Q.   Are you hoping to change what
4  Viridian's sales representatives are
5  allowed to say to customers?
6      A.   Oh, well, yes.  What I believe
7  was my recollection of what happened that
8  day.  I can only say what I believe my
9  recollection was, because it was a while
10 ago.  It was a very brief conversation.
11 I don't -- there wasn't -- I feel that
12 maybe more disclosure with regard to --
13 it was at the XL Center in Hartford.  And
14 it was a booth there.  So it was a very
15 quick conversation with regard to
16 changing over from CL&P to Viridian.  So
17 maybe there could be more disclosure with
18 regard to that.
19     Q.   I'll tell you what, let's talk
20 about that.  Let's talk about when you or
21 your household, you and your husband
22 signed up to become a Viridian customer.
23 So you were just alluding to that, right?
24     A.   Mm-hmm.
25     Q.   When did that occur?

Page 33

STEPHANIE SILVER

1
2      A.   It was quite a few years ago.
3  I want to say like 2009, 8.  2009.
4      Q.   If I represented to you that it
5  was early 2010, does that refresh your
6  memory?
7      A.   That could be.  That could be
8  it.  My son would have been 17 or 18
9  years old.  It could have been right
10 around there.
11     Q.   Okay.  And you mentioned -- I
12 am sorry, what was it, a convention
13 center?
14     A.   It was like a home, like a home
15 show at the convention center, the XL
16 Center in the center of Hartford.
17     Q.   Were you there that day?
18     A.   Yes.  My husband, my son and
19 one of his friends.
20     Q.   And do you recall who your
21 husband's friend was that was there?
22     A.   It was my son's friend.
23     Q.   Your son's friend?
24     A.   Nathan Via.
25     Q.   Was Nathan Via also 17, 18?

9 (Pages 30 - 33)

STEPHANIE SILVER

1
2    A.   They were probably like 16 or
3  17, I think.  But they were actually
4  walking around and getting freebies from
5  all the booths.
6    Q.   That's the only reason to go to
7  those things, right?
8    A.   Little chachkies.
9    Q.   Okay.  So you and your husband,
10 and your son and your son's friend were
11 at a home show at Hartford in or around
12 2009/2010?
13   A.   Right.
14   Q.   And Viridian was represented at
15 this home show?
16   A.   Yes.  There was a booth.
17   Q.   How large was the home show; do
18 you remember?
19   A.   Not very large.
20   Q.   How many Viridian
21 representatives were at the booth?
22   A.   Such a long time ago.  It would
23 be, to my recollection, which is pretty
24 vague, I am not quite sure, I would be
25 assuming again, and I am not supposed to

STEPHANIE SILVER

1
2  do that.  I would say two.
3    Q.   Is two a guess?
4    A.   It is, so.
5    Q.   Can you say with any certainty
6  how many Viridian representatives were
7  there?
8    A.   No.
9    Q.   And I think I know the answer
10 to this, but do you know the names of any
11 Viridian representatives who were there?
12   A.   No.
13   Q.   So you don't recall or you
14 don't have any personal knowledge as to
15 the identity or the number of Viridian
16 representatives at this home show, but
17 there was somebody, at least somebody
18 from Viridian there?
19   A.   Yes.
20   Q.   And this person or persons --
21 who from your household spoke with that
22 representative?
23   A.   My husband and I were both
24 there.  My husband did mainly the
25 talking.

STEPHANIE SILVER

1
2    Q.   Okay.  Were you standing in
3  proximity to your husband when he was
4  talking with the representative?
5    A.   Yes.
6    Q.   And did you hear everything
7  that the representative said to your
8  husband during that conversation?
9    A.   For the most part, yes.
10   Q.   I've been to these home shows.
11 Were you listening carefully or were you
12 kind of looking around?
13   A.   He was mainly talking to my
14 husband.
15   Q.   Did the Viridian representative
16 address you at all that you can remember?
17   A.   I can't remember.
18   Q.   Did you hear the Viridian
19 representative make any representations
20 to your husband about what Viridian does
21 or its energy rate plans?
22   A.   I am trying to make the
23 distinction between assuming and --
24   Q.   I only want to know what you
25 know.

STEPHANIE SILVER

1
2    A.   I believe I recall my husband
3  discussing with him a variable interest
4  rate.  I believe that.  But once again,
5  it was a long time ago.
6    Q.   Is it okay if I call you
7  Stephanie?
8    A.   Certainly.
9    Q.   Stephanie, did you personally
10 hear the Viridian representative say
11 anything about Viridian's variable rate
12 plans?
13   A.   About the details to it?
14   Q.   Yes.
15   A.   No.
16   Q.   Anything about how it works,
17 how the price was calculated, that sort
18 of thing?
19   A.   I don't recall.
20   Q.   Did you personally hear the
21 Viridian representative say anything
22 about saving money or anything like that?
23   A.   Yes, I do believe that was the
24 conversation about saving money, because
25 that was one of the things that my

STEPHANIE SILVER

1
2 husband was interested in the most,
3 because our electric bill, we have
4 electric heat. And it was higher.
5        So he was explaining how
6 signing up with Viridian could save us
7 money.
8    Q.   When you went to that home
9 show, your supplier was CL&P, again?
10   A.   Yes.
11   Q.   You said your belief. What did
12 you hear the Viridian representative say
13 in terms of saving money to join
14 Viridian?
15   A.   That it could save us money.
16   Q.   Anything more specific than
17 that?
18   A.   No.
19   Q.   Did the Viridian representative
20 hand you or your husband any written
21 materials regarding the energy rate plan?
22   A.   I don't recall.
23   Q.   Can you tell me, sitting here
24 today, that you received anything in
25 writing?

STEPHANIE SILVER

1
2   A.   I don't recall. I don't
3 remember if we walked away with any
4 paperwork or not.
5    Q.   So you don't know that you did?
6   A.   No.
7    Q.   And you can't remember
8 receiving anything?
9   A.   I don't, I am sorry.
10   Q.   Have you had in your possession
11 any materials from Viridian over the
12 years, such as a contract, terms of
13 conditions?
14   A.   No.
15   Q.   Nothing?
16   A.   No.
17   Q.   Okay. Did the Viridian
18 representative tell you or your husband
19 that Viridian was a wholesale electric
20 supplier?
21   A.   I don't recall.
22   Q.   You mentioned that one thing
23 your husband was looking for was a lower
24 energy bill.
25        What other reasons did you have

STEPHANIE SILVER

1
2 for wanting to switch from CL&P at the
3 time?
4    A.   That would have been it.
5    Q.   That would have been the only
6 reason?
7    A.   Right.
8    Q.   Are you guys environmentally
9 conscious at all?
10   A.   I would say yes. Like everyone
11 else wanting to.
12   Q.   I am not.
13   A.   I shouldn't I assume everyone
14 else.
15   Q.   Viridian held itself out as an
16 environmentally conscious company.
17        Was that something that
18 attracted you and your husband to
19 Viridian?
20   A.   I don't recall.
21   Q.   Did you or your husband
22 personally know anybody at Viridian?
23   A.   No.
24   Q.   Did any of your -- had any of
25 your friends been Viridian customers at

STEPHANIE SILVER

1
2 the time that you signed up?
3   A.   No.
4    Q.   Had you heard anything about
5 the company? Did it have a good
6 reputation when you went to the house
7 show?
8   A.   I hadn't heard about Viridian.
9    Q.   That show was the first time
10 that you had heard about it?
11   A.   Yes.
12   Q.   At the time you switched, had
13 you and your husband considered enrolling
14 with any other electricity suppliers,
15 instead of Viridian?
16   A.   No.
17   Q.   Did you look around at all,
18 price shop?
19   A.   No.
20   Q.   Why not?
21   A.   When Viridian first came out,
22 it was relatively new about being able to
23 switch to different -- is it suppliers?
24 Is it suppliers? I never know if it's
25 suppliers.

11 (Pages 38 - 41)

STEPHANIE SILVER

1
2    Q.   When I say suppliers, I mean it
3  to be an entity that you would pay to
4  supply you with electricity?
5    A.   It was relatively new.  So
6  Verizon -- seriously.
7         MR. BLYNN:  We'll clean that up
8  at the end.  Don't worry about it.
9    A.   I have issues.  I seriously
10 have issues.
11         Viridian seemed to be the one
12 that was out there the most.  I mean
13 their name was out there the most.
14         So when I went to, when we went
15 to the XL Center, they seemed to be, the
16 booth was out there.
17    Q.   You mean they had the biggest
18 presence at the trade show?
19    A.   Exactly.
20    Q.   Were any other electricity
21 suppliers at the trade show?
22    A.   Not that I recall.
23    Q.   And you don't recall seeking
24 any others out or talking with any
25 representatives?

STEPHANIE SILVER

1
2    A.   No.
3    Q.   Did you do anything to prepare
4  for today's deposition?
5    A.   I met with my attorney.
6    Q.   Mr. Klein?
7    A.   Yes.
8    Q.   How many times did you meet
9  with Mr. Klein?
10   A.   Once.
11   Q.   And without revealing the
12 content of anything that you and he
13 discussed, was it an in-person meeting?
14   A.   Yes.
15   Q.   Where?
16   A.   Here in his office.
17   Q.   When?
18   A.   Last week.
19   Q.   And how long did the meeting
20 last?
21   A.   About an hour.
22   Q.   Other than that meeting, any
23 preparation for today?
24   A.   Just to -- let me think -- just
25 to e-mail me the, to sign complaints and

STEPHANIE SILVER

1
2  things like that.
3    Q.   Okay.  I'll get back to that.
4         Generally, did you review any
5  documents prior to today?
6    A.   Just the complaint to sign
7  beforehand, to review those.
8    Q.   When did you sign the
9  complaint?
10   A.   Just to sign and date it.
11   Q.   Tell me about that process.
12 Let's go further back.
13         Besides Seth Klein that you
14 identified, are you represented by any
15 other attorneys in this case?
16   A.   No.
17   Q.   How did you -- did you have a
18 relationship or did you know Mr. Klein --
19 actually, I'll say Izard Nobel; is that
20 fair?
21         MR. KLEIN:  I think that would
22 probably be more accurate.
23   Q.   Did you have a relationship
24 with Izard Nobel prior to initiating this
25 lawsuit against Viridian?

STEPHANIE SILVER

1
2    A.   No.
3    Q.   Did you know anybody at the
4  firm beforehand?
5    A.   No.
6    Q.   Did you have any relationship
7  whatsoever, outside of your
8  attorney-client relationship in this
9  case, with anyone at Izard Nobel?
10   A.   No.
11   Q.   How did you come to be -- how
12 did you come to retain Izard Nobel when
13 suing Viridian?
14   A.   That was my sister.  My sister
15 Concetta.  She had -- my sister Concetta
16 Ayre, she had read that Izard Nobel
17 was -- there was an issue with Viridian.
18 And she thought that was something that
19 considering there was an issue with my
20 billing, that that would be something
21 that I should contact the attorneys'
22 office to see if that was something that
23 I should seek counsel about.
24   Q.   Your sister, I am sorry, it's
25 Concetta Ayre?

12 (Pages 42 - 45)

Page 46

1        STEPHANIE SILVER
2    A.   Concetta.
3    Q.   What does she do for a living?
4    A.   She doesn't work.  She's
5   disabled.
6    Q.   Where does she live?
7    A.   She lives in 13 Sword.
8    Q.   I am sorry?
9    A.   With me.  She lives with me.
10   Q.   Do you know whether she has any
11  relationship with anybody at the Izard
12  Nobel law firm?
13   A.   No.
14   Q.   She lives in your household?
15   A.   She does.  She didn't at the
16  time, though.  I was at 21 Bobolink when
17  she had brought this up to me.
18        I have since sold my home and
19  moved in back with my mother.
20   Q.   I understand.  At the time that
21  you and your sister lived in different
22  residences, who was her energy supplier?
23   A.   I'm not sure.  I couldn't
24  assume who my mother uses.
25   Q.   Do you know whether your mother

Page 47

1        STEPHANIE SILVER
2   was on a Viridian variable rate plan?
3    A.   I don't.  I don't know.
4    Q.   Are you seeking to represent
5   your sister and your mother in this case?
6    A.   No.
7    Q.   So what did your, what did your
8   sister tell you she understood about
9   Izard Nobel and this lawsuit?
10        You said they had an issue with
11  Viridian.  Tell me what she told you
12  about that.
13   A.   Just that there was an issue
14  with what they thought Viridian was
15  overcharging or overcharging customers,
16  consumers or -- not overcharging.  I
17  shouldn't say that.  But not following
18  the, that their variable rates were
19  higher than what the rates -- they stayed
20  consistently higher and didn't go back
21  down.  That they were looking into that.
22   Q.   And I am sorry, just so the
23  record is clear, when you say they were
24  looking into that, who was looking into
25  that?

Page 48

1        STEPHANIE SILVER
2    A.   Izard Nobel.
3        I am sorry, I do know who my
4   mother has.  She has Connecticut Light &
5   Power.
6    Q.   Okay.
7    A.   I am sorry, I do know that.
8    Q.   And so that means that when
9   your sister lived with your mother --
10   A.   Yes.
11   Q.   -- she was on the same utility
12  plan?
13   A.   She was on Connecticut Light &
14  Power.
15   Q.   And now she lives with you?
16   A.   Yes.  We all live in the same
17  house.
18   Q.   So she's on your plan now?
19   A.   Well, I don't pay the
20  electricity bill.  That's my mother's.
21   Q.   Okay.  So you don't pay the
22  electricity bill?
23   A.   No.
24   Q.   At what point did you sell your
25  house and move in with your mother?

Page 49

1        STEPHANIE SILVER
2    A.   2014.
3    Q.   So you said you're not seeking
4   to represent your sister and your mother
5   in this case.  Your mother pays the
6   electricity bill now.
7        Are you seeking compensation on
8   behalf of your mother?
9    A.   No, because she doesn't have
10  Viridian.
11   Q.   Okay.  Was there a time when
12  you were enrolled as a Viridian customer
13  and you personally were not -- you or
14  your household were not personally paying
15  the Viridian bill?
16   A.   In my house?
17   Q.   Yeah.  Do I need to ask a
18  better question?
19   A.   I am sorry?
20   Q.   During the time that you were
21  enrolled with Viridian, which I think we
22  established was either 2009/2010 until
23  the time that you terminated, were you
24  always paying the Viridian Energy bill?
25   A.   My husband and myself, yeah.

13 (Pages 46 - 49)

STEPHANIE SILVER

1
2    Q.   Nobody beside you or your
3    husband?
4    A.   No.
5    Q.   So what was the basis of your
6    sister telling you that Izard Nobel had
7    some issue with Viridian?  Where did she
8    learn that?
9    A.   I am not sure where she read
10   it.  I think she read it online.  She's a
11   very online reader.  She reads every
12   thing online.  And I think she read it
13   online.
14   Q.   Unfortunately, I am becoming
15   that way, too.
16        Did you personally have any
17   knowledge about the lawsuit that Izard
18   Nobel was filing against Viridian?
19   A.   No, I don't believe so.  No.
20   Q.   Did your sister tell you that
21   Izard Nobel was looking for Plaintiffs to
22   join a lawsuit?
23   A.   No.
24   Q.   What did she tell you?
25   A.   She just told me that they were

1                STEPHANIE SILVER
2    inquiring about -- that there was an
3    issue with Viridian.  That there was an
4    issue with the rate and the rate being
5    consistently higher than, staying
6    consistently higher.  And that they had
7    wanted to talk to people who had problems
8    with their rate.  And that there was a
9    contact number.
10   Q.   I see.  Just so I'm clear,
11   because you said "they" a lot.
12   A.   They, I am sorry.
13   Q.   So Izard Nobel was inquiring
14   and seeking people, and left a contact
15   number to call?
16   A.   I believe so.  I am sorry, no,
17   I shouldn't assume, but my sister gave me
18   the contact information.
19   Q.   Was this an advertisement or
20   something?
21   A.   No.  I am not quite sure.  She
22   just said that she had, she had read
23   online or -- she wasn't very specific.
24   She just said --
25   Q.   There was some content online

1                STEPHANIE SILVER
2    that indicated that Izard Nobel --
3    A.   Or that she had read in the
4    newspaper.
5    Q.   I am sorry, I was almost done.
6    A.   I am sorry.
7    Q.   This is the most apologetic
8    room.
9    A.   It's me.  I have a bad habit of
10   doing that.
11   Q.   I just want to make sure -- a
12   lot of this seems it's going over, but
13   it's important to understand.
14        So in conversations with your
15   sister you learned that there was some
16   online content indicating that Izard
17   Nobel was inviting people, consumers, to
18   contact it about a lawsuit against
19   Viridian.  Did I get that right?
20   A.   I am not quite sure.  I don't
21   believe she used the word inviting.  I
22   believe that --
23   Q.   You said they left a phone
24   number?
25   A.   I am not sure.  I am trying to

1                STEPHANIE SILVER
2    remember the conversation with my sister
3    and it was a while ago.
4    Q.   I understand.
5    A.   I don't know if it was just the
6    name or even if it was online.  It might
7    have been in the newspaper.
8    Q.   So is it fair to say,
9    Stephanie, that in some form of media,
10   you became aware that Izard Nobel was
11   seeking possible participants in a
12   lawsuit against Viridian?
13   A.   Or information with regard to
14   it.
15   Q.   Did your sister provide you
16   with the phone number that she saw?
17   A.   She gave me the name.  I don't
18   believe she provided me with the
19   telephone number.
20   Q.   Do you remember whose name she
21   provided you?
22   A.   Just the firm's number, the
23   firm's name.
24   Q.   Okay.  And about when was that?
25   A.   I should know this.  Sometime

14 (Pages 50 - 53)

STEPHANIE SILVER

1
2  last year.
3      Q.   Does that mean calendar year
4  2015?
5      A.   Yeah.
6      Q.   Early in the year, middle of
7  the year?
8      A.   I believe so.
9      Q.   I'll correct myself.  I asked a
10  complex question.
11          I said early in the year,
12  middle of the year, and that led you to
13  say yes, and that's not clear.
14          Did that occur early in 2015?
15     A.   I am not quite sure.
16     Q.   Did you, in fact, call the
17  phone number for Izard Nobel that you
18  were given?
19          MR. KLEIN:  Objection.  She
20     didn't testify that she was given a
21     phone number.
22     Q.   Did you call Izard Nobel?
23     A.   I am not sure if I called or
24  e-mailed.
25     Q.   Whether via telephone or

STEPHANIE SILVER

1
2  e-mail, in some manner, did you contact
3  the law firm?
4      A.   Yes.
5      Q.   Do you recall about when you
6  hired Izard Nobel to represent you?
7      A.   I am not very good with dates.
8  I do save everything to my computer.  So
9  I have all of that saved to my computer.
10     Q.   And in preparation for today,
11  did you look at your computer to look at
12  any documents, you know, concerning this
13  lawsuit?
14     A.   Just the complaint.  I reviewed
15  the complaint again.  And that was it,
16  the complaint.
17     Q.   So you didn't look through any
18  e-mails or anything that was relevant to
19  when you contacted the firm?
20     A.   No.  I am sure I have it,
21  because I saved all of the e-mails.
22     Q.   Do you know whether you
23  provided that, those e-mails to us?
24          When I say "us," I mean
25  Viridian.

STEPHANIE SILVER

1
2          MR. KLEIN:  We did not provide
3      the contact e-mails from, to the
4      extent they may exist, from Ms. Silver
5      to us.  And we would regard that as
6      privileged.
7          MR. BLYNN:  Did you guys give us
8      a privilege log, Seth?
9          MR. KLEIN:  As you know, we have
10     not.  But if you would like one, you
11     can request that.
12     Q.   Did your sister receive
13  anything, I guess for referring -- strike
14  that.
15          Did your sister receive
16  anything for notifying you about the
17  existence of this lawsuit?
18     A.   No.
19     Q.   No, you don't know or no, she
20  didn't?
21     A.   No, she didn't.
22     Q.   Have you been promised anything
23  of value in exchange for agreeing to
24  serve as a class representative in this
25  case?

STEPHANIE SILVER

1
2      A.   No.
3      Q.   You expect to be part of some
4  settlement.  We talked about that
5  earlier.
6      A.   Correct.
7      Q.   So in your role as a class
8  representative, earlier we talked about
9  your responsibilities as a class
10  representative.
11          What's your understanding of
12  how a class action lawsuit works?
13     A.   There is a group of people.
14  And there is a certain representative
15  that represents all of the Plaintiffs.
16  And then, if there is decisions that are
17  made, then the attorney would go back to
18  the representatives and they would help
19  decide what would be the best decision on
20  behalf of the Plaintiffs.  And then
21  basically, you know, decide how to
22  proceed, whether that is acceptable or to
23  proceed with, you know, obviously,
24  decline that or go forward.
25     Q.   Are you doing anything to keep

15 (Pages 54 - 57)

Page 58

STEPHANIE SILVER
1
2 abreast of what's going on with the
3 lawsuit?
4     A.   Just through my attorney.
5     Q.   Through communications with
6 your attorney.
7          So again, without telling me
8 exactly what you and Izard Nobel talk
9 about, how frequently do you speak with
10 Izard Nobel about this case?
11    A.   In preparation for this, every
12 few months.
13    Q.   In preparation for this matter,
14 you said you met in person last week for
15 an hour?
16    A.   Yes.
17    Q.   Prior to that, your last
18 communication with your attorneys about
19 this case was several months before that?
20    A.   Not several.  Probably like a
21 month before.  There was some amended
22 things that I needed to sign.
23    Q.   You were sent some document to
24 sign?
25    A.   It was an amended.

Page 59

STEPHANIE SILVER
1
2     MR. KLEIN:  You don't need to
3 look at me.  It's whatever you
4 remember.
5     (Off the record.)
6     MR. BERMAN:  Let's mark this.
7     [The Second Amended Class Action
8 Complaint, was hereby marked as Silver
9 Exhibit 1 for identification, as of
10 this date.]
11    Q.   So Stephanie, before our break,
12 I was asking you whether you had seen any
13 documents.
14         You had testified that your
15 attorneys had sent you, I think you said
16 an amended something.  So I just decided
17 to mark this.
18         This is Silver Exhibit 1.  That
19 is the Second Amended Class Action
20 Complaint that is the operative lawsuit
21 in this case.  Do you see that?
22         (Witness reviews document.)
23    A.   Mm-hmm.
24    Q.   Is that the document that you
25 were asked to review?

Page 60

STEPHANIE SILVER
1
2     A.   Yes.
3     Q.   Okay.  So are you familiar with
4 that document?
5     A.   Yes.
6     Q.   You've seen it before?
7     A.   Yes.
8     Q.   Did you review this document?
9     A.   Yes.
10    Q.   Did you read the entire thing?
11    A.   Yes, I did.
12    Q.   Did you have any, any input
13 into the content of the document?
14    A.   No.  Input as --
15    Q.   So when you reviewed the
16 document --
17    A.   Yes.
18    Q.   -- did you verify that the
19 facts that are in there that pertain to
20 you are true?
21    A.   Are accurate, yes.
22    Q.   How did you do that?
23    A.   I read, I read it over.
24 Especially the sections that pertain to
25 me.  And verified that was the

Page 61

STEPHANIE SILVER
1
2 information that I had provided.  And I
3 signed the document.  And I forwarded it
4 back.
5     Q.   Okay.  Besides reviewing and
6 approving this document, do you have any
7 other active involvement in the ongoing
8 lawsuit?
9     A.   Active involvement?
10    Q.   Yeah.  Do you seek updates
11 about the status of the lawsuit from your
12 attorneys?
13    A.   No.
14    Q.   Do you ever look at the Court
15 docket and see what's been filed?
16    A.   No.
17    Q.   And your attorneys wrote that,
18 right?
19    A.   Mm-hmm.
20    Q.   And you didn't change any of
21 the content?
22    A.   No.
23    Q.   We talked about when you
24 enrolled with Viridian.
25         Let's talk a bit more about

16 (Pages 58 - 61)

Page 62

STEPHANIE SILVER

1
2 when you terminated your contract with
3 Viridian.
4        Do you know when that occurred?
5    A.   It was after my husband passed
6 away.  It was the end of 2012, I believe.
7 I am relatively sure it was the end of
8 2012.
9    Q.   And why did you decide to
10 terminate your contract with Viridian?
11   A.   Once again, my sister had said,
12 she had called me and said that, you
13 know, had you taken a look at your --
14 there had been a lot going on, but have
15 you taken a look at your electric bills
16 lately, you know, to see what CL&P's rate
17 was as compared to the Viridian one that
18 you had to see if Viridian's rate was
19 better, to see if CL&P's rate was better
20 than Viridian's.
21   Q.   Okay.
22   A.   So I called the customer
23 service number.  We compared Viridian's
24 rate to CL&P's rate.  CL&P's rate was
25 more attractive than Viridian.

Page 63

STEPHANIE SILVER

1
2      CL&P said I didn't need to do
3 anything.  They would do the switching
4 for me.  So I switched back to CL&P.
5    Q.   So when you said you called the
6 customer service number of CL&P about
7 Viridian, so you personally compared your
8 Viridian rate to the CL&P rate at the
9 time?
10   A.   Yes, what they had provided to
11 me over the phone.
12   Q.   So you personally determined
13 that the CL&P rate was lower.  And this
14 was around the end of 2012?
15   A.   Yeah, to my recollection.
16   Q.   Stephanie, would you turn with
17 me, it's Page 9 and it's paragraph --
18 it's the document that you have in front
19 of you, Silver 1.
20   A.   Paragraph 35?
21   Q.   Yes.  Paragraph 35 is the one
22 right below that table.
23   A.   Okay.
24   Q.   There's only two sentences in
25 that paragraph.  The second one says

Page 64

STEPHANIE SILVER

1
2 "Upon information and belief, none of
3 Viridian's non-promotional variable rates
4 have matched, much less beat the standard
5 offer fixed rates in over two years."
6    A.   Mm-hmm.
7    Q.   Do you see that?
8    A.   Yes.
9    Q.   And I read that correctly?
10   A.   Mm-hmm.
11   Q.   When you say "the standard
12 offer fixed rates," are you referring to
13 the CL&P rates there?
14   A.   Well, if I am looking at the
15 grid above it, it says Total Wholesale
16 Rates and CL&P Rates in Connecticut.
17   Q.   Right.  So I am just trying to
18 understand what standard offer fixed
19 rates is.
20        Does it look like that means
21 the CL&P rates that you're comparing it
22 to?
23   A.   It leads me to believe that.
24   Q.   And this paragraph says that
25 you're alleging that on information and

Page 65

STEPHANIE SILVER

1
2 belief.
3      Does that mean that you didn't
4 personally compare the variable -- I am
5 sorry, the Viridian variable rate to the
6 CL&P rate?
7    A.   I am not a professional.  I
8 left this up to my attorney to do the
9 graphing and come up with the figures.
10   Q.   So they wrote the content and
11 you were relying on it?
12   A.   Correct.
13   Q.   I understand.  Let's do this.
14 I want to show you two documents.
15      [The document from the
16 Connecticut Department of Energy, the
17 Public Utilities Regulatory Authority
18 Website, was hereby marked as Silver
19 Exhibit 2 for identification, as of
20 this date.]
21      [The Ms. Silver's billing
22 history, Bates stamped
23 VIRIDIAN_P_000067, was hereby marked
24 as Silver Exhibit 3 for
25 identification, as of this date.]

17 (Pages 62 - 65)

STEPHANIE SILVER

1
2    Q.    So Stephanie, Dawn just handed
3 you two documents.
4         The first one with the table on
5 it is Silver Exhibit 2.  This is a
6 publically --
7         MR. BERMAN:  And Seth, for your
8    education, this is a publically
9    available document pulled from the
10   Connecticut Department of Energy, the
11   PURA, Public Utilities Regulatory
12   Authority Website.
13   Q.    And this is a table that
14 contains CL&P's standard service
15 generation rates from 2007 to 2013.
16        The other document is your
17 recent billing history, it appears, that
18 Connecticut Light & Power sent you.
19        So because we're now talking
20 about comparing your Viridian variable
21 rate to the CL&P rate, I just wanted to
22 go through some of this and compare the
23 two.  Is that fair?
24   A.    Yes.
25   Q.    Your recollection is you and

STEPHANIE SILVER

1
2 your husband joined Viridian around 2009
3 or maybe early 2010.  I know it's hard to
4 remember.  We don't like playing guessing
5 games.
6         If we turn to the last page of
7 Exhibit 3, in the bottom right-hand
8 corner, it's stamped VIRIDIAN_P_000067.
9 And this is your billing history.
10   A.    Okay.
11   Q.    So you see that it identifies
12 -- and this is a document that you
13 produced to us?
14   A.    Mm-hmm.
15   Q.    So this has your supplier
16 account number showing that you were a
17 Viridian customer, it looks like,
18 beginning in February of 2010.
19        Does that sound accurate to
20 you?
21   A.    That sounds accurate.  Like I
22 said, it's probably right around there.
23 I know my son was still in high school.
24   Q.    If you need, I think I have
25 something else that confirms that it was

STEPHANIE SILVER

1
2 February 2010.  But this appears to
3 verify that, right?
4    A.    Mm-hmm.
5    Q.    So if you take a look at your
6 billing history, on that page, the page
7 with 67 in the bottom right-hand corner,
8 do you see on the bottom it shows your
9 Viridian Energy rate from 2010 up until
10 when you terminated, which appears to be
11 around January of 2014; do you see that?
12   A.    Yes.
13   Q.    So take a look with me at the
14 rate you were paying to Viridian in 2010.
15        Do you see the rate appears to
16 vary between -- and I am just converting
17 this into kilowatt hours -- but 9.59
18 cents per kilowatt hour, above that 8.989
19 per kilowatt hour.
20        Do you see where I am?
21   A.    Yes.
22   Q.    So in 2010, your Viridian rate
23 was, at all times, less than 10 cents per
24 kilowatt hour, in some cases, less than 9
25 cents per kilowatt hour.

STEPHANIE SILVER

1
2         Am I being accurate when I say
3 that?
4    A.    Yes.
5    Q.    Now, take a look at the other
6 Exhibit, that would be Exhibit 2.
7         So can you take a look at that
8 table.  You see how it reads across from
9 2007 to 2013, and it shows CL&P's
10 residential electric rates by year?
11   A.    Yes.
12   Q.    And I am looking at the top of
13 the table, because you're not, for
14 example, a manufacturer or a small
15 business.  I imagine that you were
16 paying, or that you would have been
17 paying the residential CL&P rate.
18   A.    Okay.
19   Q.    So in 2010, the CL&P rate was
20 over 11 cents per kilowatt hour.
21        Do you see that?
22   A.    Mm-hmm.
23   Q.    So in 2010, with Viridian, you
24 were paying less than you would have paid
25 with CL&P?

18 (Pages 66 - 69)

Page 70

STEPHANIE SILVER

2    A.   Okay.
3    Q.   Is that right, based on
4 comparing your actual billing history
5 with Viridian?
6         MR. KLEIN:  Let me just object
7    to the extent that we need to confirm
8    that these are the actual rates.  But
9    the documents speak for themselves.
10    But if we're talking about comparing
11    the documents.
12         MR. BERMAN:  I can represent
13    that this is what it purports to be.
14         MR. KLEIN:  I am not questioning
15    you.  The question is limited to
16    what's in front of us at the moment.
17    Q.   Purporting this document is
18 what it purports to be, this is an
19 accurate CL&P table.  Can you see you
20 were paying a lower rate with Viridian in
21 2010 than CL&P was offering?
22    A.   Yes.
23         MR. KLEIN:  And before you
24    proceed, I just want to make clear I
25    am not trying to derail you.  I am not

Page 71

STEPHANIE SILVER

2    questioning whether or not this was an
3    accurate reproduction of this
4    document.  I have no question that it
5    is.  I am just saying I personally may
6    not be familiar with what this graph
7    is representing, if we are comparing
8    apples to apples, so we need to follow
9    up on that.  You are making the
10    assumption it's an apples to apples
11    comparison and we can proceed on that
12    basis.
13         MR. BERMAN:  I understand, Seth.
14    We can discuss that issue at the next
15    deposition in Washington.
16         MR. KLEIN:  I object to that,
17    too.
18    Q.   So let's go through it.  And
19 this won't take very long, Stephanie, but
20 let's go through the same exercise in
21 2011.
22         In 2011, if you look at Exhibit
23 2, the CL&P rate was 9.482 per kilowatt
24 hour; do you see that?
25    A.   I got it.

Page 72

STEPHANIE SILVER

2    Q.   Looking at your billing history
3 for the year 2011, your Viridian rate
4 fluctuated a bit.  It appears to have
5 fluctuated just about 10 cents a kilowatt
6 hour to just above 10 cents a kilowatt
7 hour.  And then, Stephanie, do you see
8 how it declined to 8.99 per kilowatt
9 hour.
10    A.   Mm-hmm.
11    Q.   At least for some months in
12 2011, you were paying a lower rate with
13 Viridian than you would have if you had
14 been enrolled with CL&P; is that
15 accurate?
16    A.   It appears that way.
17    Q.   Okay.  Same thing with 2012, if
18 you look at Exhibit 2, the CL&P rate for
19 2012 was 8.279 cents per kilowatt hour.
20 And if you compare to your billing
21 history with Viridian, again, you see
22 that your rate fluctuates.  Sometimes
23 it's slightly above the CL&P rate.
24 Sometimes it falls below it, right?
25    A.   Mm-hmm.

Page 73

STEPHANIE SILVER

2    Q.   So specifically, during the May
3 4th to June 5th billing cycle, your
4 Viridian rate fell below 8 cents per
5 kilowatt hour, right?
6    A.   2012, right?
7    Q.   Yes.  It's about halfway up the
8 chart.  Do you see where I am?
9    A.   Yes.
10    Q.   And it did the same thing in
11 October, right, during the October 3rd,
12 2012 to November 1st, 2012 billing
13 period, your Viridian rate, again, fell
14 below 8 cents per kilowatt hour, right?
15    A.   Yes.
16    Q.   So at least at some point
17 during 2012, you were paying less with
18 Viridian than you would have paid if you
19 had been at CL&P; is that fair?
20    A.   Right.  Yes.
21    Q.   Turn back to the second amended
22 complaint.  That's Exhibit 1 that I
23 handed you.  We were at paragraph, I
24 think it was 35.
25    A.   Right.

19 (Pages 70 - 73)

STEPHANIE SILVER

2  Q.   Why don't you turn to 49.
3     So paragraph 49 is one that
4 relates to you specifically, right?
5  A.   Mm-hmm.
6  Q.   "Plaintiff Stephanie Silver was
7 on Viridian's variable rate plan from
8 July 2013 to January 2014."
9     Did I read that accurately?
10  A.   Yes.
11  Q.   But you, in fact, were on
12 Viridian's variable rate plan going back
13 to February 2010, according to your
14 billing history, right?
15  A.   Right.
16  Q.   So why doesn't, why didn't you
17 allege that in paragraph 49; in other
18 words, why didn't you say that you were
19 on Viridian's variable rate plan from
20 February 2010 to January 2014?
21  A.   I'm not sure.
22  Q.   A few minutes ago you said your
23 attorney showed you this document?
24  A.   Yes.
25  Q.   And you reviewed it?

STEPHANIE SILVER

2  A.   I did.
3  Q.   Especially as to the
4 allegations that affect you?
5  A.   Yes.
6  Q.   And you confirmed the accuracy
7 of it?
8  A.   Yes.
9  Q.   But paragraph 49 is incorrect?
10  A.   Yes, it is incorrect.
11  Q.   But you weren't trying to hide
12 the fact that you were actually trying to
13 save money by 2013 by omitting it from
14 this?
15  A.   No, not at all.
16  Q.   Okay.  You said you spoke with
17 your sister about Viridian's rates in,
18 did you say, 2012?
19  A.   I believe it was 2012.  And
20 that sticks out for me, because that's
21 the year my husband passed away.
22  Q.   I am sorry that's the point of
23 reference for you.
24  A.   It is a point of reference.  So
25 there were a lot of things that were

STEPHANIE SILVER

2 going on.  And I was just starting to get
3 used to taking over everything.  So I
4 won't assume that it's 2012.  It could
5 have been later.  So I am not quite sure.
6  Q.   Why don't I try to help you.
7  A.   Okay.
8     MR. BERMAN:  Can you mark this
9 as Silver 4 and this as Silver 5.
10     [The Plaintiff Stephanie Silver's
11 Revised Objections and Responses to
12 Defendant's First Set of
13 Interrogatories, was hereby marked as
14 Silver Exhibit 4 for identification,
15 as of this date.]
16     [The verification, was hereby
17 marked as Silver Exhibit 5 for
18 identification, as of this date.]
19  Q.   You have two documents in front
20 of you, Silver Exhibit 4, which is this
21 document.
22  A.   Okay.
23  Q.   That is Plaintiff Stephanie
24 Silver's Revised Objections and Responses
25 to Defendant's First Set of

STEPHANIE SILVER

2 Interrogatories.  Do you see that?
3     (Witness reviews document.)
4  A.   Yes, I do.
5  Q.   Have you seen this document
6 before?
7  A.   Yes.
8  Q.   When did you see it?
9  A.   This was the -- I am not sure
10 of the specific date.
11  Q.   But it was certainly e-mailed
12 -- you certainly saw it?
13  A.   Absolutely.
14  Q.   And you reviewed this?
15  A.   Yes.
16  Q.   Did you review it carefully?
17  A.   Yes.  I read it over.  Yes, I
18 did read it.
19  Q.   And if there was anything in
20 here that was inaccurate, did you make an
21 effort to tell your lawyers to correct
22 it?
23  A.   Yes.
24  Q.   And the other document that I
25 marked for you, Stephanie, 5.  That's

20 (Pages 74 - 77)

Page 78

1        STEPHANIE SILVER
2 simply a verification?
3        (Witness reviews document.)
4    A.   Yup.
5    Q.   Have you seen that before?
6    A.   Yes.
7    Q.   Okay.  So this, so you declared
8 under penalty of perjury that you read
9 Exhibit 4, and that to the best of your
10 knowledge, it's truthful and accurate?
11   A.   Yes.
12   Q.   Is that right?
13   A.   Yes.
14   Q.   And you signed this on January
15 14th of 2016?
16   A.   Yes.
17   Q.   So a few weeks ago?
18   A.   Yes.
19   Q.   On Exhibit 4, it's Page 5,
20 about a little more than halfway down the
21 page, Stephanie, do you see in bold there
22 is an objection that your lawyers
23 wrote -- I understand that you didn't
24 write that -- and then a response?
25   A.   Mm-hmm.

Page 79

1        STEPHANIE SILVER
2    Q.   And all of these, by the way --
3 actually, strike that.
4        Let me back up.  Do you
5 understand that this document comprises
6 your responses to what are called
7 interrogatories?
8    A.   Mm-hmm.
9    Q.   Do you understand what
10 interrogatories are?
11   A.   They are answers to the
12 questions that were -- I believe I do.
13   Q.   So tell me in your own words
14 what you understand interrogatories to
15 be?
16   A.   My answers to what actually
17 happened during the -- to what
18 happened -- preceded me becoming part of
19 the lawsuit.
20   Q.   We're in the ballpark.  So
21 these are your answers or your responses.
22   A.   Okay.
23   Q.   The interrogatories are the
24 underlying questions themselves.
25   A.   Okay.

Page 80

1        STEPHANIE SILVER
2    Q.   Have you ever seen, not this
3 document, not Exhibit 4, but Viridian's
4 first set of interrogatories to you?
5 Were you ever shown that document?
6    A.   I have everything in my e-mail,
7 I'm sorry.
8    Q.   Do you know whether you were
9 shown Viridian's interrogatories, without
10 the responses that your lawyers wrote?
11   A.   Yes, I believe so.
12   Q.   Do you recall when you saw
13 them?
14   A.   I am sorry, no.  Like I said, I
15 have everything saved on my desktop.
16   Q.   Okay.  So going back to Page 5
17 of Exhibit 4.
18   A.   Mm-hmm.
19   Q.   This isn't a game of gotcha.
20 This is trying to understand what
21 happened and when.
22        In response to Viridian
23 interrogatory number 4, which you can see
24 asked for you to tell us about any
25 communications that you had with other

Page 81

1        STEPHANIE SILVER
2 people, family members, about Viridian.
3 You wrote that In or around late 2013,
4 you talked with your sister concerning
5 Viridian.
6    A.   Mm-hmm.
7    Q.   And she advised you that you
8 might be paying an excessively high
9 variable rate.
10        Did I read that right?
11   A.   Yes.
12   Q.   So is it, in fact, the case
13 that you spoke with your sister in late
14 2013 and not in 2012?
15   A.   The date, as I said, to the
16 best of my recollection, 2013, like I
17 said, 2012 is a reference point for me.
18   Q.   I understand.
19   A.   So 2013, to the best of my
20 recollection, it could be wrong.
21   Q.   Like we said, whatever is
22 written in Exhibit 4, you reviewed and
23 verified the accuracy of about two weeks
24 ago?
25   A.   Right.

21 (Pages 78 - 81)

Page 82

STEPHANIE SILVER

1
2  Q.   So is it more likely that the
3  content in here is accurate or is it more
4  likely that your memory of 2012 is
5  accurate?
6  A.   I really feel that 2013 is
7  accurate.
8  Q.   And this says late 2013.
9       Does that sound right?
10  A.   Yes.
11  Q.   You lived in Connecticut your
12  whole life?
13  A.   Yes.
14  Q.   Do you remember an extreme
15  weather event called the polar vortex
16  that happened at the end of 2013 to 2014?
17  A.   Yes.
18  Q.   You recall that occurred?
19  A.   Yes.
20  Q.   Do you recall whether that
21  event affected people's energy prices?
22  A.   I was going to say I would
23  assume so.  Yes.
24  Q.   So just so I understand.  The
25  time that your sister notified you that

Page 83

STEPHANIE SILVER

1
2  you might be paying an excessively high
3  variable rate through Viridian coincided
4  with the time that the polar vortex
5  caused energy rates to go up?
6  A.   Mm-hmm.
7  Q.   Did you ever contact Viridian
8  to complain about your rate?
9  A.   No.
10  Q.   Why not?
11  A.   I believe they were basically
12  doing what they were supposed to be
13  doing, which was adjusting the rate to
14  what it should be, and what they had said
15  that it would be, which was the, going
16  with the wholesale rates, which sometimes
17  it would go up, but mainly, it would --
18  not mainly, I wouldn't say mainly,
19  because that's not accurate.  I expected
20  it to increase, and I also expected it to
21  go down as well.
22      I didn't always monitor my bill
23  and I didn't call them.  But I expected
24  them to do what they stated they would be
25  doing.

Page 84

STEPHANIE SILVER

1
2  Q.   And where did they state that?
3  A.   Well, when we switched over to
4  Verizon -- oh my God.  There is something
5  mentally wrong with me.
6      MR. BLYNN:  It's okay.  I think
7      we all can agree if you say Verizon,
8      we'll clean it up at the end.  But
9      you're referring to Viridian.
10  A.   That when we switched over,
11  that the rate would be a variable rate,
12  but it would be based on the wholesale
13  rate, which, to my understanding, would
14  fluctuate, but would not, but could go
15  down and that -- I mean, I didn't think
16  it was necessary for me to constantly
17  monitor my bill.
18  Q.   I understand.  I guess what I'm
19  asking is you said Viridian stated that
20  they would do that.
21      Where did they state that?
22  A.   Well, when we were switching
23  over.
24  Q.   So at the home show?
25  A.   At the home show, sorry.  I

Page 85

STEPHANIE SILVER

1
2  should be more clear.
3  Q.   They said it orally?
4  A.   Yes.
5  Q.   To your husband?
6  A.   Mm-hmm.
7  Q.   And you heard it?
8  A.   I did hear the variable part.
9  And that the rates would be better, at
10  times, than the utility rates.
11  Q.   At all times or just sometimes?
12  A.   Not all times, but would -- the
13  majority of the time would be better, and
14  that we would save additional money.
15  There would be times when we would save
16  money.
17      So with that, my understanding
18  was that there would be times there would
19  be a fluctuation, but it wouldn't stay
20  consistently high.
21  Q.   I understand.  But it sounds,
22  it sounds, and tell me if I have it
23  wrong, that you understood that it's a
24  variable rate.  So at times, you would
25  save money and at times, you wouldn't.

22 (Pages 82 - 85)

Page 86

STEPHANIE SILVER

1
2  That's why it's a variable rate.
3    A.   Correct.
4    Q.   Did you ever seek the certainty
5  of a fixed rate plan?
6    A.   I wasn't aware that there was
7  an option.
8    Q.   This is 4.  Turn back to Page
9  13.  So we're on Page 13 of Exhibit 4.
10       Do you see under the heading
11 Specific Responses, there are different
12 enumerated paragraphs?
13   A.   Yes.
14   Q.   This is in response to a
15 question where we had asked your
16 knowledge about a number of allegations
17 in the complaint that you filed against
18 Viridian?
19   A.   Mm-hmm.
20   Q.   So these are the answers that
21 you've given and verified.
22       If you look next to paragraph
23 25?
24   A.   Mm-hmm.
25   Q.   Just read with me here:

Page 87

STEPHANIE SILVER

1
2  "Silver's allegation that Viridian offers
3  'teaser rates' is based on Silver's own
4  experience with Viridian's contract,
5  which transitioned from a fixed rate to a
6  variable rate."
7        Did I read that right?
8    A.   Yes.
9    Q.   But you were never on a fixed
10 rate, right?
11   A.   I don't believe I was.  The
12 only thing I recall was that him saying
13 that it was variable.
14   Q.   Okay.  Can you explain why this
15 is in your interrogatory response?
16   A.   "From a fixed rate to a
17 variable rate"?  The only thing that I
18 can recall is I was unsure whether it was
19 a fixed rate or a variable rate.  The
20 only thing I can recall is, it was so
21 long ago, was hearing the variable rate
22 piece of it.  So I am really not quite
23 sure.
24   Q.   Well, up until now, your
25 testimony has been that you were on a

Page 88

STEPHANIE SILVER

1
2  Viridian variable rate?
3    A.   Right.
4    Q.   That was your understanding?
5    A.   Mm-hmm.
6    Q.   And in fact, I will represent
7  to you that's what Viridian's records
8  reflect, as well?
9    A.   Right.
10   Q.   You were never on a fixed rate?
11   A.   Not that I recall.
12   Q.   I will ask the same question
13 again.  Usually it's improper to ask the
14 same question over.
15       Why in a document you verified
16 the accuracy of about two weeks ago, why
17 this said that you went from a fixed rate
18 to a variable rate?  Do you know why?
19   A.   No.
20   Q.   Did you actually write this?
21   A.   Did I write this?
22   Q.   Yes.
23   A.   This paragraph?
24   Q.   Yes.  I am asking whether you
25 wrote it?

Page 89

STEPHANIE SILVER

1
2    A.   No.
3    Q.   Your lawyers wrote that for
4  you?
5    A.   Yes.
6    Q.   And you just looked at it?
7    A.   I read it, and I obviously did
8  not read it closely enough, because I
9  should have corrected it.  That was my
10 fault.
11   Q.   I understand.
12   A.   And then reading it again, I
13 would have corrected it, because I would
14 have corrected it.  So it was actually my
15 fault, not theirs.
16       MR. KLEIN:  It's my fault, not
17 yours.
18   Q.   Do you see above where it says
19 Specific Responses, further up the page?
20   A.   Mm-hmm.
21   Q.   "Silver will supplement the
22 responses needed at the appropriate
23 juncture"?
24   A.   Mm-hmm.
25   Q.   Do you think you might do that?

23 (Pages 86 - 89)

STEPHANIE SILVER

1
2   A.   You mean change my answer?
3   Q.   Yes.
4   A.   Yes.
5   Q.   So you were talking to your
6 sister at the end of 2013 when the polar
7 vortex happened.  Your variable rate had
8 gone up.  She thought you might be paying
9 an excessively high rate.
10      Did she know what rate you were
11 paying Viridian?
12  A.   No.
13  Q.   Then how would she know that
14 you were paying -- how would she suspect
15 that you were paying an excessively high
16 rate?
17  A.   Because I would talk about my
18 high electric bills.
19  Q.   So what did you tell her about
20 your bills?
21  A.   Just, I have electric heat.  So
22 I would just say that my electric bills
23 were higher.  And she knew -- she had
24 asked me who my supplier was.
25  Q.   Got it.

STEPHANIE SILVER

1
2   A.   And she's the type of person
3 who is always looking out for, you know,
4 to change to see who can give you the
5 best offer or whatever.
6        And she said have you checked
7 to make sure that Viridian is -- you
8 know, CL&P might be lower than Viridian.
9        And at that point, my husband
10 used to take care of those things.  So at
11 that point she said, you know, you should
12 really call customer service.  And I, in
13 fact, did that.
14  Q.   You called CL&P's customer
15 service?
16  A.   CL&P's customer service, yes.
17  Q.   So you never wanted to call
18 Viridian's customer service to see if
19 they would give you a better rate?
20  A.   No.
21  Q.   So you're talking with your
22 sister at a time when there is extreme
23 weather and everyone's energy rates are
24 going up, and you're talking about your
25 high energy bill, and she was of the

STEPHANIE SILVER

1
2 opinion that this was an issue specific
3 to Viridian?
4   A.   Is it specific to Viridian?
5   Q.   Yes.
6   A.   I think she just thought that
7 you could get different rates for
8 different suppliers.  So she said you
9 should check back with CL&P to see what
10 CL&P's rates are.
11  Q.   Did she recommend that you
12 comparison shop with any other suppliers?
13  A.   I don't recall.
14  Q.   Did she say what rate she
15 thought you should be paying?
16  A.   No.  She's not good that way.
17  Q.   At various points, you said
18 follow the wholesale rate, and I forgot
19 what other verb you used.
20      You haven't seen any documents
21 from Viridian that make that
22 representation, right?
23  A.   No.
24  Q.   But you understand that that
25 allegation, that the Viridian rate should

STEPHANIE SILVER

1
2 be tied to the wholesale rate, that's in
3 your lawsuit?
4   A.   Yes.
5   Q.   Do you understand that?  Why is
6 it in your lawsuit if you haven't seen
7 any representation to that effect?
8   A.   The attorneys, I leave that to
9 them.  I'm not an expert with regard to
10 electrical.  I leave the charting and
11 things like that to my attorneys.  They
12 would know.
13  Q.   Are there any allegations in
14 your lawsuit where you're not simply
15 relying on your lawyers to, you know,
16 kind of draft it for you?
17  A.   With regard to the figures in
18 the charting?
19  Q.   Any allegation.  It's your
20 lawsuit.  So for the entire lawsuit?
21  A.   For the most part.
22  Q.   For the most part.  So for what
23 parts of your lawsuit do you have
24 personal knowledge of the allegations
25 that you're making against Viridian?  And

24 (Pages 90 - 93)

1          STEPHANIE SILVER
2 feel free, you have the document.  I
3 think it's Exhibit 1.  Take whatever time
4 you need to go through the complaint.
5          What I am wondering, Stephanie,
6 what part of your lawsuit, what
7 allegations and claims against Viridian
8 are you making, are you making because
9 you personally know the basis for the
10 allegation, as opposed to something your
11 lawyers told you?
12          MR. BLYNN:  Why don't you go off
13      record.  We'll let you read the
14      complaint.
15          (Off the record.)
16 BY MR. BERMAN:
17      Q.   Stephanie, before the break,
18 the question that was pending, I showed
19 you Silver Exhibit 1, that the Second
20 Amended Class Action Complaint.  That's
21 the operative lawsuit to which you are a
22 class representative and named Plaintiff
23 against Viridian.
24          My question to you was which
25 allegations, if any, in your lawsuit are

1          STEPHANIE SILVER
2 based on your personal knowledge as
3 opposed to your lawyers' representations
4 and you had adequate time to review the
5 complaint?
6      A.   Yes.
7      Q.   And what's the answer?
8      A.   The answer would be the ones
9 that pertain to me, yes, most of them
10 were prepared by my attorney.  The ones
11 that pertain to me are the ones that I
12 feel are -- the only thing that I can say
13 is that I felt at the time when I
14 switched over that my bill was higher
15 than it should be.
16          Do you know what I mean?
17      Q.   I think I do.
18      A.   Okay.
19      Q.   The allegation that your bill
20 was higher than it should be, what was
21 that based on?
22      A.   When I compared my, when I
23 called Connecticut Light & Power and I
24 compared my Viridian rate with
25 Connecticut Light & Power, my Viridian

1          STEPHANIE SILVER
2 rate was higher than Connecticut Light &
3 Power.
4      Q.   So your allegation that you
5 were paying more than you believe you
6 should have was based on -- is it fair to
7 say a snapshot, a snapshot comparison of
8 Viridian to CL&P when you called CL&P?
9      A.   Correct.
10      Q.   And remind me when that call to
11 CL&P was?
12      A.   I am sorry, I am not very good
13 on the dates on that.  All very unclear
14 for me.  I want to say 2000 -- I am not
15 sure of the date.  I am sorry.
16      Q.   Don't be sorry.
17          And just to be clear, no
18 personal information based on a
19 comparison between Viridian and CL&P at
20 any other time during which you were
21 enrolled with Viridian, right?
22      A.   No.
23      Q.   And earlier we actually did the
24 comparison ourselves.  And there were
25 times prior to 2013 where Viridian's

1          STEPHANIE SILVER
2 rates were lower than CL&P's rates,
3 right?
4      A.   According to the chart, yes.
5      Q.   Exactly right.
6          When we started the deposition,
7 we talked a little bit about your
8 responsibilities as a class
9 representative in this lawsuit.
10          You understand that if this
11 case moves forward, and eventually it
12 gets tried before a judge or a jury,
13 you'll have to prove all of the
14 allegations that you made against
15 Viridian, not just the ones that say
16 Stephanie Silver.
17          Do you understand that?
18      A.   Yes.
19      Q.   Do you have any intention of
20 enrolling with Viridian in the future?
21      A.   I would say at this time, no.
22          MR. BERMAN:  Do you have any
23      Redirect?
24          MR. KLEIN:  I do.  Let's take a
25      five minute break, and we'll come back

Page 98

```
1          STEPHANIE SILVER
2   and I will do my Redirect.
3          (Off the record.)
4          MR. KLEIN:  No questions.
5          [TIME NOTED:  11:13 a.m.]
6   _____
7          STEPHANIE SILVER
8
9   Subscribed and sworn to before me
10  this _____ day of _____, 2016.
11
12  _____
13          NOTARY PUBLIC
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 99

```
1
2          I N D E X
3
    WITNESS     EXAMINATION BY     PAGE
4
5   Stephanie Silver   Mr. Berman     3
6
7          E X H I B I T S
8   SILVER   DESCRIPTION           PAGE
9   Exhibit 1   Second Amended     59
            Class Action
10          Complaint
11
12  Exhibit 2   document from the  65
            Connecticut Department
13          of Energy, the Public
            Utilities Regulatory
14          Authority Website
15
16  Exhibit 3   Ms. Silver's       65
            billing history,
17          Bates stamped
            VIRIDIAN_P_000067
18
19
    Exhibit 4   Plaintiff          76
20          Stephanie Silver's
            Revised Objections and
21          Responses to Defendant's
            First Set of
22          Interrogatories
23
    Exhibit 5   verification        76
24
    (The court reporter has retained all
25  exhibits.)
```

Page 100

```
1
2          CERTIFICATION
3
4      I, Dawn Matera, a Notary Public for
5   and within the State of Connecticut, do
6   hereby certify:
7      That the witness whose testimony as
8   herein set forth, was duly sworn by me;
9   and that the within transcript is a true
10  record of the testimony given by said
11  witness.
12     I further certify that I am not
13  related to any of the parties to this
14  action by blood or marriage, and that I
15  am in no way interested in the outcome of
16  this matter.
17     IN WITNESS WHEREOF, I have hereunto
18  set my hand this 10th day of February,
19  2016.
20
21
            Dawn Matera
22  _____
23          Dawn Matera
24
25
```

Page 101

```
1          ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS
2          330 OLD COUNTRY ROAD
            MINEOLA, NEW YORK 10001
3          516-608-2400
4   NAME OF CASE: SANBORN VS. VIRIDIAN ENERGY, INC.
    DATE OF DEPOSITION: FEBRUARY 5, 2016
5   NAME OF DEPONENT: STEPHANIE SILVER
6   PAGE  LINE(S)    CHANGE        REASON
7   ____|_____|_____|_____
8   ____|_____|_____|_____
9   ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18  ____|_____|_____|_____
19  ____|_____|_____|_____
20  ____|_____|_____|_____
21          _____
                    STEPHANIE SILVER
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS___DAY OF _____, 20___.
24
    _____        _____
25  (NOTARY PUBLIC)    MY COMMISSION EXPIRES:
```

26 (Pages 98 - 101)