# EXHIBIT L

1

2          UNITED STATES DISTRICT COURT

3             DISTRICT OF CONNECTICUT

4       - - - - - - - - - - - - - - - - - - -x

5      LORI SANBORN, BDK ALLIANCE LLC,

       IRON MAN LLC, and STEPHANIE

6      SILVER, on behalf of themselves and all

       others similarly situated,

7

                             Plaintiffs,

8

            -against-

9

       VIRIDIAN ENERGY, INC.,

10

                             Defendant.

11

        - - - - - - - - - - - - - - - - - - -x

12

                     29 South Main Street

13                   West Hartford, Connecticut

14                   February 4, 2016

                     1:00 p.m.

15

16

17         DEPOSITION of LORI SANBORN, a

18      Plaintiff in the above-entitled action,

19      held at the above time and place, taken

20      before Dawn Matera, a Shorthand Reporter

21      and Notary Public of the State of

22      Connecticut.

23

24

25

Page 2

```
1
2  APPEARANCES:
3
4      IZARD NOBEL, LLP
           Attorneys for Plaintiffs
5          29 South Main Street
           Suite 305
6          West Hartford, Connecticut 06107
       BY:  SETH R. KLEIN, ESQ.
7
8
9
       VENABLE LLP
10     Attorney for Defendant
           575 Seventh Street, NW
11         Washington, DC 20004
       BY:  DANIEL S. BLYNN, ESQ
12     BY:  ERIC S. BERMAN, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
              LORI SANBORN
1
2  LORI SANBORN, a Plaintiff herein, having
3  first been duly sworn by the Notary
4  Public, was examined and testified as
5  follows:
6
7  EXAMINATION BY MR. BERMAN:
8      Q.   I'm Eric Berman.  This is Dan
9  Blynn.  We represent Viridian Energy.
10         Would you just state and spell
11 your name for the record, please?
12     A.   Lori, L-O-R-I, Sanborn,
13 S-A-N-B-O-R-N.
14     Q.   And Ms. Sanborn, what's your
15 home address?
16     A.   37 Kim Terrace, Stoughton,
17 Mass, 02072.
18     Q.   Is that near Boston?
19     A.   It's about 30 minutes south of
20 Boston.
21     Q.   During the period of time
22 relevant to your lawsuit against
23 Viridian, had you always lived in
24 Massachusetts?
25     A.   I moved to Mass when I was 12.
```

Page 4

```
1              LORI SANBORN
2      Q.   So yes?
3      A.   Yes.
4      Q.   So just incidentally, what is
5  the period of time that's relevant to
6  your lawsuit against Viridian; do you
7  know?
8      A.   When I started with Viridian?
9  I think it was 2012 or 13.  I am not
10 quite sure.
11     Q.   We'll probably come back to
12 that and figure it out soon enough.
13         Ms. Sanborn, have you ever
14 served as a Plaintiff in any other
15 lawsuit?
16     A.   No.
17     Q.   And in this lawsuit you're
18 represented by your attorneys?
19     A.   Yes.
20     Q.   And your attorneys are the
21 gentleman to your right, Seth Klein?
22     A.   Yes.
23     Q.   Are you represented by any
24 other attorneys?
25     A.   No.  Unless Bob is included in
```

Page 5

```
1              LORI SANBORN
2  that.
3      Q.   Bob Izard.  I am happy to get
4  his name on the record.
5          Prior to retaining Messrs.
6  Izard and Klein, did you know them?
7      A.   No.
8      Q.   Did you have any relationship
9  outside of the attorney/client
10 relationship?
11     A.   No.
12     Q.   And actually, that's a good
13 reminder.
14         So have you ever been deposed
15 before?
16     A.   No.
17     Q.   I just want to go over a couple
18 of ground rules, because this is a good
19 trigger, because we're already starting
20 to talk over each other a little bit.
21         So this is a deposition, and
22 it's a conversation, but it's not a
23 regular conversation that you and I would
24 have.
25         Normally we talk to each other,
```

2 (Pages 2 - 5)

Page 6

LORI SANBORN

1
2  and we would anticipate what the person
3  was about to say and finish each other's
4  sentences and talk over each other.
5       I am going to try not to do
6  that today and I'm going to ask you to
7  try not to do that, as well.
8       We have a court reporter, Dawn,
9  here, and we don't want to make her life
10 difficult.  Normal conversation, joke,
11 sarcasm, using gestures, body language,
12 none of that shows up on the page.  So if
13 we have to pull this transcript out a
14 year from now, we want to make sure we
15 know exactly what you were saying and it
16 was clear.  Do you understand?
17    A.   I do.
18    Q.   So I am going to ask you to
19 give verbal answers to my questions.  No
20 nodding, no uh-huh, mm-hmm, that sort of
21 thing; do you understand?
22    A.   Yes.
23    Q.   You were sworn in?
24    A.   Yes.
25    Q.   Do you understand that you've

Page 7

LORI SANBORN

1
2  taken an oath to tell the truth?  This is
3  similar to a proceeding in a courtroom;
4  do you understand?
5    A.   Yes.
6    Q.   Any reason why you can't
7  provide truthful testimony today?
8    A.   No.
9    Q.   So I am going to ask you -- I
10 will be asking you questions.  And I want
11 you to make sure that you understand my
12 questions.  If I ask you something and
13 you answer it, I am going to assume that
14 you understood my question.
15    A.   Okay.
16    Q.   If you don't, just tell me and
17 I will try to ask a better question, I
18 will try to clarify or I will move on.
19 Just let me know, okay?
20    A.   Yes.
21    Q.   I am going to try my best to
22 wait until you're done with your answers
23 before I ask my question.  I am going to
24 ask you to wait until I'm done with my
25 question before you start your answer.

Page 8

LORI SANBORN

1
2    A.   Okay.
3    Q.   I guaranty we'll violate that
4  request, but let's do our best.  I don't
5  want to keep you here very long.  But if
6  you do need a break, just let me know.
7  My only request is if I am in the middle
8  of a question, or if I asked you a
9  question and it is pending, you haven't
10 answered yet, I will ask you to answer it
11 and then we'll go on break.  Okay?
12    A.   Okay.
13    Q.   My last request is that at some
14 point during my questioning, your
15 lawyers, Seth Klein, might interpose an
16 objection.  If he does that, I am still
17 going to expect you to answer my
18 question, okay?
19    A.   Okay.
20       MR. KLEIN:  Unless I direct you
21    not to.
22    Q.   Unless -- as I was about to
23 say, the exception to that is if my
24 question requires you to provide
25 information that is legally privileged,

Page 9

LORI SANBORN

1
2  your counsel may instruct you not to
3  answer.  And we'll jump off that bridge
4  when we get to it.  Otherwise, I will
5  need an answer from you.
6       Did you prepare for today's
7  deposition?
8    A.   As best I could.
9    Q.   Tell me how you prepared.
10    A.   Just mentally preparing.  I had
11 gone over, looked at a couple of things,
12 a couple of the documents prior.  But not
13 the last week.
14    Q.   And I understand why.  So you
15 did review some documents though in
16 preparation for the deposition?
17    A.   Yes.
18    Q.   Can you tell me what documents
19 you reviewed?
20    A.   No, I am not sure exactly which
21 ones they were.
22    Q.   You can't recall, sitting here
23 now, what documents, if any, you reviewed
24 to prepare?
25    A.   I can't recall which documents.

3 (Pages 6 - 9)

LORI SANBORN

1

2    Q.    Do you have a sense of
3    approximately how much time you spent
4    reviewing any documents for today's
5    deposition?
6    A.    No.
7    Q.    Do you think you could give a
8    ballpark?  Are we talking an hour, are we
9    talking 10 hours?
10   A.    Do you mean from the time this
11   whole -- the -- from going way back to
12   when the complaint was --
13   Q.    My question is from the moment
14   that you said to yourself I received a
15   Notice of Deposition, my lawyer sent it
16   to me and I know I'm going to be deposed
17   on February 4th, I should start preparing
18   for that.  About how long do you think
19   you prepared?
20   A.    All together with all the
21   documents, a half an hour, 45 minutes.
22   Q.    In addition to possibly
23   reviewing some documents, did you do
24   anything else to prepare?
25   A.    No.

LORI SANBORN

1

2    Q.    Did you meet with anybody in
3    preparation for this deposition?
4    A.    I had met with Seth.
5    Q.    About for how long did you meet
6    with Seth?
7    A.    Maybe an hour or two.
8    Q.    Okay.  And one meeting?
9    A.    One meeting.
10   Q.    Okay.  So was the half hour
11   that you met with Seth in addition to the
12   half an hour or 45 minutes?
13       MR. KLEIN:  Objection.  She said
14   she met with me an hour or two, not a
15   half an hour.
16       MR. BERMAN:  I apologize, let me
17   apologize.
18   Q.    You testified you met with Seth
19   Klein for an hour?
20   A.    Maybe two.  An hour or two
21   hours.  I don't recall how long it was,
22   to tell you the truth.
23   Q.    And that is in addition to the
24   roughly half hour or 45 minutes that you
25   spent otherwise preparing for today's

LORI SANBORN

1

2    deposition?
3    A.    Correct.
4    Q.    And when did you meet with
5    Seth?
6    A.    Last Thursday.
7    Q.    And was that an in-person
8    meeting?
9    A.    Yes.
10   Q.    And where was that?
11   A.    At my office.
12   Q.    In?
13   A.    Sharon.
14   Q.    Why did you decide to sue
15   Viridian Energy?
16   A.    Because I was paying more money
17   for Viridian than I was paying on my bill
18   for the energy source that I had.
19   Q.    What energy supplier had you
20   used previously?
21   A.    It was NSTAR.
22   Q.    Are you sure?
23   A.    Well, now it's believe
24   Eversource, it could be -- wait a minute.
25   NSTAR or National Grid.  Oh my God.

LORI SANBORN

1

2    Q.    If I represented to you -- and
3    I understand that your mind might be
4    scattered -- if I represent to you --
5    A.    I believe it's National Grid.
6    Q.    -- National Grid, would that
7    sound accurate to you?
8    A.    Yes, that was my previous one.
9    Q.    So just to be clear, you sued
10   Viridian because you were paying more for
11   your electricity supply than you had been
12   previously with another supplier?
13   A.    Yes.
14   Q.    Are there any other reasons why
15   you sued Viridian?
16   A.    That's why I wanted to sue
17   Viridian, because of that.
18   Q.    So the basis for your lawsuit
19   for Viridian is that you paid too much
20   for your electricity service when you
21   were enrolled with Viridian.
22       How much do you think you --
23   how much less do you think you should
24   have been paying for electricity service?
25   A.    Honestly, I don't know.  I

4 (Pages 10 - 13)

LORI SANBORN

1         LORI SANBORN
2  don't know how much less.  All I know I
3  was paying more.  And that wasn't what I
4  was told I was going to be doing.
5      Q.   And we'll come back to what you
6  were told in just a few minutes.
7           Do you know how much you were
8  paying for electricity service with
9  National Grid when you were getting your
10  supply from them?
11     A.   How much money a month?
12     Q.   Yes.
13     A.   No, I don't remember what it
14  was.
15     Q.   Do you remember what your rate
16  per kilowatt hour was with National Grid?
17     A.   No.
18     Q.   Over what period of time,
19  Ms. Sanborn, were you alleging that you
20  paid too much to Viridian?  I'll ask a
21  better question.
22           Are you alleging that you paid
23  too much to Viridian during the entire
24  time that you were a Viridian customer?
25     A.   I don't believe it was every

1         LORI SANBORN
2  month that I paid more.  But however,
3  when I found out that I was paying more,
4  that's when I canceled with Viridian,
5  because I was paying too much money.  And
6  it was more -- it ended up being over a
7  period of time.
8      Q.   And just so I'm clear, so when
9  you say that you were paying too much to
10  Viridian --
11     A.   I was paying -- I am sorry.
12     Q.   I'll try again.
13     A.   Sorry about that.
14     Q.   That's okay.  And it's going to
15  happen again.
16           The allegation that you were
17  paying too much money to Viridian, that
18  is by way of comparison to another rate
19  that you could or should have been
20  paying; is that your contention?
21     A.   Right, because I was told that
22  I was going to be paying a less of a rate
23  than I would to my, to the company that I
24  had, to National Grid than to Viridian.
25     Q.   Okay.

1         LORI SANBORN
2      A.   So as I understood it, Viridian
3  was a wholesale company.  I was going to
4  be paying -- the rate was going to be
5  lower.  And it wasn't, and it wasn't
6  lower.  And that's why I wanted to sue.
7  It was not lower.
8      Q.   And you just said that your
9  understanding is that Viridian is a
10  wholesale electric supplier?
11     A.   Wholesale or discount company.
12  The rate was going to be lower than what
13  I paid.  That's what I was told.
14     Q.   Okay.
15     A.   Or your bill would go down, you
16  would have a lower energy rate, a bill.
17     Q.   I want to try to be as clear as
18  we can on this.  Sometimes this could be
19  a little bit like going to the dentist,
20  but it's important.
21           Were you given the impression
22  that -- I am going to ask a two part
23  question.
24           Were you given the impression
25  that Viridian itself was a wholesale

1         LORI SANBORN
2  supplier of electricity, or were you
3  given the impression that Viridian was a
4  retail supplier of electricity whose
5  rates would be as low as the wholesale
6  rate?
7           Does that question make sense
8  to you?
9      A.   It makes sense.  However -- and
10  I think I'm going to answer a little bit
11  differently.
12           This is what I was told:
13  You're going to have a lower energy bill.
14  That's the only really way I can answer
15  that.
16     Q.   The representation that you
17  received that you were going to have a
18  lower energy bill, was that a general
19  representation, just lower in general or
20  lower as compared to something else?
21     A.   Lower than the bills that I was
22  paying, it would be lower than National
23  Grid.
24     Q.   So lower -- okay.
25           So somebody from Viridian made

5 (Pages 14 - 17)

Page 18

LORI SANBORN

2 a representation to you at the time
3 roughly that you enrolled -- and we'll
4 talk about when in a minute -- that you
5 would be paying a lower energy bill than
6 you had been when you were enrolled with
7 National Grid.
8         Did I get that right?
9     A.   Yes.
10    Q.   Do you know when you decided to
11 sue Viridian?
12    A.   The exact date, no.
13    Q.   I don't need the exact date.
14 Do you remember month and year?
15    A.   No.
16    Q.   How did you go about deciding
17 that you needed to file a lawsuit?
18    A.   Well, I was cancelling -- I was
19 on the phone with Viridian, cancelling
20 Viridian.  And somebody had overheard the
21 conversation and said if you are
22 interested, put me in touch with Seth.
23    Q.   Who put you in touch with
24 Mr. Klein?
25    A.   Somebody that I work with.

Page 19

LORI SANBORN

2     Q.   Who is that?
3     A.   Jim Glaser.
4     Q.   And who is Jim Glaser?
5     A.   What do you mean who is he?  My
6 relationship with him?
7     Q.   Yes.
8     A.   He's my boss.
9     Q.   And what communications did you
10 have with Jim Glaser that led to him
11 recommending that you contact Seth Klein
12 to file a lawsuit against Viridian?
13    A.   Can you say that again?
14    Q.   Describe the circumstances
15 where Jim Glaser recommended that you
16 contact Seth Klein to file a lawsuit.
17    A.   He said to me -- I said to him
18 I'm getting rid of Viridian.  I'm paying
19 too much money for it.  It's ridiculous.
20 I said this is crazy.
21        And he said to me why don't you
22 speak to my buddy Seth about this or my
23 colleague Seth or somebody I know Seth.
24 Not his colleague.  It's not his
25 colleague.

Page 20

LORI SANBORN

2     Q.   Do you know whether Jim Glaser
3 is a Viridian customer himself?
4     A.   I believe he's not.
5     Q.   Did he ever tell you that he
6 isn't?
7     A.   I don't remember.
8     Q.   And do you remember
9 approximately when you had this
10 conversation with Jim Glaser?
11    A.   No.
12    Q.   You don't remember.
13        I can represent to you that the
14 initial lawsuit that you filed in this
15 case was filed in November of 2014.
16        Does that refresh your
17 recollection about approximately when you
18 were making these decisions?
19    A.   I don't remember the dates.
20    Q.   So at Mr. Glazer's
21 recommendation --
22    A.   Not his recommendation.  He
23 just mentioned it to me.  And I wanted to
24 contact -- I wanted to speak to him.
25    Q.   So that's what I was trying to

Page 21

LORI SANBORN

2 figure out.  So the outreach was from you
3 to Mr. Klein and not vice versa?
4     A.   Oh, yeah.  Me to Mr. Klein.
5     Q.   So you called him?
6     A.   I believe I did.  I don't
7 remember -- yes.
8     Q.   Where do you and Mr. Glaser
9 work?
10    A.   In Sharon, Massachusetts.
11    Q.   At a company?
12    A.   Yes.
13    Q.   What is the name of the
14 company?
15    A.   It's called Glaser Legal.
16    Q.   What's Glaser Legal?
17    A.   It's a legal law firm or a
18 legal network.  Hard to explain.
19    Q.   Is Mr. Glaser an attorney?
20    A.   Yes.
21    Q.   Does he actively practice law?
22    A.   He's not a litigator.  He is an
23 attorney.
24    Q.   You use the term a legal -- did
25 you say network?

6 (Pages 18 - 21)

Page 22

```
1          LORI SANBORN
2      So what does that mean?
3     A.   We don't do any in-house cases.
4 We refer cases out.
5     Q.   Do you know whether Mr. Glaser
6 is compensated for cases that he refers
7 to other lawyers?
8     A.   Yes.
9     Q.   Do you know whether Mr. Glaser
10 was compensated for referring you to
11 Mr. Klein?
12    A.   No.
13    Q.   No, you don't know or --
14    A.   I don't know.  I don't know --
15 I don't handle any of that end of it.
16    Q.   Okay.
17    A.   Of what comes in, what money
18 end of it, I don't do that.  So I don't
19 know.
20    Q.   You don't know whether or not
21 Mr. Glaser was compensated for this case?
22    A.   I don't know.  I wouldn't know.
23 Right now there is no compensation.  I
24 don't know.
25    Q.   What do you do at Glaser Legal?
```

Page 23

```
1          LORI SANBORN
2     A.   I am a case manager.
3     Q.   And so what does that entail?
4     A.   I deal with the clients.
5     Q.   Who are Glaser Legal clients?
6 I apologize, you weren't done.  Go ahead?
7     A.   Say that again?
8     Q.   I talked over you as you were
9 answering.
10      I asked you what you do.  You
11 said you were --
12    A.   A case manager.
13    Q.   And I asked what that entails?
14    A.   And I speak to the clients that
15 are looking for attorneys.
16    Q.   What types of clients does
17 Glaser Legal have?
18    A.   We do Workers' Comp, Social
19 Security Disability.
20    Q.   So generally, individuals,
21 injured individuals?
22    A.   Yes.
23    Q.   What is your goal with respect
24 to this lawsuit?
25    A.   Just stop Viridian from
```

Page 24

```
1          LORI SANBORN
2 charging people more money, or saying
3 that they're going to charge less money
4 and have people change their energy over
5 to them.
6     Q.   So your goal is to, in some
7 way, to change Viridian's business
8 practices or pricing practices; is that
9 right?
10    A.   No.  My goal -- being a lead
11 Plaintiff, it is to represent the people
12 in Massachusetts.
13    Q.   So who are you representing?
14    A.   In the class.
15    Q.   So tell me more about that.
16 Who are you representing in
17 Massachusetts?
18    A.   The class of people that have
19 had Viridian and had the same problems
20 that I had.
21    Q.   So that means that you are
22 representing a group of people in
23 Massachusetts who paid more than they
24 would have paid to National Grid?
25    A.   Or whatever their energy source
```

Page 25

```
1          LORI SANBORN
2 was.
3     Q.   So not limited to people who
4 came from National Grid?
5     A.   Right.  That had signed up for
6 Viridian under the pretense that they
7 were going to pay less money.
8     Q.   Are you only representing
9 people in Massachusetts who had the same
10 Viridian Energy plan that you did?
11    A.   The same exact plan as I do?
12    Q.   Well, let me back up and ask a
13 better question.
14      What energy plan did you have
15 when you were enrolled with Viridian?
16    A.   I don't know which plan it was.
17    Q.   I just want to go back two
18 minutes, if you don't mind.
19      I asked you your goal with
20 respect to this lawsuit.  And correct me
21 if I'm wrong, you said you want to stop
22 Viridian from charging people more money
23 or having them switch under pretense.
24      Did I get that right?
25    A.   Not really.  I don't think I
```

7 (Pages 22 - 25)

Page 26

1          LORI SANBORN
2 said that the way I should have said it.
3 It's to represent the people in
4 Massachusetts or in the class action suit
5 against Viridian because I believe,
6 because Viridian charged more money than
7 they said that they would have, thinking
8 it would be, the rate would be lower, as
9 it was represented by their
10 representatives, the rate would be lower
11 than what they currently pay for their
12 energy bill.
13     Q.   I think I got that.  So
14 representing people in Massachusetts on
15 that basis, but with the goal of what
16 outcome?
17     A.   That Viridian would stop what
18 they were doing, stop their practices of
19 charging more money, charging more money
20 than what they were represented by.  The
21 representative told me I would be paying
22 less money.  I wasn't.  I am sure they
23 told everybody else the same thing.  They
24 didn't.
25     Q.   How are you sure of that?

Page 27

1          LORI SANBORN
2     A.   Not sure.  I could never be
3 sure.  But they wouldn't be interested in
4 this if they weren't charged more money.
5 Bottom line is they were charged more
6 money.
7     Q.   I'm sorry, who would be
8 interested in this if they weren't
9 charged more money; about whom are you
10 talking about?
11     A.   Anybody who would be in this
12 lawsuit.
13     Q.   And we don't know the identity
14 of any of those people at this point,
15 right?
16     A.   No.
17     Q.   When you originally filed your
18 lawsuit, were you the only named
19 Plaintiff on the complaint?
20     A.   To the best of my knowledge,
21 yes.
22     Q.   Is that the case anymore?
23     A.   I don't know anybody else on
24 the complaint.
25     Q.   Do you know whether there are

Page 28

1          LORI SANBORN
2 other Plaintiffs on the complaint now?
3     A.   I don't know who's on it.
4 There are other Plaintiffs on it, yes.
5     Q.   Okay.  How many others?
6     A.   I am not sure how many.
7     Q.   Do you know the identity of any
8 of your named Coplaintiffs in this case?
9     A.   No.
10     Q.   Do you know whether any of your
11 Coplaintiffs are individuals or
12 businesses?
13     A.   I believe individuals.  I don't
14 know the answer.
15     Q.   Do you know in what state your
16 Coplaintiffs live?
17     A.   Mass, Connecticut.
18     Q.   Do you know how many
19 Coplaintiffs live in Massachusetts along
20 with you?
21     A.   I don't know how many.
22     Q.   But there are some?
23     A.   I believe.
24     Q.   Do you have any insights as to
25 the rate your Coplaintiffs pay to

Page 29

1          LORI SANBORN
2 Viridian?
3     A.   No.
4     Q.   Do you have any insight over
5 what period of time your Coplaintiffs
6 were enrolled with Viridian?
7     A.   No.
8     Q.   Do you have any insight as to
9 what energy plan your Coplaintiffs are
10 enrolled with Viridian?
11     A.   No.
12     Q.   Do you think your Coplaintiffs
13 are aligned with these other Plaintiffs?
14     A.   Yes.
15     Q.   Without knowing anything about
16 them?
17     A.   I think when it comes down to
18 it, people don't -- if they weren't
19 overcharged, then they wouldn't care.  So
20 I think everybody is in it for the same
21 goal.
22     Q.   So if you care about something,
23 I imagine you pay attention to it, right?
24 You pay attention to what's going on with
25 the suit?

8 (Pages 26 - 29)

LORI SANBORN
2  A.  Yes.
3  Q.  Do you know the current status
4 of the lawsuit?
5  A.  No.
6  Q.  Do you care about the lawsuit?
7  A.  Yes, I do.
8     What do you mean by current
9 status?  I am sorry.
10  Q.  When you file a lawsuit, your
11 lawyers file a complaint in Court.
12     You understand that?
13  A.  Yes.
14  Q.  That's the very beginning.
15  A.  Right.
16  Q.  From the beginning to the end,
17 in front of a judge or jury is a long
18 time.  There's lots of steps along the
19 way.
20     Do you know where in the
21 process your lawsuit is right now?
22  A.  No.  I rely on my attorneys for
23 that.
24  Q.  Do you have any personal
25 knowledge of where the status is right

LORI SANBORN
2 now?
3  A.  No.  I rely on my attorneys for
4 all of that.
5  Q.  When did you first sign up to
6 become a Viridian customer?
7  A.  I don't know the exact date.
8  Q.  Can you give me an
9 approximation?
10  A.  No.
11  Q.  Do you know what year?
12  A.  No, I don't know the exact
13 year.  I don't know the --
14  Q.  You're done answering that
15 question.
16     Before enrolling with Viridian,
17 you told me that National Grid supplied
18 your electricity, right?
19  A.  Yes.
20  Q.  Were you unhappy with National
21 Grid's service?
22  A.  No.
23  Q.  Why did you switch from
24 National Grid to Viridian?
25  A.  Because I was told that I would

LORI SANBORN
2 save money.
3  Q.  At the time that you switched
4 from National Grid to Viridian, did you
5 consider enrolling with any other
6 suppliers besides Viridian?
7  A.  No.
8  Q.  Why not?
9  A.  I wasn't even aware that there
10 were other suppliers at the time.
11  Q.  So would you say that the
12 representation that you would save money
13 switching to Viridian, that that's the
14 primary reason that you switched?
15  A.  Yes.
16  Q.  Are there any other reasons
17 that you switched?
18  A.  No.
19  Q.  Did you have any interest in
20 the fact that Viridian touts its green
21 energy program or its environmentally
22 conscious nature?
23  A.  No.
24  Q.  That wasn't important to you at
25 all?

LORI SANBORN
2  A.  No.
3  Q.  Are you friendly with anybody
4 at Viridian, any of the sales
5 representatives?
6  A.  No.
7  Q.  Did Viridian's reputation aid
8 you in switching?
9  A.  In switching?
10  Q.  To Viridian.
11  A.  To Viridian?
12  Q.  Yeah.
13  A.  No.
14  Q.  Was the way that Viridian
15 calculates its variable rates, was that a
16 reason why you would switch?
17  A.  Switch to Viridian?
18  Q.  Yeah.
19  A.  Can you say that again?
20  Q.  The manner in which Viridian
21 calculates -- I'll back up.
22     Are you aware that Viridian
23 offers both fixed rate energy plans and
24 variable rate energy plans?
25  A.  I wasn't fully aware of that

9 (Pages 30 - 33)

LORI SANBORN

1
2 until I had a problem, until I noticed
3 that I was paying more money.  And then I
4 noticed that the rate fluctuated.
5    Q.    Approximately, when did you
6 notice that?
7    A.    Right before I was calling to
8 cancel, which was -- I don't know if you
9 told me when it was.  I forget when it
10 was.  Was it April in 2014 or something?
11    Q.    You have to tell me.
12    A.    I don't know the exact date.  I
13 can't think of the exact date.
14    Q.    Did you just throw out an
15 approximation?
16    A.    Yeah, for some reason, I don't
17 know why that is stuck in my mind.  I
18 could be wrong.
19    Q.    What was the month?
20    A.    April.
21    Q.    Of which year?
22    A.    2014.  But I don't even know
23 that for a fact.
24    Q.    Okay.  And you said earlier
25 that you don't recall when you initially

LORI SANBORN

1
2 signed up with Viridian, right?
3    A.    No.
4    Q.    Okay.  By the way, one thing I
5 probably should have said at the very
6 beginning, I will say it now.  At any
7 point I ask you something and you don't
8 know the answer, and maybe an hour from
9 now you remember or you want to clarify
10 something, that's fine.  You're more than
11 welcome to do that, okay?
12        So I want to talk a little bit
13 about your experience when you signed up
14 for Viridian.  And you already -- and I
15 know that you told me that someone made
16 representations to you about saving
17 money.  So let's talk about that.
18        You spoke with, I guess, a
19 Viridian sales representative at some
20 point?
21    A.    A friend of mine said to me
22 that a friend of his who I had met, who I
23 knew was representing, was a
24 representative of Viridian, and said did
25 you sign up for this.  You're going to

LORI SANBORN

1
2 save money on your energy bill.  And
3 that's how the whole thing started.
4    Q.    Do you remember the friend of
5 -- your friend's name?
6    A.    Daniel Zuckerman.
7    Q.    That's my understanding, as
8 well.
9        So how did you come into -- did
10 Mr. Zuckerman contact you?
11    A.    I don't remember.
12    Q.    You were somehow connected by
13 your mutual friend?
14    A.    Yes.
15    Q.    And who is your mutual friend?
16    A.    Al Segrini.
17    Q.    Can you spell that for the
18 court reporter?
19    A.    S-E-G-R-I-N-I.
20    Q.    Al is the first name?
21    A.    Allan.
22    Q.    And Allan Segrini, your
23 relationship to him is that you're
24 friends?
25    A.    Yes.

LORI SANBORN

1
2    Q.    Any other aspect of your
3 relationship; do you work together or
4 anything like that?
5    A.    Just friends.
6    Q.    And you had not met
7 Mr. Zuckerman prior to being introduced
8 through Al Segrini; is that right?
9    A.    He introduced me to him, yes.
10    Q.    And again, do you recall
11 approximately when that was?
12    A.    No.
13    Q.    Did you speak with anybody else
14 at Viridian besides Mr. Zuckerman at the
15 time that you enrolled?
16    A.    No.
17    Q.    Were your communications with
18 Mr. Zuckerman written, or oral or both?
19    A.    Don't remember.
20    Q.    Now, I know you said a few
21 times that one thing Mr. Zuckerman told
22 you about Viridian's electricity supply
23 is that if you enrolled you would save
24 money, right?
25    A.    Yes.

10 (Pages 34 - 37)

LORI SANBORN

1
2    Q.   Did he tell you anything else?
3    A.   Not that I remember.
4    Q.   Do you remember any further
5    details about how he represented to you
6    that you would save money?
7    A.   No.
8    Q.   Did he tell you that you would
9    pay a certain percentage less than you
10   were paying at National Grid?
11   A.   I don't remember.
12   Q.   Did he quote you a particular
13   rate per kilowatt hour; do you remember?
14   A.   I don't remember.
15   Q.   Did he tell you that you would
16   save, you know, X dollars per month if
17   you enrolled with Viridian?
18   A.   I don't remember.
19   Q.   Did Mr. Zuckerman ever
20   represent to you that you would be able
21   -- that you would be eligible to receive
22   the wholesale market rate for energy in
23   Massachusetts?
24   A.   I don't remember.
25   Q.   Did you tell Mr. Zuckerman what

LORI SANBORN

1
2    rate you were paying with National Grid
3    when you and he spoke?
4    A.   Don't remember.
5    Q.   So as far as you recall, the
6    representation was no more specific than
7    a kind of generic you'll save money?
8    A.   Exactly, yes.
9    Q.   And you don't remember any
10   other representations?
11   A.   No.
12   Q.   And you don't recall what type
13   of plan you enrolled?
14   A.   No.
15   Q.   I will tell you the certain
16   type of plan.  Fixed versus variable.
17        Do you know whether you signed
18   up for a fixed rate plan where your rate
19   stays flat for a period of time?
20   A.   No.
21   Q.   Do you recall if you signed up
22   for what the company calls a green plan
23   or renewable energy plan?
24   A.   No.
25   Q.   I believe the company has 100

LORI SANBORN

1
2    percent renewable or 20 percent
3    renewable; does that ring a bell?
4    A.   No.
5        MR. KLEIN:  When you say no to
6    the fixed and no to the green, you're
7    saying no, you didn't or no, you don't
8    remember if it was?
9        THE WITNESS:  I am saying I
10   don't remember.
11       MR. BERMAN:  That's how I
12   understood her testimony.
13       [The Revised Objections and
14   Responses to Defendant's First Set of
15   Interrogatories, was hereby marked as
16   Sanborn Exhibit 1 for identification,
17   as of this date.]
18   Q.   So during the course of my
19   questioning, I will ask, I will show you
20   documents that are relevant to the case
21   and we can talk about them.  This is the
22   first example.
23       So Dawn handed you what's been
24   marked as Sanborn Exhibit 1.  And this is
25   your Revised Objections and Responses to

LORI SANBORN

1
2    Defendant's First Set of Interrogatories.
3        Do you see that?
4        (Witness reviews document.)
5    A.   Yes.
6    Q.   Do you recall receiving
7    Viridian's interrogatories?
8    A.   Yes.
9    Q.   And you reviewed them?
10   A.   I looked them over, yes.
11   Q.   And just to be clear for the
12   record, I am asking -- I am not asking
13   for the document in front of you.  I am
14   asking about the underlying
15   interrogatories themselves.
16       In other words, the questions
17   that ask you for information.
18   A.   I received -- whatever my
19   attorney had sent me, I looked over.
20   Q.   Does that look like a document
21   that your attorney sent you?
22   A.   Yes.
23   Q.   Okay.  And you reviewed it?
24   A.   Yes, I looked it over, yes.
25   Q.   So when you say --

11 (Pages 38 - 41)

LORI SANBORN

1
2    A.   I reviewed it.
3    Q.   Did you glance at it or did you
4 review it carefully?
5    A.   I didn't read every objection.
6 I didn't read every word of it, because I
7 rely on my attorneys for all of that, but
8 I did look everything over.  Every time I
9 got something, I looked it over.
10    Q.   So for the responses that
11 pertain -- well, I guess all of these
12 responses pertain to particular -- did
13 you provide any input into the content of
14 these responses?
15    A.   Can you say that again?
16    Q.   Did you provide any -- when
17 your attorneys sent this to you, you
18 looked it over.
19       Did you offer any thoughts?
20    A.   I don't remember.
21    Q.   Do you remember requesting any
22 changes or corrections?
23    A.   I don't remember.
24    Q.   Do you remember signing a
25 verification that everything in here is

LORI SANBORN

1
2 truthful and accurate, to the best of
3 your knowledge?
4    A.   I must have, yes.
5    Q.   I am happy to show you that, if
6 you want?
7    A.   Yes, yes.
8    Q.   But do you accept my
9 representation that you verified that
10 this is accurate?
11    A.   Yes.
12    Q.   Ms. Sanborn, can I trouble you
13 to turn to Page 12.  And we're going to
14 jump from this very quickly.
15       Do you see at the bottom of
16 Page 12, it says interrogatory number 15?
17    A.   Yes.
18    Q.   So this is an interrogatory
19 that asked for full and complete detail
20 for all the facts that support,
21 essentially, the allegations contained in
22 a large part of the lawsuit that you
23 filed against Viridian.
24       Do you see that?
25    A.   Mm-hmm.

LORI SANBORN

1
2    Q.   If you can flip now to Page 14,
3 please.  So these are denoted by
4 paragraph numbers.
5       If you look next to paragraph
6 25, "Sanborn's" -- I am just reading this
7 for the record.  "Sanborn's allegation
8 that Viridian offers teaser rates is
9 based on Sanborn's own experience with
10 Viridian's contract which transitioned
11 from a fixed rate to a variable rate."
12 Did I read that correctly?
13    A.   Yes.
14    Q.   So does that refresh your
15 recollection as to whether you initially
16 signed up for a fixed rate plan or a
17 variable rate plan?
18    A.   You know what?  It was so long
19 ago, I don't remember.
20    Q.   Okay.  Do you have any reason
21 to think that the information -- I
22 apologize, please go ahead.
23    A.   Go ahead.
24    Q.   Any reason to think the
25 information obtained in this

LORI SANBORN

1
2 interrogatory is incorrect?
3    A.   No.
4    Q.   And you verified that it was
5 true and accurate, right?
6    A.   Yes.  I just don't remember,
7 that's the problem.
8    Q.   When you initially enrolled
9 with Viridian in its fixed rate plan, do
10 you recall Mr. Zuckerman making any
11 representations to you about Viridian's
12 variable rates?
13    A.   No.
14    Q.   Any recollection of him making
15 representations to you about how Viridian
16 calculates those rates?
17    A.   No.
18    Q.   What makes them go up and down?
19    A.   Did he, no.  I don't -- no.
20    Q.   When you spoke with
21 Mr. Zuckerman, did he provide you with
22 any materials like a contract or
23 Viridian's term of service at the time
24 you enrolled?
25    A.   I don't remember.

12 (Pages 42 - 45)

LORI SANBORN

1
2    Q.    May I refresh your memory.
3         Staying with the same document,
4  would you mind flipping to Page 5 of this
5  document, of Sanborn Exhibit 1, please.
6         So at the top of the page, do
7  you see it says interrogatory number 3.
8         Do you see where it asks to
9  identify all written and oral
10  communications that you had?
11         And your response, in the
12  boldface font -- I believe this was the
13  second sentence, "Although most of those
14  communications were oral, Mr. Zuckerman
15  or another Viridian agent also provided
16  Sanborn with Viridian's terms of service
17  on or around the date of her enrollment
18  as previously produced at" -- and these
19  are Bates numbers for our identification.
20         Did I read that correctly?
21    A.    Mm-hmm.
22    Q.    Do you recall receiving terms
23  of service at the time that you enrolled
24  with Viridian?
25    A.    I just don't remember.

LORI SANBORN

1
2    Q.    If you had received terms of
3  service, would it have been your practice
4  to read them carefully?
5    A.    Yes.  I assume that I would
6  have read them.  I read, I went over
7  them, I read them.  I just don't
8  remember.  It was so long ago.  I don't
9  remember exactly what I read or what I
10  thought at that time.
11    Q.    Do you recall whether you asked
12  Mr. Zuckerman or any other Viridian
13  representative any questions about the
14  terms of service that they provided you,
15  if you didn't understand them?
16    A.    I don't remember at the time,
17  no.
18    Q.    Did you retain a copy of the
19  terms of service during your time as a
20  Viridian customer?
21    A.    Do you mean my contract?
22    Q.    I am referring to it as --
23  well, I will tell you what, why don't we
24  do this.
25         MR. BERMAN:  Can we go off for

LORI SANBORN

1
2  one second.
3         (Off the record.)
4         MR. BERMAN:  Dawn, can you also
5  mark this.
6         [The Revised Objections and
7  Responses to Defendant's First Set of
8  Interrogatories, Bates stamped
9  VIRIDIAN_P_000060 through 63, was
10  hereby marked as Sanborn Exhibit 2
11  for identification, as of this date.]
12         [The more legible copy of
13  Revised Objections and Responses to
14  Defendant's First Set of
15  Interrogatories, Bates stamped
16  VIRIDIAN_P_000060 through 63, was
17  hereby marked as Sanborn Exhibit 3
18  for identification, as of this date.]
19    Q.    Ms. Sanborn, here is what we're
20  doing.  In the interrogatory response
21  that you and I just talked about, you
22  referenced that Mr. Zuckerman or some
23  other Viridian agent provided you with
24  terms of service about the time that you
25  enrolled.  And you identified those terms

LORI SANBORN

1
2  of service by a particular Bates number.
3  Those are the numbers that are kind of
4  stamped in the bottom right-hand corner
5  of these documents.
6    A.    Mm-hmm.
7    Q.    So I handed you Exhibit 2,
8  which I'll read for the record is
9  VIRIDIAN_P_000060 through 63.
10         However, as you can see, it's
11  kind of dark and illegible to read.
12         Through agreement with your
13  counsel, I've also handed you what's been
14  marked as Sanborn Exhibit 3, which I will
15  represent to you based on my review and
16  others' review purports to be an
17  identical copy of the difficult to read
18  Exhibit 2.
19         Does that make sense?
20    A.    Yes.
21    Q.    Just so that we -- I actually
22  think I'm able to make out what's in the
23  other Exhibit, but I don't want to risk
24  it.
25         So just for ease, looking at

13 (Pages 46 - 49)

LORI SANBORN

2 Exhibit 3, do you recall receiving these
3 Terms and Conditions of Service?
4     (Witness reviews document.)
5     A.   Do I recall getting this?  I
6 must have gotten this, yes, because I
7 have it, yes.
8         Do I recall at that time
9 getting it?  No, not at the time.  But I
10 had it.
11    Q.   Just so I'm clear, you say you
12 must have received it?
13    A.   I don't ever recall receiving
14 -- when I received this.  I don't recall
15 when I received this.
16    Q.   Do you recall ever reviewing
17 this document?
18    A.   I must have reviewed it.
19 Something like this, I probably reviewed
20 it.
21    Q.   At some point during your
22 enrollment with Viridian, your plan
23 changed from the fixed rate plan that we
24 just talked about to a variable rate
25 plan, right?

LORI SANBORN

2     A.   Right.
3     Q.   Do you recall approximately
4 when that change occurred?
5     A.   No.
6     Q.   Did you want to switch to a
7 variable rate plan?
8     A.   Did I?  No.  I don't recall.
9     Q.   Earlier I thought I heard you
10 say, you referenced when you noticed the
11 rate getting higher?
12    A.   Right.
13    Q.   So that would be during the
14 time when your enrollment was under a
15 variable rate plan, right?
16    A.   Right.
17    Q.   Did you -- was it your
18 understanding that you were compelled to
19 switch from a fixed rate plan to a
20 variable rate plan?
21    A.   I didn't know.  I didn't know
22 it had even switched.  All I know is that
23 I noticed that my bill was high.  And I
24 was paying more money than I would have
25 been paying if I had been with my

LORI SANBORN

2 original company.
3     Q.   And when did you notice that
4 your bill was getting high?
5     A.   I don't remember the date.
6     Q.   Mr. Sanborn, can you turn to
7 Page 2 of this document, Exhibit 3.
8         Do you see where it says
9 paragraph 8, Renewal Notice?
10    A.   Mm-hmm.
11        MR. KLEIN:  Remember to say yes
12 or no.
13    A.   Yes, I'm sorry.
14    Q.   Thank you.  Paragraph 8
15 entitled Renewal Notice says the
16 following:  "For any fixed rate plan you
17 have selected, you will receive notice
18 from company between 30 and 60 days prior
19 to the end of your term that you will be
20 automatically enrolled on either the
21 fixed rate plan provided in the notice or
22 the company's" variable rate -- I misread
23 that -- "the company's variable plan
24 available at such time, which variable
25 plan can be canceled at any time without

LORI SANBORN

2 any termination fees."
3         Did I read that correctly?
4     A.   Yes.
5     Q.   Did you receive a renewal
6 notice from Viridian when your fixed rate
7 plan was set to expire?
8     A.   Not that I can remember.
9     Q.   Were you enrolled, were you
10 aware that you had signed up for a six
11 month fixed rate plan?
12    A.   Not that I remember.
13    Q.   But you did say that you must
14 have read this when you signed up, right?
15    A.   Right.
16    Q.   If you hadn't received a
17 renewal notice, did you call Viridian
18 around the time that your fixed rate plan
19 would have expired to ask what was going
20 on?
21    A.   Not that I remember.
22    Q.   Why not?
23    A.   Because if it was either fixed
24 or the variable, either one, I thought I
25 was paying a wholesale price.  And I was,

14 (Pages 50 - 53)

LORI SANBORN

1
2 no matter which way it went, whether it
3 was fixed, where it was, or whether it
4 was a variable rate, I thought it was a
5 wholesale price and I was going to be
6 paying less.
7        The bottom line is I was told I
8 was going to pay less. And that's where
9 I -- fixed or variable.
10    Q.    Where did you get the
11 impression that you would be paying a
12 wholesale price for electricity?
13    A.    Because I was under the
14 impression that that was a wholesale
15 energy company. And whatever -- it was a
16 wholesale energy company. I was going to
17 be paying less.
18    Q.    I get that. So I guess --
19    A.    That's what I was told.
20    Q.    Sorry?
21    A.    That's what I was told.
22    Q.    By whom?
23    A.    The representative.
24    Q.    So Mr. Zuckerman told you that
25 --

LORI SANBORN

1
2    A.    Wait a second. Let me go back.
3 I don't -- I don't remember if he told
4 me. I was under that impression from
5 either him verbalizing it to somebody, to
6 -- actually, it must have been him that
7 said I was going to be paying the
8 wholesale price. It was going to be a
9 discounted price.
10    Q.    Did he say you were going to be
11 paying a discounted price or a wholesale
12 price?
13    A.    I don't remember the
14 terminology that he used.
15    Q.    Have you ever seen any Viridian
16 marketing materials where the company
17 holds itself as a wholesale supplier of
18 energy?
19    A.    I don't remember reading
20 anything. It's so long ago, I don't
21 remember what I read.
22    Q.    Have you ever looked at
23 Viridian's Website?
24    A.    Yes. When I found out I was
25 paying too much money, I did.

LORI SANBORN

1
2    Q.    Is there any place that you can
3 point me to on the Website that, where
4 Viridian holds itself out as a wholesale
5 supplier of electricity?
6    A.    I don't at this point know. I
7 can't print it out right now, no.
8    Q.    So is there any basis for you
9 thinking that Viridian is a wholesale
10 supplier of electricity other than the
11 fact that Mr. Zuckerman either told you
12 that you would be paying a wholesale rate
13 or a discounted rate, is there anything
14 beyond that?
15    A.    There is, but I don't remember
16 which exactly, because I don't remember
17 -- I am trying to think, because it was
18 such a long time ago. Well, I was told
19 it was a wholesale energy company.
20    Q.    Can you point me to any writing
21 that makes that representation? I'm
22 sorry, did you answer the question?
23    A.    I didn't.
24    Q.    Take whatever time you need.
25    A.    That's what I was told, I would

LORI SANBORN

1
2 be paying less money.
3    Q.    I understand that you were told
4 that you would be paying less money.
5        I am trying to figure out
6 whether you were told that Viridian is a
7 wholesale supplier of energy, that you
8 would be paying a wholesale rate.
9        Is that your specific
10 recollection?
11    A.    I believe so.
12    Q.    Are you certain?
13    A.    I don't remember. I don't
14 remember how it was presented exactly,
15 the exact words. But whatever I was
16 told, that's what I interpreted it as.
17    Q.    Could you take another look at
18 that Exhibit 3. The top right corner,
19 letter D says Understanding and Selecting
20 Rates.
21        It says "You understand unless
22 you have been offered a rate in writing
23 confirmed by the company that expressly
24 provides otherwise, there are no
25 guaranteed savings and your rate may be

15 (Pages 54 - 57)

1       LORI SANBORN
2 higher or lower than the utility's rate
3 in any given month."
4     Did I read that correctly?
5    A.   Mm-hmm.  Yes.
6    Q.   Is there anything in that
7 language that gives you the impression
8 that Viridian is charging a wholesale
9 rate for electricity?
10   A.   I don't remember if I was given
11 a written rate.  I don't remember what I
12 was given.
13   Q.   While you were enrolled with
14 Viridian, did you, yourself, ever check
15 on what the wholesale prices for
16 electricity in Massachusetts were?
17   A.   No.
18   Q.   If part of the basis of your
19 lawsuit is that you were supposed to be
20 paying a wholesale rate and you weren't,
21 how could that be the basis of your suit
22 if you never checked what the wholesale
23 rates were?
24   A.   Well, first of all, the rate
25 fluctuated, okay?  So even if it

1       LORI SANBORN
2 fluctuated, I was told that I was still
3 going to be paying less than what I was
4 paying for my energy.  The bottom line is
5 no matter what, I was going to be paying
6 less.
7   Q.   And is that the sole basis of
8 your lawsuit, you simply paid too much?
9   A.   Yes.
10   Q.   You terminated your
11 relationship with Viridian, right?
12   A.   Yes.
13   Q.   Were you able to do that
14 without paying a termination fee?
15   A.   I believe so.
16   Q.   When did you decide to
17 terminate your contract with Viridian?
18   A.   Date or --
19   Q.   Your best approximation or your
20 best recollection.
21   A.   I don't remember.
22   Q.   At what point during your
23 enrollment with Viridian did you become
24 dissatisfied with your service?
25   A.   When I noticed my bill was

1       LORI SANBORN
2 high, and then I looked into it.  I
3 looked into, I looked into the bill, and
4 then I noticed that I was paying a higher
5 rate.  My bills were higher.
6   Q.   And I think I've asked this
7 before, but I just want to make sure I'm
8 clear:  Do you remember when you noticed
9 that your bill was high?
10   A.   No.
11   Q.   I think I can help you.
12   A.   Okay.
13   Q.   Can you take a look at Sanborn
14 Exhibit 1. Can you turn to Page 18 for
15 me.  Toward the bottom of the page,
16 interrogatory 16 is one in which you
17 describe in detail any practices that you
18 employed to review your monthly electric
19 bills and compare Viridian's rates to the
20 "average wholesale rate" or the rates
21 charged by other suppliers.
22     This was your answer in your
23 sworn response:  "Sanborn responds that
24 she would review her monthly electric
25 bill and noticed it getting particularly

1       LORI SANBORN
2 high in or about October or November
3 2014, at which point she phones
4 Viridian's customer service line as set
5 forth in response to interrogatory number
6 3," which is earlier.
7     So I read that correctly?
8   A.   Yes.
9   Q.   Does that sound accurate to
10 you?
11   A.   To the best of my knowledge,
12 yes.
13   Q.   Remember we talked about
14 earlier that your first lawsuit against
15 Viridian was filed in November of 2014?
16   A.   Mm-hmm.
17   Q.   So help me through the timeline
18 here.
19     Did you decide to sue Viridian
20 before or after you noticed your rates
21 getting high?
22   A.   After.  It was when I was
23 terminating it.
24   Q.   I know it's hard to remember
25 dates from two years ago.  I actually

16 (Pages 58 - 61)

LORI SANBORN

1
2  think the timeline is kind of important
3  here.
4       If you had noticed that your
5  rates were getting high in October or
6  November, but you also filed your lawsuit
7  in November, and I presume you didn't
8  file your suit instantaneously, there was
9  some preparation for that; is that right?
10      A.   I believe so.
11      Q.   So it seems to be at about the
12  same time.
13      Do you recall with any more
14  specificity when you noticed your rates
15  getting high?
16      A.   The month and date?  No, I
17  don't recall which month it was.
18      Q.   Without revealing any
19  communications that you had with Seth or
20  any other lawyer, do you remember the
21  earliest time, approximately when you
22  contemplated filing a lawsuit?
23      A.   After November -- no, I don't
24  remember the time exactly, no.
25      Q.   Well, the first complaint was

LORI SANBORN

1
2  November -- why don't I do this.
3       MR. BERMAN:  Can you mark this,
4  please.
5       [The document reflecting filing
6  date of November 19th, 2014, was
7  hereby marked as Sanborn Exhibit 4
8  for identification, as of this date.]
9       Q.   Ms. Sanborn, that is Sanborn
10  Exhibit 4.  And I actually don't have any
11  substantive questions about this
12  document, because it's not the operative
13  lawsuit.  The more recent version is.
14      I am handing this to you,
15  because when a document is filed in
16  Court, it is sort of time and date
17  stamped, not time stamped, but date
18  stamped.
19      So do you see this lawsuit was
20  filed November 19th, 2014?
21      A.   Yes.
22      Q.   So your decision to sue
23  Viridian must have come at some point
24  before November 19th, right?
25      A.   Right.

LORI SANBORN

1
2       Q.   And I presume that you
3  conducted some sort of investigation or
4  inquiry; you didn't just fire off a
5  lawsuit willy-nilly; right, you wouldn't
6  do that?
7       A.   Right.
8       Q.   Is that right?
9       A.   Right.
10      Q.   So your decision to file the
11  lawsuit -- how far in advance of November
12  19th would you estimate you decided to
13  sue Viridian?
14      A.   I can't answer that.  I don't
15  know.
16      Q.   Did you take any time -- did
17  you have any role in drafting this
18  document that was filed on November 19th?
19      A.   Did I draft it?
20      Q.   I am not asking -- I know that
21  you didn't draft it.
22      A.   Right.
23      Q.   I am asking if you had any
24  input into its content?
25      A.   I was asked questions.

LORI SANBORN

1
2       Q.   Do you remember when?
3       A.   No.  I don't remember the time,
4  no.  Prior to November 19th.
5       Q.   Were you afforded an
6  opportunity to review a document that
7  looks like this, digest it, comment to
8  it, offer any input at all?
9       A.   I don't remember.  I relied on
10  the attorneys to do all of this, so.
11      Q.   I understand.  Why don't I ask
12  it this way, Ms. Sanborn.
13      I presume you didn't first see
14  this document on, let's say, November
15  18th and immediately approve it.
16      Am I correct in that?
17      A.   I can't answer.  I don't know
18  the dates.
19      Q.   Okay.  Did you have to do any
20  work, for example, compiling bills or
21  anything like that, before you approved
22  this document?
23      A.   I got a list of my bills.
24      Q.   About how long did that take
25  for you to compile?

17 (Pages 62 - 65)

1                LORI SANBORN
2     A.   I don't remember.
3     Q.   Do you think it took more than
4 a week?
5     A.   I don't remember.
6     Q.   When did you cancel your
7 Viridian plan?
8     A.   I don't remember the date.
9     Q.   If I told you our records
10 report that you canceled on December 4th,
11 2014, would that sound accurate to you?
12    A.   I don't remember.
13    Q.   Does it seem plausible that you
14 would cancel?
15    A.   I don't remember the date.
16        MR. BLYNN:  Let him ask the
17    question, and then you can answer.
18    Q.   Did you sue Viridian before you
19 canceled your energy plan with them?
20    A.   I don't remember the dates and
21 I don't remember the timeline, but I'm
22 almost positive it took a while for me to
23 get that cancellation to go through.  I
24 know I had a problem with them.  But I
25 don't remember the dates:

1                LORI SANBORN
2     Q.   At least directionally, you
3 complained, can we say late in the year,
4 2014?
5     A.   I don't remember the dates.
6     Q.   But in your interrogatory, you
7 say you notice your rates getting
8 particularly high in October or November
9 of 2014.  And that's when you phoned
10 Viridian's customer service.
11        So you called to complain --
12    A.   Yeah.
13    Q.   -- approximately then?
14    A.   Okay, yes.
15    Q.   And I understand there is going
16 to be a lag time between when someone
17 cancels something and when the service
18 stops.
19        Have you been billed by
20 Viridian at all in, say, 2015?
21    A.   In 2015, not to my knowledge.
22 I don't know.
23    Q.   Let me ask a better question.
24        From the time that you called
25 to cancel, do you recall being billed by

1                LORI SANBORN
2 Viridian for, say, more than one billing
3 cycle after you canceled?
4     A.   I don't recall.
5     Q.   You're certainly not being
6 billed by them now?
7     A.   No.
8     Q.   You weren't billed by them six
9 months ago, right?
10    A.   I don't believe so.
11    Q.   Where do you get your energy --
12 I am sorry, your electricity supply from
13 now?
14    A.   It's National Grid.
15    Q.   Are you currently paying more
16 or less with National Grid than you were
17 with Viridian?
18    A.   I am paying less.
19    Q.   How much are you paying with
20 National Grid right now?
21    A.   The rate?
22    Q.   Yeah.
23    A.   I don't know.
24    Q.   Then how do you know that
25 you're paying less than with Viridian?

1                LORI SANBORN
2     A.   Because I remember my bills
3 being much higher from Viridian when I
4 was with Viridian.  I don't know what
5 they are now.
6     Q.   Let me ask you this:  When you
7 called Viridian to complain and cancel,
8 did they offer anything to you?  Did they
9 offer a rebate, or a discount or anything
10 like that?
11    A.   No.
12    Q.   Did they offer you the
13 opportunity to enroll in a lower fixed
14 rate plan if you wanted to take them up
15 on that opportunity?
16    A.   I don't recall.
17    Q.   Is it possible?
18    A.   I don't recall.  I do recall
19 that they gave me a hard time, though.
20 It was more than one phone call with
21 them.  But I don't really.
22    Q.   How many phone calls did you
23 have with Viridian's customer service
24 people?
25    A.   I don't know how many there

18 (Pages 66 - 69)

Page 70

LORI SANBORN

2 were.
3    Q.   Okay.  But you said it was more
4 than one?
5    A.   Mm-hmm.
6    Q.   Was it more than five?
7    A.   I don't recall.
8    Q.   What, if anything, did they do
9 -- strike that.
10        When you say they gave you a
11 hard time, what do you mean?
12    A.   I remember calling more than
13 one time, because I remember it was a
14 problem.  But I don't recall what exactly
15 it was.
16    Q.   Did they try to dissuade you
17 from cancelling?
18    A.   I don't recall.
19    Q.   Did they charge you a fee to
20 cancel?
21    A.   I don't recall.
22    Q.   Can I ask you one more question
23 about the document you have open, Sanborn
24 Exhibit 1.  And I am still on Page 18.
25 Is that where you are?

Page 71

LORI SANBORN

2    A.   Yes.
3    Q.   This is right below the
4 language that I read.  Toward the bottom
5 of the page, "Sanborn never herself
6 directly compared Viridian's rates to the
7 'average wholesale rate."
8        Did I read that right?
9    A.   Where are we?  Correct.
10    Q.   So your contention is that you
11 thought Viridian would be charging you a
12 wholesale rate, but you never even
13 looked at the wholesale rate to know
14 whether you were being charged that or
15 not?
16    A.   It didn't matter, because I --
17 it didn't matter because I was told it
18 was going to be a lower rate, lower than
19 my electric company that I currently had.
20    Q.   But you also said you thought
21 Viridian was a wholesale supplier of
22 electricity, right?
23    A.   That was my understanding.
24 That's why I thought I would get a
25 wholesale rate.  Wholesale means less

Page 72

LORI SANBORN

2 money.
3    Q.   I understand you.
4        I guess what I'm trying to
5 figure out, Ms. Sanborn, is by saying
6 that you never compared Viridian's rates
7 to the average wholesale rate, doesn't
8 that suggest there are two different
9 things, or else there wouldn't be a point
10 of comparison at all, right?
11    A.   I never compared it.  I just
12 again, thought I was getting a lower rate
13 -- why would I switch from my current
14 supplier to Viridian if I wasn't going to
15 get a lower rate?
16    Q.   Why, indeed.
17    A.   There would be no reason to.
18        (Off the record.)
19    THE WITNESS:  I have one thing
20 to go back to and I don't remember if
21 I was or I wasn't because it was so
22 many years ago.
23        But you asked if I ever was
24 deposed before.  When I got divorced,
25 I don't know if I was or not.

Page 73

LORI SANBORN

2    Q.   Beyond a domestic dispute --
3    A.   No.
4    Q.   -- have you been deposed
5 before?
6    A.   No.
7        [The Second Amended Class
8 Action Complaint, was hereby marked
9 as Sanborn Exhibit 5 for
10 identification, as of this date.]
11    Q.   Lori, what you've just been
12 handed is Sanborn Exhibit 5.  This is
13 captioned the Second Amended Class Action
14 Complaint.
15        I will represent to you this is
16 the operative lawsuit, okay?
17    A.   Okay.
18    Q.   This supercedes Exhibit 4.
19    A.   Okay.
20    Q.   I just want to ask you your
21 understanding about what this case is
22 about.
23        Do you see what's called the
24 caption on the front of the page, in
25 addition to your name, there's the name

19 (Pages 70 - 73)

Page 74

LORI SANBORN

1
2 of three other named Plaintiffs in this
3 case?
4    A.   Mm-hmm.
5    Q.   We talked a little bit about
6 that earlier.
7    A.   Mm-hmm.
8    Q.   Have you had any discussions
9 with any of your Coplaintiffs about this
10 litigation outside of the presence of
11 your attorneys?
12    A.   No.
13    Q.   You allege that "Viridian
14 represents that it offers a variable rate
15 electricity plan to residential consumers
16 that is tied to the market rate in the
17 wholesale power market."
18        Did I read that correctly?
19    A.   Yes.
20    Q.   And if you go a little bit
21 further, still in paragraph 4, that
22 allegation ends with "Notwithstanding
23 Viridian's representations that its
24 variable rates 'reflect monthly wholesale
25 electric prices.'"  Did I get that right?

Page 75

LORI SANBORN

1
2    A.   Yes.
3    Q.   So when you make this
4 allegation about the market rate in the
5 wholesale power market, what are you
6 talking about?
7    A.   I'm talking about a wholesale
8 rate.  Whatever it is, whatever the
9 market value is, it still should be lower
10 than what the original electric company
11 should be because it's a wholesale
12 company.  Their rate should be a
13 wholesale rate, therefore it makes it a
14 lower rate.
15    Q.   So the way paragraph 4 is
16 worded, it talks about Viridian
17 representation that it offers a variable
18 rate that is tied to the market rate in
19 the wholesale power market.
20        Am I understanding this
21 correctly that this should read that
22 Viridian's rate should be identical to
23 the rate in the wholesale power market,
24 that they are one and the same?
25    A.   I'm not understanding that

Page 76

LORI SANBORN

1
2 actually.
3    Q.   Are you alleging that Viridian
4 should be charging a wholesale power
5 market rate?
6    A.   A wholesale rate, a lower rate.
7 As I understand it, that's what the
8 company was.
9    Q.   And going back to what we
10 talked about earlier, your understanding
11 is based on communications with Dan
12 Zuckerman; is that right?
13    A.   I believe so, yes.
14    Q.   How many times did you meet
15 with Mr. Zuckerman?
16    A.   I don't remember.
17    Q.   Did you ever meet with him
18 face-to-face?
19    A.   Have I ever met him
20 face-to-face?  Have I ever met him?
21    Q.   Yeah.
22    A.   Yes.
23    Q.   And during that meeting, do you
24 recall talking about -- is that when he
25 made representations to you that Viridian

Page 77

LORI SANBORN

1
2 is a wholesale power company?
3    A.   I heard about Viridian through
4 somebody, as I said before, Al Segrini.
5    Q.   Did Al Segrini tell you that
6 Viridian is a wholesale power company?
7    A.   I don't remember if he said it
8 or Dan Zuckerman said it.  I don't
9 remember.
10    Q.   Can you say for sure that Al
11 Segrini or Dan Zuckerman told you that
12 Viridian is a wholesale power company?
13    A.   It must have been Dan told me
14 -- as I don't remember the conversation,
15 as per when, that it was a, it's a
16 wholesale company and you're going to pay
17 less money.
18    Q.   Could you take a look back at,
19 is it Exhibit 3 that is the more legible
20 Terms and Conditions?
21        So this is the document that
22 you received from Mr. Zuckerman when you
23 enrolled, remember?
24        MR. KLEIN:  Objection.  I don't
25    think she said she actually received

20 (Pages 74 - 77)

Page 78

LORI SANBORN

1
2   it from him.
3        MR. BERMAN:  She said she must
4   have received it, though, right?
5        MR. KLEIN:  But not necessarily
6   from him.
7        MR. BERMAN:  I'll ask a
8   different question.
9    Q.   This is a document that you
10  received from somebody?
11   A.   Yes.
12   Q.   At or around the time that you
13  enrolled at Viridian?
14   A.   Yes.
15   Q.   Take whatever time you need.
16  But I am wondering if you can point me to
17  any place in this document that would
18  give you the impression that Viridian's
19  rates are reflected or tied to the
20  wholesale power market?
21   A.   Let me just cut this short.
22  Whether it says it or it doesn't say it
23  on here, that's what I was told.  Why
24  would anybody want to switch to Viridian,
25  a different company, if it wasn't going

Page 79

LORI SANBORN

1
2   to be less.  Why switch?  I don't
3   understand.  Like we keep going over
4   that.  Just the bottom line is I was told
5   it was going to be less money.  I
6   wouldn't have switched if it wasn't.
7    Q.   When you switched from National
8   Grid to Viridian, did your rate go up or
9   down?
10   A.   The first bill?
11   Q.   Yeah.
12   A.   I don't remember.  I believe
13  that month it must have gone down.
14   Q.   The reason for switching took
15  place, your bill initially went down?
16   A.   Not every month.  It didn't
17  consistently go down.  It ended up going
18  up.  And I ended up paying more money.
19   Q.   But, at first you --
20   A.   I remember looking at my bill,
21  saying -- it might have been the first
22  bill.  But my bills were higher, and I
23  paid more money.
24   Q.   When you initially switched
25  from National Grid to Viridian, at least

Page 80

LORI SANBORN

1
2   at first, do you recall that your bills
3   went down?
4    A.   I don't know how many bills.
5    Q.   But some did?
6    A.   I don't know.  It could have
7   been one.  I don't remember.
8    Q.   We established that you
9   enrolled in a fixed rate plan.  If it
10  went down for the first month, it should
11  have stayed low during that period of
12  time, right?
13   A.   I don't remember.  I don't
14  remember how long or if they did.
15   Q.   Can you take a look at
16  paragraph 5 in the second amended
17  complaint.  So the most recent document
18  that I handed you.
19        And in that paragraph you
20  allege that "Viridian's rates go up to
21  match spikes in the underlying market
22  rate.  However when the market rate goes
23  down, Viridian's rate remains at an
24  inflated level several times higher than
25  the market rate."

Page 81

LORI SANBORN

1
2        Did I read that correctly?
3    A.   Yes.
4    Q.   You told me earlier that you
5   personally never checked on the
6   underlying market rate, right?
7    A.   I never compared prices.
8    Q.   Do you have any basis for
9   making this allegation, other than what,
10  you know, other than relying on your
11  attorneys' work?
12   A.   No.  Only that my bills
13  reflected it, that they went up.
14   Q.   I'll tell you what, we'll come
15  to your bills in a second.
16        Before we get to your bills,
17  let me just ask you about the next
18  allegation.
19        I am looking at paragraph 6
20  now, Lori.
21   A.   Mm-hmm.
22   Q.   "This unfair and deceptive
23  scheme of charging inflated electric
24  prices is intentionally designed to
25  maximize revenue for Viridian."

21 (Pages 78 - 81)

LORI SANBORN

1
2        I guess my first question is:
3  What do you mean by something being
4  unfair and deceptive?
5        MR. KLEIN:  I object to the
6    extent that that calls for a legal
7    conclusion.
8        As a layperson, if you have an
9    answer, you can answer.
10    Q.   I am just asking for your
11  opinion for what -- this is your
12  allegation.  So when you allege that
13  Viridian is engaged in an unfair or
14  deceptive, a scheme, what did you mean
15  when you alleged that?
16    A.   That I believe that they lure
17  people in saying you are going to pay a
18  lower price and you don't.
19    Q.   Isn't it possible that some of
20  the other consumers in Massachusetts who
21  joined Viridian wanted to join for other
22  reasons besides price?
23    A.   I can't answer that.
24    Q.   But if there were Massachusetts
25  consumers who were, let's say,

LORI SANBORN

1
2  environmentally conscious and they were
3  attracted to Viridian because of
4  Viridian's green energy plans, would that
5  fall under what you're alleging is unfair
6  and deceptive?
7    A.   I can't answer that.  I don't
8  know.
9    Q.   What do you think is illegal
10  about Viridian trying to maximize its
11  revenue?
12        MR. KLEIN:  Objection.  She's
13    not a lawyer.  She can't say whether
14    it's legal or not.
15    Q.   What do you think is wrongful
16  about Viridian trying to maximize their
17  revenue?
18    A.   Because they said they were
19  charging lower prices.  And then they
20  charged higher prices.
21    Q.   And that's the basis of your
22  complaint?
23    A.   I ended up paying more money
24  when I was told that I wouldn't.
25    Q.   Do you have any insight into

LORI SANBORN

1
2  Viridian's profits?
3    A.   No.
4    Q.   Have you ever reviewed any of
5  Viridian's internal business or financial
6  documents?
7    A.   No.
8    Q.   Do you have any personal
9  insight as to what Viridian's operating
10  costs are or costs of goods sold?
11    A.   No.
12    Q.   Do you have any insight into
13  Viridian's hedging strategy and how that
14  might affect its profits?
15    A.   No.
16    Q.   So otherwise, you're just
17  saying that they made too much money?
18        MR. KLEIN:  Objection.  I think
19    that's argumentative and not really
20    what she said.  But to the extent that
21    you want to respond.
22    Q.   Go ahead.
23    A.   I don't know how much money
24  they make.  I don't care how much money
25  they make.

LORI SANBORN

1
2    Q.   Don't you?  Your allegation is
3  that their unfair and deceptive scheme is
4  intentionally designed to maximize
5  revenue for Viridian.
6        It sounds like you do care
7  about how much money they make?
8    A.   Okay.  I care that because of
9  that, I -- well, I am paying more money.
10  The bottom line, I am paying more money
11  than I should have.  Maybe I said that
12  wrong.
13    Q.   As long as you're being
14  truthful, you haven't said anything
15  wrong.
16        MR. KLEIN:  I will second that.
17    A.   The bottom line is, I paid too
18  much money.  My price went up.  I can't
19  say it any other way, or how many more
20  times can I say it?
21    Q.   Why don't we turn to something
22  that we just talked about.  I just asked
23  you, I think, less artfully than I wanted
24  to, about what might attract other
25  Massachusetts consumers to Viridian.  And

22 (Pages 82 - 85)

1          LORI SANBORN
2  you said you don't know, right?
3          Can you turn to paragraph 26 of
4  this second amended complaint.  So
5  paragraph 26 says "Viridian represents
6  that its variable rate plan is based upon
7  the wholesale market rate.  Indeed, that
8  is the entire hook by which Viridian
9  attracts consumers to variable rate
10 plans."
11         Did I read that right?
12 A.   Yeah.
13 Q.   So if you don't know what would
14 attract other Massachusetts consumers to
15 Viridian, how could you make this
16 allegation?
17         MR. KLEIN:  I am just going -- I
18 don't know if this is technically an
19 objection, but plainly, this is not a
20 representation of facts specific to
21 Ms. Sanborn.
22         This is something part of an
23 overarching complaint that was drafted
24 by counsel.
25         To the extent that you're asking

1          LORI SANBORN
2  her to reflect, making it sound as
3  though she may have drafted this
4  provision, that's obviously not true.
5          If you want to ask her her
6  understanding of it, that's fine.
7          I want to make clear for the
8  record that this paragraph, and indeed
9  this complaint, were not drafted by
10 Ms. Sanborn.
11         MR. BLYNN:  And that's clear.
12 We know you and Bob drafted it.
13         We just want to know her level
14 of understanding -- these are her
15 allegations, these are IronMan's,
16 these are Stephanie's and BDK's.  And
17 these are, they are going to be the
18 ones sitting in the courtroom being
19 examined and cross-examined, not you
20 and Bob.
21         So we need to understand, if
22 your name is on this, no problem.  But
23 it's not.  It's hers.  SO we're
24 entitled to ask.  We will ask.  It
25 sounds like she doesn't know what this

1          LORI SANBORN
2  case is about.  And we'll get there.
3  And we're not trying to be difficult.
4  But we're trying to understand the
5  basis of this.
6          We've spent -- our client has
7  spent a fair amount of money, as you
8  know, to get to where we are at.
9          If Ms. Sanborn wants to
10 voluntarily dismiss her own claim and
11 make the other three Plaintiffs go on,
12 that's fine.  That doesn't change the
13 fact that a lawsuit is pending.  She's
14 going to have to stand in front of the
15 judge and testify.
16         MR. KLEIN:  We both obviously
17 know each other's position.
18         Ultimately, I'll need to hear
19 the questions as we go forward.
20 You're going to ask what you're going
21 to ask.
22         To the extent that the question
23 implies that she drafted it, I have a
24 bigger objection, than if you ask what
25 her her understanding.  But we'll take

1          LORI SANBORN
2  it from there.
3  BY MR. BERMAN:
4  Q.   Before I follow up, would you,
5  in fact, like to dismiss the complaint
6  right now.  Ms. Sanborn?
7  A.   No.
8  Q.   Just checking.
9          MR. KLEIN:  Thank you.
10 Q.   Improper speaking objections
11 aside, let's turn back to paragraph 26.
12         How exactly do you know what
13 attracts other consumers to Viridian's
14 variable rate plans?
15 A.   What attracts them to the
16 variable rate?  I believe that they are
17 under the impression that it's a
18 wholesale rate.  Whether it reflects
19 whatever the market rate is, you're going
20 to get a discounted rate.
21 Q.   So are you telling me that you
22 think other consumers believe that
23 Viridian's rate is the wholesale rate or
24 is based upon the wholesale rate?
25 A.   It's a wholesale rate based

23 (Pages 86 - 89)

LORI SANBORN

1
2 upon market conditions, which is the
3 wholesale rate, that they offer a
4 wholesale rate.  They are a wholesale
5 company.  And they are offering a reduced
6 rate.  Otherwise, again, why would people
7 change?
8    Q.   Have you spoken to any other
9 Massachusetts consumers who have signed
10 up with Viridian?
11    A.   No.
12    Q.   Have you conducted any type of
13 surveys or questionnaires for Viridian
14 variable rate customers?
15    A.   No.
16    Q.   Do you have any insight or
17 evidence, other than your own personal
18 beliefs, as to what would attract a
19 Massachusetts consumer to Viridian's
20 variable rate plan?
21    A.   Can you say that one again?
22    Q.   Do you have any evidence as to
23 what would attract a Massachusetts
24 resident to a Viridian variable rate
25 plan?

LORI SANBORN

1
2    A.   Only that they are going to get
3 a discounted rate.
4    Q.   I am sorry, I don't think I
5 understood your answer?
6    A.   I don't think I understood your
7 question.
8       MR. BLYNN:  That's fair.  Ask
9    him to clarify and he will do his very
10    best.  We want you to understand the
11    question he's asking.
12    Q.   I am trying to understand the
13 basis for this allegation.
14       You wrote in your complaint
15 that you are a named Plaintiff on, that
16 the entire hook by which Viridian
17 attracts consumers to its variable rate
18 plan is that it tells, it tells people or
19 it represents to people that its plan is
20 based on the wholesale market rate.
21       Earlier I had asked you for
22 what reasons a Massachusetts consumer
23 might switch over.  And you didn't know.
24       I am wondering what evidence
25 you have to support this allegation that

LORI SANBORN

1
2 you made in your complaint?
3    A.   I think I -- all right.  So
4 when you asked me, I thought it was more
5 of a broad question when you asked me
6 about Massachusetts.
7       So again, I will say, why they
8 would switch, because if it's a wholesale
9 rate, they are getting a discounted
10 price.
11    Q.   So in this lawsuit, you are
12 only representing consumers who received
13 a representation that they would save
14 money if they switched to Viridian?
15    A.   As far as the consumer.
16    Q.   Yes?  That's a yes?
17    A.   Mm-hmm.
18    Q.   Earlier I asked you why you
19 sued Viridian.  And you told me that you
20 got a representation that if you
21 switched, you would obtain a lower rate
22 than you did with National Grid, right?
23    A.   Yes.
24    Q.   Where in your lawsuit do you
25 make that allegation?  I don't see it.

LORI SANBORN

1
2    A.   Where in this complaint?  I
3 don't know.  I would have to ask where it
4 was drafted, how it was drafted in here.
5    Q.   I am just asking you your
6 personal knowledge as a named Plaintiff
7 on this document.  You reviewed it, you
8 approved it?
9    A.   Right.
10    Q.   I don't see an allegation that
11 Viridian did something wrongful because
12 it represented that you or other
13 consumers would pay less than National
14 Grid.
15       Is there any place in there
16 that you say that?  Take whatever time
17 you need.
18    A.   I am not sure exactly where
19 that would be.  I would rely on my
20 counsel.
21       MR. KLEIN:  To the best you can
22 --
23    A.   I would rely on my counsel for
24 that.
25    Q.   When you -- when you filed the

24 (Pages 90 - 93)

1          LORI SANBORN
2  suit, your counsel drafted the complaint.
3  Did they give you the opportunity to
4  review it?
5     A.   Yes.
6     Q.   And did you, in fact, review
7  it?
8     A.   Yes.
9     Q.   So did you take that
10  opportunity -- did you take that
11  opportunity to add an allegation as a
12  named Plaintiff that Viridian made
13  misrepresentations about its rate as
14  compared to National Grid?
15     A.   I don't remember.
16     Q.   If I represented to you that
17  that allegation was not in the complaint,
18  do you have any reason to doubt the
19  veracity of what I'm saying?
20     A.   I don't remember if I, I don't
21  remember.
22     MR. BLYNN:  I think his question
23     was do you have any reason to believe
24     that he's misrepresenting what's in
25     here?

1          LORI SANBORN
2     THE WITNESS:  Oh, no.
3     MR. BLYNN:  Sorry, I don't like
4  to do deposition by committee here.
5     MR. KLEIN:  We are all friends
6  here, more or less.
7     MR. BLYNN:  I don't want to
8  overstep.
9     MR. BERMAN:  Can you mark this,
10  please.
11     [The Account Activity
12     Statement, Bates stamped
13     VIRIDIAN_P_58 through 59, was hereby
14     marked as Sanborn Exhibit 6 for
15     identification, as of this date.]
16     Q.   Lori, that is Sanborn 6.  We
17  will turn to that in a second.
18     Before we get there, can you
19  turn to paragraph 31 of your complaint,
20  your second amended complaint.
21     You allege in your lawsuit that
22  "A reasonable consumer would understand
23  that Viridian's variable rates would be
24  reasonably related to and fluctuate in a
25  manner correlated with the underlying

1          LORI SANBORN
2  wholesale market rate.  And that although
3  prices would go up when the wholesale
4  prices rose, they would also go down when
5  the wholesale prices decreased."
6     Did I read that correctly?
7     A.   Yes.
8     Q.   Is that the basis of your
9  lawsuit?
10     A.   Yes.
11     Q.   In your view, how should
12  Viridian's variable rates fluctuate with
13  respect to the wholesale rate?
14     A.   Whatever the rate is, I thought
15  it was a discount rate.  It should be
16  discounted.  It should be less than the
17  original energy company.
18     Q.   Sorry, it should be less than
19  the?
20     A.   Than the original company.
21     Q.   Is it fair to call that the
22  utility company?
23     A.   The utility company, yes.
24     Q.   Do me a favor, I have forgotten
25  what number this is.

1          LORI SANBORN
2  I think we read this already,
3  Lori, but I want to go back to it because
4  of what you said.
5     A.   Mm-hmm.
6     Q.   If you look at Exhibit 3,
7  "There are no guaranteed savings and your
8  rate may be higher or lower than the
9  utility's rate in any given month."
10     So this, this is in the terms
11  of service that you received, maybe not
12  from Mr. Zuckerman, but from somebody
13  when you enrolled.
14     Given that, what is your basis
15  for thinking that Viridian's rate must be
16  lower than the utility's rate?
17     A.   Because I was told it would be.
18     Q.   Staying on terms of service,
19  staying at the top, under the bold, the
20  paragraph that starts with "You authorize
21  Viridian Energy."
22     A.   Mm-hmm.
23     Q.   If you read into the middle of
24  that paragraph, "Your enrollment
25  documentation, which includes your

25 (Pages 94 - 97)

LORI SANBORN

1        LORI SANBORN
2  welcome letter and these terms and
3  conditions of service create your
4  agreement with the company" -- that of
5  course is Viridian -- "and supercedes any
6  oral or written statements made in
7  connection with this agreement or the
8  supply of your services."
9     Did I read that correctly?
10   A.  Yes.
11   Q.  Can we turn to paragraph 33 of
12  your second amended complaint, please?
13   A.  Exhibit 5?
14   Q.  Yes.  And as you can see, Lori,
15  this is a paragraph that contains,
16  there's some allegations that contains a
17  table or a chart.  It goes by month.  The
18  total wholesale rate for Connecticut,
19  Viridian's highest non-promotional
20  variable rates that it charged to
21  consumers in Connecticut and then the
22  spread.
23     Do you see what I'm looking at?
24   A.  Mm-hmm.
25   Q.  As a Massachusetts consumer and

1        LORI SANBORN
2  Viridian customer, why did you make
3  allegations about the wholesale rate in
4  Connecticut and Viridian's highest price
5  to consumers in Connecticut and not
6  Massachusetts?
7   A.  I don't remember why I did
8  that.
9     MR. KLEIN:  Objection.  I think
10   that leaves out the context of the
11   paragraph, but go ahead.
12   Q.  Do you know whether
13  Massachusetts wholesale rates are
14  identical to Connecticut?
15   A.  No.
16   Q.  If I told you that they were
17  different, would you have any reason to
18  doubt me?
19   A.  No.
20   Q.  In the table, the column that
21  says Viridian price and the column that's
22  bold, you see 14.49 cents and so on.
23  That's not the price that you paid
24  Viridian at any time, was it?
25   A.  I don't remember.

1        LORI SANBORN
2   Q.  Looking at 6, Lori, this is a
3  document that you produced to us.  This
4  is Bates labeled VIRIDIAN_P_58 and 59,
5  and it's titled Account Activity
6  Statement.
7   A.  Mm-hmm?
8   Q.  Okay?  And this is what it
9  purports to be.  It has your name and
10  your address on it.
11     Do you remember compiling this?
12   A.  Yes.
13   Q.  And does this look familiar to
14  you?  Does this look like something that
15  you reviewed before?
16   A.  A while ago, yes.
17   Q.  I became a lawyer because I am
18  not good at math.  This requires a little
19  bit of math.  I will verify with my
20  calculator, but if you go down the column
21  that says Charge Amount, and you divide
22  the dollar amount that's associated with
23  Viridian Energy by the kilowatt hours,
24  that's how we would get your -- the price
25  that you paid per kilowatt hour to

1        LORI SANBORN
2  Viridian while you were a customer there;
3  is that fair?
4   A.  Okay.
5   Q.  Do you have any reason to doubt
6  that methodology?  It's just simple
7  division?
8   A.  No.
9   Q.  Do you see in the table in the
10  second amended complaint --
11     MR. BERMAN:  And I just want to
12   state for the record that the table
13   says, it starts with November 2013,
14   and then it says December 2014.
15   That's obviously a typo.  That's
16   supposed to say December 2013, right?
17   MR. KLEIN:  I assume.
18   Q.  Do you see from November of
19  2013 to December of 2013, the total
20  wholesale rate for Connecticut goes from
21  about 5.34 cents per kilowatt hour to
22  10.58 cents?  It effectively doubles.  It
23  goes from about 5-and-a-half to 11,
24  almost?
25   A.  Mm-hmm.

Page 102

1        LORI SANBORN
2    Q.    So earlier you had alleged that
3  a reasonable consumer would understand
4  that Viridian's rate fluctuates, you
5  know, in a manner that correlates with
6  the wholesale price.
7        So if the wholesale price
8  doubles, wouldn't a reasonable consumer
9  expect that Viridian's rate also doubles?
10   A.    No, because you're supposed to
11  give a discount.  There should be a
12  discount on that.  It's a discounted
13  company.  It's a wholesale company.
14   Q.    So your contention is that the
15  Viridian price is supposed to -- well,
16  you tell me.  How is the Viridian price
17  supposed to compare to the total
18  wholesale rate for Connecticut?
19   A.    I just -- again, I thought it
20  should be a discounted wholesale price.
21   Q.    So, in other words, Viridian's
22  price to you should have been less than
23  5.344 cents per kilowatt hour in December
24  of 2013?
25   A.    Honestly, I am trying to

Page 103

1  understand the basis for this table.
2    Q.    This table is in the lawsuit
3  that you filed, included in this
4  complaint, obviously.
5        Part of the allegations are
6  that, as the wholesale price goes up,
7  Viridian's price goes up, but as the
8  wholesale price goes down, Viridian's
9  price goes down.  I read that in
10  paragraph 31; do you remember?
11   A.    Mm-hmm.
12   Q.    So we're together, so far?
13   A.    Mm-hmm.
14   Q.    Now what I'm trying to figure
15  out is how that translates to this table
16  that you included in your original
17  lawsuit and the current version of the
18  lawsuit.
19        And I can't help but notice
20  that, for example, the wholesale rate
21  almost doubles from November 2013 to
22  December 2013, but the Viridian price,
23  which is the highest non-promotional
24  price in Connecticut from November to

Page 104

1        LORI SANBORN
2  December 2013, doesn't double.  In fact,
3  it only goes up by 1 cent per kilowatt
4  hour.
5        So I guess my question to you
6  is:  Are you suing for what occurred
7  during that month?
8    A.    And other months it went up,
9  too.  This isn't the only month it went
10  up.
11   Q.    I understand the rate went up.
12  So I guess that's my -- so then I'll ask
13  that question:  Are you only suing
14  Viridian for the months in which its rate
15  went up?
16   A.    It shouldn't have gone up, it
17  shouldn't have gone up.  It should have
18  been discounted.  It should have been
19  discounted, because it's supposed to be,
20  again, a discounted rate.
21   Q.    I hear you.  I think --
22   A.    Even if it goes up, I can
23  understand it going up.  But at a
24  discount.
25   Q.    A discount from what?

Page 105

1        LORI SANBORN
2    A.    A discount from it being lower
3  than what your bills going to be, your
4  original bill, from your original
5  company.
6    Q.    Which in your case was National
7  Grid?
8    A.    Right.
9    Q.    And you're suing on behalf of
10  any consumer whose bill was not lower
11  than their original utility bill when
12  they switched; do I have that right?
13   A.    Yes.  Because their prices
14  didn't reflect the wholesale price.
15  Viridian's prices should reflect the
16  wholesale price.  I keep saying it.  I
17  can't say it anymore.
18   Q.    So Lori, after this document,
19  the account statement -- I know you said
20  you don't recall when you enrolled with
21  Viridian or what plan you enrolled in,
22  but at the very least, based on this
23  document, we know that you are a Viridian
24  customer, it looks like, from December of
25  2013 through November of 2014; is that

27 (Pages 102 - 105)

Page 106

```
 1            LORI SANBORN
 2 fair?
 3    A.   Yes.
 4    Q.   I'm happy to do the math with
 5 you, but I will represent to you that I
 6 have done it before coming here today.
 7 Are you aware that the rate that you paid
 8 to Viridian from April of 2014 through
 9 the end of year was 17.49 cents per
10 kilowatt hour in almost every month?
11 Does that reasonable?
12    A.   That's what it is.
13    Q.   I am happy, just for the
14 record, I am happy to take a --
15    A.   No.
16    Q.   The rate was consistently 17.49
17 cents in April of 2014, May of 2014, June
18 of 2014, July of 2014, August of 2014,
19 September of 2014; is that fair?
20    A.   Yes.
21    Q.   Will you accept my
22 representation?
23        MR. KLEIN:  If that's your
24    representation, subject to my, I am
25    sure it's correct, but I will accept
```

Page 107

```
 1            LORI SANBORN
 2 it.
 3        MR. BERMAN:  Okay.
 4    Q.   Here's where I'm going with
 5 that, Lori.  If you look back at
 6 objections and responses to Viridian's
 7 interrogatories, which I know you
 8 reviewed and verified the accuracy of?
 9    A.   Exhibit 1?
10    Q.   Exhibit 1.  When you responded
11 to interrogatory number 16, you said that
12 you would review your monthly electric
13 bill, and you noticed it getting
14 particularly high in or about October or
15 November of 2014, at which time you
16 phoned Viridian's customer service line.
17        My question is:  If your rate
18 was a flat consistent 17.49 cents going
19 back to April of 2014, and you reviewed
20 your bill every month, how is it that you
21 didn't notice your rate getting
22 particularly high before October or
23 November?
24    A.   I don't remember.
25    Q.   Is this accurate that you
```

Page 108

```
 1            LORI SANBORN
 2 reviewed your electric bills every month?
 3    A.   I always looked at my electric
 4 bills, yes.  It dawned on me that it was
 5 getting higher.  To the best of my
 6 knowledge, I remember that.
 7    Q.   Are you testifying that you
 8 did, in fact, review your bills every
 9 month?  You looked at the rate every
10 month?
11    A.   I looked at the -- I reviewed
12 my bills, and I looked at my price more
13 than the rate, until I noticed that it
14 increased.  My bills were getting high.
15 They were high.  And I also asked my
16 friends, what do you pay for your
17 electric bill?  Mine was higher than
18 everybody's.
19    Q.   You said you looked more at
20 your total price and not your rate.  But
21 the total price is based on not just your
22 rate, but your usage, right?
23        Did you take that into account
24 when noticing whether the total price
25 went up or down?
```

Page 109

```
 1            LORI SANBORN
 2    A.   No.  But when I dug deeper into
 3 it, then yes.
 4    Q.   Did you go through the steps to
 5 determine that if your total price went
 6 up, but your usage went up, your actual
 7 rate per kilowatt actually stayed the
 8 same during the year?
 9    A.   I don't remember.
10    Q.   You don't remember -- do you
11 know whether you did that?  Can you tell
12 me that you did do that?
13    A.   I don't remember if I did that.
14    Q.   Is it possible that you didn't
15 calculate your hourly rate?
16    A.   I don't remember.
17        MR. BLYNN:  The answer is yes or
18    no.  Is it possible.
19        THE WITNESS:  Is it possible
20    that I calculated the rate?
21        MR. BLYNN:  No.  His question
22    was is it possible that you did not?
23        THE WITNESS:  Calculate the
24    rate?
25        MR. BLYNN:  Ask, ask it again
```

28 (Pages 106 - 109)

LORI SANBORN

1
2     for a clear record.
3  BY MR. BERMAN:
4     Q.   Is it possible that you didn't
5  actually calculate your rate to Viridian?
6     A.   Every month?
7     Q.   Yes.
8     A.   Yes, it's possible.
9     Q.   Take a look at paragraph 37 in
10 the second amended complaint, so that's
11 Exhibit 5?
12    A.   What paragraph?
13    Q.   37.  In this paragraph, Lori,
14 you allege that "Viridian doesn't add any
15 value to the consumer whatsoever."  Do
16 you see that?
17         About halfway through the
18 paragraph, you allege that "Viridian does
19 not even handle customer billing."
20         Do you see that?
21    A.   Yes.
22    Q.   You told me that you had
23 multiple conversations with Viridian's
24 customer service department?
25    A.   It was more than one phone call

LORI SANBORN

1
2  to them.
3     Q.   So they do handle customer
4  billing?
5     A.   I don't know who did the
6  billing.
7     Q.   Okay.  So let me ask you this
8  way:  If Viridian doesn't add any value
9  to the customer, if Viridian doesn't even
10 handle customer billing, when you have a
11 complaint, why did you call Viridian, as
12 opposed to the utility?
13    A.   Because I signed up with
14 Viridian.
15    Q.   And you understood that they
16 handle customer billing?
17    A.   I didn't -- I didn't -- no, I
18 didn't understand that at all.  I didn't,
19 at the time.  I just called the number
20 that I was given.
21    Q.   And there was somebody from
22 Viridian there to take your call and talk
23 with you?
24    A.   To the best of my knowledge.
25    Q.   Okay.  And there was somebody

LORI SANBORN

1
2  there to facilitate your cancelling of
3  your contract?
4     A.   To my knowledge, yes.
5     Q.   Yes?  You're back with National
6  Grid now, you said?
7     A.   Yes.
8     Q.   Do you ever plan to enroll with
9  Viridian again?
10    A.   No.
11    Q.   Never?
12    A.   No.
13    Q.   You ever plan to sign up with a
14 third-party supplier separate from the
15 utility?
16    A.   No.
17    Q.   Never?
18    A.   No.  I have to add something,
19 too.  I just remembered.
20         You asked if I have ever talked
21 with another Viridian customer.  I have.
22 I just remembered this.  My friend Al,
23 who is a Viridian customer, as well.
24    Q.   Al Segrini?
25    A.   Yes.  And his bill went up,

LORI SANBORN

1
2  too.
3     Q.   When did you talk to Al about
4  his Viridian bill?
5     A.   Must have been the same time
6  that I noticed that mine had gone up.
7     Q.   Not sure what "must have been"
8  meant?
9     A.   When my bill had gone up.  When
10 my bills --
11    Q.   Did you talk to him when you
12 noticed your own rates going up?
13    A.   I said did your rates go up.
14 And he said yes.
15    Q.   And approximately, when during
16 the year was this?
17    A.   I don't remember.
18    Q.   I am asking because in your
19 interrogatory response, you say you
20 notice that your rates went up in October
21 or November.  But we just established
22 that they were the same rates that they
23 were six months earlier.
24         I am trying to understand when
25 that was?

29 (Pages 110 - 113)

Page 114

LORI SANBORN

1
2     A.   I don't know.  I can't answer
3  that question.
4     Q.   So what Viridian plan is Al
5  Segrini enrolled in?
6     A.   I don't know.
7     Q.   And what rate is he paying
8  Viridian?
9     A.   I don't know.
10     Q.   You're simply relying on his
11  representation that his Viridian rate
12  went up?
13     A.   Yes.  I just did that because
14  you said if you remember anything, go
15  back.  And that's what I'm doing.
16     Q.   I appreciate that.
17         I just want to return to one
18  thing we talked about, because I felt
19  like we left it open.
20         Exhibit 1, your Revised
21  Objections and Responses to Viridian's
22  First Set of Interrogatories.
23         Do you remember when we first
24  showed you this, and I had asked you -- I
25  asked you if you had seen Viridian's

Page 115

LORI SANBORN

1
2  interrogatories.  You said there was
3  confusion about what your attorneys sent
4  you?
5     A.   Yes.
6     Q.   I just want to make it clear,
7  because I don't think it's clear on the
8  record.
9         The document you're looking at
10  is your response to the interrogatories.
11         Did you ever see Viridian's
12  first set of interrogatories?
13     A.   Whatever was sent to me I
14  opened up and printed and looked at.  I
15  don't remember which one it was.
16     Q.   Right.  So my question is: Is
17  one of the things that was sent to you to
18  review Viridian's first set of
19  interrogatories?
20     A.   If that's what my attorney sent
21  me, then I looked at that.
22     Q.   Do you personally remember
23  whether you saw Viridian's first set of
24  interrogatories?
25     A.   I don't remember which one was

Page 116

LORI SANBORN

1
2  now first, second or third, because
3  honestly, right at this point, I am a
4  little confused.  So if he sent them to
5  me, then I looked at them.
6     Q.   Are you under the impression
7  that Viridian has issued a second set of
8  interrogatories?
9     A.   Yes.  Yes, I looked at them,
10  because it came through as a second one,
11  so I looked at the first one.
12     Q.   Have you reviewed Viridian's
13  requested set of documents?
14     A.   If it was sent to me, I did.
15     Q.   Do you recall that you verified
16  the accuracy of this document last month?
17         MR. KLEIN:  You have to answer
18     out loud.
19     A.   Yes, that I received it, yes.
20     Q.   And that you verified the
21  accuracy of what's in here?
22     A.   Yes.
23     Q.   Last month, January of 2016?
24     A.   I looked through it.  Did I
25  read every page?  I didn't study it, I

Page 117

LORI SANBORN

1
2  read it, but I read through it.
3     Q.   So you didn't read every
4  page --
5     A.   I read through it.
6     Q.   I'm sorry, I'm sorry, I just
7  have to finish my question.
8         You didn't read every page of
9  your revised objections and responses to
10  the interrogatories, right?
11     A.   I read through it.  I read
12  through whatever I was given.
13     Q.   The whole thing?  Did you read
14  the whole thing?
15     A.   Word for word?  Mostly.  I
16  mean, I read through it.
17     Q.   Okay.  Mostly is not all.
18     A.   I read through it.
19         MR. BLYNN:  I'll try and
20     short-circuit it.
21         So you skimmed it, right?  You
22     reviewed it?
23         MR. KLEIN:  Objection, I think
24     that mischaracterizes her testimony.
25         MR. BLYNN:  Ask the question,

30 (Pages 114 - 117)

LORI SANBORN

1
2    Eric.
3    A.   I reviewed it.
4         MR. BLYNN:  We're trying to get
5    her out of here.
6    A.   I went through the
7    interrogatories.  I went through
8    everything that I was given, I went
9    through.
10   Q.   How quickly did you go through
11   them?
12   A.   How long did it take me?
13   Q.   Yeah.
14   A.   About an hour.
15   Q.   Did you provide any comments to
16   your attorney about the content?
17   A.   We talked about it, yes.
18   Q.   For how long did you talk about
19   it?
20   A.   15 minutes.
21   Q.   Did you have any substantive
22   comments about the document at all?
23   A.   Oh, we discussed everything.
24   So whatever I --
25   Q.   So as part of your discussion,

LORI SANBORN

1
2    did you have any substantive comments to
3    the document?
4    A.   I believe so, yes.
5    Q.   What were those substantive
6    comments?
7    A.   I don't remember.
8    Q.   You called Viridian in November
9    of 2014 to complain about -- because you
10   had noticed your rate getting high?
11   A.   Yes.
12   Q.   You don't remember what precise
13   date you did?
14   A.   No.
15   Q.   If I told you that, according
16   to Viridian's records, you called on
17   November 13th, 2014, would you accept
18   that representation?
19   A.   If that's what they said, then
20   that's when I did it.
21   Q.   Now, you filed your first
22   lawsuit on November 19th 2014?
23   A.   Okay.
24   Q.   So that's six days later?
25   A.   Mm-hmm.

LORI SANBORN

1
2    Q.   What, if anything, did you do
3    between November 13th -- without
4    revealing any communication with your
5    lawyers, what did you do between November
6    13th, when you complained to Viridian,
7    and November 19th, six days later, when
8    you decided to sue them?
9    A.   What did I do?
10   Q.   Yes.
11   A.   Pertaining to what?  Can you
12   clarify it?
13        MR. BLYNN:  Why don't you step
14   her through it.
15   Q.   So you were displeased with
16   your variable rate?
17   A.   Yes.
18   Q.   You called Viridian's customer
19   service in mid-November to complain?
20   A.   Yes.
21   Q.   Six days later, there was a
22   federal lawsuit filed in Court?
23   A.   Yes.
24   Q.   Federal lawsuits usually don't
25   materialize instantaneously.

LORI SANBORN

1
2         Had you decided to sue Viridian
3    before you called the customer service
4    line?
5    A.   No.
6    Q.   As of the time that you called
7    Viridian's customer service line on
8    November 13th, you had not decided to sue
9    the company?
10   A.   No.
11   Q.   Was your decision to sue
12   Viridian based in any way on your outcome
13   of the November 13th call to the customer
14   service department?
15   A.   You mean after that call?
16   Q.   Could a Viridian customer
17   service rep on November 13th have said
18   something to you that would have made you
19   happy and resulted in you not suing
20   Viridian?
21   A.   I don't remember.
22   Q.   Have you talked to Jim Glaser
23   at Viridian prior to November 13th, 2013?
24   A.   Prior to my calling, no.
25   Q.   No, you had not?

31 (Pages 118 - 121)

Page 122

LORI SANBORN

2   A.   No.
3   Q.   At some point after November
4  13th, 2014 and November 19th, when you
5  filed your lawsuit, you talked to Jim
6  Glaser about this?
7   A.   Mm-hmm.
8   Q.   And what did you and Jim talk
9  about?
10   A.   I said my bill was too high
11  with Viridian, and higher than my
12  electric company.  And he told me to
13  speak to Seth.
14   Q.   Did Jim make you aware that
15  there was a lawsuit in the works against
16  Viridian?
17   A.   I don't remember.
18   Q.   Did they refer you to your
19  attorneys and tell you that they were
20  planning on filing a lawsuit against
21  Viridian?
22   A.   Honestly, I don't know how it
23  all went.  All I know is I was cancelling
24  and that's how it came up.
25   Q.   I understand.

Page 123

LORI SANBORN

2   A.   I don't remember the timeline.
3   Q.   I am not trying to belabor
4  anything.
5   A.   I just don't remember the
6  timeline.
7   Q.   We are almost done, but the
8  timeline can be important.
9   A.   I am sorry, I don't remember.
10      What came first is me trying to
11  terminate my relationship with Viridian.
12  That's all I can tell you.
13   Q.   And that process started on
14  November 13th, 2014?
15   A.   If that's what it says, then
16  that's when it was.
17   Q.   But the lawsuit that was filed
18  less than a week later is, you know, you
19  can see it, it's right in front of you,
20  this is a 70 paragraph sophisticated
21  legal document drawn up by brilliant
22  jurists.
23      Are you under the impression
24  that this document came into existence
25  between November 13th and November 19th?

Page 124

LORI SANBORN

2   A.   I don't know.
3      Say that again.
4   Q.   Do you think this document was
5  created -- this is your lawsuit?
6   A.   Right.
7   Q.   You're the named Plaintiff.
8   A.   Right, after the 13th.  That's
9  when I got in touch with Seth.
10   Q.   When did you call Seth?
11   A.   After the 13th.  It had to be
12  after the 13th.  It could have been on
13  the 13th.  It was after I terminated my
14  relationship, after I spoke to them.
15   Q.   Without revealing the substance
16  of any communications that you had with
17  Seth, did you undertake any efforts in
18  support of the document that was filed on
19  November 19th?
20   A.   You mean did I -- did he ask me
21  questions, and did we do it --
22   Q.   That's one question.
23   A.   Yeah.  We talked about it.
24   Q.   How many conversations did you
25  have between November 13th and November

Page 125

LORI SANBORN

2  19th?
3   A.   I don't remember.
4   Q.   More than one?
5   A.   I don't remember.
6   Q.   Did you have any subsequent
7  conversations with Jim Glaser after the
8  13th about this?
9   A.   I'm sure he asked.  I'm sure he
10  probably would have said did you speak to
11  Seth.
12   Q.   Did he seem eager to know
13  whether you had spoken to Seth?
14   A.   I don't remember.
15      MR. KLEIN:  I just want the
16  record to be clear.
17      It's not a matter of protecting
18  myself or whatever, but just so that
19  we're all on the same page, right.
20  I've been dealing with Lori.  That's
21  why she keeps saying me.
22      To the extent this is ever an
23  issue down the road, I want to make
24  clear that her conversations were with
25  Bob, not because I am trying to

32 (Pages 122 - 125)

LORI SANBORN

2  deflect anything.
3       MR. BLYNN:  Yeah, how about
4  we'll say Izard Nobel, the law firm.
5       MR. KLEIN:  Okay.
6       MR. BLYNN:  That's fair.
7  BY MR. BERMAN:
8  Q.   Before the November -- before
9  the initial lawsuit was filed on November
10  19th, I imagine you had a chance to look
11  at it and review it, right?
12  A.   Yes.
13  Q.   How much time were you given to
14  look at it and review it?
15  A.   I don't remember how much time
16  I was given.
17  Q.   Was it more than a day?
18  A.   I don't remember.
19  Q.   Do you recall when between --
20  let me back up.
21       Is it possible that you
22  received this document prior to November
23  13th?
24  A.   No.
25  Q.   So do you recall when during

LORI SANBORN

2  the week between November 13th and
3  November 19th, 2014 you received this
4  class action complaint to review?
5  A.   No.
6       MR. BERMAN:  Can we go off for a
7  second?
8       (Off the record.)
9  Q.   What we've been trying to do is
10  clarify the chronology of what happened
11  in or about November 2014.  I know it's
12  hard to remember specific dates.  Just
13  trying to make sure we remember what
14  happened.
15       So what we established, based
16  on your testimony, is that you became
17  aware that you were dissatisfied with
18  your rate on November 13th, 2014.
19       We know that you filed -- we
20  know that you sued Viridian in Court on
21  November 19th.
22       Trying to figure out what
23  happened between the 13th and the 19th.
24       Take a look at Sanborn Exhibit
25  4, the original class action complaint.

LORI SANBORN

2  That's the one you have in front of you.
3       If you look at paragraph 36.
4  Paragraph 36 contains an allegation about
5  the rate that you paid to Viridian.  You
6  see where it says "April through October
7  of 2014, Plaintiff paid Viridian 17.49
8  cents per kilowatt hour."
9       I take it you provided that
10  information to Izard Nobel to help draft
11  the complaint, right?
12  A.   Yes.
13  Q.   When did you help them do that?
14  A.   I don't remember.
15  Q.   Can you take a look at Sanborn
16  Exhibit 6, that's the one called Account
17  Activity Statement.
18       Do you see in the upper
19  right-hand corner, it says Date,
20  11/19/14?
21  A.   Yes.
22  Q.   What date does that represent?
23  A.   It's the date that the
24  complaint was made.
25  Q.   I should have asked a better

LORI SANBORN

2  question.
3       With respect to the Account
4  Activity Statement, what date -- what I
5  am trying to ask is does this represent
6  the date that you requested this
7  information?
8  A.   I believe so.  I would assume
9  so, if that's the date that's there.
10  Q.   Okay.  So you requested this
11  information on the very date that you
12  filed your lawsuit against Viridian and
13  it found its way into the lawsuit?
14  A.   I could have requested it prior
15  to that as well.  I don't remember.
16  Q.   Do you recall providing the
17  information in the Account Activity
18  Statement to Izard Nobel verbally before
19  the 19th?
20  A.   I don't remember.  I don't
21  remember if I pulled it off before.  I
22  could have looked at it and then printed
23  it.  I don't remember.
24  Q.   From whom did you request the
25  Account Activity Statement?

33 (Pages 126 - 129)

1         LORI SANBORN
2     A.   I don't remember.
3     Q.   Did you call Viridian for it?
4     A.   I don't remember.  If it came
5 from Viridian, I might have.  I don't
6 remember.
7     Q.   Is it clear to you that it came
8 from Viridian or did it come from the
9 utility or somewhere else?
10     A.   I don't remember.
11     Q.   Do you recall whether this
12 document was e-mailed to you?
13     A.   I don't remember.
14     Q.   Do you recall whether this
15 document was sent to you hard copy in the
16 mail?
17     A.   I don't.  I don't remember.
18     Q.   Did you actually request this
19 statement, did you, personally do it?
20     A.   I believe I did.
21     Q.   Are you sure that you did?
22     A.   Probably.  I cannot say I'm 100
23 percent sure, but if anybody did it, it
24 would have been me.  So I must have.
25     Q.   It's not possible that someone

1         LORI SANBORN
2 else requested this information and
3 provided it to you?
4     A.   No.  I don't know who else
5 would do it, so it would have to be me.
6     Q.   Could Jamie Glaser have done
7 it?
8     A.   No.
9     Q.   Does anyone else have access to
10 your account?
11     A.   No.  It had to be.
12     Q.   Could Izard Nobel have done it?
13     A.   No.
14     Q.   So if your testimony is that
15 you did it, you did it, but you can't
16 remember when you did it?
17     A.   I can't remember when I did it.
18 It's dated the 19th, which is, I don't
19 know if I had looked at it before,
20 printed it then or called previous.
21 Maybe I could have had it done four days
22 before, lost it and had it done again.  I
23 don't remember.
24     Q.   Well, but let's not talk
25 hypothetical.

1         LORI SANBORN
2        Did you, in fact, request it
3 four days earlier and then get it back
4 again?
5     A.   I don't know.
6     Q.   Do you have any evidence of
7 requesting your account information,
8 other than this specific document that
9 appears to be pulled on November 19th,
10 2014?
11     A.   Can you say that again?
12     Q.   Do you have any evidence that
13 you requested this document?
14     A.   No.
15     Q.   Earlier than November 19th,
16 2014?
17     A.   Do I have any evidence of it?
18 No.
19     Q.   Can you explain to me how your
20 billing information that was pulled on
21 November 19th, 2014 found its way into a
22 lawsuit that you filed on November 19th,
23 2014?
24     A.   No.
25     Q.   Do you think the lawsuit was

1         LORI SANBORN
2 already drafted?
3     A.   No.
4     Q.   Are you being paid by anyone to
5 be a Plaintiff in this case?
6     A.   No.
7     Q.   Are you getting any
8 consideration in exchange for your
9 agreement to be a named Plaintiff in this
10 case?
11     A.   No.
12     Q.   Were you promised a larger
13 percentage of any agreed upon settlement
14 in exchange for being a named Plaintiff
15 in this case?
16     A.   No.
17     Q.   Did Mr. Glaser receive any
18 consideration for referring you to Izard
19 Nobel to be a named Plaintiff in this
20 case?
21     A.   Not that I know of.
22     Q.   Have you discussed it with him?
23     A.   No.
24     Q.   No, you have not discussed it
25 or no --

34 (Pages 130 - 133)

LORI SANBORN
1
2     A.   We've never discussed it.
3     Q.   Do you know that he isn't?
4     A.   No.  We never discussed it.
5         MR. BERMAN:  We may be done.
6  Bear with me for one second.
7     Q.   I just want to return to
8  Exhibit 2 for a second.  That's the
9  Massachusetts Terms and Conditions of
10 Service.
11        MR. KLEIN:  2 or 3?
12        MR. BERMAN:  2.  The one that
13 starts with 60.
14     Q.   I will represent to you, Lori,
15 on the record, the document that you
16 asked is this the same thing is
17 substantively identical to the one that
18 you're holding in your hand, Exhibit 2.
19        Exhibit 2 is the document that
20 you referenced in your interrogatory
21 responses as being provided by Viridian
22 when you enrolled.
23     A.   Okay.
24     Q.   Did you compile that document?
25     A.   Did I get the document?

LORI SANBORN
1
2     Q.   Yes.
3     A.   I believe so, yes.  I have had
4  it.  I must have.
5     Q.   You had -- you were in
6  possession or custody of that document,
7  Exhibit 2?
8     A.   Yes.
9     Q.   And did you provide that to
10 Izard Nobel in response to a document
11 request?
12     A.   Yes.
13     Q.   That appears to be an image of
14 something.
15        How did you go about providing
16 that document to your attorneys?
17     A.   How did I get this document?
18     Q.   No.  How did you provide it to
19 your attorneys?
20     A.   I don't remember.  How did I
21 give it to him?
22        MR. KLEIN:  I think what he's
23   asking, this is blurry and it looks
24   like it's some kind of screenshot or
25   something, whereas this is clean.

LORI SANBORN
1
2         I guess what he's asking is why
3  is this --
4         THE WITNESS:  I don't remember.
5     Q.   Do you have a clean copy of
6  that document, Exhibit 2?
7     A.   In my possession now, other
8  than this, no.
9     Q.   Did you destroy the original?
10    A.   I don't know what I did with
11 it.  We moved our offices.  Things got
12 shuffled in between.  Some of my files.
13 I don't know.
14    Q.   When you say "we," Glaser Legal
15 moved its offices?
16    A.   Yes.
17    Q.   And in the process of moving
18 its offices, it may be possible that
19 documents that were responsive to
20 Viridian's requests were destroyed?
21    A.   No.  No.  All of my documents
22 went to Seth, this office.  They all went
23 to this office.  I am sorry, some of it
24 --
25    Q.   I am just trying to understand

LORI SANBORN
1
2 why that document looks the way that it
3 does?
4    A.   I don't know.  Honestly, I
5 don't know.
6    Q.   Do you know whether you're
7 under a document retention or litigation
8 hold?  Do you know what that is?
9    A.   No.
10   Q.   A litigation hold is an
11 instruction, when you are a party in
12 litigation, to preserve any documents
13 that are relevant to the litigation.
14       Were you provided with a
15 litigation hold in this case?
16   A.   I don't remember.  I would have
17 to ask my attorney.
18   Q.   I am just asking you if you
19 know?
20 (CONTINUED ON NEXT PAGE TO ACCOMMODATE
21 THE JURAT.)
22
23
24
25

Page 138

LORI SANBORN

2    A.   I don't know.  I mean, I have
3  my documents.  I don't -- I've had -- I
4  don't know how this became like this.  I
5  don't remember.
6    Q.   Have you preserved any and all
7  documents in your custody, possession and
8  control that are relevant to this
9  litigation?
10    A.   Yes.
11         MR. BERMAN:  I'm done.
12         MR. KLEIN:  No questions.
13         [TIME NOTED:  3:57 p.m.]
14    _____
15         LORI SANBORN
16
17  Subscribed and sworn to before me
18  this _____ day of _____, 2016.
19
20  _____
21         NOTARY PUBLIC
22
23
24
25

Page 140

1
2  EXHIBITS (Continued):
3
   Exhibit 4   document reflecting      63
4              filing date of November
               19th, 2014
5
6
   Exhibit 5   Second Amended Class    73
7              Action Complaint
8
9  Exhibit 6   Account Activity        95
               Statement, Bates
10             stamped VIRIDIAN_P_58
               through 59
11
12
   (The court reporter has retained all
13  exhibits.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 139

1
2         I N D E X
3
   WITNESS      EXAMINATION BY        PAGE
4
5  Lori Sanborn    Mr. Berman        3
6
7
8
9         E X H I B I T S
10
   SANBORN     DESCRIPTION         PAGE
11  Exhibit 1   Revised Objections    40
               and Responses to
12             Defendant's First Set
               of Interrogatories
13
14
   Exhibit 2   Revised Objections    48
15             and Responses to
               Defendant's First Set
16             of Interrogatories,
               Bates stamped
17             VIRIDIAN_P_000060
               through 63
18
19
   Exhibit 3   more legible copy of  48
20             Revised Objections
               and Responses to
21             Defendant's First Set
               of Interrogatories,
22             Bates stamped
               VIRIDIAN_P_000060
23             through 63
24
25

Page 141

1
2         CERTIFICATION
3
4    I, Dawn Matera, a Notary Public for
5  and within the State of Connecticut, do
6  hereby certify:
7    That the witness whose testimony as
8  herein set forth, was duly sworn by me;
9  and that the within transcript is a true
10  record of the testimony given by said
11  witness.
12    I further certify that I am not
13  related to any of the parties to this
14  action by blood or marriage, and that I
15  am in no way interested in the outcome of
16  this matter.
17    IN WITNESS WHEREOF, I have hereunto
18  set my hand this 10th day of February,
19  2016.
20
21
22  _____
23         Dawn Matera
24
25

36 (Pages 138 - 141)

Page 142

```
 1          ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS
 2          330 OLD COUNTRY ROAD
            MINEOLA, NEW YORK 10001
 3          516-608-2400
 4  NAME OF CASE: SANBORN VS. VIRIDIAN ENERGY, INC.
    DATE OF DEPOSITION: FEBRUARY 4, 2016
 5  NAME OF DEPONENT: LORI SANBORN
 6  PAGE  LINE(S)   CHANGE       REASON
 7  ___|_____|_____|_____
 8  ___|_____|_____|_____
 9  ___|_____|_____|_____
10  ___|_____|_____|_____
11  ___|_____|_____|_____
12  ___|_____|_____|_____
13  ___|_____|_____|_____
14  ___|_____|_____|_____
15  ___|_____|_____|_____
16  ___|_____|_____|_____
17  ___|_____|_____|_____
18  ___|_____|_____|_____
19  ___|_____|_____|_____
20  ___|_____|_____|_____
21          _____
            LORI SANBORN
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS___DAY OF _____, 20__.
24
    _____  _____
25  (NOTARY PUBLIC)      MY COMMISSION EXPIRES:
```

37 (Page 142)