# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LORI SANBORN, BDK ALLIANCE LLC, IRON MAN LLC, STEPHANIE SILVER, DAVID STEKETEE, SUSANNA MIRKIN, BORIS MIRKIN, ELIZABETH HEMBLING, PATRICIA KULESA, STEWART CONNARD and STEVEN LANDAU on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>VIRIDIAN ENERGY, INC., VIRIDIAN ENERGY PA, LLC, VIRIDIAN ENERGY NY, LLC AND VIRIDIAN ENERGY, LLC,<br><br>        Defendants. | No. 3:14-cv-01731 (SRU)<br><br><br>June 11, 2018 |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASSES, AND APPROVAL OF AWARD OF ATTORNEYS' FEES AND EXPENSES AND PLAINTIFF SERVICE AWARDS

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

BACKGROUND ................................................................................................................5

    I.     THE LITIGATION. ..............................................................................................5

          A.    Conduct of the Litigations .........................................................................5

          B.    Mediation and Settlement ..........................................................................6

    II.    THE SETTLEMENT TERMS...............................................................................10

ARGUMENT....................................................................................................................11

    I.     THE SETTLEMENT SHOULD BE APPROVED.................................................11

          A.    Settlements of Class Action Litigations are Favored................................11

          B.    The Settlement is Procedurally Fair...........................................................12

          C.    The Settlement is Substantively Fair, Reasonable and Adequate.............15

               1.   The Stage of the Proceedings and the Amount of Discovery Completed .............................................................................15

               2.   The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risk of Litigation ............16

               3.   The Reaction of the Class Was Overwhelmingly Positive .................19

               4.   The Risks of Establishing Liability and Damages..............................22

               5.   The Risks of Recovery.......................................................................24

               6.   The Actions Are Complex and Further Litigation Will Be Expensive and Lengthly ..............................................................24

               7.   Maintaining the Class Action Through Trial May Be Challenging.....25

          D.    Notice was Provided in the Best Practicable Manner................................25

    II.    THE COURT SHOULD CERTIFY THE CLASS .............................................28

    III.   THE COURT SHOULD APPROVE THE REQUESTED AWARD OF ATTORNEYS' FEES AND EXPENSES TO BE PAID BY DEFENDANTS TO CLASS COUNSEL..............................................................................28

A.     Class Counsel is Entitled to Compensation ................................................28

B.     The Second Circuit Has Approved Both the Percentage Method and the Lodestar Method, but the Percentage Method is Preferred........................29

C.     The Requested Fee is Justified Under the Percentage Method.................29

     1.   The Full Value of The Settlement Fund Available Is Considered.......29

     2.   The Fee Award Is Supported by the *Goldberger* Factors ...................25

         a.     Counsel's Time and Lodestar.......................................................33

         b.     The Relationship of the Requested Fee to the Settlement ..........34

         c.     The Risk of Litigation .................................................................35

         d.     The Magnitude and Complexity of the Litigation ......................36

         e.     The Quality of Representation ....................................................37

         f.     Public Policy Considerations.......................................................38

         g.     Reaction of the Class .................................................................39

D.     The Fee is Justified Under the Lodestar/Multiplier Method....................40

E.     The Fee Request Includes Counsel's Reasonable and Necessary Expenses .................................................................................................40

F.     The Court Should Approve the Requested Service Awards....................41

IV.     OBJECTOR'S COUNSEL IS A NOTORIOUS SERIAL OBJECTOR WHO ABUSES THE OBJECTION PROCESS ...........................................................43

**CONCLUSION** ....................................................................................................51

## **TABLE OF AUTHORITIES**

**Cases**

*Adams v. Rose*,
  No. 03 Civ. 7011, 2003 WL 21982207 (2d Cir. Aug. 20, 2003) ............................................... 36

*Allen v. JPMorgan Chase Bank, NA*,
  No. 13 Civ. 8285 (RRP) (N.D. Ill. Nov. 12, 2015) .................................................... 47

*Arnett v. Bank of Am., N.A.*,
  No. 11 Civ. 1372 (MHS), 2014 WL 4672458 (D. Or. Sept. 18, 2014) .................................... 27

*Aros v. United Rentals, Inc.*,
  No. 10 Civ. 73, 2012 WL 3060470 (D. Conn. July 26, 2012)  (Hall, J.)...................... 31, 33, 40

*Arthur v. SLM Corp.*,
  No. 10 Civ. 198 (W.D. Wash. Aug. 8, 2012) ........................................................... 22

*Beckman v. KeyBank, N.A.*,
  No. 12 Civ. 7836 (RLE), 2013 WL 1803736 (S.D.N.Y. Apr. 29, 2013)................................... 35

*Blessing v. Sirius XM Radio Inc.*,
  507 F. App'x 1 (2d Cir. 2012) ............................................................................... 14

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980)............................................................... 28, 30, 31, 32, 33, 40

*Bozak v. FedEx Ground Package Sys., Inc.*,
  No. 11 Civ. 0738, 2014 WL 3778211 (D. Conn. July 31, 2014).......................... 30, 33, 35, 40

*Brown v. Wal-Mart Stores, Inc.*,
  No. 01 L 85 (Ill. Cir. Ct., Fourteenth Judicial Cir. Oct. 29, 2009) .................................... 47, 48

*Caitflo LLC v. Sprint Commc'ns Co., LP*,
  No. 11 Civ. 0497, 2013 WL 3243114 (D. Conn. June 26, 2013) ................................. 31, 33, 40

*Capsolas v. Pasta Resources Inc.*,
  No. 10 Civ. 5595, 2012 WL 4760910 (S.D.N.Y. Oct. 5, 2012) ............................................. 35

*Carnegie v. Household Int'l, Inc.*,
  376 F.3d 656 (7th Cir. 2004) ................................................................................. 23

*Charron v. Pinnacle Grp. N.Y. LLC*,
  874 F. Supp. 2d 179 (S.D.N.Y. 2012) ...................................................................... 20

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ................................................................................... 15, 22, 36

*Cohen v. Chilcott*,
   522 F. Supp. 2d 105 (D.D.C. 2007) ........................................................................ 31

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ................................................................................................... 18

*Conroy v. 3M Corp.*,
   No. 00 Civ. 2810 (CW), 2006 U.S. Dist. LEXIS 96169 (N.D. Cal. Aug. 10, 2006) .......... 47, 48

*Cunningham v. Suds Pizza, Inc.*,
   290 F. Supp. 3d 214 (W.D.N.Y. 2017) ................................................................... 32

*Dahingo v. Royal Caribbean Cruises, Ltd.*,
   312 F. Supp. 2d 440 (S.D.N.Y. 2004) ................................................................... 31

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001) .................................................................................... 12, 16

*deMunecas v. Bold Food, LLC*,
   No. 09 Civ. 440 (DAB), 2010 WL 3322580 (S.D.N.Y. Aug. 23, 2010) ................................. 34

*Dennings v. Clearwire Corp.*,
   No. 10 Civ. 1859 (JLR) (W.D. Wash. Aug. 20, 2013) ...................................................... 46, 47

*Dornberger v. Metropolitan Life Ins. Co.*,
   203 F.R.D. 118 (S.D.N.Y. 2001) ............................................................................. 42

*Edelson PC v. Bandas Law Firm PC*,
   No. 16 Civ. 11057 (RRP), 2018 WL 723287  (N.D. Ill. Feb. 6, 2018) ............................. 50, 51

*Elliot v. Leatherstocking Corp.*,
   No. 10 Civ. 0934 (MAD) (DEP), 2012 WL 6024572 (N.D.N.Y. Dec. 4, 2012) ..................... 42

*Embry v. ACER Am. Corp.*,
   No. 09 Civ. 01808 (JW), 2012 WL 3777163 (N.D. Cal. Aug. 29, 2012) ................................. 47

*Ferrington v. McAfee, Inc.*,
   No. 10 Civ. 1455 (SGW) (JGW), 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012) ..................... 21

*Fleisher v. Phoenix Life Ins. Co.*,
   No. 11-cv-8405 (CM), 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) ............................. 16, 32

*Fleisher v. Phx. Life Ins. Co.*,
   No. 11 Civ. 8405 (CM), 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) .................................. 32

*Frank v. Eastman Kodak Co.*,
   228 F.R.D. 174 (W.D.N.Y. 2005) .......................................................................................... 24

*Garber v. Office of Comm'r of Baseball*,
   No. 12 Civ. 03704 (VEC),  2017 WL 752183 (S.D.N.Y. Feb. 27, 2017) .......... 4, 44, 46, 49, 50

*Gilliam v. Addicts Rehab. Ctr. Fund*,
   No. 05 Civ. 3452 (RLE), 2008 WL 782596 (S.D.N.Y. Mar. 24, 2008) ................................... 35

*Goldberger v. Integrated Resources, Inc.*,
   209 F.3d 43 (2d Cir. 2000) ............................................................ 28, 33, 34, 39, 40

*Guoliang Ma v. Harmless Harvest, Inc.*,
   No. 16 Civ. 7102 (JMA) (SIL), 2018 WL 1702740 (E.D.N.Y. Mar. 31, 2018) ...................... 14

*Hall v. ProSource Technologies, LLC*,
   No. 14 Civ. 2502 (SIL), 2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016) ............................ 41, 42

*Hamilton v. SunTrust Mortg. Inc.*,
   No. 13 Civ. 60749 (JIC), 2014 WL 5419507 (S.D. Fla. Oct. 24, 2014) ................................. 22

*Hart v. RCI Hospitality Holdings, Inc.*,
   No. 09 Civ. 3043, 2015 WL 5577713 (S.D.N.Y. Sept. 22, 2015) ........................................... 32

*Hayes v. Harmony Gold Mining Co.*,
   No. 08 Civ. 03653 (BSJ), 2011 WL 6019219 (S.D.N.Y. Dec. 2, 2011)
   *aff'd* 509 F. App'x 21 (2d Cir. 2013) ................................................................................... 35

*Hernandez v. Merrill Lynch & Co., Inc.*,
   No. 11 Civ. 8472, 2013 WL 1209563 (S.D.N.Y. Mar. 21, 2013) ................................ 34, 35, 42

*Hicks v. Stanley*,
   No. 01 Civ. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ........................ 12, 38

*Hubbard v. Donahoe*,
   No. 03 Civ. 1062 (RJL), 2013 WL 3943495 (D.D.C. July 31, 2013) ..................................... 31

*In re "Agent Orange" Prod. Liab. Litig.*,
   597 F. Supp. 740 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. Apr. 1987) ........................ 16

*In re Abrams & Abrams, P.A.*,
   605 F.3d 238 (4th Cir. 2010) ................................................................................................ 39

*In re Alan Barinholtz*,
Commission No. 2010PR00070 (Attorney Registration & Disciplinary Comm'n of the
Supreme Court of Illinois, May 2, 2013) ................................................................................ 47

*In re American Bank Note Holographics, Inc. Sec. Litig.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001) .................................................................................... 19

*In re Austrian & German Bank Holocaust Litig.*,
80 F. Supp. 2d 164 (S.D.N.Y. 2000) ........................................................................ 16, 20, 24

*In re Baby Prod. Antitrust Litig.*,
708 F.3d 163 (3d Cir. 2013) ................................................................................................... 45

*In re Brown Co. Sec. Litig.*,
355 F. Supp. 574 (S.D.N.Y. 1973) ........................................................................................ 37

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
281 F.R.D. 531 (N.D. Cal. 2012) ........................................................................................... 49

*In re Checking Account Overdraft Litig.*,
830 F. Supp. 2d 1330 (S.D. Fla. 2011) ................................................................................. 17

*In re China Sunergy Sec. Litig.*,
No. 07 Civ. 7895 (DAB), 2011 WL 1899715 (S.D.N.Y. May 13, 2011)............................... 41

*In re Fab Universal Corp. Shareholder Derivative Litig.*,
No. 14 Civ. 687 (RWS), 2015 WL 7299773 (S.D.N.Y. Nov. 17, 2015) .............................. 12, 13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
No. 02 Civ. 3400 (CM) (PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) .................. 38, 40

*In re Gen. Elec. Co. Sec. Litig.*,
998 F. Supp. 2d 145 (S.D.N.Y. 2014) ...................................................................... 46, 47, 49

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ........................................................................................... 20

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
851 F. Supp. 2d 1040 (S.D. Tex. 2012) ................................................................................ 31

*In re Hi-Crush Partners L.P. Securities Litig.*,
No. 12 Civ. 8557 (CM), 2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014)............................ 25, 36

*In re HIKO ENERGY LLC, Energy Litigation*,
No. 14 Civ. 1771 (VB) (S.D.N.Y. May 9, 2016)............................................. 11, 12, 20, 21, 25

vi

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
   No. 09 Civ. 1088 (BTM) (KSC), 2013 WL 5275618 (S.D. Cal. Sept. 17, 2013) .. 44, 46, 47, 49

*In re Initial Public Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009) .................................................................. 17

*In re Lloyd's Am. Tr. Fund Litig.*,
   No. 96 Civ. 1262 (RWS), 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ............................ 36

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
   233 F.R.D. 306 (E.D.N.Y. 2006) ...................................................................... 11

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) .......................................................... 15, 35, 38

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   No. 02 MDL 1484 (JFK), 2007 WL 313474, at *24 (S.D.N.Y. Feb. 1, 2007) ........................ 41

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ...................................................................... 34

*In re Nigeria Charter Flights Litig.*,
   No. 04 Civ. 304 (MDG), 2011 WL 7945548 (E.D.N.Y. Aug. 25, 2011) ................................ 32

*In re PaineWebber Ltd. Partnerships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) *aff'd* 117 F.3d 721 (2d Cir. 1997) ........................... 16, 20, 22

*In re Polaroid*,
   No. 03 Civ. 8335 (WHP), 2007 WL 2116398 (S.D.N.Y. July 19, 2007) .................... 29, 33, 42

*In re Processed Egg Prods. Antitrust Litig.*,
   284 F.R.D. 278 (E.D. Pa. 2012) ...................................................................... 27

*In re Prudential Sec. Ltd. P'ships Litig.*,
   985 F. Supp. 410 (S.D.N.Y. 1997) .................................................................... 39

*In re Sony Corp. SXRD Rear Projection TV Mktg., Sales Practices and Products Liab. Litig.*,
   No. 09 MD 2102 (RPP), 2010 WL 3422722 (S.D.N.Y. Aug. 24, 2010) .................................. 41

*In re Sumitomo Copper Litig.*,
   74 F. Supp. 2d 393 (S.D.N.Y. 1999) .................................................................. 29

*In re Telik, Inc. Sec. Leg.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) .......................................................... 29, 34, 36

*In re TJX Cos. Retail Sec. Breach Litig.*,
    584 F. Supp. 2d 395 (D. Mass. 2008) ........................................................ 33

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
    724 F. Supp. 160 (S.D.N.Y. 1989) ........................................................... 34

*In re Veeco Instruments*,
    No. 05 MD 01695 (CM) (GAY), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) .......... 29, 35, 41

*In re Vitamins Antitrust Litig.*,
    No. 99 Civ. 197 (TFH), 2001 WL 34312839 (D.D.C. July 16, 2001) ..................... 31

*In re Wal-Mart Wage & Hour Emp't Practices Litig.*,
    No. 06 Civ. 0225 (PMP) (PAL), 2010 WL 2132094 (D. Nev. May 25, 2010) ........... 44, 45, 47

*In re Warner Chilcott Ltd. Sec. Litig.*,
    No. 06 Civ. 11515 (WHP), 2008 WL 5110904 (S.D.N.Y. Nov. 20, 2008) .......................... 11

*In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*,
    364 F. Supp. 2d 980 (D. Minn. 2005) ...................................................... 39

*Ingles v. Toro*,
    438 F. Supp. 2d 203 (S.D.N.Y. 2006) ...................................................... 15

*Johnston v. Comerica Mortg. Corp.*,
    83 F.3d 241 (8th Cir. 1996) ................................................................ 31

*Karic v. Major Automotive Companies, Inc.*,
    No. 09 Civ. 5708 (CLP), 2016 WL 1745037 (E.D.N.Y. Apr. 27, 2016) ................. 42

*Kiefer v. Moran Foods, LLC*,
    No. 12 Civ. 756, 2014 WL 3882504 (D. Conn. Aug. 5, 2014) .................... 30, 33, 40

*Lessard v. Rent-A-Center East, Inc.*,
    No. 06 CV 000666 (VLB) (D. Conn.) ...................................................... 13

*Lopez v. Youngblood*,
    No. 07 Civ. 0474 (DLB), 2011 WL 10483569 (E.D. Cal. Sept. 2, 2011) ............... 31

*Malchman v. Davis*,
    761 F.2d 893 (2d Cir. 1985) ................................................................ 14

*Maley v. Del Glob. Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................................. 19, 20, 38

*Markos v. Wells Fargo Bank, N.A.*,
   No. 15 Civ. 01156 (LMM), 2017 WL 416425 (N.D. Ga. Jan. 30, 2017) ................................ 46

*Masters v. Wilhelmina Model Agency, Inc.*
   473 F.3d 423 (2d Cir. 2007) ......................................................................... 21, 30, 31, 32, 40

*McReynolds v. Richards-Cantave*,
   588 F.3d 790 (2d Cir. 2009) ......................................................................................... 12

*Missouri v. Jenkins*,
   491 U.S. 274 (1989) .................................................................................................... 34

*Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*,
   No. 06 Civ. 4270 (PAC), 2009 WL 5851465 (S.D.N.Y. Mar. 31, 2009) ............................... 35

*Mussmann v. Wal-Mart Stores, Inc.*,
   No. LACV-27486 (Iowa Dist. Ct., Clinton Cnty. Oct. 13, 2009) ........................................ 48

*Nieberding v. Barrette Outdoor Living, Inc.*,
   129 F. Supp. 3d 1236 (D. Kan. 2015) ............................................................................ 27

*Parker v. Time Warner Entm't Co., L.P.*,
   613 F. Supp. 2d 242 (E.D.N.Y. 2009) ............................................................................ 32

*Perez v. Asurion Corp.*,
   501 F. Supp. 2d 1360 (S.D. Fla. 2007) .......................................................................... 22

*Poertner v. Gillette Co.*,
   618 Fed. Appx. 624, (11th Cir. 2015) ............................................................................ 22

*Puglisi v. TD Bank, N.A.*,
   2015 WL 4608655 (E.D.N.Y. July 30, 2015) .................................................................. 42

*Raniere v. Citigroup Inc.*,
   310 F.R.D. 211 (S.D.N.Y. 2015) .................................................................................... 12

*Richards v. Direct Energy Servs., LLC*,
   246 F. Supp. 3d 538 (D. Conn. 2017), appeal docketed, No. 17-1003 (2d Cir.) .................... 23

*Rincon-Marin v. Credit Control, LLC*,
   No. 17 Civ. 0007 (VLB) (D. Conn.) .......................................................................... 13, 32

*Schulte v. Fifth Third Bank*,
   805 F. Supp. 2d 560 (N.D. Ill. 2011) ............................................................................. 17

*Siler v. Landry's Seafood House–North Carolina, Inc.*,
   No. 13 Civ. 587, 2014 WL 2945796 (S.D.N.Y. June 30, 2014).............................................. 23

*Silverstein v. AllianceBernstein, L.P.*,
   No. 09 Civ. 05904 (LGS), 2013 WL 7122612 (S.D.N.Y. Dec. 20, 2013) .............................. 19

*Spicer v. Pier Sixty LLC*,
   No. 08 Civ. 10240 (LBS), 2012 WL 4364503 (S.D.N.Y. Sept. 14, 2012)............................. 34

*Steiner v. Williams*,
   No. 99 Civ. 10186 (JSM), 2001 WL 604035 (S.D.N.Y. May 31, 2001)................................. 29

*Strougo v. Bassini*,
   258 F. Supp. 2d 254 (S.D.N.Y. 2003) .................................................................................... 11

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
   No. 01 Civ. 11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ................................ 16

*Tennille v. Western Union Co.*,
   785 F.3d 422 (10th Cir. 2015) ................................................................................................ 27

*Torres v. Gristede's Operating Corp.*,
   No. 04 Civ. 3316 (PAC), 2010 WL 5507892 (S.D.N.Y. Dec. 21, 2010)
   *aff'd* 519 F. App'x 1 (2d Cir. 2013) .................................................................................. 25, 31

*Touhey v. United States*,
   No. 08 Civ. 1418 (LDW), 2011 WL 3179036 (C.D. Cal. July 25, 2011) .............................. 22

*Trustees v. Greenough*,
   105 U.S. 527 (1881)................................................................................................................ 28

*Velez v. Novartis Pharm. Corp.*,
   No. 04 Civ. 09194 (GEL), 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010)............................. 31

*Viafara v. MCIZ Corp.*,
   No. 12 Civ. 7452 (RLE), 2014 WL 1777438 (S.D.N.Y. May 1, 2014) .................................. 42

*Vollmer v. Selden*,
   350 F.3d 656 (7th Cir. 2003) ................................................................................................. 45

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ..................................................................................................... 29

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982) ..................................................................................................... 11

*Williams v. First National Bank,*
  216 U.S. 582 (1910) ................................................................................................ 11

*Willix v. Healthfirst, Inc.,*
  No. 07 Civ. 1143 (ENV) (RER), 2011 WL 754862 (E.D.N.Y. Feb. 18, 2011) ................ 25, 35

*Zeltser v. Merrill Lynch & Co., Inc.,*
  No. 13 Civ. 1531 (FM), 2014 WL 4816134 (S.D.N.Y. Sept. 23, 2014) ................................ 34

**Rules**

Fed. R. Civ. P. 23(c)(2)(B). ....................................................................................... 25

Fed. R. Civ. P. 23(c)(3) ............................................................................................. 26

Fed. R. Civ. P. 23(e)(2) ............................................................................................. 11

**Statutes**

Class Action Fairness Act, 28 U.S.C. § 1715 (2005). .................................................... 9

**Treatises**

4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11.45 (4th ed. 2002) .......... 16

4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 14.6 (4th ed. 2002) ........... 31

Manual for Complex Litigation, Fourth, § 21.71 ......................................................... 31

Plaintiffs Lori Sanborn, BDK Alliance LLC, Iron Man LLC, and Stephanie Silver (the "*Sanborn* Plaintiffs"); David Steketee (the "*Steketee* Plaintiff"); Susanna Mirkin and Boris Mirkin (the "*Mirkin* Plaintiffs"); Elizabeth Hembling, Patricia Kulesa, and Stewart Connard (the "*Hembling* Plaintiffs"); and Steven Landau (the "*Landau* Plaintiff") (collectively, "Plaintiffs"), individually and on behalf of the Settlement Classes (as defined in the Settlement Agreement), respectfully submit this memorandum of law in support of their Motion for Final Approval of the Class Action Settlement, Certification of Settlement Classes, and Approval of Award of Attorneys' Fees and Expenses (the "Motion"), and in response to the single objection filed in this case.  In conjunction herewith, Plaintiffs also respectfully submit the Declarations of Lead Class Counsel Robert A. Izard ("Izard Decl.") and Steven L. Wittels ("Wittels Decl."); of Class Counsel Troy M. Frederick ("Frederick Decl."); Richard D. Greenfield ("Greenfield Decl."); Charles J. LaDuca ("LaDuca Decl."); Laurie Rubinow ("Rubinow Decl.") and Jonathan Shub ("Shub Decl."); as well as the Declaration of Scott Fenwick of the Heffler Claims Group, the Settlement Administrator appointed by the Court in this case. ("Fenwick Decl.").

## INTRODUCTION

The proposed Settlement resolves five litigations pending against Viridian Energy, Inc. and related entities (collectively, "Viridian" or "Defendant"):

- *Sanborn v. Viridian Energy, Inc.*, No. 14 Civ. 1731 (SRU) (D. Conn. Nov. 19, 2014)

- *Steketee v. Viridian Energy, Inc.*, No. 15 Civ. 0585 (SRU) (D. Conn. Apr. 22, 2015)

- *Mirkin v. Viridian Energy, Inc.*, No. 15 Civ. 1057 (SRU) (D. Conn. July 10, 2015)

- *Hembling v. Viridian Energy, LLC*, No. 15 Civ. 1258 (SRU) (D. Conn.) (Aug. 21, 2015)

- *Landau v. Viridian Energy PA, LLC*, No. 16 Civ. 2383 (GAM) (E. D. Pa. Mar. 18, 2016)

The Plaintiffs in all five actions filed an Amended Consolidated Complaint ("AC") consolidating all claims in all cases for settlement purposes (the "Litigation"). Amended Consolidated Class Action Complaint, *Sanborn*, ECF No. 143. The Plaintiffs collectively allege that Viridian agreed in its contracts that its variable rate for electricity and/or gas supply services would fluctuate to reflect changes in the wholesale energy markets, while in practice Viridian failed to decrease its variable rates when wholesale market rates fell. *See* AC at ¶¶ 4–6.

After hard-fought litigation that included extensive investigation, motion practice, and discovery—including Defendant's multiple attempts to dismiss the actions; data analysis by energy industry experts; review of over 250,000 pages of documents produced by Defendant, including voluminous electronic files related to customer energy usage and Viridian's costs; numerous depositions; and three separate full-day mediation sessions with Judge Shira Scheindlin (U.S.D.J. S.D.N.Y., Ret.), followed by extensive negotiations directly between the parties—Plaintiffs and Defendant agreed to a global settlement that will resolve all of the Actions. Plaintiffs respectfully request that this Court now grant final approval in the form set forth in the [Proposed] Order attached as Exhibit A to Plaintiffs' Motion.

***First***, the Settlement offers substantial benefits to Class Members and avoids the delay, expense, and risks inherent in litigating class claims through trial and appeal. Under the Settlement, each Class Member is entitled to receive ***65%*** of his or her "Calculated Amount," up to a maximum of $425 per account for "Average Usage" Class Members and $500 per account for "Above-Average Usage" customers.[1] *See* Settlement Agreement (ECF No. 155-1) at ¶ 5.1.[2]

---

[1] The definition of "Calculated Amount" is discussed further in note 12 below.

[2] At one point in Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval (ECF No. 154), Plaintiffs inadvertently misstated that the cap on Average Use Class

This represents over 50 cents on the dollar under Plaintiffs' reasonable "best case" damages model.  Moreover, *every* Class Member is entitled to a minimum payment of $5 or $10 (for Average Usage and Above-Average Usage customers respectively).[3]  In the alternative, each Class Member with a Calculated Loss above zero, regardless of the length of their prior (or ongoing) enrollment with Defendant, has the option to select a bill credit of $8.50 per month for up to twelve months (worth up to $102).  *Id*. at ¶ 5.1.[4]  As of June 8, 2017, more than 18,200 Class Members had filed claims to share in the available benefits (and 166 additional individuals who do not appear to be Class Members on initial review had also filed claims; these submissions are being further investigated).[5]  Fenwick Decl. at ¶ 14.

   *Second*, the Settlement was the product of extensive arm's length negotiations, including negotiations aided by an experienced, independent mediator and conducted by experienced counsel who obtained extensive formal and informal discovery and were well-positioned to evaluate the strengths and weaknesses of the claims and defenses, potential damages, and the fairness of the Settlement.

---

Members was $450 (rather than the correct $425).  *Id*. at 12.  The correct $425 cap was stated elsewhere in the Memo (*id*. at 2, 10), and in the long Notice sent to Class Members and on the Settlement website.

[3]  Defendant's liability (including payment of attorneys' fees and costs, Settlement Administrator expenses, and lead plaintiff awards) is capped at $18.5 million.  In the event the total amounts claimed by Class Members exceed the funds available, each approved claimants' final award would be reduced *pro rata*.

[4]  The monetary value of billing credits selected by Class Members does not count against the $18.5 million cap.  *Id*. at ¶ 2.46.  Viridian has also agreed to provide its sales agents with a written notice to abide by Viridian's policies regarding advertising and marketing, including refraining from making unsubstantiated claims regarding cost savings or how Viridian's variable rates are determined, and advising these agents that failure to comply will lead to discipline up to and including termination.  *Id*. at Part VI.

[5]  The deadline for filing claims is June 14, 2018.

**Third**, the positive response from the Class weighs in favor of approving the Settlement. This Court set May 15, 2018, as the deadline for Class Members to file objections or requests for exclusion. Only one out of approximately 364,000 Class Members has opted out, and there has been only one objection. Fenwick Decl. at ¶ 13. To date, there have been no late-filed requests for exclusion or objections. Moreover, as discussed below, the one objection that was filed is without merit (and, indeed, is the work of the law firm that is the most prolific class action objector in the United States, a law firm that has been severely criticized and sanctioned by courts across the country for routinely filing wholly baseless objections in an apparent effort to extort a payment of attorneys' fees). See, e.g., *Garber v. Office of Comm'r of Baseball*, No. 12 Civ. 03704 (VEC), 2017 WL 752183, at *6 (S.D.N.Y. Feb. 27, 2017) ("This Court joins the other courts throughout the country in finding that Bandas has orchestrated the filing of a frivolous objection in an attempt to throw a monkey wrench into the settlement process and to extort a pay-off"). The Settlement Administrator's help line received over 4,800 calls from Class Members (including nearly 3,100 who chose to speak to a live operator) (Fenwick Decl. at ¶ 7), and Class Counsel fielded dozens of calls as well, ensuring that all Class Member questions were fully addressed.

Class Counsel also moves for an award of $4,047,333.39 in attorneys' fees and $407,666.61 in expenses.[6] The requested fee is less than 21.9% of the $18.5 million value available under the Settlement and constitutes a **negative** multiplier (*i.e.,* 0.876) of counsels' lodestar. As the amount requested falls well within the range of attorneys' fees and expenses awarded by courts within this Circuit using either the percentage of the fund or lodestar

---

[6] A [Proposed] Order awarding attorneys' fees and expenses and Plaintiff service awards is attached as Exhibit B to Plaintiff's Motion.

methodology and was adequately disclosed in advance to the Class through various notices, this Court should approve the requested attorneys' fees and expenses to compensate Class Counsel for the outstanding result achieved.

Class Counsel also requests that the Court approve the payment of service awards in the amount of $5,000.00 ("Service Awards") to each of the eleven Plaintiffs to compensate them for their time and effort spent in assisting in the prosecution of the Actions on behalf of the Class. Viridian has agreed to pay the requested service awards the Court approves up to this requested amount.  The Service Award request is comparable to other service award payments in other class actions and was adequately disclosed in advance to the Class.  Many of the named Plaintiffs were deposed and/or produced documents, and all exposed themselves to public scrutiny by choosing to bring this public lawsuit for the benefit of their fellow consumers and should be fairly compensated for these efforts.

**BACKGROUND**

I.      **THE LITIGATION**

   A.      **Conduct of the Litigations**

Before bringing the instant action, Class Counsel exhaustively investigated the Class' claims by communicating with Plaintiffs; reviewing their files; reviewing relevant contracts and marketing materials; researching the energy industry and markets; analyzing causes of action; and developing a litigation strategy.  *See* Izard Decl. at 3; Wittels Decl. at 4; Frederick Decl. at ¶ 9; LaDuca Decl. at ¶ 2.

As set forth in the Recitals of the Settlement Agreement (ECF No. 155-1 at 2–4), each action has been vigorously litigated over several years.  *See, e.g.,* Izard Decl. at ¶¶ 4-21; Wittels Decl. at ¶¶ 5-15.  Motion practice included multiple motions to dismiss, as well as motions to consolidate, stay and transfer.  The *Sanborn* Plaintiffs also filed motions for summary judgment,

class certification, and for a prejudgment remedy.  Izard Decl. at ¶ 5.  Discovery has included, among other things, more than 250,000 pages of documents and native files produced by Viridian to the *Sanborn*, *Steketee*, *Hembling* and *Mirkin* Plaintiffs; hundreds of pages of documents produced by the *Sanborn*, *Steketee*, and *Mirkin* Plaintiffs; depositions of several of the *Sanborn* Plaintiffs and the *Steketee* Plaintiff; depositions by the *Sanborn* Plaintiffs of Viridian's corporate representatives; and third-party discovery taken by both the *Sanborn* Plaintiffs and Viridian.  Class Counsel engaged in frequent and lengthy exchanges of correspondence and telephonic conferences with defense counsel to address discovery disputes and other matters that were extremely hard-fought.  The *Sanborn*, *Steketee*, and *Mirkin* Plaintiffs also retained electricity and gas industry experts to assist in their assessment of liability and damages.  All told, counsel collectively spent 6,283.45 hours in painstaking litigation against aggressive and experienced defense counsel from both Venable LLP and Skadden Arps Slate Meagher & Flom LLP.

## B.    Mediation and Settlement

During the summer of 2016, the parties held ***three*** (3) all-day mediation sessions with the Hon. Shira Scheindlin, a former United States District Judge.[7]  Izard Decl. at ¶ 15; Wittels Decl. at ¶ 15.  While the parties reached agreement on many components of a settlement, they were unable to agree on certain terms concerning the structure and method of calculation of settlement payments to Class Members. *Id.*

The parties resumed litigation, which included additional conferences with the Court, substantial additional written discovery, discovery negotiations, document production and

---

[7]  Plaintiffs Hembling, Connard, and Kulesa took part in some but not all three (3) days of the mediations with Judge Scheindlin.

review, deposition testimony, expert analysis and motion practice.  After extensive further litigation, the parties agreed to revisit the possibility of a settlement and engaged in more than three (3) months of vigorous negotiations toward a comprehensive settlement of the Litigation. As part of these renewed settlement negotiations, Viridian provided Plaintiffs with a substantial amount of data regarding its variable pricing practices in all states where Viridian sells energy, which Plaintiffs and their experts reviewed and analyzed.  *See* Izard Decl. at ¶ 18; Wittels Decl. at ¶ 15.

In early August 2017, the parties agreed on the material terms of a comprehensive settlement, which were memorialized in a written Memorandum of Understanding ("MOU"), signed by Plaintiffs' and Viridian's counsel.  Izard Decl. at ¶ 16.  Significantly, in the August 2017 MOU, Viridian agreed to the $18.5 million settlement amount proposed at the 2016 mediation and abandoned its prior demand for a "flat rate" compensation structure (as had been adopted in numerous other energy service company class action settlements) and consented to Plaintiffs' demand that individual recoveries would be calculated based upon the actual, individual, month-to-month purchases made by each Class Member, which provides a more favorable recovery to Class Members.  *Id.* at ¶ 17.  The parties also agreed to a maximum payment to Average Usage Class Members of $425 and for Above Average Usage Class Members of $500, in recognition of Viridian's mitigation argument (which the Court or jury could ultimately have accepted) that individual Class Members bore at least some responsibility for monitoring the electric rates they were paying as the months (and years) progressed.  *Id.* Based upon Lead Class Counsel's review of the underlying claimant data provided by Viridian, these caps affect only 17,632 of the 364,184 total Class Members (or 5%).  Viridian also agreed to a minimum payment for all Class Members, ensuring that every Average Usage Class

7

Member would receive at least $5 and every Above Average Usage Class Member would receive at least $10, even if their actual damages were lower.  This floor **benefits** 338,920—or **93%**—of Class Members.  *Id.*  Finally, Plaintiffs' Counsel agreed to seek only $4.5 million in fees, costs and Plaintiff service awards—or approximately 24% of the total value of the Settlement—which is substantially **lower** than the 29% they had proposed in their August 2016 mediator-brokered demand to Defendant.  *Id.*

Following execution of the MOU, Viridian provided Class Counsel with substantial additional data to confirm the basis for its calculation of benefits and the representations by Viridian concerning the methodology for calculating those awards.  Class Counsel, aided by expert analysis, confirmed the sufficiency of the information and reasonableness of the methodology.  The parties then spent several months finalizing the exact language of the Settlement Agreement.  *See* Izard Decl. at ¶¶ 16, 19; Wittels Decl. at ¶ 15.

On February 6, 2018, the parties submitted the Settlement Agreement (including a proposed Notice plan) to the Court for preliminary approval.  *See* ECF Nos. 153, 154, 155.  The Court held a telephonic conference with the parties on February 7, 2018.  During the conference, the Court specifically requested that the parties amend the Notice so that objections were **not** to be filed with the Court.  *See* ECF No. 158.  In addition, the Court expressed its opinion that the parties should consider having the objection deadline **before** the date on which Plaintiffs filed their final approval motion, so that Plaintiffs could respond to any objections in their final approval memorandum.  Izard Decl. at ¶ 22.  The parties accepted the Court's suggestion and amended the Notices and schedule accordingly.  Izard Decl. at ¶ 22; *see id.* at Ex. A (email chain between Class Counsel S. Klein and this Court's judicial clerk A. Pincus).

This Court granted preliminary approval of the Settlement on February 16, 2018 (ECF No. 163) (the "Preliminary Approval Order"), certifying the Class for settlement purposes and authorizing the dissemination of Class notice.  Pursuant to the Preliminary Approval Order, the Parties worked with Settlement Administrator Heffler Claims Group ("Heffler") to provide notice to the Class.  Izard Decl. at ¶ 21; Fenwick Decl. at ¶ 3.  In accordance with the Notice Plan approved by the Court, the Class was provided with notice of the Settlement by e-mail, and with postcard notice where no email address was available or the email notice proved undeliverable.  Fenwick Decl. at ¶¶ 8-10.  In accord with the Notice forms approved by the Court, the email and postcard Notices included basic information about the Settlement and provided both a website address (www.variableratesettlement.com) where the full Notice could be reviewed and a toll-free telephone number that consumers could call with questions or to request paper copies of the relevant documents.  Fenwick Decl. at ¶¶ 6-10 and Exs. A, B.  The full Notice and Email and Postcard Notices inform Class Members of the key terms of the Settlement, including the fact that Plaintiffs would request an award of attorneys' fees, expenses and lead plaintiff case contribution awards of up to $4.5 million, to be paid from the Settlement Fund, and the procedures for opting-out or objecting to the Settlement or motion for attorneys' fees, expenses and case contribution awards.  *Id.*[8]

On May 16, 2018, the parties jointly held a telephonic conference with the Court to discuss the possibility of sending reminder Notices to the Class.  The Court declined the suggestion, and

---

[8] In addition, in accordance with the requirements of the Class Action Fairness Act, 28 U.S.C. § 1715 (2005) ("CAFA"), counsel for Defendant sent copies of the Settlement Agreement and all pleadings and orders in the Litigation to the United States Attorney General and the Attorneys General of all States and U.S. Territories.  ECF No. 165.  None of the Attorneys General has filed any opposition or objection to the Settlement

"advised the parties to follow the plan for providing notice that they negotiated during the settlement discussions." *See* ECF No. 173.

## II.    THE SETTLEMENT TERMS

The Settlement allows Class Members who submit a valid Claim Form to choose between a cash award of (i) 65% of their Calculated Losses (up to a maximum of $425 per account for Average Usage Class Members and $500 per account for Above-Average Usage Class Members) or (ii) a credit of $8.50 per month for up to twelve months, up to $102. Settlement Agreement (ECF No. 155-1) at ¶ 5.1.[9]   Regardless of the Calculated Amount, all Class Members who file claims receive a minimum of $5 or $10 depending on their usage classification.  Viridian has also agreed to pay Plaintiffs' attorneys' fees and costs and Service Awards to the named Plaintiffs in a total amount to be approved by the Court of up to $4,500,000.00.  *Id.* at Part VIII.  Additionally, Viridian is paying the costs of notice settlement and claims administration.  *Id.* at Part X.

In return for these benefits, the Class Members' claims against Defendants will be dismissed with prejudice and all Class Members (other than those who opt-out of the Settlement Class) will release and be permanently barred from pursuing any claims in accordance with Settlement Agreement.  *Id.* at Part XII.

---

[9] Viridian has also agreed to provide its sales agents with a written notice to abide by Viridian's policies regarding advertising and marketing.  *Id.* at Part VI.

# ARGUMENT

## I.    THE SETTLEMENT SHOULD BE APPROVED

### A.    Settlements of Class Action Litigations Are Favored

Strong judicial policy favors the settlement of class actions.  *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910).  "Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation.  There is a strong public interest in quieting any litigation; this is particularly true in class actions."  *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006); *see also Strougo v. Bassini*, 258 F. Supp. 2d 254, 257 (S.D.N.Y. 2003); *In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ. 11515 (WHP), 2008 WL 5110904, at *1 (S.D.N.Y. Nov. 20, 2008).

Indeed, in a case much like this, Judge Briccetti approved a similar claims-made class settlement.  *See* Final Approval Order in *In re HIKO ENERGY LLC, Energy Litigation*, No. 14 Civ. 1771 (VB) ("*In re HIKO*") at Dkt. No. 93 (S.D.N.Y. May 9, 2016); *see also* Transcript of Final Approval Hearing, in *In re HIKO* dated May 9, 2016 (the "*HIKO* Trans.") (attached as Exhibit C to the Izard Decl.).  In *In re HIKO*, the plaintiffs alleged essentially identical claims against another independent energy company.  Judge Briccetti granted final approval, finding that the settlement was both procedurally and substantively fair.  *See HIKO* Trans. at 11:17–20:12.  Just as in *In re HIKO*, the Settlement here is fair, reasonable, and adequate, both procedurally and substantively, and warrants final approval by this Court.

Courts assess proposed class action settlements to determine whether they are "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  This involves two components: procedural fairness and substantive fairness.  This Settlement satisfies both criteria.

### B.      The Settlement is Procedurally Fair

A class settlement is presumed to be fair, adequate, and reasonable where it is "reached in arm's-length negotiation between experienced, capable counsel after meaningful discovery." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803–04 (2d Cir. 2009); *see also HIKO* Trans. at 12:2–12:5 ("[A] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."); *Raniere v. Citigroup Inc.*, 310 F.R.D. 211, 217 (S.D.N.Y. 2015).  In determining whether a settlement is procedurally fair, courts evaluate the "negotiating process, to ensure that the settlement resulted from arm's length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests."  *D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001).  A settlement reached after mediation is presumed to be arm's-length.  *Hicks v. Stanley*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *5 (S.D.N.Y. Oct. 24, 2005).

This Settlement, reached as a result of arm's length negotiation after protracted, hard-fought litigation and three mediation sessions, meets the standard for procedural fairness.  "The parties are represented by experienced counsel, supporting a conclusion that the settlement negotiations were based on informed judgments as to the merits of the claims and defenses." *In re Fab Universal Corp. S'holder Derivative Litig.*, No. 14 Civ. 687 (RWS), 2015 WL 7299773, at *2 (S.D.N.Y. Nov. 17, 2015).  Plaintiffs' counsel in this case were well-positioned to make informed judgments about the strengths and weaknesses of Plaintiffs' claims due to the thorough discovery in the Actions, as well as their extensive experience and knowledge in the area of complex and class action litigation generally, and consumer rights' energy litigation in particular, as set forth on their firm resumes.  *See* Izard Decl. at Ex. B; Wittels Decl. at Ex. A; Frederick Decl. at Ex. B; Greenfield Decl. at Ex. A; *see also* Rubinow Decl. at ¶ 9, Shub Decl. at ¶ 15.  The fact that the

Settlement Agreement (at ¶ 8.2) specifically provides that the Settlement is not conditioned on approval of Class Counsel's attorney fee request is "further evidenc[e of] arm's-length negotiations." *In re Fab Universal Corp.*, 2015 WL 7299773, at *2.

In the one objection filed to the Settlement ("Objection") (ECF No. 167), the professional objector[10] alleges that the settlement is "collusive" because the mediation sessions before Judge Scheindlin had ended without resolution, and the parties' did not reach a final agreement until approximately a year later. Objection at 10–13. But as discussed above, the final Settlement is ***more*** advantageous to the Class than the final mediator-facilitated demand Plaintiffs made in mediation. The enhancements include the fact that the Settlement provides for a minimum recovery which benefits the vast majority of Class Members; and a reduced attorneys' fees sought by Class Counsel. *See* Part I.B above. Accordingly, there can be little question that Class Counsel aggressively pursued the Class' interests after the mediation, and thus that the Settlement is procedurally fair.

The professional objector also objects to Defendant's agreement not to contest the amount of attorneys' fees as evidence of collusion. This argument is particularly ironic in that the objector's Connecticut counsel, Peter Van Dyke, has himself twice moved in this Court for preliminary approval of similar claims-made settlements with negotiated fees. *See* Settlement Agreement and Memorandum of Law in Support of Preliminary Approval in *Rincon-Marin v. Credit Control, LLC*, No. 17 Civ. 0007 (VLB) (D. Conn.), ECF Nos. 27-2, 27-1 (Izard Decl. at Exs. D and E); Memorandum of Law in Support of Final Approval of Settlement in *Lessard v. Rent-A-Center East, Inc.*, No. 06 CV 000666 (VLB) (D. Conn.), ECF No. 71 (Izard Decl. at Ex. F) at 5 (defendant "has agreed not to contest

---

[10] While the objection was technically filed by Class Member Michael Ferraro, the true actor behind the objection is notorious professional objector Christopher Bandas. Because Bandas is the true party with a stake in the objection we hereafter refer to the objector as "Bandas" or the "professional objector."

Plaintiff's counsel's request of attorneys' fees and expenses"). Indeed, as the Second Circuit has noted, such terms are typical. Further, as a market-set price resulting from opposing interests, a fee negotiated between the parties is the most accurate method of determining an appropriate fee. Defendant had an interest in minimizing the fee, Class Counsel had an interest in maximizing it, and the negotiations were informed by the parties' knowledge of the work done and result achieved and their views on what the court might award if the matter were litigated. In *Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985), the Second Circuit concluded that courts should be hesitant to interfere in fee arrangements between parties when the defendants have agreed not to oppose the payment of fees up to a certain amount:

> [W]here . . . the amount of the fees is important to the party paying them, as well as to the attorney recipient, it seems to the author of this opinion that an agreement "not to oppose" an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged. It is difficult to see how this could be left entirely to the court for determination after the settlement.

*Malchman*, 761 F.2d at 905 n.5. In fact, the Second Circuit has already rejected the professional objector's argument here and held that "clear-sailing and reversionary provisions" do ***not*** "suggest improper collusion between class counsel and [defendant]" absent other evidence of wrongful conduct. *Blessing v. Sirius XM Radio Inc.*, 507 F. App'x 1, 4 (2d Cir. 2012).[11]

---

[11] The professional objector's reliance upon *Guoliang Ma v. Harmless Harvest, Inc.,* No. 16 Civ. 7102 (JMA) (SIL), 2018 WL 1702740 (E.D.N.Y. Mar. 31, 2018), to support an inference of collusion is misplaced. In *Guoliang Ma*, the court denied final approval of a settlement where, *inter alia*, (i) there had been no motion practice or discovery; (ii) class counsel sought a $555,000 fee but only "offers injunctive relief that is worth little, if anything, to the class"; and (iii) after the objector filed his objection, class counsel attempted to persuade the court to redefine the class specifically to exclude the objector from membership. *Id.* at *4, *6, *8. Under these circumstances, the *Gouliang Ma* court's concerns were well-founded. But they have nothing to do with the present settlement.

The professional objector's final purported "indic[ia] of a collusive settlement" boils down to nothing more than an argument that claims-made settlements that allow for reversion of funds to defendants are, in essence, ***always*** collusive and improper.  *See* Objection at 10–13.  But that is not the law and is contrary to the routine practice of courts in this District and this Circuit approving such settlements as fair and reasonable.  *See* Part III.C.1 below.

## C.      The Settlement is Substantively Fair, Reasonable and Adequate

The Second Circuit identified nine factors in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462–63 (2d Cir. 1974) that district courts should consider in evaluating the substantive fairness of a proposed class action settlement:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

"In finding that a settlement is fair, not every factor must weigh in favor of settlement, rather the court should consider the totality of these factors in light of the particular circumstances." *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 138 (S.D.N.Y. 2010) (internal quotation marks and citations omitted).  "The weight given to any particular factor will vary based on the facts and circumstances of the case." *Ingles v. Toro*, 438 F. Supp. 2d 203, 211 (S.D.N.Y. 2006).  Here, the *Grinnell* factors weigh heavily in favor of final approval of the proposed Settlement.

### 1.      The Stage of the Proceedings and the Amount of Discovery Completed

In evaluating a settlement, "[t]here is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact.  It is clear that the court need not possess evidence to decide the merits of the issue, because the

15

compromise is proposed in order to avoid further litigation." ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 11.45 (4th ed. 2002).

As discussed above, by the time the Settlement was reached, Class Counsel were well informed of the strengths and weaknesses of their claims and Defendant's defenses through both documentary and deposition evidence and through the work of Plaintiffs' experts, which permitted them to fully consider and evaluate the Settlement's fairness. *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01 Civ. 11814 (MP), 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004).

> ### 2.   The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987). Moreover, the Court need only determine whether the Settlement falls within a "'range of reasonableness.'" *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997) (citation omitted). Determining whether a settlement is reasonable "is not susceptible of a mathematical equation yielding a particularized sum." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 178 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001) (internal citations omitted). Indeed, "even a recovery of only a fraction of one percent of the overall damages could be a reasonable and fair settlement." *Fleisher v. Phx. Life Ins. Co.*, No. 11 Civ. 8405 (CM), 2015 WL 10847814, at *11 (S.D.N.Y. Sept. 9, 2015).

Here, as discussed above, the Settlement represents a 65% recovery of each Class Member's Calculated Amount, subject to $425 or $500 per-claimant caps (for Average Usage

and Above-Average Usage claimants respectively) and an overall $18.5 million cap.[12]  *See*

Settlement Agreement (ECF No. 155-1) at ¶¶ 2.46, 5.1.  This recovery constitutes more than

50% of damages under Plaintiffs' reasonable, best-case damages model.  ECF No. 154 at 8.  This

level of recovery far exceeds recoveries in other class action settlements.  *See In re Checking*

*Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) (noting that "a 9 percent

settlement . . . is still within the range of reasonableness" in a consumer class action); *Schulte v.*

*Fifth Third Bank*, 805 F. Supp. 2d 560, 583 (N.D. Ill. 2011) (approving settlement representing

10% of maximum damages and noting that "[n]umerous courts have approved settlements with

recoveries around (or below) this percentage"); *In re Initial Pub. Offering Sec. Litig.*, 671 F.

Supp. 2d 467, 483 (S.D.N.Y. 2009) (approving settlement with 2% recovery of maximum

damages).

The professional objector has requested a "proffer" as to the "estimated value of the

aggregate class claims released under the settlement."  Objection at 8, 15.  Plaintiffs' damages

model is based on the difference between the variable rate that Viridian charged and the variable

rate that they allege ***should*** have been charged.  Plaintiffs' experts concluded that the rate that

---

[12]  As explained in Section 6 both of the Court-approved long Notice and of the website FAQs, the "Calculated Amount" is derived from a complex formula based upon the difference between the (i) actual payment made by each Class Member during the period in which the Class Member was enrolled in a Viridian variable rate electricity and/or gas plan during the Class Period based on Viridian's records (or reasonable, good-faith estimates where records are incomplete or inconsistent), and (ii) amount the Class Member would have paid during that same period if the Class Member paid the Price to Compare ("PTC"), plus one cent ($0.01) per kilowatt hour/therm, plus a 20% margin.  The PTC is a good faith estimate of the price that the customer's relevant public utility would have charged for the supply portion of the electric or gas service, based on reasonably available information.  The PTC is based on a weighted average price per therm or kilowatt hour charged by the relevant public utility for the duration of the period in which the Class Member was enrolled in a Viridian variable rate electricity and/or natural gas plan during the Class Period.  The one-cent addition reflects an estimated average premium charged by public utilities for green energy.

should have been charged was Viridian's cost of goods sold plus a reasonable gross margin of 20%. That gross margin includes not just profit, but also overhead, employee costs, General and Administrative ("G & A") expenses, taxes, financing costs, customer credit costs, and similar legitimate expenses. Based on this model, Plaintiffs' experts calculated that the estimated aggregate class-wide damages were $34,713,769. $18.5 million—Viridian's maximum liability under the overall liability cap—represents 53.3% of aggregate damages.

In addition to disputing that it overcharged customers at all (which would be hotly contested at trial), Viridian vigorously objected to the specific mechanics of Plaintiffs' damages model and contested its adequacy under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). For example, Viridian argued that Plaintiffs' cost of goods sold excluded numerous components that Viridian argued should be included in its costs of goods sold (which would increase COGS and thus reduce damages from the amount calculated under Plaintiffs' model) but which Plaintiffs included in the gross margin. For example, Plaintiffs' model excluded Viridian's taxes and customer credit costs. Including just these costs as costs of goods sold in the damage model would have reduced class-wide damages to $7,515,670. Accordingly, leaving aside the other risks, assuming Defendants prevailed on this issue alone, the $18.5 million settlement would represent 246% of actual damages.

The settlement has real value to Class Members on an individual as well as aggregate basis. As of the claims accepted and processed by June 8, 2018, the average claimant will receive approximately $70. Approximately 10,000 of the current 17,171 cash award claimants that have been fully processed are receiving the minimum $5 or $10 payments under the

Settlement, which is itself a nontrivial sum.[13]  Approximately 1,300 Class Members are receiving

between $30 and $100; approximately 1,600 are receiving between $100 and $300; and another

1,600 are receiving over $300.  Izard Decl. at ¶23.  Approximately 165 Class Members are

receiving over $500 and up to $2,000, based on their enrollment in multiple Viridian accounts.

*Id.*  Accordingly, every Class Member is receiving a genuine monetary benefit, and many are

receiving hundreds of dollars.[14]  This is an outstanding result, and one that falls well within the

range of reasonableness in this hard-fought litigation.

### 3.    The Reaction of the Class Was Overwhelmingly Positive

"It is well-settled that the reaction of the class to the settlement is perhaps the most

significant factor to be weighed in considering its adequacy."  *Maley v. Del Glob. Techs. Corp.*,

186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) (citing *In re Am. Bank Note Holographics, Inc. Sec.

Litig.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001) (citation omitted)).  There is a "strong

indication of fairness" where the "vast majority of class members neither objected nor opted

out."  *Silverstein v. AllianceBernstein, L.P.*, No. 09 Civ. 5904 (LGS), 2013 WL 7122612, at *5

(S.D.N.Y. Dec. 20, 2013) (citation omitted).

---

[13]  Moreover, the fact that many Class Members are receiving the "floor" payment amount
demonstrates that many Class Members were not significantly harmed by Viridian's pricing
practices.  This situation both reinforces the value of the recovery Plaintiffs were able to obtain
for all Class members, but also the risk that Plaintiffs would not be able to establish (significant)
damages at trial ***at all***.

[14]  The professional objector's argument that the credit option is "worthless" (Objection at 9) is
incorrect.  Every Class member has the option to accept a cash award.  But if a Class Member is
satisfied with their Viridian service, then the credit option could have value to them, particularly
if the Class Member would otherwise receive the minimum award.  Indeed, over ***700*** Class
members have selected the credit option as of this filing.  Fenwick Decl. at ¶ 14.  Moreover, as
the professional objector acknowledges, the credit option does ***not*** count against the $18.5
million liability cap, so the Class is not and cannot be harmed by offering that additional
valuable option to Class Members.

Here, Class Member response to the Settlement was overwhelmingly positive.  **First**, as of June 8, 2018, the Claims Administrator reported that only **one** Class Member opted out of the Settlement.  Fenwick Decl. at ¶ 13.  Likewise, only **one** objection has been filed.  *Id.*[15]  That there were a *de minimis* number of opt-outs and objections is especially noteworthy, as "the notice and approval process generally solicits negative feedback regarding a settlement, because it is designed to solicit opt outs and objections by advising class members of the procedures and deadlines for filing such responses with the court. . . . [I]n litigation involving a large class, such as that here, it would be extremely unusual not to encounter objections."  *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 197 (S.D.N.Y. 2012) (internal quotation marks and citations omitted); *see also HIKO* Trans. at 16:9–16:16 (finding that "reaction of the class as a whole supported approval" because "[t]he low number of objectors and opt-outs"—only one objector and 108 opt-outs out of roughly 186,000 class members—" indicates that the proposed settlement is fair").  "In fact, the lack of objections may well evidence the fairness of the Settlement."  *Maley*, 186 F. Supp. 2d at 362 (citing *PaineWebber*, 171 F.R.D. at 126); *In re Austrian & German Bank*, 80 F. Supp. 2d at 175.  And courts routinely find that the reaction of the class is positive and weigh this factor in favor of approval even when there are far more objections and opt-outs.  *See, e.g.*, *Charron*, 874 F. Supp. 2d at 196 (118 objectors from a class of 22,000); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 457 (S.D.N.Y. 2004) (noting that there were 12 objectors and 9 opt-outs from a class of a million and holding that

---

[15]  Moreover, as set forth below, the law firm behind the objection has been widely criticized by courts across the country for filing frivolous objections solely to generate fees.  Further, no attorney general from any of the U.S. states or territories who received notice of the Settlement under CAFA has raised any objection or opposition to the Settlement, which is further evidence of its reasonableness.

"[t]hese extremely low numbers of objectors and opt-outs strongly support settlement approval.").

*Second*, "the prevailing rule of thumb with respect to consumer class actions is [a claims rate of] 3–5 percent." *Ferrington v. McAfee, Inc.*, No. 10 Civ. 1455 (SGW) (JGW), 2012 WL 1156399, at \*4 (N.D. Cal. Apr. 6, 2012).  Indeed, in holding that attorneys' fees in a claims-made settlement should be based upon the maximum value of the recovery (rather than on the claims actually filed), the Second Circuit implicitly recognized that, unfortunately, consumers often will not take advantage of the substantive recoveries offered to them.  *See generally Masters v. Wilhelmina Model Agency, Inc.* 473 F.3d 423, 436–38 (2d Cir. 2007).  Here, as of June 8, 2018, Heffler reported that 18,273 Class Members have submitted claims (not including submissions by non-verified claimants; some additional claims also expected by the June 14, 2018 deadline).  Fenwick Decl. at ¶ 14.  This constitutes a 5.02% claims rate, at the top of the ordinary range.  As discussed above, when, out of an abundance of caution, Lead Class Counsel asked the Court for permission to send (and pay for) a supplemental reminder notice to Class Members, the Court stated that additional notice was unnecessary.  *See* ECF No. 173.  Indeed, in *In re HIKO*, the court approved a claims-made class settlement with a lower claims rate.  *See HIKO* Trans. (Izard Decl., Ex. C) at 6:4–9:25 (noting that 6,213 claims out of 185,593-member class—or a claims rate of 3.34%—was "within the normal range in class action settlements of this type" and granting motion for final approval); Final Approval Order at 3–4, *In re HIKO*, (S.D.N.Y. May 9, 2016), ECF No. 93 (finally approving settlement, finding that the "notice, opt-

out and claims submission procedures . . . fully satisfy Rule 23 . . . and the requirements of due process" and that the settlement was "fair, reasonable, and adequate").[16]

The small number of opt-outs and absence of objections, coupled with a claims rate at the upper end of the typical range in consumer class actions, weighs heavily in favor of the Settlement.

### 4.    The Risks of Establishing Liability and Damages

In assessing a proposed settlement, the Court should balance the benefits afforded the Class, including the *immediacy* and *certainty* of a recovery, against the continuing risks of litigation. *Grinnell*, 495 F.2d at 463. While Class Counsel believe that Plaintiffs' claims are meritorious, Class Counsel are both experienced and realistic and understand that the resolution of liability issues, the results at trial, and the inevitable appeals process are inherently uncertain in terms of outcome and duration. *See In re PaineWebber*, 171 F.R.D. at 126 ("Litigation inherently involves risks."). Indeed, "the primary purpose of settlement is to avoid the

---

[16] Indeed, courts have approved claims-made class settlements where the claims rate was even lower. *See, e.g.*, *Poertner v. Gillette Co.*, 618 F. App'x. 624, 625–26 (11th Cir. 2015) (unpublished) (approving 7.26 million-member settlement class when just 55,346—less than 1%—filed claims); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1377 (S.D. Fla. 2007) (approving 10.3 million-member settlement class when less than 119,000—approximately 1.1%—filed claims); *Touhey v. United States*, No. 08 Civ. 1418 (LDW), 2011 WL 3179036, at *7–8 (C.D. Cal. July 25, 2011) (finding a 2% response rate acceptable—38 responses out of 1,875 notices mailed—where there were no objections and the overall recovery was fair and reasonable); *Arthur v. SLM Corp.*, No. 10 Civ. 0198 (JLR) (W.D. Wash. Aug. 8, 2012), ECF. No. 249 at 2–3 (claims rate of approximately 2%). Although courts look to the claims rate to gauge class reaction to a proposed settlement, "[t]he question for the Court at the Final Fairness Hearing stage is whether the settlement provided to the class is 'fair, reasonable, and adequate,' not whether the class decides to actually take advantage of the opportunity provided." *Hamilton v. SunTrust Mortg. Inc.*, No. 13 Civ. 60749 (JIC), 2014 WL 5419507, at *5 (S.D. Fla. Oct. 24, 2014).

uncertainty of a trial on the merits." *Siler v. Landry's Seafood House–N.C., Inc.*, No. 13 Civ. 587 (RLE), 2014 WL 2945796, at *6 (S.D.N.Y. June 30, 2014).  For example, Defendant would vigorously contest Plaintiffs' claims that Defendant charged excessive amounts for energy, and this issue would be resolved through a "battle of the experts."  Additionally, although Plaintiffs believe that their damage model is sound, Viridian's experts will challenge the inputs into Plaintiffs' damages model.  Indeed, Viridian contends that no Plaintiff was overcharged.[17]

Moreover, there is no guarantee that this case will lend itself to class certification. Certain of Plaintiffs' claims hinge upon the question of how a reasonable consumer would interpret Viridian's specific and varying contract language regarding its pricing.  *See* AC at ¶¶ 41–48.  Viridian has raised, and undoubtedly would continue to raise, numerous arguments, including, *inter alia*, arguments concerning the proper understanding of the different versions of Viridian's pricing language.  Although Plaintiffs believe that the plain meaning of each of Viridian's contracts is clear, there is no guarantee that Plaintiffs would prevail on these points. Accordingly, absent the proposed settlement, there is a genuine possibility that no class would be certified and thus Class Members would recover no part of losses.  *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (emphasis in original).

---

[17]  Notably, this District Court (Bolden, J.) granted summary judgment in favor of the defendant energy supplier in a case involving allegations and claims similar to those at issue here.  See *Richards v. Direct Energy Servs.*, LLC, 246 F. Supp. 3d 538, 550-59 (D. Conn. 2017), appeal docketed, No. 17-1003 (2d Cir.).

### 5.     The Risk of Recovery

Viridian Energy, Inc., Viridian Energy, LLC, and Viridian Energy PA, LLC are among

many subsidiaries of Crius Energy, LCC, which in turn is owned by Crius Energy Trust

("Trust"), an Ontario provincial trust.  As these entities simply buy and sell energy, they do not

have significant assets that could be executed upon to satisfy a judgment.  Indeed, as of

December 31, 2017, the Trust only had $18 million in cash and $8 million in hard assets.

Moreover, the Trust had a 2017 operating *loss* of $17 million (as opposed to 2016 operating

income of just $9 million).  *See* Izard Decl. at Ex. G.  And, the numbers concern the Canadian

Trust as a whole, not the specific Defendants in this case (who do not prepare separate financial

statements).  Accordingly, there may be significant collection risks in this case which could, for

example, concern cross-border collection issues.

### 6.     The Actions Are Complex and Further Litigation Will Be Expensive and Lengthy

The Settlement Agreement provides substantial monetary benefits to the Settlement Class

while avoiding the significant expenses and delays attendant to discovery and motion practice

related to summary judgment and class certification.  Indeed, "[m]ost class actions are inherently

complex and settlement avoids the costs, delays and multitude of other problems associated with

them."  *In re Austrian & German Bank*, 80 F. Supp. 2d at 174; *Frank v. Eastman Kodak Co.*, 228

F.R.D. 174, 184–85 (W.D.N.Y. 2005) (same).  Here, the Settlement Class includes all current

and former customers of Viridian during a Class Period spanning 7½ years.  Continued litigation

would necessitate motions for class certification and summary judgment, and potentially trial.

Engaging in motion practice under the consumer protection laws of multiple states would be

time-consuming and expensive.  The Settlement, on the other hand, will result in prompt and

equitable payments to the Settlement Class, providing important relief to consumers of

Defendants' products. *See HIKO* Trans. at 16:1–16:8; *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557 (CM), 2014 WL 7323417, at *6 (S.D.N.Y. Dec. 19, 2014).

### 7.     Maintaining the Class Action Through Trial May Be Challenging

Viridian will no doubt argue that purported differences between individual contracts, state laws, and purchaser geographies and rate experiences create individual issues that predominate over class-wide issues.  Moreover, each Class Member may have been damaged in differing amounts, depending on the amount of energy used, and the rate and market structures in their geographic areas.  Demonstrating that liability and damages can be handled on a class-wide basis may be challenging (although Plaintiffs are confident that their expert can develop a data set demonstrating each Class Member's damages).  Moreover, even assuming Plaintiffs obtained class certification, Defendants can always move to decertify the class, highlighting the inherent risks and expense of maintaining a class through trial.  *Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316 (PAC), 2010 WL 5507892, at *5 (S.D.N.Y. Dec. 21, 2010), *aff'd*, 519 F. App'x 1 (2d Cir. 2013); *Willix v. Healthfirst, Inc.*, No. 07 Civ. 1143 (ENV) (RER), 2011 WL 754862, at *4 (E.D.N.Y. Feb. 18, 2011).  The proposed Settlement avoids the risks inherent in further litigation, and therefore, this factor weighs in favor of final approval.

### D.     NOTICE WAS PROVIDED IN THE BEST PRACTICABLE MANNER

Rule 23(c)(2)(B) requires that class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  The Rule also requires that any such notice clearly and concisely state in plain, easily understood language: the nature of the action; the definition of the class certified; the class claims, issues, or defenses; that a class member may enter an appearance through an attorney if the member so desires; that the court will exclude

from the class any member who requests exclusion; the time and manner for requesting

exclusion; and the binding effect of a class judgment on class members under Rule 23(c)(3).  *Id.*

Here, the Court approved the form and content of the Notice and approved the parties'

proposal for distribution of the Notice.  Order Granting Preliminary Approval, ECF No. 163 at

Part III.  The Court further found that the parties' proposal regarding notice to the Class

constituted "the best notice practicable under the circumstances and satisfies all requirements of

federal and state laws and due process."  *Id.* at 12.  The Settlement Administrator provided the

approved notice to the Class in accord with the timetable ordered by the Court.  *See generally*

Fenwick Decl.

In his Objection, the professional objector raises three baseless objections to the Notice

plan.  First, the objector complains that the Settlement Agreement provides that objections be

filed with the Court, while the Notice directs objections to be filed with the Settlement

Administrator.  Objection at 3–4.  As discussed above, this change from the terms of the

Settlement Agreement was made at the Court's express direction and is embodied in the Court's

order, which controls.  ECF No. 158.  Moreover, the notion that this change (or any resultant

confusion) regarding the recipient of the objection paralyzed potential objectors into inaction is

not credible.  The Court-ordered notice campaign afforded Class Members with several avenues

and opportunities to respond to the Settlement, which they robustly utilized.

Second, the professional objector complains that the deadline for objections was before

the date on which Plaintiffs are filing their final approval, service awards, and fees motion.

Objection at 13–14.  This sequence was made at the Court's suggestion (Izard Decl. at ¶ 22; *see*

*id.* at Ex. A) and again is embodied in the Court's preliminary approval order.  And because only

the professional objector has filed any objection of any type, this minor modification was immaterial.

Finally, the professional objector objects that the entire notice plan is compromised because the long form Notice states that objections must be "received" by May 15, 2018, while the website only requires that objections be "postmarked" by May 15, 2018.  Objection at 4.  There is no evidence whatsoever that this minor inconsistency caused widespread "confusion" such as to "stymie dissent."  Moreover, the parties would have deemed timely any objections postmarked by May 15.  Indeed, regardless of whichever date is used, the only objection raised was the professional objector's.  Because courts routinely hold that minor defects in the notice are immaterial (and certainly do not amount to a violation of due process as claimed by the professional objector), especially when any ostensible confusion could be readily cleared up by a call to Heffler's live phone support (or to Class Counsel), the Objector's claim should be rejected.  *Arnett v. Bank of Am., N.A.*, No. 11 Civ. 1372 (MHS), 2014 WL 4672458, at *3 n.7 (D. Or. Sept. 18, 2014) (typographical error identifying date of final approval hearing as "Friday, September 9" rather than "Tuesday, September 9 . . . did not render the Class Notice insufficient because any Class Member who may have been confused about the date of the hearing could confirm the date by calling the toll-free number."); *Nieberding v. Barrette Outdoor Living, Inc.*, 129 F. Supp. 3d 1236, 1247 (D. Kan. 2015) (wrong address for final approval hearing does not render notice insufficient); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 278, 284 n.7 (E.D. Pa. 2012) (approving settlement notwithstanding typographical error misstating end of class period as nine months before actual end date); *Tennille v. Western Union Co.*, 785 F.3d 422, 439–440 (10th Cir. 2015) (error in notice telling class members that objectors must sit for a deposition within the *county or state* in which they reside rather than their *county* of residence

27

did not "materially affect[] class members' exercise of their right to file objections."). As the Class Notice was disseminated in strict compliance with this Court's directives, this Court should grant final approval of the Settlement.

## II.   THE COURT SHOULD CERTIFY THE CLASS

Plaintiffs moved to preliminarily certify the Class for settlement purposes on February 6, 2018 (ECF Nos. 153–55), and the Court granted the motion on February 16, 2018 (ECF No. 163). For the reasons stated in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement (ECF No. 154 at 16–21), this Court should certify the Class.

## III.   THE COURT SHOULD APPROVE THE REQUESTED AWARD OF ATTORNEYS' FEES AND EXPENSES TO BE PAID BY DEFENDANTS TO CLASS COUNSEL

Viridian has agreed to pay Class Counsel up to $4,500,000.00 in attorneys' fees, costs, Plaintiff case contribution awards and other litigation expenses. This award for fees and expenses merits approval.[18]

### A.   Class Counsel Is Entitled to Compensation

The Supreme Court has held that "where an attorney succeeds in creating a common fund from which members of a class are compensated for a common injury," the attorney is entitled to a reasonable fee. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (citing *Trustees v. Greenough*, 105 U.S. 527 (1881); *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)). Awarding Class Counsel fees "serves the salutary purpose of encouraging counsel to pursue meritorious claims on behalf of a class of individuals who could not afford to litigate their

---

[18]  Fees will be allocated among Class Counsel and with Glaser Legal PC per agreement of Class Counsel.

individual claims." *Steiner v. Williams*, No. 99 Civ. 10186 (JSM), 2001 WL 604035, at *1 (S.D.N.Y. May 31, 2001).  Indeed, the contingency fee awarded to Class Counsel should be greater than the fees that the same attorneys would charge their clients in non-contingency cases. "No one expects a lawyer whose compensation is contingent on success of his services to charge, when successful, as little as he would charge a client who in advance has agreed to pay for his services, regardless of success." *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 396 (S.D.N.Y. 1999); *In re Veeco Instruments*, No. 05 MD 01695 (CM) (GAY), 2007 WL 4115808, at *6 (S.D.N.Y. Nov. 7, 2007) (same).[19]

**B.      The Second Circuit Has Approved Both the Percentage Method and the Lodestar Method, but the Percentage Method Is Preferred**

District courts in the Second Circuit may award attorneys' fees to prevailing class counsel under either a "percentage of the fund" or "lodestar" method to compute fees in common fund cases.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005); *In re Polaroid*, No. 03 Civ. 8335 (WHP), 2007 WL 2116398, at *2 (S.D.N.Y. July 19, 2007). However, "[t]he trend in this Circuit is toward the percentage method." *Wal-Mart*, 396 F.3d at 121; *Polaroid*, 2007 WL 2116398, at *2.

**C.      The Requested Fee Is Justified Under the Percentage Method**

**1.      The Full Value of The Settlement Fund Available Is Considered**

Attorneys' fees awarded as a percentage of a fund should take into consideration the entirety of the fund, not only the portion received directly by the class members.  As the

---

[19] *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 585 (S.D.N.Y. 2008) ("Courts have also recognized that, in addition to providing just compensation, awards of attorneys' fees from a common fund serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future misconduct of a similar nature.").

Supreme Court has observed, where plaintiffs obtain a claims-made settlement, they "have recovered a determinate fund for the benefit of every member of the class whom they represent." *Boeing*, 444 U.S. at 479.  Absent class members' "right to share the harvest of the lawsuit upon proof of their identity, ***whether or not they exercise it***, is a benefit in the fund created by the efforts of the class representatives and their counsel."  *Id.* at 480 (emphasis added).  This is true even where a defendant has the right "to the return of money eventually unclaimed[,] contingent on the failure of absentee class members to exercise their present rights" to the money.  *Id.* at 482.  Accordingly, the Second Circuit held in *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007), that "[t]he entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class.  An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available whether claimed or not.  We side with the circuits that take this approach."  The Court further noted that "[o]ur own cases refer to 'percentage of *the fund*,' and 'percentage of *the recovery*.'  We take these references to be to the whole of the Fund."  *Id.* (emphasis in original, citations omitted). This Court has routinely cited *Boeing* and *Masters* to hold that class counsel are entitled to a percentage of the ***entire*** fund their efforts create, regardless of how much absent class members claim from the fund, and whether unclaimed amounts revert to Defendants.  *See Kiefer v. Moran Foods, LLC*, No. 12 Civ. 756, 2014 WL 3882504, at *8 (D. Conn. Aug. 5, 2014) (Young, J.) ("In applying the common fund method, the Supreme Court, the Second Circuit, and other Circuit Courts, have held that it is appropriate to award attorneys' fees as a percentage of the entire maximum gross settlement fund, even where amounts to be paid to settlement class members who do not file claims will revert to the Defendants."); *Bozak v. FedEx Ground Package Sys., Inc.*, No. 11 Civ. 0738, 2014 WL 3778211, at *6 (D. Conn. July 31, 2014)  (Chatigny, J.) (same);

30

*Caitflo LLC v. Sprint Commc'ns Co., LP*, No. 11 Civ. 0497, 2013 WL 3243114, at *2 (D. Conn.

June 26, 2013) (same); *Aros v. United Rentals, Inc.*, No. 10 Civ. 73, 2012 WL 3060470, at *5 (D.

Conn. July 26, 2012)  (Hall, J.) (same).[20]

Moreover, it is appropriate to include **both** the amount made available to the class **and** the

amount of attorneys' fees and expenses requested to determine the value of the total fund for

purposes of determining the percentage of the fund the fee request represents.  *See, e.g.*, *Torres v.

Gristede's Operating Corp.*, 519 F. App'x 1, 5 (2d Cir. 2013); *Johnston v. Comerica Mortg.

Corp.*, 83 F.3d 241, 246 (8th Cir. 1996) ("Even if the fees are paid directly to the attorneys, those

fees are still best viewed as an aspect of the class' recovery."); MANUAL FOR COMPLEX

LITIGATION § 21.71, at 525 (4th ed. 2004) ("If an agreement is reached on the amount of a

settlement fund and a separate amount for attorney fees and expenses . . . the sum of the two

amounts ordinarily should be treated as a settlement fund for the benefit of the class . . . .").[21]

---

[20] *See also Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 9194 (GEL), 2010 WL 4877852, at *21
(S.D.N.Y. Nov. 30, 2010) (quoting *Masters*, 473 F.3d at 437) ("[T]his Circuit has ruled that '[a]n
allocation of fees by percentage should therefore be awarded on the basis of total funds made
available whether claimed or not.'"); *Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F. Supp. 2d
440, 443 (S.D.N.Y. 2004) (noting that attorneys' fees equivalent to one-third of common fund of
$18.4 million were approved notwithstanding that only $5.6 million of the $18.4 was claimed by
class members with the remaining $11.8 million unclaimed and reverting to the defendants);
ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 14:6, at 570 (4th ed.
2002) (stating that *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) settled the issue of whether
the benchmark common fund amount for fee award purposes is made up of the amount claimed
by class members or the amount potentially available to class members by ruling that class
counsel are entitled to a reasonable fee based on the funds potentially available to be claimed,
regardless of the amount actually claimed).

[21] *See also Hubbard v. Donahoe*, No. 03 Civ. 1062 (RJL), 2013 WL 3943495, at *4, 8 (D.D.C.
July 31, 2013) (collecting cases); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach
Litig.*, 851 F. Supp. 2d 1040, 1072 (S.D. Tex. 2012); *Lopez v. Youngblood*, No. 07 Civ. 0474
(DLB), 2011 WL 10483569, at *12 (E.D. Cal. Sept. 2, 2011) (awarding 28.5% of the recovery
where attorneys' fees were paid separate and apart from benefit to the class and citing with
approval *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241 (8th Cir. 1996) and *In re Vitamins
Antitrust Litig.*, No. 99 Civ. 197 (TFH), 2001 WL 34312839, at *4 (D.D.C. July 16, 2001));
*Cohen v. Chilcott*, 522 F. Supp. 2d 105, 121 (D.D.C. 2007).

Citing two District Court cases from within the Second Circuit, the professional objector argues (wrongly) that *Masters* does not apply because Viridian will "retain[] the unclaimed benefits for itself."  Objection at 12 (citing *Cunningham v. Suds Pizza, Inc.*, 290 F. Supp. 3d 214, 225–26) (W.D.N.Y. 2017)); *id*. at 15 (citing *Parker v. Time Warner Entm't Co., L.P.*, 613 F. Supp. 2d 242, 264–77 (E.D.N.Y. 2009)).  This argument is particularly disingenuous because objector's counsel, Mr. Van Dyke, has himself asked for a fee in a claims-made settlement where the defendant retained any unclaimed funds.  *See* Class Action Settlement Agreement in *Rincon - Marin* (Izard Decl. Ex. D) at 6 ("[a]ny surplus from the Class Recovery will be returned to" defendant).  Moreover, at least one Court in this District has directly rejected *Parker*, noting that "the *Parker* court relied on a case that predated *Masters*."  *Aros*, 2012 WL 3060470, at *5. Moreover, courts considering the issue throughout this Circuit have routinely rejected the objector's argument.  "Circuit precedent supports taking the gross monetary settlement into account when calculating the percentage of the fund . . . even when unclaimed funds were to revert to the defendants."  *Hart v. RCI Hospitality Holdings, Inc.*, No. 09 Civ. 3043, 2015 WL 5577713, at *17 (S.D.N.Y. Sept. 22, 2015) (citing *Masters* and District Court cases); *see also Fleisher v. Phx. Life Ins. Co.*, No. 11 Civ. 8405 (CM), 2015 WL 10847814, *16 n.10 (S.D.N.Y. Sept. 9, 2015) (citing *Masters*); *In re Nigeria Charter Flights Litig.*, No. 04 Civ. 304 (MDG), 2011 WL 7945548, at *5 (E.D.N.Y. Aug. 25, 2011) (citing *Masters* and rejecting argument "that due to the reversionary aspect of the fund, the proper analysis is to compare the fees sought to the actual claims made by the class members").  More important, the objector's analysis is directly contrary to the Supreme Court's ruling in *Boeing* and the rulings from this District in

*Kiefer*, *Bozak*, *Caitflo*, and *Aros*.  Accordingly, this Court should assess Class Counsel's fee request against the entirety of the $18.5 million available under the terms of the Settlement.[22]

## 2.    The Fee Award Is Supported by the *Goldberger* Factors

Under *Goldberger*, a court setting a percentage of the recovery as a fee considers six factors: (1) the time and labor expended by counsel; (2) the magnitude and complexity of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  *Goldberger*, 209 F.3d at 50; *accord Polaroid*, 2007 WL 2116398, at *2.  Here, as discussed below, the aggregate $4.5 million sought by Class Counsel includes $407,666.61 in reasonable and necessary expenses and $55,000 in total Service Awards to the lead Plaintiffs.  Accordingly, Class Counsel are seeking $4,047,333.39 in attorneys' fees, constituting approximately 21.9% of the total $18.5 million Settlement value.  This 21.9% fee is fully justified under *Goldberger*.

### a.    Counsel's Time and Labor

There is no question that Class Counsel expended significant time and effort to bring this litigation to a successful resolution.  As detailed above, counsel have devoted substantial time and effort to this case for over many years.  Even when courts do not employ the lodestar method to determine fees, they often consider the lodestar calculation in evaluating a requested percentage fee, although "where used as a mere cross-check, the hours documented by counsel

---

[22]  The objector's reliance on the out-of-Circuit decision in *In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395 (D. Mass. 2008) is equally unavailing.  In addition to being inconsistent with the decisions in this District discussed above, *TJX* fundamentally misreads *Boeing* as premised on the existence of a set, non-reversionary common fund.  *TJX*, 584 F. Supp 2d at 402–03.  However, as discussed above, *Boeing* by its own terms specifically applies even where a defendant has a "right" to "return of money eventually unclaimed" by "absentee class members."  *Boeing*, 444 U.S. at 482.

need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50.  Here,

Class Counsel's contemporaneous records indicate that they collectively spent 6,284.45 hours of

attorney time with an aggregate lodestar of $4,621,298.25.   *See* Izard Decl. at ¶26; Wittels Decl.

at ¶25; Frederick Decl. at ¶ 17; Greenfield Decl. at ¶ 4; LaDuca Decl. at ¶ 3; Rubinow Decl. at ¶

5; Shub Decl. at ¶ 17.[23]  Class Counsel's $4,047,333.39 fee request, thus, is only about 87.6% of

their lodestar (*i.e., **below*** their lodestar).  This negative multiplier is far less than the multipliers

of three, four or even five routinely approved in other cases.  *In re Telik*, 576 F. Supp. 2d at 590

(noting that a multiplier of 4.65 was "well within the range awarded by courts in this Circuit and

courts throughout the country"). [24]

### b.   The Relationship of the Requested Fee to the Settlement

At 21.9% of the total Settlement value, the attorneys' fees and expenses that Class Counsel

seek and which Viridian has agreed to pay is at the low end of the spectrum of fee awards

---

[23] The Supreme Court has approved the use of current hourly rates to compensate for inflation and loss of use of funds.  *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989); *see also In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 163–64 (S.D.N.Y. 1989) (citing cases); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 n.25 (S.D.N.Y. 1998). Moreover, the hourly rates for Class Counsel's attorneys are the same as the regular current rates charged for services in non-contingent matters and/or that have been accepted and approved in class action litigation in other courts throughout the country.  *See* Izard Decl. at ¶ 28; Wittels Decl. at ¶ 26; Frederick Decl. at ¶ 19; Greenfield Decl. at ¶ 5; LaDuca Decl. at ¶ 3; Rubinow Decl. at ¶ 6; Shub Decl. at ¶ 19.

[24] *See also Zeltser v. Merrill Lynch & Co., Inc.*, No. 13 Civ. 1531 (FM), 2014 WL 4816134, at *10 (S.D.N.Y. Sept. 23, 2014) (multiplier of 5.1 "falls within the range granted by courts"); *Hernandez v. Merrill Lynch & Co., Inc.*, No. 11 Civ. 8472 (DF), 2013 WL 1209563, at *9 (S.D.N.Y. Mar. 21, 2013) (awarding lodestar multiplier of 3.8; holding it is "well within the range of multipliers that have been granted by courts in this Circuit and elsewhere" and noting that "Courts regularly award lodestar multipliers of up to eight times lodestar, and in some cases, even higher multipliers.") (collecting cases); *Spicer v. Pier Sixty LLC*, No. 08 Civ. 10240 (LBS), 2012 WL 4364503, at *4 (S.D.N.Y. Sept. 14, 2012) ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts.") (quoting *In re Telik*, 576 F. Supp. 2d at 590); *deMunecas v. Bold Food, LLC*, No. 09 Civ. 0440 (DAB), 2010 WL 3322580, at *10 (S.D.N.Y. Aug. 23, 2010) ("Courts regularly award lodestar multipliers from 2 to 6 times lodestar.").

repeatedly approved by the Courts of this Circuit, with many cases awarding 33% of the settlement value.  "The one-third amount that plaintiffs request is typical of awards in this Circuit."  *Bozak v. FedEx Ground Package Sys., Inc.*, No. 11 Civ. 0738 (RNC), 2014 WL 3778211, at * 7 (D. Conn. July 31, 2014); *Capsolas v. Pasta Res. Inc.*, No. 10 Civ. 5595 (RLE), 2012 WL 4760910, at *8 (S.D.N.Y. Oct. 5, 2012); *Willix v. Healthfirst Inc.*, No. 07 Civ. 1143 (ENV) (RER), 2011 WL 754862, at *7 (E.D.N.Y. Feb. 18, 2011).[25]  Accordingly, a 21.9% fee, well below the 33% standard, is reasonable in relation to the settlement, especially given the complexity and novelty of the case, the attendant litigation risks, and the effort Class Counsel expended to reach the Settlement, as discussed above.

### c.   The Risk of Litigation

As discussed above, Plaintiffs' counsel and Plaintiffs faced obstacles in successfully prosecuting this case.  The Second Circuit has recognized that the risk involved in prosecuting a class action is an important consideration in determining an appropriate fee award.  The case law contains many examples of unsuccessful class actions that provided no relief to the putative class and no fee for class counsel.  *See, e.g.*, *In re Veeco Instruments*, 2007 WL 4115808, at *6 (collecting cases). This factor thus reflects that cases taken on a contingent fee basis entail risk of non-payment for the attorneys that prosecute them, and it embodies a principle that contingency

---

[25] *See also In re Marsh*, 265 F.R.D. at 149; *Hernandez*, 2013 WL 1209563, at *8; *Beckman v. KeyBank, N.A.*, No. 12 Civ. 7836 (RLE), 2013 WL 1803736, at *12 (S.D.N.Y. Apr. 29, 2013); *Hayes v. Harmony Gold Mining Co.*, No. 08 Civ. 3653 (BSJ), 2011 WL 6019219 (S.D.N.Y. Dec. 2, 2011), *aff'd*, 509 F. App'x 21 (2d Cir. 2013); *Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, No. 06 Civ. 4270 (PAC), 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (noting that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit."); *Gilliam v. Addicts Rehab. Ctr. Fund*, No. 05 Civ. 3452 (RLE), 2008 WL 782596, at *5 (S.D.N.Y. Mar. 24, 2008) (fee equal to one-third of the settlement fund is reasonable and "consistent with the norms of class litigation in this circuit") (citing cases).

work is entitled to greater compensation than non-contingency work.  *In re Telik*, 576 F. Supp. 2d at 592; *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 WL 31663577, at *27 (S.D.N.Y. Nov. 26, 2002), *aff'd sub nom. Adams v. Rose*, No. 03 Civ. 7011 (DJ) (SS), 2003 WL 21982207 (2d Cir. Aug. 20, 2003) ("[C]ontingent fee risk is the single most important factor in awarding a multiplier[.]").  As the Second Circuit has observed:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*In re Hi-Crush Partners*, 2014 WL 7323417, at *15 (quoting *Grinnell*, 495 F.2d at 470).

Plaintiffs' counsel incurred 100% of the risk, devoting their time and labor gathering evidence of Viridian's suspected wrongdoing, evaluating Viridian's potential liability, analyzing potential legal theories, drafting the complaints, and engaging in substantial motion practice and discovery and investigation.  Throughout, there was no assurance of success or compensation. The requested fee award is entirely reasonable in light of the risks incurred by Plaintiffs' counsel.

### d.      The Magnitude and Complexity of the Litigation

The requested fee award is reasonable considering the magnitude and complexity of the litigation.  The Class itself comprises 364,184 members and Viridian agreed to a settlement with a total cash value of $18.5 million (not even including the value of the credit option available to Class Members).  By any measure, the magnitude of the case is substantial, fully justifying Class Counsel's investment of time and labor, and fully merits the requested fee award.

In addition, the litigation involves several complex legal and factual issues.  The magnitude and complexity of this action is even greater because of the multiple states in which Viridian is operating, differences in state law, the differing contracts that Viridian used in each

state and over time, and the prevailing electric and gas rates over time.  If not for the Settlement,

the need to research, brief, and develop factual submissions on class certification and summary

judgment relating to these issues would increase the expense, complexity, and duration of the

litigation.  Moreover, trial preparation would have required countless hours of additional work,

including preparing fact and expert witnesses, identifying exhibits, preparing proposed jury

instructions, and preparing cross-examination outlines.  The trial itself would consume

significant judicial resources and would engender additional motion practice (including

evidentiary motions and any dispositive motions filed during or at the close of trial).  Further, an

appeal would have added to the complexity of the litigation.  This is especially likely in view of

the experience of defense counsel.  *See In re Brown Co. Sec. Litig.*, 355 F. Supp. 574, 592–93

(S.D.N.Y. 1973).  The magnitude and complexity of the litigation weigh heavily in favor of the

requested fee award.

### e.      The Quality of Representation

The quality of Class Counsel's representation is reflected in the reputation of Class

Counsel; the experience of the attorneys principally involved in these action; and above all, the

way they prosecuted these actions from the pleadings, through motion practice and discovery, to

the settlement negotiations and the instant motion for final approval.

Class Counsel enjoy a strong reputation in complex and class action litigation.

Moreover, as demonstrated by their firm resumes, the various attorneys comprising Class

Counsel have been appointed class counsel in numerous other cases and are highly experienced

and knowledgeable in complex and class action litigation generally, and consumer rights energy

litigation in particular.  *See* Izard Decl. at Ex. B; Wittels Decl. at Ex. A; Frederick Decl. at Ex. B;

Greenfield Decl. at Ex. A; *see also* Rubinow Decl. at ¶ 9, Shub Decl. at ¶ 15.

The Settlement is a highly favorable outcome for the Class, and is the direct result of the creativity, diligence, hard work, and skill brought to bear by Plaintiffs' counsel at every stage of the proceedings.  Throughout the litigation, Plaintiffs' counsel put the best interests of the Class first, negotiating the most favorable settlement terms possible and foregoing a portion of their August 2016 fee demand—even though Class Counsel had an additional year's worth of work—to get the deal done.  Plaintiffs' counsel's exemplary prosecution of this class action weighs strongly in favor of the proposed fee award.

The high quality of the opposition that Plaintiffs' counsel faced is further testament to the quality of Plaintiffs' counsel's representation.  Viridian is represented by skilled and highly regarded counsel from two prestigious firms with a well-deserved reputation for vigorous advocacy in the defense of complex civil cases.  Courts have repeatedly recognized that the caliber of the opposition faced by plaintiffs' counsel should be taken into consideration in assessing the quality of the plaintiffs' counsel's performance, and in these cases, it supports final approval of the requested fee.  *See, e.g.*, *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010).

### f.      Public Policy Considerations

Strong public policy supports rewarding counsel for bringing successful consumer protection litigation.  *See, e.g.*, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02 Civ. 3400 (CM) (PED), 2010 WL 4537550, at *29 (S.D.N.Y. Nov. 8, 2010); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002); *Hicks v. Stanley*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).  The Settlement provides substantial benefits to the public as well as the individual Viridian consumers.  It serves public policy as embodied in state consumer fraud statutes by compensating consumers, holding Viridian accountable for its

allegedly misleading terms of service, and deterring future deceptive practices by Viridian.  This deterrent effect, moreover, should carry over to other energy suppliers, who are on notice that they will suffer unwanted cost, inconvenience, bad publicity, and legal exposure.  Further, "Plaintiffs may find it difficult to obtain representation if attorneys know their reward for accepting a contingency case is merely payment at the same rate they could obtain risk-free for hourly work, while their downside is no payment whatsoever."  *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 246 (4th Cir. 2010).

Moreover, the fee request does not bestow a windfall on Class Counsel (*see* lodestar cross-check above).  Therefore, the policy of awarding fees in a lower range to account for economies of scale and to prevent windfalls is not at issue here.  Simply put, there is no reason to depart from the amount that Viridian has agreed to pay, as this amount falls squarely within the range of fees normally approved within this Circuit under either the percentage of the fund or lodestar methodology, and any reduction would be against public policy as it would discourage future class counsel from bringing similar cases and reward the alleged wrongdoers without any benefit to the Class or the public at large.

### g.       Reaction of the Class

Although not a formal *Goldberger* factor, the reaction by members of the Class is also entitled to great weight by the Court.  *See In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*, 364 F. Supp. 2d 980, 996 (D. Minn. 2005) "[N]umerous courts have [noted] that the lack of objection from members of the class is one of the most important" factors in determining reasonableness of the requested fee.  *In re Prudential Sec. Ltd. P'ships Litig.*, 985 F. Supp. 410, 416 (S.D.N.Y. 1997).  Here, 364,184 notices were disseminated.  The Notices clearly set forth that Class Counsel would apply for an award of fees and expenses of up to $4.5 million.  Of the over

364,000 Class Members who have received individual Notice, only the professional objector has

taken issue with the proposed award of attorneys' fees to Class Counsel.  Fenwick Decl. at ¶ 13.

Moreover, the objection to the requested fee award (Objection at 14–15) is without merit.

As discussed above, the objector's conclusion that *Masters* does not apply (Objection at 14–15;

*see also id.* at 5–9) is incorrect.  Moreover, he ignores the Supreme Court's ruling in *Boeing* and

this Court's rulings in *Kiefer, Bozak*, *Caitflo,* and *Aros* altogether.  His entire argument is premised

on the false proposition that attorneys' fees in claims-made settlements are based on the claims

filed rather than the value obtained.  As Mr. Van Dyke has essentially admitted, the objector is

wrong, and his objection should be overruled.

### D.     The Fee Is Justified Under the Lodestar/Multiplier Method

Application of the lodestar method confirms the reasonableness of Class Counsel's

request.  The Second Circuit has advised that it remains potentially useful as a "cross-check"

against the percentage method.  *Goldberger*, 209 F.3d at 50.  Under the lodestar method, the

court multiplies the number of hours each attorney spent on the case by each attorney's

reasonable hourly rates, and then the court adjusts that lodestar figure (by applying a multiplier)

"to reflect litigation risk, the complexity of the issues, the contingent nature of the engagement,

the skill of the attorneys, and other factors."  *In re Flag Telecom Holdings*, 2010 WL 4537550, at

*23.  As discussed above, lodestar multiples of over 4 are routinely awarded by courts.

Accordingly, the fee requested here, with a negative lodestar multiple of only 0.876, is more than

justified under the lodestar method.

### E.     The Fee Request Includes Counsel's Reasonable and Necessary Expenses

The Notice provides that Class Counsel may seek up to $4.5 million in fees and expenses

(and Plaintiff service awards).  Fenwick Decl. at Exs. A, B.  Here, in addition to their fee request,

Class Counsel incurred a total of $407,666.61 in expenses in prosecuting this litigation.  *See*

Izard Decl. at ¶ 29; Wittels Decl. at ¶31; Frederick Decl. at ¶ 23; Greenfield Decl. at ¶ 5; LaDuca Decl. at ¶ 4; Rubinow Decl. at ¶ 7; Shub Decl. at ¶ 23.  All of the expenses were reasonable and necessary to the prosecution of these actions and are of the type that law firms typically bill to their clients and that courts typically approve for reimbursement.[26]  By far the largest component of these expenses involve payment of the cost of experts who spent innumerable hours reviewing documents from Viridian and third parties and creating models for determining injury and damages.  *See* Izard Decl. at ¶ 29.  Accordingly, Class Counsel respectfully submit that the requested $407,666.61 award to cover Class Counsel's expenses is fair and reasonable.  *See, e.g.*, *In re Sony Corp. SXRD Rear Projection TV Mktg., Sales Practices and Prods. Liab. Litig.*, No. 09 MD 2102 (RPP), 2010 WL 3422722, at *8–9 (S.D.N.Y. Aug. 24, 2010) (approving flat payment covering fees and expenses).

## F.     The Court Should Approve the Requested Service Awards

The Notice also provides that Class Counsel may seek up to $5,000 in service awards for each Plaintiff as a component of their $4.5 million application for fees and expenses.  Fenwick Decl., Exs. A, B.  Providing named plaintiff case contribution awards, also known as service awards, to consumers who come forward to represent a class is a necessary and important component of class action practice.  *See Hall v. ProSource Technologies, LLC*, No. 14 Civ. 2502

---

[26] *See, e.g.*, *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 313474, at *24 (S.D.N.Y. Feb. 1, 2007) (awarding expenses for "computer research, reproduction/duplication, secretarial overtime, phone/fax/postage, messenger/overnight delivery, local transportation/meals, filing fees and attorney services") (internal quotations omitted); *In re Veeco Instruments*, 2007 WL 4115808, at *10 (awarding expenses including "consultant and expert fees, photocopying of documents, mediation fees, court filing fees, deposition transcripts, fees for service of subpoenas to witnesses, on-line research, creation of a document database, messenger service, postage and next day delivery, long distance and facsimile expenses, transportation, [and] travel"); *In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895 (DAB), 2011 WL 1899715, at *6 (S.D.N.Y. May 13, 2011) (same).

(SIL), 2016 WL 1555128, at *9 (E.D.N.Y. Apr. 11, 2016) ("Courts regularly grant requests for service awards in class actions to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs.") (internal quotations and citations omitted); *Viafara v. MCIZ Corp.*, No. 12 Civ. 7452 (RLE), 2014 WL 1777438, at *16 (S.D.N.Y. May 1, 2014); *Elliot v. Leatherstocking Corp.*, No. 10 Civ. 0934 (MAD) (DEP), 2012 WL 6024572, at *7 (N.D.N.Y. Dec. 4, 2012).

Plaintiffs' counsel respectfully request that the Court approve the payment of Service Awards to the Named Plaintiffs in the amount of $5,000.00 each in recognition of their efforts on behalf of the Class. The requested payments are well-deserved and fall well within the range of service awards approved in prior cases. *Polaroid*, 2007 WL 2116398, at *3 (citing *Dornberger v. Metropolitan Life Ins. Co.*, 203 F.R.D. 118 (S.D.N.Y. 2001)); *see also Karic v. Major Automotive Companies, Inc.*, No. 09 Civ. 5708 (CLP), 2016 WL 1745037 at *8 (E.D.N.Y. Apr. 27, 2016) (collecting cases and approving service awards of $20,000 each to seven named plaintiffs); *Puglisi v. TD Bank, N.A.*, 2015 WL 4608655, at *1 (E.D.N.Y. July 30, 2015) (approving service awards of $15,000 each for each two named plaintiffs and $10,000 each for three other named plaintiffs); *Hernandez v. Merrill Lynch & Co., Inc.*, No. 11 Civ. 8472, 2013 WL 1209563, at *10 (S.D.N.Y. Mar. 21, 2013) (approving service awards of $15,000 and $13,000 to class representatives). Moreover, as with the fee request, the service award request was subject to arm's length negotiations between parties and was adequately disclosed in advance to the Class.

Each Plaintiff voluntarily submitted him- or herself to public scrutiny by bringing a class action claim. Plaintiffs reviewed and discussed with Class Counsel the pleadings, discovery

demands, discovery responses, and memoranda of law; conferred with their respective counsel regarding the status of the cases and the settlement negotiations, always encouraging Class Counsel to obtain the best possible result for the absent Class Members; and in most instances sat for depositions and/or produced document discovery. *See, e.g.,* Izard Decl. at ¶ 24; Wittels Decl. at ¶ 19.  Plaintiffs' participation was substantial and indispensable.

## IV.    OBJECTOR'S COUNSEL IS A NOTORIOUS SERIAL OBJECTOR WHO ABUSES THE OBJECTION PROCESS

Only one objection was filed.  As discussed throughout this memorandum, the objection is without merit.  For example, the objections concerning the Notice itself (Objection at 3–5) involve provisions that were either specifically suggested by the Court and/or are trivial and *de minimis.  See* Argument Part I.D above.  The objections concerning claims-made settlements (Objection at 5–10) and the fees to be awarded in such settlements (Objection at 13–15) ignore controlling precedent from the Supreme Court and the Second Circuit, as well as the holdings of Courts in this District.  *See* Argument Part III.C.1 above.  And the objections concerning the alleged collusion (Objection at 10–13) between Class Counsel and Viridian in reaching the settlement is factually and legally baseless.  *See* Argument Part III.B above.  Accordingly, this Court should strike the objection or, at a minimum, overrule the objection in its entirety.

Not only is the objection wholly groundless, but objector's counsel routinely file such meritless objections for the sole purpose of extorting attorneys' fees.  Although Michael Ferraro is officially represented by attorneys Peter Van Dyke of Eagan, Donohue, Van Dyke & Falsey, LLP in Bridgeport (ECF No. 166) and Robert Clore of the Bandas Law Firm, P.C in Corpus Christi, Texas (ECF No. 170), the true party behind Ferraro's objection is Christopher Bandas— the senior partner of Mr. Clore's firm and the most notorious and prolific professional objector in

the United States.[27]  Bandas has been sanctioned and judicially condemned as an extortionist

pursuing a strategy to profit from holding up class action settlements through frivolous

objections and appeals.  *Garber*, 2017 WL 752183, at *6 ("This Court joins the other courts

throughout the country in finding that Bandas has orchestrated the filing of a frivolous objection

in an attempt to throw a monkey wrench into the settlement process and to extort a pay-off").

Bandas' playbook is the same in each case.  As here, at the latest possible time, he files

frivolous objections that courts readily deny.  He then uses his right to appeal (and the potential

delay of the settlement's payments) to extort a ransom in exchange for dismissing the appeal.

Notably, while feigning concern with the terms of arms' length settlements to insert himself into

the settlement process, Bandas has no interest in the class and only uses his objection as a lever

to force the parties to engage in "mediation" or "settlement discussions" regarding his ransom.

*See In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09 Civ. 1088 (BTM) (KSC), 2013 WL

5275618, at *5 (S.D. Cal. Sept. 17, 2013) ("Mr. Bandas said that he didn't care about changing

one word of the settlement . . . ."); *see also id.* (referring to Bandas' conduct as a "scheme").

As courts around the country have observed, Bandas holds class action settlements

hostage because "he [is] willing to wager that [class counsel] would gladly pay him somewhere

in the neighborhood of $400,000 to make his objection go away-otherwise, he could hold the

settlement process up for two to three years through the appeal process."  *Id.*; *see also In re Wal-*

*Mart Wage & Hour Emp't Practices Litig.*, No. 06 Civ. 0225 (PMP) (PAL), 2010 WL 2132094,

---

[27] A project that tracks the activities of serial objectors through a website
www.serialobjector.com lists Christopher Bandas as the No. 1 objector in the United States.
Serial Objector Index Beta, *available at* https://www.serialobjector.com/persons (last visited
June 8, 2018).  Robert Clore from Christopher Bandas' law firm is also listed on
serialobjector.com.  Serial Objector Index Beta, *available at*
https://www.serialobjector.com/persons/681 (last visited June 8, 2018).

at *1 (D. Nev. May 25, 2010) ("The conduct of Objectors and their counsel [Bandas] is compounded by their prior demand of $800,000 to cease their appeals.").  The Seventh Circuit correctly labeled such behavior "extortion."  *Vollmer v. Selden*, 350 F.3d 656, 660 (7th Cir. 2003) ("In the context of intervening in a class action settlement, extortion would mean intervening not to increase the value of the settlement, but in order to get paid to go away.").

The parties and the Court are now in the first phase of Bandas' ploy.  Consistent with his infamous pattern of filing frivolous objections at the last minute, Bandas filed the sole objection to this class action settlement on May 14, 2018, just one day before the objection deadline.  ECF No. 167.  Bandas' objection is meritless, which evidently is of little concern to him.  He knows that the substance of his objection is irrelevant because it is the threat of an appeal of the Court's order approving the settlement that he will try to use to extract his unearned payment.[28]

Due to his widespread improper conduct spanning more than a decade Bandas has assembled a troubling public dossier.  Attached as Ex. H to the Izard Declaration is a chart detailing the results of (and judges' harsh words regarding) 33 class actions in which Bandas entered a notice of appearance as an objector or as an attorney representing an objector.  The true number of Bandas' objections is much higher because, like in this case, Bandas often does not file an appearance as an attorney for the objector but works with other lawyers (often unsuspecting) who are counsel of record.[29]

---

[28] *In re Baby Prod. Antitrust Litig.*, 708 F.3d 163, 169 n.3 (3d Cir. 2013) (noting that Christopher Bandas filed an objection and appeal but did not even bother to file a brief in the Court of Appeals).

[29] According to the serialobjector.com count, Christopher Bandas lodged 73 objections as an objector, as a signer, and as an attorney.  SERIAL OBJECTOR INDEX BETA, *available at* https://www.serialobjector.com/persons (last visited June 8, 2018).  Bandas and his associate Clore together have compiled a list of the 77 objections that have lodged in the past five years.

According to a Reuters report on Bandas, he changed "his business model after U.S. District Judge James Robart of Seattle barred Bandas from practicing in the Western District of Washington.  Judge Robart sanctioned Bandas for bad faith conduct after Bandas failed to pay a court-ordered bond to pursue his appeal of a class action settlement . . . ."[30]  In response, and to potentially shield himself from sanctions, Bandas began appearing through other attorneys like he has done here.  *See, e.g.*, *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09 Civ. 1088 (BTM) (KSC), 2014 WL 815394, at *3 (S.D. Cal. Mar. 3, 2014) (declining to impose Rule 11 sanctions for improper objection because it was "doubtful whether the Court has jurisdiction to sanction Mr. Bandas," but threatening to refer Christopher Bandas "to the State Bar of Texas's Commission for Lawyer Discipline"); *Garber*, 2017 WL 752183, at *6 ("the Court is not convinced that it has jurisdiction to sanction him, given that he has not appeared in this case, and he is not a member of the bar of the Southern District of New York.").[31]

---

ECF No. 167-2.  In other words, Clore and Bandas admit to filing an average of more than one objection per month for the past five years.

[30] Alison Frankel, *A New Way for Class Action Firms to Combat Serial Objectors*, REUTERS (June 29, 2015), http://blogs.reuters.com/alison-frankel/2015/06/29/a-new-way-for-class-action-firms-to-combat-serial-objectors/; *Dennings v. Clearwire Corp.*, No. 10 Civ. 1859 (JLR) (W.D. Wash. Aug. 20, 2013), ECF No. 166: "The court hears from counsel re: sanctions.  The court rules that the appropriate sanction is to revoke Mr. Bandas' authorization to practice in the Western District of Washington."

[31] Bandas is also known for ghostwriting objections to make the objections seem *pro se*.  *See In re Gen. Elec. Co. Sec. Litig.*, 998 F. Supp. 2d 145, 156 (S.D.N.Y. 2014) ("Moreover, while [objector] is appearing *pro se* before this Court, he admits that he is 'represented in this matter' by attorney Christopher A. Bandas ('Bandas'), who has been repeatedly admonished for pursuing frivolous appeals of objections to class action settlements."); *Markos v. Wells Fargo Bank, N.A.*, No. 15 Civ. 01156 (LMM), 2017 WL 416425, at *1 (N.D. Ga. Jan. 30, 2017) ("[Objector] filed a *pro se* objection to this Settlement on November 25, 2016, in which she stated that '[a]ttorney Christopher Bandas represents [objector] and assisted her in preparing her objection.'").

46

Nonetheless, other courts have found jurisdiction to sanction Bandas.  For example, in *In re Wal-Mart Wage & Hour Emp't Practices Litig.*, No. 06 Civ. 0225 (PMP) (PAL), 2010 WL 2132094, at *1 (D. Nev. May 25, 2010), the Court sanctioned Bandas for his failure to post a $500,000 appeal bond.  In *Embry v. ACER Am. Corp.*, No. 09 Civ. 01808 (JW), 2012 WL 3777163, at *2 (N.D. Cal. Aug. 29, 2012), the Court struck Bandas' objection after he failed to post a $70,650 appeal bond and refused to dismiss his appeal.  In *Dennings v. Clearwire Corp.*, No. 10 Civ. 1859 (JLR) (W.D. Wash. Aug. 20, 2013), ECF No. 166, the court "revoke[d] Mr. Bandas' authorization to practice in the Western District of Washington," after he failed to post a $41,400 bond.[32]

Courts have also found jurisdiction to refer Bandas and his co-counsel to state disciplinary authorities.  For example, Judge Moskowitz in the Southern District of California threatened to refer him to the State Bar of Texas Commission for Lawyer Discipline. *Hydroxycut*, 2014 WL 815394, at *3; *see also Brown v. Wal-Mart Stores, Inc.*, No. 01 L 85 (Ill. Cir. Ct., Fourteenth Judicial Cir. Oct. 29, 2009) at 4 ("Bandas' co-counsel is being referred by the Iowa court to the Iowa Supreme Court's disciplinary committee."); *In re Alan Barinholtz*, Commission No. 2010PR00070 (Attorney Registration & Disciplinary Comm'n of the Supreme Court of Illinois, May 2, 2013), *available at*

---

[32] Indeed, Courts routinely impose bond requirements on Bandas and his clients because it is well-known that his appeals are part of his scheme.  *See, e.g.*, *In re Wal-Mart Wage & Hour Emp't Practices Litig.*, 2010 WL 786513, at *1–2 (D. Nev. Mar. 8, 2010) ($500,000.00 bond); *Conroy v. 3M Corp.*, No. 00 Civ. 2810 (CW), 2006 U.S. Dist. LEXIS 96169 (N.D. Cal. Aug. 10, 2006), ECF No. 265 ($431,167.00 bond); *Allen v. JPMorgan Chase Bank, NA*, No. 13 Civ. 8285 (RRP) (N.D. Ill. Nov. 12, 2015), ECF No. 102 ($121,866.00 bond); *Embry*, 2012 WL 3777163, at *2 ($70,650.00 bond); *Dennings v. Clearwire Corp.*, 928 F. Supp. 2d 1270, 1272 (W.D. Wash. 2013) ($41,400.00 bond); *In re Gen. Elec. Co. Sec. Litig.*, 998 F. Supp. 2d at 157 ($54,700 bond).

http://www.iardc.org/rd_database/rulesdecisions.html (last visited June 8, 2018) (disciplining

Bandas' local counsel for acting as Bandas' pawn and blaming local counsel for not learning that

"Bandas was a 'professional objector' and the subject of judicial criticism.").[33]

 In fact, the courts took notice of Bandas' scam more than a decade ago, calling his

objections "patently frivolous." *Conroy v. 3M Corp.*, No. 00 Civ. 2810 (CW), 2006 U.S. Dist.

LEXIS 96169 (N.D. Cal. Aug. 10, 2006). Almost nine years ago a court publicly admonished

Bandas for the very tactics he hopes to employ here:

> The Bandas Objection filed on behalf of Ms. Carlson is a generic boilerplate
> objection prepared and filed by attorneys working for their own personal benefit
> and not for the benefit of this Class or for those lawyers' client.
>
> The record before the Court demonstrates that Bandas is a professional objector
> who is improperly attempting to "hijack" the settlement of this case from deserving
> class members and dedicated, hard working counsel, solely to coerce ill-gotten,
> inappropriate and unspecified "legal fees."

*Brown v. Wal-Mart Stores, Inc.*, No. 01 L 85 (Ill. Cir. Ct., 14th Judicial Cir. Oct. 29, 2009).

Further, just two weeks earlier an Iowa court found Bandas to be "engaging in a conspiracy with

his clients and co-counsel to extort money from class members and class counsel . . . ."

*Mussmann v. Wal-Mart Stores, Inc.*, No. LACV-27486 (Iowa Dist. Ct., Clinton Cnty. Oct. 13,

2009).

 Despite the mountain of judicial criticism he and his tactics have received, Bandas

nevertheless continues his lucrative scheme. Indeed, Judge Valerie Caproni of the Southern

District of New York recently called Bandas' conduct "gravely concerning":

> This Court joins the other courts throughout the country in finding that Bandas has
> orchestrated the filing of a frivolous objection in an attempt to throw a monkey
> wrench into the settlement process and to extort a pay-off. His plan was thwarted

---

[33] As discussed above, Mr. Van Dyke, the only attorney who signed the Objection, has moved
for preliminary approval of settlements containing the terms that are the primary subject of the
Objection here.

> when the Court permitted discovery to proceed on the sanctions motions, which ultimately, apparently, created more risk for Bandas than he was prepared to endure.  Hull [the objector] testified that in Bandas' numerous representations of him in objections to class action settlements, Hull has *never* received funds from the settlement of any of his objections, whereas Bandas has. *See* Deposition of Sean Hull at 44:1–45:8.  That testimony, if true, is gravely concerning. It indicates that Bandas' settlement of objections has been without *any* benefit to his client, Hull, or to the class, supporting the conclusion that many, if not most, of the objections being raised by Bandas are not being pursued in good faith.  Ultimately, Bandas wasted a substantial amount of judicial time and effort, without any benefit to Hull or to the class.

*Garber*, 2017 WL 752183, at *6.

Judge Conti of the Northern District of California found that "Bandas routinely represents objectors purporting to challenge class action settlements and does not do so to effectuate changes to settlements, but does so for his own personal financial gain; he has been excoriated by Courts for this conduct." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012).  Judge Cote of the Southern District of New York required Bandas to post an appeal bond because he is a "known vexatious appellant," who "has been repeatedly admonished for pursuing frivolous appeals of objections to class action settlements." *In re Gen. Elec. Co. Sec. Litig.*, 998 F. Supp. 2d at 156, 157.  Judge Moskowitz also held that objections filed by Bandas to "were filed for the improper purpose of obtaining a cash settlement in exchange for withdrawing the objections." *Hydroxycut*, 2013 WL 5275618, at *5.  Specifically, Judge Moskowitz found that "Mr. Bandas was attempting to pressure the parties to give him $400,000 as payment to withdraw the objections and go away.  Mr. Bandas was using the threat of questionable litigation to tie up the settlement unless the payment was made." *Id.*

Judge Pallmeyer of the Northern District of Illinois recently concluded that Bandas' "reprehensible" conduct "appears to be in bad faith, to have no genuine social value, and to be inconsistent with the ethical standards of the legal profession.  Gaming the rules of the legal

system solely for personal self-enrichment wastes the time and money of courts and attorneys, wrests funds away from deserving litigants, and tarnishes the public's view of the legal process." *Edelson PC v. Bandas Law Firm PC*, No. 16 Civ. 11057 (RRP), 2018 WL 723287, at \*2, \*13 (N.D. Ill. Feb. 6, 2018).  These reactions from judges across the country are just a small sample of the harsh judicial rejection of Christopher Bandas' conduct.  Should the Court wish to review a more complete dossier of sanctions and judicial admonitions Bandas has accumulated, we respectfully refer the Court to Izard Decl. Ex. H.  In fact, Bandas' history of abuse is so contemptible that another well-known serial objector Ted Frank has disassociated himself from Bandas, having concluded that his tactics are "repugnant" and "unethical."[34]

In sum, Bandas has a long history of abusing the class-action objection process.  In this case, as in many others, Bandas is seeking a ransom via the threat of wasting "a substantial amount of judicial time and effort, without any benefit to his [his client] or to the class." *Garber*, 2017 WL 752183, at \*6.  Unfortunately, reputational harm and the punishments imposed on Bandas to date have not been sufficient to deter his conduct and the Court is now required to expend valuable resources dealing with his frivolous objection.

Courts have wrestled with various ways to deal with Bandas' misconduct, including through sanctions and bond requirements.  Judge Pallmeyer conducted a lengthy analysis of possible remedies, noting all of Bandas' efforts to insulate himself from the repercussions of his behavior and concluding that "[t]he court is hopeful that, if there is ultimately no remedy [available] in this case, courts presiding over class actions will craft effective means to deter

---

[34] Alison Frankel, *The Ted Frank Interview*, REUTERS (June 25, 2015), http://blogs.reuters.com/alison-frankel/2015/06/25/the-ted-frank-interview-i-was-doing-it-for-the-greater-good/.

the alleged behavior of Bandas [and his colleagues] who seek private gain at the expense of deserving class members." *Edelson*, 2018 WL 723287, at *14. To the extent Bandas continues his practices in this case, this Court should consider taking up Judge Pallmeyer's challenge. Accordingly, Plaintiffs respectfully request that this Court should consider striking the objection; imposing an appeal bond should Bandas seek to further pursue his frivolous arguments; and imposing such other sanctions on Bandas as it deems just and equitable. At a minimum, the objection should be denied, and this fair and reasonable settlement should be approved.

## **CONCLUSION**

Plaintiffs respectfully request that the Court finally approve the Settlement Agreement, certify the Settlement Class, enter the proposed Final Approval Order in the form submitted as Exhibit A to the Motion, and approve the requested attorneys' fees and expenses and Plaintiff Service Awards in the form submitted as Exhibit B to the Motion.

Dated: June 11, 2018

PLAINTIFFS,

    \s\ Robert A. Izard
By: Robert A. Izard, Esq. (ct01601)
    Craig A. Raabe, Esq. (ct04116)
    Seth R. Klein, Esq. (ct18121)
    **Izard Kindall & Raabe LLP**
    29 South Main Street, Suite 305
    West Hartford, CT  06107
    Phone: (860) 493-6292
    e-mail: rizard@ikrlaw.com
            craabe@ikrlaw.com
            sklein@ikrlaw.com

*Attorneys for Plaintiffs Lori Sanborn, BDK Alliance, LLC. Iron Man LLC, Stephanie Sliver, David Steketee, and the Classes*

    \s\ Steven L. Wittels       

By: Steven L. Wittels, Esq.
    J. Burkett McInturff, Esq.
    Tiasha Palikovic, Esq.
    **Wittels Law, P.C.**
    18 Half Mile Road
    Armonk, NY 10504
    Phone: (914) 319-9945
    Facsimile: (914) 273-2563
    e-mail: slw@wittelslaw.com
           jbm@wittelslaw.com
           tpalikovic@wittelslaw.com

Daniel Hymowitz, Esq.
Andrey Belenky, Esq.
**Hymowitz Law Group, PLLC**
45 Broadway, 27th Floor
New York, NY 10006
Phone: 212-913-0401
Facsimile: (866) 521-6040
e-mail: daniel@hymowitzlaw.com
        abelenky@hymowitzlaw.com

*Attorneys for Plaintiffs Susanna Mirkin, Boris Mirkin, and the Classes*

    \s\ Laurie Rubinow       

By: Laurie Rubinow, Esq. (ct27243)
    James E. Miller, Esq. (ct21560)
    **Shepherd, Finkelman, Miller & Shah, LLP**
    65 Main Street
    Chester, CT  06412
    Phone: (860) 1100
    e-mail: lrubinow@sfmslaw.com
        jmiller@sfmslaw.com

Charles J. LaDuca, Esq.
Beatrice Yakubu, Esq.
**Cuneo Gilbert & LaDuca, LLP**

8120 Woodmont Avenue, Suite 810
Bethesda, MD 20814
Phone: (202) 789-3960
e-mail: byakubu@cuneolaw.com

Richard D. Greenfield, Esq.
Marguerite R. Goodman, Esq.
**Greenfield & Goodman, LLC**
250 Hudson Street – 8th Floor
New York, NY 10013
Phone: (917) 495-4446
e-mail: rdg@twowhitehats.com

*Attorneys for Plaintiffs Elizabeth Hembling, Patricia Kulesa, Stewart Connard and the Classes*

　　\s\ Jonathan Shub

By: Jonathan Shub, Esq.
**Kohn, Swift & Graf, P.C.**
Identification No: 53965
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Phone: (215) 564-2300
Fax: (215) 851-8029
jshub@kohnswift.com

Troy M. Frederick, Esq.
**Marcus & Mack, P.C.**
Identification No: 207461
57 South Sixth Street
Indiana, PA 15701
Phone: (724) 349-5602
Fax: (724) 349-8362
TFrederick@MarcusandMack.com

*Attorneys for Plaintiff Steven Landau and the Classes*

## <u>CERTIFICATE OF SERVICE</u>

I, Seth R. Klein, hereby certify that on this 11th day of June, 2018, the foregoing was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this document though the court's CM/ECF system.


/s/ Seth R. Klein
Seth R. Klein